UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ACTION ALLIANCE OF SENIOR CITIZENS, GRAY PANTHERS )<br>Plaintiffs, )<br>)<br>v. )<br>)<br>MICHAEL LEAVITT, Secretary of Department Of Health and Human Services )<br>)<br>Defendant. )<br>) | C.A. No. |

## MOTION FOR A TEMPORARY RESTRAINING ORDER AND FOR A PRELIMINARY INJUNCTION, WITH REQUEST FOR AN EXPEDITED HEARING

Pursuant to Fed.R.Civ.P. 65(a) and LCvR 65.1(a) and (c), plaintiffs hereby move for a temporary restraining order and for a preliminary injunction. They make this Motion based on the complaint on file in this action, their Memorandum in support of this Motion, and the declarations filed with this Motion. Proposed orders accompany the Motion.

## EXPEDITED HEARING REQUESTED

Furthermore, pursuant to LCvR 65.1(d), they request an expedited hearing on their motion for a preliminary injunction. In support of that request, they offer the following statement of relevant facts:

1. This motion concerns the decision of the defendant Secretary of Health and Human Services not to notify about 230,000 Medicare beneficiaries of their right to seek waiver of recovery of payments that were incorrectly made to them.

2.  In early August 2006, refunds for premium for the Part D prescription drug plan were incorrectly sent to about 230,000 Medicare beneficiaries.

3.  In late August or early September 2006, the Secretary sent a letter to each of these beneficiaries demanding that they repay the incorrect payment by September 30, 2006.

4.  Neither the letter that went to the beneficiaries, nor other documents or website postings explaining the obligation to repay, stated or alluded to the right of beneficiaries to seek waiver of recovery.  They were told only that they had to repay.

5.  Medicare, like other federal benefit programs, includes a provision that mandates waiver of recovery when the beneficiary is not at fault and it would either be against equity and conscience or would defeat the purposes of Titles II (Social Security) or XVIII (Medicare) to recover the amount incorrectly paid out.  42 U.S.C. § 1395gg(c). A regulation, 42 C.F.R. § 405.358, and a Social Security Program Operations Manual System (POMS) provision, HI 01001.330C., repeat this obligation.

6.  The Supreme Court has held that the virtually identical waiver provision for Title II benefits, 42 U.S.C. § 404(b), requires a decision on a waiver request before any part of an incorrect payment may be recovered.  *Califano v. Yamasaki*, 442 U.S. 682, 693-695 (1979).

7.  Medicare regulations (42 C.F.R. § 405.357), the POMS (HI 01001.330B.), and case law applying the Due Process Clause (which has been unchallenged and previously followed by the Secretary) all require him to notify Medicare beneficiaries of their right to seek waiver.

8. Since the letter from the Secretary provided no explanation of the right to request waiver and directed that beneficiaries repay the amounts by September 30, 2006, beneficiaries are presently in the process of sending in money to the Secretary that, in many instances, is legally theirs pursuant to the waiver law.

9. An expedited briefing schedule and hearing is therefore needed so that a preliminary injunction may timely issue prohibiting the Secretary from collecting these payments unless and until he informs the beneficiaries in writing of their right to seek waiver. If immediate action is not taken, the Secretary will continue to collect payments from beneficiaries who are legally entitled to keep the money but have not been so informed.

Respectfully submitted,

VICKI GOTTLICH
D.C. Bar No. 937185
PATRICIA B. NEMORE
D.C. Bar No. 204446
Center for Medicare Advocacy, Inc.
1101 Vermont Avenue, N.W., Suite 1001
Washington, D.C. 20005
(202) 216-0028

GILL DEFORD
D.C. Bar No. 459280
JUDITH STEIN
BRAD PLEBANI
Center for Medicare Advocacy, Inc.
P.O. Box 350
Willimantic, CT 06226
(860) 456-7790

SALLY HART
Center for Medicare Advocacy, Inc.
100 North Stone Ave., Suite 305

Tucson, AZ 85701
(520) 327-9547

Attorneys for Plaintiff

DATED:  September 12, 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ACTION ALLIANCE OF SENIOR CITIZENS,<br>GRAY PANTHERS<br>　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>MICHAEL LEAVITT, Secretary of Department<br>Of Health and Human Services<br><br>　　　　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No.

**MEMORANDUM IN SUPPORT OF MOTION FOR A TEMPORARY
RESTRAINING ORDER AND FOR A PRELIMINARY INJUNCTION, WITH
REQUEST FOR AN EXPEDITED HEARING**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

I.  THE SECRETARY COMPOUNDED HIS PROCESSING ERROR
    WITH A REFUSAL TO NOTIFY MEDICARE BENEFICIARIES OF
    THEIR RIGHTS..............................................................................................................2

II. PLAINTIFFS MEET THE STANDARDS FOR A TEMPORARY RESTRAINING
    ORDER AND A PRELIMINARY INJUNCTION.............................................................3

    A.  Plaintiffs will prevail on the merits..........................................................................4

    B.  The plaintiff organizations, their beneficiary members, and those who
        depend on them will be irreparably harmed without the requested relief....................9

    C.  The balance of hardships and the public interest also favor injunctive relief.............13

III. THE REQUESTED RELIEF REPRESENTS A MINIMAL INTRUSION INTO
     THE SECRETARY'S AFFAIRS. ....................................................................................14

CONCLUSION....................................................................................................................16

# TABLE OF AUTHORITIES

**Cases**

*Biovail Corp. v. U.S. Food and Drug Administration,*
   --- F.Supp.2d ---, 2006 WL 2556352 (D.D.C. 2006) ..............................................4

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ...........................................................................5, 6, 7, 10, 16

*Canales v. Paulson,*
   No. 06-1330(GK), 2006 WL 2520611 (D.D.C. 2006) ........................................4

*Christian Civic League of Maine, Inc.,*
   433 F.Supp.2d 81 (D.D.C. 2006)........................................................................11

*CityFed Fin. Corp. v. Office of Thrift Supervision,*
   58 F.3d 738 (D.C.Cir. 1995)..............................................................................4, 9

*Conn. Dept. of Environmental Protection v. OSHA,*
   356 F.3d 226 (2d Cir. 2004) ................................................................................10

*Davenport v. Int'l Brotherhood of Teamsters,*
   166 F.3d 356 (D.C.Cir. 1999)..............................................................................13

*Elliott v. Weinberger,*
   371 F.Supp. 960 (D.Haw. 1974), aff'd in part, rev'd in part,
   564 F.2d 1219 (9th Cir. 1977), aff'd in part, rev'd in part *sub nom.*
   *Califano v. Yamasaki,* 442 U.S. 682 (1979) ......................................... 5, 7, 8, 14

*Fischer v. United States,*
   529 U.S. 667 (2000) .............................................................................................14

*Goldie's Bookstore, Inc. v. Superior Court,*
   739 F.2d 466 (9th Cir. 1984) .............................................................................10

*Groseclose v. Bowen,*
   809 F.2d 502 (8th Cir. 1987) ...............................................................................9

*Long v. Department of Homeland Security,*
   436 F.Supp.2d 38 (D.D.C. 2006).........................................................................4

*Mattern v. Mathews,*
   582 F.2d 248 (3d Cir. 1978) .................................................................................5

*Pope v. Railroad Retirement Board,*
   672 F.2d 972 (D.C.Cir. 1982).............................................................................5, 7

*Pope v. Railroad Retirement Board,*
   744 F.2d 868 (D.C.Cir. 1984) ..................................................................................8

*Quinlivan v. Sullivan,*
   916 F.2d 524 (9th Cir. 1990) ..................................................................................9

*Serono Laboratories, Inc. v. Shalala,*
   158 F.3d 1313 (D.C.Cir. 1998).................................................................................3

*Shannon v. U.S. Civil Service Comm'n,*
   444 F.Supp. 354 (N.D.Cal. 1977), aff'd in part, rev'd in part,
   621 F.2d 1030 (9th Cir. 1980) ........................................................................5, 7, 10

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,*
   559 F.2d 841 (D.C.Cir. 1977)..................................................................................4

**Statutes**

5 U.S.C.
   § 8346(b)...............................................................................................................5

42 U.S.C.
   § 404(b).............................................................................................................5, 8
   § 1395gg(c).........................................................................................................4, 6

45 U.S.C.
   § 231i....................................................................................................................5

**Regulations and Rules**

20 C.F.R.
   § 404.502a..............................................................................................................5
   § 404.506................................................................................................................5
   § 404.508................................................................................................................9
   § 404.509................................................................................................................9

42 C.F.R.
   § 405.357...........................................................................................................5, 6
   § 405.358...........................................................................................................5, 6

Program Operations Manual System,
   HI 010001.330B .....................................................................................................6
   HI 010001.330C .....................................................................................................5

**Miscellaneous**

Federal Register
   61 F.R. 49269 (Sept. 19, 1996)..................................................................................5

Medicare Payment Advisory Commission, "A Data Book, Healthcare Spending
and the Medicare Program June 2006" .................................................................10

11A Charles A. Wright *et al., Federal Practice and Procedure*,
§ 2948.1 (2d ed. 1995)..............................................................................................10

## INTRODUCTION

This case seeks to require the Secretary of the Department of Health and Human Services (HHS) to comply with clear-cut statutory and constitutional requirements applicable to his attempt to recover payments mistakenly made to Medicare beneficiaries. Specifically, the Secretary, through HHS' Centers for Medicare and Medicaid Services (CMS), which is responsible for the Medicare program, has refused to inform about 230,000 Medicare beneficiaries of their right to seek waiver of recovery of payments made in early August 2006 in the new Part D prescription drug program. In so doing, the Secretary is violating explicit regulations and program rules, as well as decisions that have interpreted identical waiver statutes to impose a constitutional obligation that federal agencies provide notice of the right to seek waiver.

By this motion, plaintiffs are requesting a temporary restraining order and a preliminary injunction. The TRO seeks to prohibit the Secretary from continuing to direct beneficiaries who received the payments – either in writing or via his website – from demanding repayment of the amounts mistakenly paid. This is intended to reduce the pressure on beneficiaries while the Court considers plaintiffs' request for a preliminary injunction. The latter would prohibit the Secretary from recovering – and would require repayment of any amounts that have been recovered – the mistaken payments unless and until the Secretary provides written notice of the right to waiver. Because the Secretary has set September 30, 2006 as the deadline by which beneficiaries must pay these amounts, the Court should step in immediately and protect the beneficiaries' rights to seek waiver of recovery if they so desire.[1]

---

[1] Plaintiffs also contend, see Complaint, ¶¶ 43 and 44, that the Secretary is further in violation of the Medicare statute and the Constitution by his failure to provide an oral hearing on a waiver request prior to recovering any amounts. This contention is not the subject of this

I.     **THE SECRETARY COMPOUNDED HIS PROCESSING ERROR WITH A REFUSAL TO NOTIFY MEDICARE BENEFICIARIES OF THEIR RIGHTS.**

There is no dispute about what happened.  Under the new Medicare Part D prescription drug program, beneficiaries pay premiums to participate in a private prescription drug plan (PDP) or a drug plan that is part of a managed care plan under the Medicare Advantage program (MA-PD).  These premiums can be paid via monthly deductions from the beneficiaries' Social Security payments.  In early August 2006, what the Secretary refers to as "a processing error" occurred that resulted in approximately 230,000 Medicare beneficiaries who pay premiums through the monthly deduction method (or who the Secretary believes pay premiums in that way) receiving refunds of their premium amounts either in their Social Security checks or through direct deposit.[2]

The Secretary's response to this mistake was to demand repayment from these beneficiaries by September 30, 2006.  The Tip Sheet (discussed *supra* at n. 2) informed the Secretary's partners of the mistake, explained that beneficiaries had to repay these amounts, and stated that beneficiaries would receive a letter in early September setting out their obligation to repay.  Similarly, the Secretary sent out a release that newsletters and other publications could publish in which similar information appeared.  A copy of this notice is attached as Exhibit B to this memo.

_____

motion for immediate relief, but plaintiffs will shortly move for summary judgment on this issue in addition to the notice issue.

[2]  The Secretary explained what had happened in the "Tip Sheet" that he posted on his web site so that his "partners" could assist him in recovering these amounts.  The Tip Sheet is posted at http://www.cms.hhs.gov/partnerships/downloads/PremiumWithholdRefundIssue.pdf; a hard copy is attached as Exhibit A to this brief.

Finally, and most important, the Secretary sent letters to each of the approximately 230,000 affected beneficiaries. (A copy of that is attached to the complaint, and another is attached hereto as Exhibit C for the Court's convenience.) In that letter he stated the amount of their mistaken payment, and explained how the payment could and should be returned, including returning the actual uncashed check, sending a personal check or money order, or requesting that Medicare directly debit the amount from the beneficiary's bank account. Beneficiaries were informed that they "should return this payment by September 30, 2006. If returning the amount in full presents you with a hardship, you may request to make monthly installment payments for as many as seven months." A toll-free number was provided for those beneficiaries who "would like to discuss th[e] option" of making installment payments.

Thus, the Secretary recognized that at least some of these 230,000 beneficiaries would find it a hardship to repay the mistaken amount in one payment. Ironically, though, he never acknowledged, in the letter or in any other writing or posting, that this very hardship might entitle some of these beneficiaries to have recovery waived altogether, not just put off. Nothing in the letter, implicitly or explicitly, informs these affected beneficiaries of their right to seek waiver of recovery and that, if they meet the standards, they will not have to repay this money.

## II.    PLAINTIFFS MEET THE STANDARDS FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION.

The standards for issuance of a preliminary injunction are well settled. A court

must examine whether: 1) there is a substantial likelihood plaintiffs will succeed on the merits; 2) plaintiff will be irreparably injured if an injunction is not granted; 3) an injunction will substantially injure the other party; and 4) the public interest will be furthered by the injunction. These factors interrelate on a sliding scale and must be balanced against each other.

*Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313, 1317-1318 (D.C.Cir. 1998) (citation

omitted). Furthermore, "[i]f the arguments for one factor are particularly strong, an injunction

may issue even if the arguments in other areas are rather weak. An injunction may be justified,
for example, where there is a particularly strong likelihood of success on the merits even if there
is a relatively slight showing of irreparable injury. *CityFed Fin. Corp. v. Office of Thrift
Supervision*, 58 F.3d 738, 747 (D.C.Cir. 1995); see also, *e.g., Long v. Department of Homeland
Security*, 436 F.Supp.2d 38, 41-42 (D.D.C. 2006). "The same standards apply for both
temporary restraining orders and preliminary injunctions. *Washington Metro. Area Transit
Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir. 1977)." *Canales v. Paulson*, No.
06-1330(GK), 2006 WL 2520611, *3 (D.D.C. 2006); see also, *e.g., Biovail Corp. v. U.S. Food
and Drug Administration*, --- F.Supp.2d ---, ---, 2006 WL 2556352, *2 (D.D.C. 2006) (in ruling
on request for a TRO, court states the standard for "interim injunctive relief"). In this case, while
the likelihood of success on the merits is so strong that temporary relief should issue even if the
other factors were relatively weak, the other factors all strongly support granting the TRO and
preliminary injunction.

### A.    Plaintiffs will prevail on the merits.

The Medicare statute's waiver provision states:

> There shall be no adjustment as provided in subsection (b) of this section (nor
> shall there be recovery) in any case where the incorrect payment has been made
> ... with respect to an individual who is without fault ... if such adjustment (or
> recovery) would defeat the purposes of subchapter II or subchapter XVIII of this
> chapter or would be against equity and good conscience.

42 U.S.C. § 1395gg(c). The implementing regulation repeats this rule, mandating that recovery
is prohibited of "an incorrect payment under title XVIII" when the individual is "without fault,"
and recovery would either "(1) Defeat the purposes of title II or title XVIII of the [Social

Security] Act, or (2) Be against equity and good conscience." 42 C.F.R. § 405.358.[3]  Finally, the

Social Security Administration Program Operations Manual System (POMS) repeats this

obligation in the specific context of an incorrect premium refund for Medicare coverage:

> Whether or not the enrollee may be excused from repayment depends on whether repayment of this amount would be against equity and good conscience or deprive the individual of funds that are reasonably necessary for ordinary living expenses. This is the same test used in determining whether recovery of a benefit overpayment would defeat the purposes of Title II (Social Security).  Therefore, the same rules and procedures pertaining to recovery of a monthly benefit overpayment (see GN02250.150-GN 02250.425) apply even though the correct premium refund is not a benefit overpayment.

POMS, § HI 01001.330C.  (A copy of this provision is attached as Exhibit D; it is posted at

https://s044a90.ssa.gov/apps10/poms.nsf/lnx/0601001330!opendocument.)

In short, the applicable statute, regulations, and program guidelines all state

unequivocally that Medicare beneficiaries who receive incorrect payments are entitled to request

waiver of the recovery.  This right generally adheres in federal benefit programs and has been

thoroughly analyzed, explained, and upheld by the courts, including the Supreme Court.[4]  The

holding of these decisions – all of which ultimately followed the Supreme Court in *Califano v.*

---

[3]  The relevant Medicare regulations, 42 C.F.R. §§ 405.357 and 405.358, "duplicate[ ] ... the content of the two Social Security Administration regulations concerning waiver of recovery of overpayments."  61 F.R. 49269 (Sept. 19, 1996).  Those Social Security regulations, 20 C.F.R. §§ 404.502a and 404.506, had previously applied to both incorrect Medicare and incorrect Social Security payments, but a restructuring of the Social Security regulations necessitated that separate – though substantively identical – regulations be established for Medicare.  See 61 F.R. at 49270.

[4]  See *Elliott v. Weinberger*, 371 F.Supp. 960 (D.Haw. 1974), aff'd in part, rev'd in part, 564 F.2d 1219 (9th Cir. 1977), aff'd in part, rev'd in part *sub nom. Califano v. Yamasaki*, 442 U.S. 682 (1979) (discussing the Social Security Title II waiver statute, 42 U.S.C. § 404(b)); *Mattern v. Mathews*, 582 F.2d 248 (3d Cir. 1978) (same); *Pope v. Railroad Retirement Board*, 672 F.2d 972 (D.C.Cir. 1982) (discussing the Railroad Retirement waiver statute, 45 U.S.C. § 231i);  *Shannon v. U.S. Civil Service Comm'n*, 444 F.Supp. 354 (N.D.Cal. 1977), aff'd in part, rev'd in part, 621 F.2d 1030 (9th Cir. 1980) (discussing the Civil Service waiver statute, 5 U.S.C. § 8346(b)).

*Yamasaki*, 442 U.S. 682 (1979) – is that these waiver statutes require a decision before recoupment of any alleged overpayment. Although the statutes do not explicitly address the timing of the decision, they "speak in mandatory terms and imply that the mandated act – here waiver of recoupment … -- is to precede other action." *Yamasaki*, 442 U.S. at 695. Furthermore, because of the credibility determinations necessary for a waiver inquiry, beneficiaries have a right to an oral hearing before any recovery is effected. See, *e.g., id.* at 695-697.[5] The right to a pre-recoupment oral hearing, however, is not before the Court on these motions, but will be raised shortly in a forthcoming motion for summary judgment.

Since there can be no dispute that Medicare beneficiaries have a right to waiver of recovery, the issue of the present motion is their right to notification of that right. There should be no dispute on that issue either, because both the regulations and the POMS guidelines make it clear that notice is required:

> Whenever an initial determination is made that more than the correct amount of payment has been made, notice of the provisions of [42 U.S.C. § 1395gg(c)] of the Act regarding waiver of adjustment or recovery shall be sent to the overpaid individual and to any other individual against whom adjustment or recovery of the overpayment is to be effected (see § 405.358).

42 C.F.R. § 405.357. And: "[T]he individual will be notified of the amount he/she erroneously received, asked to return it, and told of his/her right to request relief from repayment of the incorrectly funded amount." POMS, § HI 01001.330B.

More important even than these provisions, however, is that, in a nationwide class action challenging the Social Security Administration's implementation of the virtually identical Title II

---

[5] By contrast, they do not have a right to an oral hearing on a reconsideration request, in which they can challenge the very existence of the overpayment. See, *e.g., Yamasaki*, 442 U.S. at 695-696.

waiver rule, it was determined that the Due Process Clause guaranteed written notice of the right to seek waiver:

> Social Security recipients have a due process right to receive adequate notice of recoupment, plainly and clearly communicated. The notice should inform the recipient of the basis for the recoupment, the procedural rights available to the recipient, and the consequences if the recipient exercises those rights.

*Elliott*, 564 F.2d at 1235-1236. Significantly, although he sought review of several aspects of this decision, in his petition for certiorari "[t]he Secretary ... did not request review of the holding that his notice of recoupment was constitutionally defective." *Yamasaki*, 442 U.S. at 692. Consequently, even if the Secretary were to disavow the regulation and guidelines dictating notice of the right to waiver, he cannot escape the fact that he has conceded that such a right exists, and the courts and federal agencies have uniformly accepted it. See also, *e.g., Shannon*, 444 F.Supp. at 354, 371 (noting that previously issued preliminary injunction had required the Civil Service Commission to "giv[e] notice of the right to waiver and the factors entering into the waiver determination" and issuing a permanent injunction requiring notification of "the procedural rights available to the annuitant as set forth herein and ... the consequences if the annuitant exercises those rights").

Furthermore, and significantly, in the Railroad Retirement Board case involving another waiver statute with identical standards, the D.C. Circuit noted that, when the case was filed, the notice from the Board, like the notice in this case, "merely included a statement of the amount of the overpayment" and options for repayment, and did not consistently inform annuitants of their right to waiver. *Pope*, 672 F.2d at 973. (Of course, in the instant case *no* beneficiaries were informed of that right.) Although the Board made changes during the course of the litigation to bring its recoupment and waiver policies in line with developments in the law, including implementing a pre-recoupment oral hearing after the *Yamasaki* decision came down, it refused

to inform annuitants retroactively of their newly established rights. *Id.* at 974-975. The Court of Appeals disagreed, noting the importance of these rights and the money at stake to retired individuals living on fixed incomes:

> This burden [on the Board] ... cannot outweigh the harm and deprivation suffered by an annuitant who has been wrongfully recouped in the past. Appellants ... have been and are continuing to be subjected to a significant loss of income without any real opportunity to contest their loss. For many, a small reduction in their monthly annuities mandates that they seek monetary assistance elsewhere, possibly on the welfare rolls .... [T]he loss occasioned by recoupment should not be minimized. The deprivation of a significant portion of fixed income can be a substantial loss indeed. Retired individuals living on fixed income frequently can ill afford even a moderate temporary decrease in their disposable income.

*Id.* at 975 (internal quotation marks and citations omitted); see also *Pope v. Railroad Retirement Board*, 744 F.2d 868, 870 (D.C.Cir. 1984) (noting the unreasonableness of the Board's position).

In short, the D.C. Circuit views beneficiaries' rights in the recoupment context as so important that agencies must take retroactive action to correct their failure to provide these rights. The intention of this case and this motion is to avoid having to force such a retroactive result.

The Secretary's letter and postings on this issue suggest a belief that Medicare beneficiaries who incorrectly received these premium refunds have no rights. In light of the nature of the waiver provisions, the Ninth Circuit explicitly rejected this attitude, and this case and motion are necessary to inform the Secretary once again of his misperception:

> A Social Security recipient has a statutory right to waiver if he is without fault and is financially dependent on the benefits, or has detrimentally relied on the overpayment. *Waiver is not a matter of "governmental beneficence," as the Secretary puts it.* Under § 404(b) waiver is not discretionary, but mandatory, under the conditions specified. Thus, the statute creates a property interest in retention of overpayments if the conditions of waiver are met, even if there was no right to receive the overpayments in the first place.

*Elliott*, 564 F.2d at 1230 (emphasis added).

In other words, satisfaction of the waiver standards alters the ownership interest in the

amount paid out by the agency.  If the standards are met, the mandatory nature of waiver dictates

that the incorrect payment belongs to the beneficiary, not to the Secretary.  It is beyond dispute

that the first part of the waiver test was met – the beneficiaries were not at fault – and the

Secretary's recognition of potential hardship if beneficiaries are forced to repay the mistaken

refunds indicates that the second factor of the waiver test will be satisfied by many, probably

most, of the affected beneficiaries.[6]  As a consequence, the Secretary's refusal to inform

beneficiaries of their right to seek waiver amounts to a deprivation of property that has become

theirs.  The need for notice – so that they will know that the incorrect refund may in fact be theirs

and take appropriate action -- is therefore critical.

Given the existing statutory, regulatory, and programmatic dictates, the case law, and the

purpose and effect of the waiver statute, there can be little doubt that plaintiffs will prevail on

their contention that these Medicare beneficiaries are entitled to notice of their right to waiver.

They have demonstrated "a particularly strong likelihood of success on the merits," thus

suggesting that, even if the other factors were not so compelling, they are entitled to interim

relief.  *CityFed Fin. Corp*, 58 F.3d at 747.

    **B.**    **The plaintiff organizations, their beneficiary members, and those who depend on them will be irreparably harmed without the requested relief.**

---

[6] The "defeat the purposes" prong of the second part of the waiver test essentially looks to whether the beneficiary would be deprived of needed income if recoupment is carried out, 20 C.F.R. § 404.508, while the alternative "equity and good conscience" test represents a basic notion of fairness. See *Quinlivan v. Sullivan*, 916 F.2d 524, 527 (9th Cir. 1990) (Congress intended "a broad concept of fairness" in the equity and good conscience language); *Groseclose v. Bowen*, 809 F.2d 502, 505-506 (8th Cir. 1987) (equity and good conscience goes beyond the detrimental reliance concept set out in the regulation, 20 C.F.R. § 404.509).

The waiver statute itself demonstrates that there will be irreparable harm in the absence of injunctive relief. Congress recognized that federal programs designed for elderly and disabled people must have a built-in protection in the event that they received incorrect payments through no fault of their own. The alternative prongs of the second part of the waiver test – a showing that the beneficiary would be deprived of necessary income or would be treated unfairly if forced to repay (see *supra* at 9 n. 6) – are clearly directed at preventing elderly and disabled people dependent on fixed incomes from suffering harm through no fault of their own. The Supreme Court effectively recognized as much when it determined that the waiver statute implicitly required a decision on a waiver request *before* recoupment could be effected. *Yamasaki*, 442 U.S. at 693-695; see also *Shannon*, 444 F.Supp. at 356 (discussing the preliminary injunction previously issued in that case in which the Commission had been ordered to provide notice of the right to waiver).[7]

In short, the waiver provision at issue is itself intended to prevent irreparable harm. By definition, therefore, it is irreparable harm not to inform beneficiaries that they possess that right and can exercise it.

Moreover, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." 11A Charles A. Wright *et al., Federal Practice and Procedure*, § 2948.1 at 161 (2d ed. 1995); see, *e.g., Conn. Dept. of Environmental Protection v. OSHA*, 356 F.3d 226, 231 (2d Cir. 2004) ("violations of constitutional rights are presumed irreparable"); *Goldie's Bookstore, Inc. v. Superior Court*, 739

---

[7] The financial profile of Medicare beneficiaries demonstrates why, for so many, it is crucial to waive recoveries of incorrect payments. The latest figures, for 2003, show that 19% have incomes below the federal poverty line, 11% are at 100-125% of the poverty line, 21% are at 125-200%, and 29% are at 200-400%. Medicare Payment Advisory Commission (MedPAC), "A Data Book, Healthcare Spending and the Medicare Program June 2006," Chart 1-5. Thus, over half (51%) of all Medicare beneficiaries have incomes below 200% of the federal poverty line.

F.2d 466, 472 (9th Cir. 1984) ("alleged constitutional infringement will often alone constitute irreparable harm"). This is not a situation where plaintiffs are merely *alleging* a constitutional violation. See *Christian Civic League of Maine, Inc.*, 433 F.Supp.2d 81, 90 (D.D.C. 2006) (3-judge court). Rather, they have shown that the denial of notice of the right to waiver has previously been found by an appellate court in a nationwide class action to deny due process, and the Secretary, while questioning other aspects of that ruling, did not seek review of the notice analysis and requirement. The instant case therefore presents an instance of an ongoing constitutional violation, thus alternatively satisfying the irreparable harm requirement.

The plaintiffs are membership organizations that will themselves be irreparably harmed by the challenged action. Action Alliance, with an annual budget of only $80,000, organizes grassroots senior groups throughout Pennsylvania and has over 110,000 people in its membership and affiliated clubs. A large percentage of these are Medicare beneficiaries, and most of them are enrolled in a Part D-authorized plan. Complaint, ¶ 27. Action Alliance promotes information about Medicare among its members and the wider population of older people throughout Pennsylvania, and actively attempts to address both individual and system issues faced by Medicare beneficiaries. *Id.*, ¶ 28. Through a newsletter sent to more than 4,100 individuals and organizations, and numerous meetings and presentations that often include segments on beneficiary rights, Action Alliance attempts both to educate its members and others and to advise and advocate for them. *Id.*, ¶ 29.

Action Alliance is bringing this case because of a determination to head off the problems that the Secretary's letter will cause. It knows that beneficiaries in Pennsylvania have received the letter and is in the process of trying to determine how best to help its members and others to understand what their real options are, and to advise them how to proceed. It intends to start that

effort any day now, *id.*, ¶ 30, but success with these motions would obviate the need for it to undertake that additional effort.  The Secretary's decision not to notify beneficiaries of their waiver rights has placed that obligation on Action Alliance and is thus forcing it to devote its time and resources to dealing with that issue.  *Id.*, ¶ 32. With all the additional efforts needed to assist beneficiaries with the new prescription drug plans, the need to inform and advocate on still another issue only adds to the burdens on Action Alliance.  Furthermore, and significantly, because the Secretary is demanding that beneficiaries repay in just two weeks, Action Alliance is under a time burden as well, which will make it particularly difficult to carry out its obligations to its membership.  *Id.*

Gray Panthers, a national organization with 25 chapters, focuses on health care issues that affect its membership of about 20,000 people, a large majority of whom are Medicare beneficiaries and enrolled in Part D-authorized plans.  *Id.*, ¶ 33.  Gray Panthers is active in promoting information about Medicare among its members and among the wider population of older people throughout the country and in trying to redress difficulties Medicare beneficiaries have with Medicare Part D. In particular, a California chapter has a grant to provide outreach and education about Medicare Part D throughout the state of California. *Id.,* ¶ 34. Gray Panthers has been contacted about Part D problems by members and the general public who do not understand the information and advice they have been provided. Gray Panthers is trying to dispense information and advice to its members and others about what they should do. *Id.,* ¶ 35,

Like Action Alliance, Gray Panthers will be forced to expend its limited resources on providing the information about waiver rights to its members that the Secretary should be providing.  *Id.*, ¶ 36.  It too will be subject to severe time constraints and will not be able to provide the advice and assistance that its members expect and rely upon.  Moreover, Gray

Panthers also will be devoting its efforts to this issue at a time when there is a compelling need for assistance on the numerous problems arising under the Part D program. *Id.*, ¶ 37.

Inevitably, although they will expend time, effort, and resources in the effort to make up for the Secretary's failure, Action Alliance and Gray Panthers will be unable to provide the full component of assistance that their members need and expect. These failures cannot be remedied at a later date by money damages (even if money damages were available from the Secretary, which they are not.) See, *e.g., Davenport v. Int'l Brotherhood of Teamsters*, 166 F.3d 356, 367 (D.C.Cir. 1999). The Secretary's actions will therefore cause irreparable harm not just to the beneficiaries themselves, but to the organizations that are attempting to serve them.

## C. **The balance of hardships and the public interest also favor injunctive relief.**

The balance of hardships also dramatically favors the plaintiffs. Without injunctive relief, tens – perhaps hundreds – of thousands of unsuspecting Medicare beneficiaries will give up money that is legally theirs and that, as retirees living on fixed incomes, they desperately need, to make up for a mistake that was none of their doing. Given the courts' strong pronouncements about the importance of waiver and the rights that waiver confers (see, *e.g., supra* at 7-9), the deprivation of that right must be viewed as a considerable hardship.

By contrast, the main hardship to the Secretary in complying with the proposed preliminary injunction is the need to send out another letter to the affected beneficiaries. Since he has already sent out two,[8] sending a third does not represent a significant burden. The Secretary will also be required to return money that has been sent to him so far by beneficiaries, but this too is not a serious burden when compared to the financial situations of the people who

---

[8] The most recent letter (Exhibit C) refers in the first sentence to a previous letter that he had sent to the beneficiaries.

have been misled by his previous letter into returning money that they need and that may in fact be theirs.

For the temporary restraining order, there is virtually no burden on the Secretary, as it only calls for him not to send out any more written material to or about the affected beneficiaries and to remove any website postings that explain the beneficiaries' "obligation" to pay back the money. These are minimal intrusions.

The balance of hardships favors issuance of the temporary restraining order and the preliminary injunction.

Similarly, the public interest would be furthered by the requested injunctive relief since it will assist in ensuring that the affected beneficiaries receive the rights that Congress and the courts, repeatedly, have said is their due. Again, "[w]aiver is not a matter of governmental beneficence," *Elliott*, 564 F.2d at 1230, but is a right that Congress has determined belongs to beneficiaries of federal benefit programs. "[I]t ought not to be disputed that the elderly and disabled rank as the primary beneficiaries of the Medicare program," *Fischer v. United States*, 529 U.S. 667, 677 (2000), and guaranteeing that they have access to all the rights to which they are entitled is an implied component of that covenant. Ensuring that Medicare beneficiaries are informed of their right to waiver, which is in turn intended to ensure that they have sufficient resources to live on, can only advance the public interest.

All four factors therefore favor issuing a temporary restraining order and a preliminary injunction. In light of the overwhelming likelihood of success on the merits, there can be no doubt that interim injunctive relief is appropriate.

### III.    THE REQUESTED RELIEF REPRESENTS A MINIMAL INTRUSION INTO THE SECRETARY'S AFFAIRS.

As plaintiffs have indicated and as the proposed orders filed with this motion demonstrate, plaintiffs are seeking a temporary restraining order to stop the Secretary from further disseminating information to or about the affected beneficiaries, and more comprehensive relief in the form of a preliminary injunction to prohibit the Secretary from recovering and withholding the incorrect payments unless and until beneficiaries are informed of their right to waiver.

The temporary restraining order should be issued immediately so that there will be no further attempts by the Secretary to recover these amounts until the Court can rule on the motion for a preliminary injunction. Plaintiffs are not asking that the temporary restraining order direct the Secretary to correct the improper letters and postings that he has sent and posted, but, rather, that he send out no more and that he remove any and all postings on this issue from the website. This is not a fail-safe resolution of the problem, as some of the affected beneficiaries will probably act based on the letter that they have received or publications that they have read with the same incorrect and misleading information. But it is a reasonable temporary response to prevent any further efforts by the Secretary to demand repayment until the preliminary injunction can be ruled upon.

Since the requested preliminary injunction is intended to build upon the temporary restraining order, plaintiffs request that the Court set an expedited briefing and argument schedule on that motion so that it may be resolved as far ahead of the Secretary's September 30 deadline as possible. The preliminary injunction would have several interrelated features designed to prevent the Secretary from carrying out his illegal recoupment scheme.

First, it would require the Secretary immediately to send out a letter to all the affected Medicare beneficiaries explaining that 1) they have a right to request waiver of recovery, the

nature of that right, and how to request it;  2) the deadline for taking action – whether that be to repay or to seek waiver – would be extended (either until October 31, 2006 or to thirty days from the date that the letter is sent out, whichever is later); and 3) any amounts paid by beneficiaries would be refunded.  Second, the injunction would require the Secretary immediately to refund all amounts that had been paid to him.  He would also be required to return any amounts paid to him in the future until the repayment was accompanied by a form that had been enclosed in the letter and that now indicated the beneficiary's intent to repay the money without requesting waiver.

Plaintiffs believe that this is a reasonable compromise, as it attempts to correct the grievous wrong that the Secretary has committed with as little intrusion into the workings of his agency as possible.  Plaintiffs are not asking that the Court order the Secretary to waive all recovery,[9] but simply to give the affected beneficiaries the option that they should have been given in the first place.  Leveling the playing field in that respect requires returning the amounts that have previously been refunded; otherwise, the Secretary will have reaped benefits from his illegal action, in violation of the directive that recoupment is not permitted until a decision has been made on a waiver request.  See *Yamasaki*, 442 U.S. at 693-694.

## CONCLUSION

For the reasons stated, plaintiffs request that the Court issue the proposed temporary restraining order, set an expedited briefing and argument schedule on the motion for a preliminary injunction, and issue the proposed preliminary injunction order.

---

[9] Of course, the Secretary could decide to take that action, or a modified form of it, in lieu of the relief suggested by plaintiffs.  For instance, the Secretary could decide automatically to waive recovery of all payments below a specified amount.  This would be consistent with the existing policy for Social Security overpayments, by which any request for waiver of an overpayment of $500 or less is automatically granted without further development.  POMS, GN 02210.220.

*Vicki Gottlich* (signature)

VICKI GOTTLICH
D.C. Bar No. 937185
PATRICIA B. NEMORE
D.C. Bar No. 204446
Center for Medicare Advocacy, Inc.
1101 Vermont Avenue, N.W., Suite 1001
Washington, D.C. 20005
(202) 216-0028

GILL DEFORD
D.C. Bar No. 459280
JUDITH STEIN
BRAD PLEBANI
Center for Medicare Advocacy, Inc.
P.O. Box 350
Willimantic, CT 06226
(860) 456-7790

SALLY HART
Center for Medicare Advocacy, Inc.
100 North Stone Ave., Suite 305
Tucson, AZ 85701
(520) 327-9547

Attorneys for Plaintiff

DATED:  September   15, 2006

# EXHIBIT A

## To Plaintiffs' Points and Authorities in support of their Motion for Temporary Restraining Order and Preliminary Injunction



★ ★ TIP SHEET ★ ★

## Information Partners Can Use to Help Beneficiaries with:

# PREMIUM WITHHOLD REFUND ISSUE

New Medicare Prescription Drug Coverage                    As of August 28, 2006

In early August, due to a Medicare processing error, roughly 230,000 people received refunds for their drug plan or Medicare Advantage plan premiums in their August 2006 Social Security benefit checks or direct deposits.

People whose plan premiums were mistakenly refunded will not lose any of their Medicare coverage. However, Medicare needs to re-collect the money that was refunded in error.

## What People With Medicare Need to Know

People who are affected will receive a letter from Medicare in early September explaining the error and letting them know the process for returning the overpayment. If you are helping someone with Medicare who was affected by this error, here are some steps that people can take right now to help correct the situation:

■ People who received a refund check and have not cashed it can return the check by writing "VOID" on the face of the check, and mailing it to:

>    Medicare—Drug Premiums
>    PO Box 9058
>    Pleasanton, CA 94566-9058

■ People can send Medicare a personal check or money order for the amount of the overpayment. The check or money order should be made payable to "MEDICARE" and mailed to:

>    Medicare—Drug Premiums
>    PO Box 9058
>    Pleasanton, CA 94566-9058

■ People can have Medicare directly debit the overpayment amount from a personal bank account. To choose the direct debit option, call Medicare toll-free at 1-866-292-8080, Monday through Friday, from 7:00 AM (Eastern) to 6:00 PM (Pacific).

■ People can request to pay in monthly installments over as many as seven months. To discuss the monthly installment option, call Medicare toll-free at 1-866-292-8080, Monday through Friday, from 7:00 AM (Eastern) to 6:00 PM (Pacific). Operators will work to structure a plan that suits the person's needs.

■ People who have already returned their overpayment should let Medicare know by calling 1-866-292-8080, Monday through Friday, from 7:00 AM (Eastern) to 6:00 PM (Pacific).

■ Regular premium withholding will resume beginning in October, with premiums for September and October being withheld from October SSA benefits.

It is important to remember that Medicare will not call and ask anyone for any personal information in connection with this issue. People who are contacted by someone asking for Social Security or banking information should not give this information out. People can call 1-877-7SAFERX (1-877-772-3379) if they suspect someone is contacting them fraudulently.

## For More Information

Anyone who has any questions about Medicare's error or the premium refund some people received in their Social Security benefit payments should call 1-800-MEDICARE (1-800-633-4227). TTY users should call 1-877-486-2048.

★ 1 ★

# EXHIBIT B

# To Plaintiffs' Points and Authorities in support of their Motion for Temporary Restraining Order and Preliminary Injunction

## Medicare announces steps to correct drug plan premium refunds

**Some people with Medicare have mistakenly received a refund payment on their drug plan premiums – either a check or a direct deposit. If you received a refund payment in recent weeks, Medicare asks that you take the following steps to correct this situation:**

- If you received a refund check, please return the check by writing "VOID" on the face of the check, and mail it to the following address: Medicare – Drug Premiums, PO Box 9058, Pleasanton, CA 94566-9058

- If you received payment via electronic direct deposit, you have two options:

  – Mail a personal check or money order, made payable to "MEDICARE" in the amount of the overpayment. The check or money order should be sent to: Medicare Drug Premiums, PO Box 9058, Pleasanton, CA 94566-9058

  – Ask that Medicare directly debit the amount from your personal bank account by calling **1-(866) 292-8080** to make those arrangements.

- If you have already returned this payment, call **1-(866) 292-8080** and alert a Medicare operator.

- If repaying the amount in full presents a hardship, you may request to make monthly installment payments for as many as seven months. If you would like to discuss this option, please call us toll-free at **1-(866) 292-8080**. Medicare operators will work to structure a plan that suits your needs and minimizes any potential disruption.

Medicare customer service representatives are available when you call **1-(866) 292-8080** from 7:00 AM (Eastern) to 6:00 PM (Pacific).



This information provided by the U.S. Department of Health and Human Services.

# EXHIBIT C

# To Plaintiffs' Points and Authorities in support of their Motion for Temporary Restraining Order and Preliminary Injunction

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



Mr. XXX XXXXX
XXXX Any Street
City, State  XXXXX

**Account Number:  XXXXXXXX**

Dear Mr. XXXXX:

As you may recall from the recent letter we sent to you, Medicare experienced a processing error that resulted in you receiving a refund of your Prescription Drug Plan premiums.  Again, we apologize for this error and any inconvenience it may have created for you.  **Most importantly, we want to make certain that you understand that your prescription drug coverage will continue uninterrupted.**

There are two main purposes of this letter:

- First, to inform you about your future premium withholding status.

- Second, to inform you about the steps you can take to return the incorrect payment, so that it can be used to pay your premiums as you intended.

Medicare has worked hard to develop options for returning the incorrect payment that are intended to minimize any inconvenience for you.  You would have received this incorrect payment in one of two ways.  Either as a refund check or a direct deposit into your bank account.  If you received a refund check and have not already done so, please do not deposit the refund check.  I will explain below how you can return the check to us by mail.  If you received a payment directly deposited into your bank account, please set aside that amount of money for now.

## What you can expect concerning withholding of your future premiums:

The Centers for Medicare & Medicaid Services is working to restart withholding from your Social Security benefits.  The Social Security Administration will resume premium withholding beginning in October.  In most cases, your premiums for September and October will be withheld from your October benefits.

## Here is how you can return the incorrect payment you received:

Our records indicate that within the last month you received an incorrect payment of **$xxx.xx**.

You may choose from the following options:

1. You can return the check you received by writing **"VOID"** on the face of the check, and then mail it to the following address:

    > Medicare - Drug Premiums
    > P.O. Box 9058
    > Pleasanton, CA 94566-9058

2. You can mail us a personal check or money order, made payable to **"Medicare"** in the amount indicated above. Please mail your check or money order to:

    > Medicare - Drug Premiums
    > P.O. Box 9058
    > Pleasanton, CA 94566-9058

    Please include your name and the account number given above on the check or money order.

3. You can ask that we directly debit the amount from your personal bank account. Please **telephone us toll free at 1-866-292-8080** any time from 7:00 AM (Eastern) to 6:00 PM (Pacific) and we will be happy to make those arrangements for you.

    **Choosing this option will require that you provide personal banking information to our customer service representatives.**

4. If you have already returned this payment, please **telephone us toll free at 1-866-292-8080** any time from 7:00 AM (Eastern) to 6:00 PM (Pacific) and let us know.

You should return this payment by September 30, 2006. If returning the amount in full presents you with a hardship, you may request to make monthly installment payments for as many as seven months. If you would like to discuss this option please **telephone us toll free at 1-866-292-8080** any time from 7:00 AM (Eastern) to 6:00 PM (Pacific). Our customer service representatives will work with you to develop a repayment plan that suits your needs.

**Please note that no one from Medicare will call you and ask for your bank account number or any other personal information. If someone contacts you seeking this information or other personal information, do not give it to them.**

Thank you for your prompt attention to this matter and again accept our apologies for the inconvenience caused. If you have any questions, please **telephone us toll free at 1-866-292-8080** any time from 7:00 AM (Eastern) to 6:00 PM (Pacific).

Sincerely,

# EXHIBIT D

# To Plaintiffs' Points and Authorities in support of their Motion for Temporary Restraining Order and Preliminary Injunction

Social Security Administration Policy Site: POMS Section HI 01001.330

Table of Contents | Search | Previous | Next

**TN 22 (11-01)**

# HI 01001.330 Incorrect Premium Refunds

## A. POLICY--INCORRECT PREMIUM REFUND DISTINGUISHED FROM PREMIUM ARREARAGE

An individual may receive a refund which is not actually due him/her with an explanation that this amount represents premiums not owed (or greater than the amount owed). The refund may be made in a separate check or added to the individual's monthly benefit. Such an erroneous refund may occur, for example, because of incorrect information supplied by a third party, a processing error, or because of incorrect data entered into the Direct Billing System. The amount incorrectly paid him/her represents an incorrect premium refund, not a premium arrearage, although it may have been received and treated as such on the direct billing record. The significance of this distinction is that a premium arrearage, which is not paid by the end of the grace period, requires termination of an individual's Supplementary Medical Insurance (SMI) or Premium-Hospital Insurance (HI). An incorrect premium refund, on the other hand, has to be repaid unless the individual may be relieved of the responsibility for repayment of the erroneously refunded amount, but it cannot cost the enrollee his/her SMI or Premium-HI coverage. If termination of his/her Medicare coverage results from recording the erroneous premium refund as a premium arrearage, the termination is erroneous and must be reversed.

An enrollee meets his/her premium obligation when he/she pays his/her premiums. In the case of a beneficiary, premiums are paid when they are deducted from his/her benefits. If his/her benefits are in suspense or he/she is an uninsured beneficiary, premiums are paid when a payment is made by him/her (or by someone on his/her behalf). If SSA mistakenly sends him/her a "refund" after he/she has paid his/her premiums and this mistake results in termination of his/her Medicare coverage, this termination is erroneous and will be reversed when identified. Thus, if after receipt of a premium payment, the premium payment is inadvertently returned to the enrollee, he/she owes Centers for Medicare & Medicaid Services (CMS) the amount incorrectly returned but his/her Medicare coverage is not endangered by the administrative error. When an enrollee submits a "bad check" or one that is unsigned, he/she has not, in fact, paid his/her premiums. However, such a mistake, if made in good faith, may be reason for granting a 3-month good cause extension of the grace period for payment of premiums. (See HI 01001.355.)

Where an incorrect premium refund (regardless of the amount) cannot be recovered, the SMI or (in the case of Premium-HI), the HI Trust Fund rather than the Old-Age and Survivors Insurance Trust Fund is charged. Any rules applicable to incorrect SMI premium refunds are applicable to Premium-HI refunds, except as otherwise provided.

## B. POLICY--WHEN RELIEF FROM REPAYMENT WILL BE CONSIDERED

When an individual receives a premium refund which is not due, he/she has not received a benefit

Case 1:06-cv-01307-RMC    Document 5    Filed 09/09/2006    Page 2 of 3

overpayment nor has a true premium arrearage been created. However, he/she does owe CMS the excess amount received. Accordingly, when a premium refund is identified as incorrect or erroneous, the program service center (PSC) will compare the erroneously refunded amount with the enrollee's SMI premium rate to determine if it exceeds the tolerance amount in HI 01001.330 and thus requires recovery action. Where the amount does not exceed the tolerance, action will be taken to adjust SSA's record for the amount of the refund but no attempt will be made to recover from the individual. If the amount does exceed the tolerance, the individual will be notified of the amount he/she erroneously received, asked to return it, and told of his/her right to request relief from repayment of the incorrectly refunded amount.

# C. POLICY--DEVELOPMENT OF RELIEF

If the individual expressly requests relief from repayment or states that he/she does not have the means to repay the incorrectly refunded amount, a determination on his/her request must be made. Whether or not the enrollee may be excused from repayment depends on whether repayment of this amount would be against equity and good conscience or deprive the individual of funds that are reasonably necessary for ordinary living expenses. This is the same test used in determining whether recovery of a benefit overpayment would defeat the purpose of Title II (Social Security). Therefore, the same rules and procedures pertaining to recovery of a monthly benefit overpayment (see GN02250.150 - GN 02250.425) apply even though the incorrect premium refund is not a benefit overpayment.

If an individual has received an incorrect premium refund and requests relief from repayment of the erroneously refunded amount, the field office (FO) is responsible for the development and the determination. The FO should identify for special handling and forward the following to the appropriate PSC:

1. The appropriate documents used in the development (including SSA-632-F4);

2. A determination made on a report of contact as to whether the individual may be excused from repaying the incorrectly refunded amount.

   Favorable decisions should be forwarded to the Post Office Box number address shown in HI 01005.802.

   Unfavorable decisions should be forwarded in a separate envelope to the appropriate PSC. These cases will be reviewed in the PSC and if there is concurrence with the initial FO decision, a denial notification which includes the reconsideration paragraph will be sent to the enrollee. If the decision is questionable, the file will be returned to the FO for further consideration. However, if the FO reaffirms its prior decision, the decision will not be questioned further.

   In order to avoid confusion and uncertainty as to the amount of premiums owed, the FO and reviewing office should develop and process these cases as soon as possible.

# D. POLICY--TOLERANCE AMOUNT

In the interest of efficient administration, SSA will not attempt to recover an incorrect premium refund if the cost of recovery exceeds the collectible amount. Accordingly, if the incorrect refund does not exceed 3 months of SMI premiums, no recovery action should be taken under B. and C. above.

EXAMPLE 1:

John Dough is paying $316 per month for Premium-HI and $58.70 for SMI. He received an incorrect refund of $316. The tolerance is $176.10 (3 times his SMI premium). Since the amount of the erroneous refund is greater than the tolerance amount, SSA must notify Mr. Dough that he owes $316, and inform him of his right to request relief from repayment of the erroneously refunded amount.

EXAMPLE 2:

Alice Johnson pays $64.60 for SMI (including a 10% premium increase). She received an incorrect refund of $129.20. The tolerance in this case is $193.80 (3 times her SMI premium). Since the amount of the refund is less than the tolerance amount, SSA will not take any action to recover the erroneous refund from the enrollee, but will adjust its records for the amount erroneously refunded and remove any additional premium liability generated by the incorrect premium refund.

---

HI 01001.330 - Incorrect Premium Refunds - 12/05/2003

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ACTION ALLIANCE OF SENIOR CITIZENS,<br>GRAY PANTHERS<br><br>       Plaintiffs,<br><br>     v.<br><br>MICHAEL LEAVITT, Secretary of Department<br>Of Health and Human Services<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)  C.A. No.<br>)<br>)<br>)<br>)<br>)<br>) |

**(PROPOSED) ORDER GRANTING PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION**

The Court having considered plaintiffs' motion for a preliminary injunction and

the supporting documentation, and defendant's opposition thereto,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

1.  Plaintiffs' motion for a preliminary injunction is granted.

2.  Defendant, his successors in office, his agents, employees and all persons

acting in concert with him are preliminarily enjoined to send to each of the approximately

230,000 Medicare beneficiaries who received an incorrect premium refund in early

August 2006 and a letter from the Secretary requiring repayment of those amounts by

September 30, 2006 an additional letter that sets out the following:

   a.  that the beneficiary has a right under federal law to request that

recovery of the incorrect payment be waived;

   b.  that the right to waiver includes a showing that the beneficiary was not

at fault (and a statement to the effect that that has already been established in this

situation) and that either it would be against equity and good conscience to recover the

overpayment or would defeat the purpose of the Social Security program or the Medicare program;

   c.  that the beneficiary may request waiver by checking the box on the form that is included with the letter indicating a desire to request waiver and returning it to the Secretary with a postmark of on or before the later of October 31, 2006 or 30 days from the date that the Secretary sends out the letter;

   d.  that if the beneficiary requests waiver, no recovery will be effected or demanded until the Secretary has made a decision on the waiver request;

   e.  that if the beneficiary has previously paid back any or all of the amount that was incorrectly paid to him, it will be immediately refunded by the Secretary;

   f.  that the beneficiary may check the box on the form indicating his or her intention not to seek waiver and to repay the amount incorrectly paid, and including payment for that amount, to be returned by the later of October 31, 2006 or 30 days from the date that the Secretary sends out the letter;

  2.  Defendant, his successors in office, his agents, employees and all persons acting in concert with him are preliminarily enjoined from collecting or holding any payment returned by any of the beneficiaries unless and until he has sent out the letter described in paragraph 1 and has received the form back checking the box indicating a desire to repay with accompanying payment.  Any payments previously received, or received after the date of this Order, must be immediately returned to the beneficiaries so that they may decide whether to request waiver or to repay.


   DATED:         _____
                UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ACTION ALLIANCE OF SENIOR CITIZENS, GRAY PANTHERS <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL LEAVITT, Secretary of Department Of Health and Human Services <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) )     C.A. No. |

**(PROPOSED) ORDER GRANTING PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**

The Court having fully considered plaintiffs' motion for a temporary restraining order,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

The defendant Secretary of Health and Human Services, his successors in office, his agents, employees, and all persons acting in concert with him, are

1) prohibited from sending out any further written material to, or concerning, the approximately 230,000 Medicare beneficiaries who received an incorrect premium refund in early August 2006 and who received a letter requiring them to repay that amount on or before September 30, 2006;

2) prohibited from posting new material, or maintaining existing material, on any website under his control concerning the Medicare beneficiaries discussed in paragraph 1.

This Order shall continue in effect until the Court has ruled on plaintiffs' motion for a preliminary injunction.

DATED: September   , 2006

_____

UNITED STATES DISTRICT JUDGE