# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ACTION ALLIANCE OF SENIOR CITIZENS | ) | |
| | ) | |
| GREY PANTHERS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No.:  06-1607-HHK |
| | ) | |
| MICHAEL LEAVITT, Secretary of Health | ) | |
| and Human Services., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MOTION TO DISMISS

Defendant, Michael O. Leavitt, Secretary of Health and Human Services, respectfully moves the Court, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, to dismiss this action. In support of this motion, Defendant respectfully refers the Court to the accompanying Memorandum of Points and Authorities. A proposed order is also attached.

Respectfully submitted,

/s/
KENNETH L. WAINSTEIN, D.C. Bar # 451058
United States Attorney

/s/
MEGAN L. ROSE, N.C. Bar # 28639
Assistant United States Attorney
Civil Division
555 Fourth St., N.W.
Washington, D.C. 20530
202-514-7220

_/s/_____

MARCUS H. CHRIST
LAWRENCE J. HARDER
U.S. Department of Health and Human Services
   Office of the General Counsel
Centers for Medicare & Medicaid Services
   Division
7500 Security Blvd., C2-05-23
Baltimore, MD 21244
410-786-9304

OF COUNSEL:

DANIEL MERON
General Counsel

KATHLEEN H. McGUAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
  for Litigation

United States Department of
   Health and Human Services

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ACTION ALLIANCE OF SENIOR CITIZENS | ) | |
| | ) | |
| GREY PANTHERS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No.:   06-1607-HHK |
| | ) | |
| MICHAEL LEAVITT, Secretary of Health and Human Services., | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AND OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

Plaintiffs, two Medicare advocacy groups, come before this Court seeking a preliminary injunction requiring the Secretary to offer waiver of recovery of erroneously refunded health insurance premium payments to some 230,000 individuals enrolled in the new Medicare prescription drug program, Medicare Part D.  Plaintiffs, however, cannot identify in their complaint even one Medicare beneficiary who has allegedly been harmed by reason of having to repay the erroneously refunded premiums, nor do they have standing to bring their claims in their own right.  As a result, this action should be dismissed for lack of standing.  At the very least, Plaintiffs' inability to show any imminent harm flowing from the Secretary's request that affected beneficiaries repay the premiums defeats their request for emergency relief.

Moreover, while Plaintiffs' preliminary injunction papers contain a long discussion of cases

1

in which courts have ordered the Secretary to offer waiver of repayment to beneficiaries in other contexts such as Social Security benefits disputes, Plaintiffs can cite to no instance in which a court has ever required such waiver to be afforded to any Medicare beneficiary regarding a refund of a Medicare prescription drug premium. None of the various provisions and authorities that Plaintiffs cite regarding the availability of waiver have any applicability to premium payments under Medicare Part D. Indeed, no authority for the proposition that the Secretary must offer waiver of the erroneous Part D premium refund exists. Accordingly, Plaintiffs have no likelihood of success on the merits of this dispute and their request for preliminary injunctive relief should be denied on that ground also.

## STATUTORY AND REGULATORY BACKGROUND

### I. Medicare Parts A, B, and C.

Medicare, the federal medical insurance program for the aged and disabled, is contained in Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg (the "Medicare statute"). The Secretary of Health and Human Services ("the Secretary") has delegated the authority to administer the Medicare program to the Centers for Medicare & Medicaid Services ("CMS"). The Medicare Act is divided into several parts. Part A of the Medicare program, called in the statute "Hospital Insurance Benefits for the Aged and Disabled," provides medical insurance coverage for institutional services such as hospital and skilled nursing care. See 42 U.S.C. §§ 1395c, 1395d. Part B of the Medicare program, called in the statute "Supplementary Medical Insurance Program for the Aged and Disabled," is voluntary supplemental medical insurance covering certain outpatient services such as physician services, medical supplies, x-rays and laboratory tests. 42 U.S.C. §§ 1395k, 1395l, 1395x(s). Medical insurance for eligible individuals under Parts A and B of Medicare is delivered

2

on a fee-for-service model; in other words, Medicare directly reimburses participating health care providers who furnish Medicare Part A and B beneficiaries a covered medical service. <u>See</u> 42 U.S.C. §§ 1395d(a); 1395k(a). Thus, Parts A and B of Medicare are often referred to as "traditional" or "fee-for-service" Medicare. In the case of Part B, Congress has required that Part B beneficiaries share in the cost of providing these covered services by requiring beneficiaries to pay monthly premiums. <u>See</u> 42 U.S.C. § 1395j.

Medicare Part A is funded by Social Security taxes. <u>See</u> 42 U.S.C. § 1395i(a). In addition, a small number of certain individuals who are not otherwise eligible for Medicare Part A can obtain coverage by paying a monthly premium. <u>See</u> 42 U.S.C. § 1395i-2. The taxes that fund Part A and any Part A premium amounts are paid into the Federal Hospital Insurance Trust Fund, out of which payments are made directly to hospitals and other providers of Part A services as reimbursement for health care furnished to Part A beneficiaries. <u>See</u> 42 U.S.C. §§ 1395i(h),1395i-2(f).

Part B is funded by beneficiary premiums (as explained above) and contributions from funds appropriated by the federal government. <u>See</u> 42 U.S.C. §§ 1395j, 1395s. These premium amounts and appropriated funds are paid into the Federal Supplementary Medical Insurance Trust Fund, out of which payments are made directly to physicians and other providers and suppliers of Part B services as reimbursement for health care furnished to program beneficiaries. <u>See</u> 42 U.S.C. §§ 1395l(a), 1395t(a), (g). The statute directs that the Part B premium of any individual who receives monthly Social Security benefits shall be collected by deducting the amount of the premium from the amount of such monthly benefits. 42 U.S.C. § 1395s(a)(1).

In the Balanced Budget Act of 1997, Pub. L. No.105-33, 111Stat. 251, 426-32 (Aug. 5, 1997), Congress added a new Part C to the Medicare statute. This Part, referred to in the statute as

the "Medicare+Choice Program" and found at 42 U.S.C. §§ 1395w-21- 1395w-28, increased beneficiary choice by authorizing Medicare beneficiaries to obtain covered Medicare services through health maintenance organizations, preferred provider plans, and other "managed care" arrangements offered by private health insurers.  See 42 U.S.C. §1395w-21(a)(1).  Under Part C, Medicare does not make direct payment to health care providers as it does in the Part A and Part B, "fee-for-service" context.  Rather, Medicare contracts with private health insurers who agree to provide covered services to Part C beneficiaries through their own network of health care providers. Medicare makes periodic payments to these organizations, who share in the risk of providing covered services to the Part C beneficiaries.  In turn, these private insurers are responsible for reimbursing providers in their organization, network or plan.

## II.  The Medicare Modernization Act of 2003 – Revising Medicare Part C and Creating Medicare Part D.

On December 8, 2003, the President signed into law the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. 108-173, 117 Stat. 2066, 42 U.S.C. § 1395w-101 et seq. (2003).  Title I of the MMA amended the Medicare Act by inserting a new Part D, the "Voluntary Prescription Drug Benefit Program," which for the first time established Medicare coverage of prescription drugs.  See 42 U.S.C. §§ 1395w-4 et seq. (117 Stat. 2066, 2071-2176). CMS has described Medicare Part D as "the most significant change to the Medicare program since its inception in 1965."  70 Fed. Reg. 4,194, 4,197 (Jan. 28, 2005).

The effective date of Medicare Part D was January 1, 2006.  See 42 U.S.C. § 1395w-101(a)(2) (117 Stat. 2066, 2072) ("Coverage . . . shall first be effective on January 1, 2006.").  Like

Medicare Part C[1] coverage, Medicare Part D coverage must generally be elected by the beneficiary and is offered through private insurance plans – known as Prescription Drug Plans or PDPs – operating in various regions of the country.  See 42 U.S.C. § 1395w-101.  Thus, in one important respect, Part D insurance is like Part C.  Under Part D Medicare does not directly pay providers of prescription drugs, such as pharmacies, under a fee-for-service model.  Rather Medicare makes periodic capitated payments to the PDPs who share in the risk of providing prescription drug coverage.  See 42 U.S.C. § 1395w-115.  In turn, the PDPs are responsible for reimbursing their network pharmacies for their services.

In addition to these capitated payments from Medicare, the insurance provided by Part D plans is also funded through monthly beneficiary premiums – that is, the beneficiary's share of the cost of providing insurance.  42 U.S.C. §§ 1395w-113(a), 1395w-115(a), (b), and (e).  Unlike Part B and (in the few applicable cases) Part A premiums, however, Part D premiums are not paid to the federal government to offset its obligations to pay health care providers on behalf of program beneficiaries.  Rather, these premiums are ultimately paid to the Part D prescription drug plans themselves, which they then use to fund coverage of their enrollees' prescription drug needs.  See 42 U.S.C. § 1395w-116(b)(3).  The Social Security Administration, at the request of the Part D enrollee, will withhold or deduct the amount of any monthly premium due to the Prescription Drug Plan from the beneficiary's monthly Social Security check.  See 42 U.S.C. § 1395w-113(c)(1),

---

[1]  Title II of the MMA, 117 Stat. 2176-2221, renamed the Medicare+Choice program contained in Medicare Part C "Medicare Advantage" ("MA") and made certain other revisions in that program.  See MMA §201(a), 117 Stat 2176.  An MA organization may not offer an MA plan to individuals in an area "unless either that plan (or another MA plan offered by the organization in that same service area) includes required prescription drug coverage . . . ."  42 U.S.C.§ 1395w-131.  Such plans, under which MA organizations also offer prescription drug coverage, are referred to as "MA-PD plans."

incorporating 42 U.S.C. § 1395w-24(d).

In order to promote a wide choice of Medicare Part D plan options for Medicare beneficiaries, the Congress granted Part D plans flexibility in designing their Medicare prescription drug offering, provided the plans meet the minimum requirements set forth in the Medicare statute and the Part D Final Rule. 42 U.S.C. §§ 1395w-102(a), 1395w-111(e)(2)(D). Consequently, Part D plans differ from one another in several respects, including enrollee cost-sharing requirements (*i.e.,* premiums), the prescription drugs covered under the plan, and the pharmacies included in the plan's pharmacy network.

### STATEMENT OF FACTS

This case involves Part D premiums which Congress has required enrollees to pay to their PDPs, or MA-PDs, in order to share in the cost of providing coverage. Specifically, Plaintiffs allege that, due to a computer processing error, the government erroneously refunded the Part D premiums of approximately 230,000 Medicare Part D enrollees (a small subset of all Part D enrollees) in their August 2006 Social Security checks. Compl.¶ 3. The amounts refunded were for premiums which these beneficiaries had previously paid by way of deductions, or withholdings, from their Social Security checks in prior months. Id. ¶ 19. Thus, the erroneously refunded premiums applied to periods in which these beneficiaries had already received Part D insurance coverage. In other words, the premiums applied to periods in which the enrollee's PDPs had presumably fulfilled their obligation to provide prescription drug coverage in exchange for these premium payments.

By letters released in late August and early September 2006, the Secretary informed these beneficiaries of the amount of the erroneous refund that had been sent to each of them and of their obligation to return that amount. Id. ¶ 20. These letters provided the enrollees with a variety of

6

repayment options, including repayment in monthly installment payments if full repayment presented a hardship. The Secretary also provided a toll-free telephone number to discuss these options. Id. ¶¶ 3, 20; see also Exhibits A-C to Plaintiffs' Memorandum in Support of Motion for a Temporary Restraining Order and for a Preliminary Injunction ("Plaintiffs' Mem.").

Although they have not, and cannot, cite to a statutory or regulatory provision that is specific to Part D premiums, Plaintiffs contend that the Part D enrollees affected by the Secretary's actions are entitled to request a waiver of recovery of the erroneously refunded premiums. Plaintiffs' Mem. at 4-9. They contend that the Secretary has failed to notify these enrollees of this (non-existent) right. Id. Plaintiffs now seek a preliminary injunction that would require the Secretary to send a letter to each of the approximately 230,000 enrollees which states: 1) that the beneficiary has a right to request waiver of the recovery of these erroneously refunded premiums; 2) that the beneficiary may request a waiver by October 31, 2006; and 3) that the Secretary will "repay" the amount of any erroneously refunded premium he has already recovered from the beneficiary. Plaintiffs' (Proposed) Order Granting Plaintiffs' Motion for a Preliminary Injunction.

## STANDARD OF REVIEW

Defendant moves for dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction. "In reviewing a motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the court must accept the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor." Thompson v. Capitol Police Board, 120 F. Supp.2d 78, 81 (D.D.C. 2000) (citations omitted). "The court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." Rann v. Chao, 154 F. Supp.2d 61, 64 (D.D.C. 2001), aff'd 346 F.3d 192 (D.C. Cir. 2003), cert

denied, 125 S.Ct. 35 (2004).  In addition, "[on] a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of persuasion to establish subject-matter jurisdiction by a preponderance of the evidence."  Thompson, 120 F. Supp.2d at 81.

A court may resolve a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) in either of two ways.  First, the court may determine the motion based solely on the complaint.  Herbert v. National Acad. Of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).  Alternatively, to determine the existence of jurisdiction, a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence.  See id.; Rann, 154 F. Supp.2d at 64.

## ARGUMENT

Plaintiffs' complaint, and its request for emergency relief, suffers from several legal deficiencies.  As a preliminary matter, Plaintiffs' complaint has not articulated facts sufficient to grant them standing to bring these claims, and this Court lacks subject matter jurisdiction as a result.  As to their request for emergency relief, this is simply not a case in which emergency relief is even remotely appropriate.  Plaintiffs have not alleged, at least in any specific way, that they will be irreparably harmed if the affected Part D enrollees continue to repay the erroneously refunded premiums during the course of this litigation.  Furthermore, there is no chance, let alone a likelihood, that Plaintiffs will be successful on the merits of this lawsuit.  The merits of their legal claims suffer from one fatal flaw: all of the statutory and regulatory provisions upon which they rely simply do not apply on their face to the erroneous refund of Part D premiums.

**I.    Plaintiffs Do Not Have Standing as Representatives of
      Their Members or on Their Own Behalf.**

This case has not been brought by any Part D enrollee who has been asked to return an incorrectly refunded cost-sharing premium. Nor have Plaintiffs identified in their complaint a single enrollee who contends that he will be irreparably injured by the actions of the Secretary. Rather, this action is brought by two organizations, the Action Alliance of Senior Citizens and the Gray Panthers, who contend that they themselves are injured by the Secretary's actions, and who purport to be acting on behalf of unidentified members (again, no specific members who actually received these erroneous refunds are identified) who they speculate will be injured by the Secretary's actions. See Compl. ¶¶ 7, 8, 27-38.

Both organizations allege that their mission is to "promot[e] information about Medicare among its members" and to assist their members with Medicare issues they encounter. Id. ¶¶ 28, 34. Because the Secretary has asked the affected Part D enrollees to return their cost-sharing premiums that were erroneously refunded, both organizations contend that they are harmed in two ways: they will not have a sufficient amount of time to advise their members as to how to respond to this issue, id. ¶¶ 32, 37, and, somewhat paradoxically, advising their members as to how to respond will, in an unspecified and speculative way, divert resources from other projects and thereby "reduce[] the overall effectiveness of [their] programs and efforts." Id. The allegations regarding harm to their members are even more vague and speculative. Because of the Secretary's actions, their members do not have "adequate information" about "what steps to take with respect to" the erroneous refund of their cost-sharing premium. Id. ¶¶ 31, 36. And again without describing the specific circumstances of a single Part D enrollee affected, they allege that the Secretary's request to repay

the erroneous refunds will deprive their members "of income needed to pay for food or other necessities . . . ." Id. These allegations, however, fall far short of what is necessary for this Court to assert subject matter jurisdiction over Plaintiffs' claims.

In order to confer Article III standing, a plaintiff (including an organizational plaintiff) must allege four things. First, he must show that he himself has suffered "personal injury" or an injury-in-fact. Raines v. Byrd, 521 U.S. 811, 818 (1997) (quoting Allen, 468 U.S. at 751) (emphasis added in Raines). Second, he must demonstrate that the injury is "fairly traceable to the defendant's allegedly unlawful conduct," Daimler/Chrysler Corp. v. Cuno, 126 S. Ct. 1854, 1861 (2006) (quoting Allen, 468 U.S. at 751), and not to "the independent action of some third party not before the Court." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (quoting Simon v. E. Kentucky Welfare Rights Org., 426 U.S. 26, 41-42 (1976)). Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision." Id. at 561 (quoting Simon, 426 U.S. at 38, 43). Finally, the alleged injury must represent the "invasion of a legally protected interest," id. at 560, that "arguably [falls] within the zone of interests to be protected or regulated," FEC v. Akins, 524 U.S. 11, 20 (1998), by the specific source of law "whose violation forms the legal basis for his complaint." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 883 (1990). While their complaint is far from clear, Plaintiffs appear to contend that they have standing to sue both on their own behalf ("organizational" standing) as well as on behalf of their members ("representational" standing). See Smith v. Pacific Properties and Dev. Corp., 358 F.3d 1097, 1101 (9th Cir. 2004). Under either theory, Plaintiffs must still satisfy the four-part test set forth above. Under either theory, they have not.

10

### A.    Plaintiffs Lack Standing to Sue On Behalf of Their Members.

An organization's "representational standing is contingent upon the standing of its members to bring suit. . . ."  Smith v. Pacific Properties and Dev. Corp., 358 F.3d at 1101.  Therefore, "[t]o establish representational standing, [an organization] must demonstrate that . . its members would have standing to sue in their own right . . . and . . .  neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Id. at 1101-02; see also Arizonans for Official English v. Arizona, 520 U.S. 43, 65- 66 (1997) ("association has standing to sue" on behalf of its members "only if its members would have standing to sue in their own right" on basis of "concrete injury").

As a threshold matter, Plaintiffs fail to allege a "concrete injury" or "injury-in-fact" on behalf of any specific organizational member.  Indeed, they have failed to even identify a single individual as a member, much less a member who has suffered an injury-in-fact.  See American-Arab Anti-Discrimination Committee v. Thornburgh, 970 F.2d 501, 510 (9th Cir. 1991) (organization lacked standing where it failed to allege that members were, or would be, subject to deportation under challenged statute).  An "injury-in-fact" is an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.  Lujan v. Defenders of Wildlife, 504 U.S. at 560.  Again, Plaintiffs do not allege in any concrete or particularized way precisely how their members will be harmed – indeed, it is fatal to their claims of representational standing that they do not identify even one member who is, in fact, one of the 230,000 Part D enrollees who erroneously was refunded his cost-sharing premium.  Plaintiffs only broadly state that their members will not have "adequate information to make informed decisions" regarding the Part D premium refund issue, but this allegation is merely conjectural, and certainly

11

not concrete, since they do not allege that any member, or group of members, has actually complained to them that they need additional information in order to determine their next course of action. And the same is true of Plaintiffs' allegation that their members "will be deprived of income needed for food and other necessities" – there is not a single allegation in their complaint that any specific individual is now experiencing, or imminently will experience, any such problems. Indeed the thrust of their complaint – that beneficiaries are repaying this money without knowing all of their alleged rights – strongly suggests that such deprivation is far more conjectural than real. Having failed to identify any actual or concrete injuries to their members, the organizations' representational claims must be dismissed. See Coalition for ICANN Transparency, Inc. v. Verisign, Inc., 2006 WL 2033375, at *7 (N.D. Cal. Feb. 28, 2006) (organization's failure to identify specific members who would have standing to sue in their own right is "fatal to [their] attempt to plead associational standing.").[2]

Even if Plaintiffs could identify individual members with standing, resolution of this case would require the participation of that individual. An organization cannot claim representational

---

[2]  See also, e.g., id. at *8 (explaining that, "[r]egardless of whether there is a bright-line rule mandating that organizations name at least one member in order to" demonstrate representational standing, it "makes sense" to insist on such specificity); New York Statewide Senior Action Council v. Leavitt ("NYSSAC"), 409 F. Supp. 2d 325, 330 (S.D.N.Y. 2005) (holding that the judicial review provision in Part D "clearly indicates that Congress did not intend to allow requests for relief by associations on behalf of unidentified individuals"); Nat'l Alliance for the Mentally Ill, St. Johns Inc. v. Bd. of County Comm. of St. Johns County, 376 F.3d 1292, 1296 (11th Cir. 2004) (holding that organizations' "failure to identify an injured constituent prevents them from asserting associational standing"); Hill v. Park, 2004 WL 180044, at *6 (E.D. Pa. Jan. 27, 2004) (organizational's failure to "identify any single member whose interests would confer associational standing" is grounds for dismissal); Maine Ass'n of Interdependent Neighborhoods v. Comm'r, Maine Dep't of Human Servs., 747 F. Supp. 88, 92 (D. Me. 1990) (organization failed to establish associational standing where complaint, "[did] not identify the member allegedly affected . . . , nor [did] it identify any of the factual circumstances supporting her claim to be subject to the regulation").

standing where the claims it purports to bring on behalf of its members "are not common to the entire membership, nor shared by all in equal degree . . . ."  Lake Mohave Boat Owners Ass'n v. Nat'l Park Serv., 78 F.3d 1360, 1367 (9th Cir. 1996).  If "whatever injury may have been suffered is peculiar to the individual members concerned," then "both the fact and extent of the injury would require individualized proof."  Id.  Participation of members who have actually been harmed, therefore, is necessary to determine whether their harms are truly representative of the entirety of the organizations' membership.

There is reason to doubt that even the speculative harms of which Plaintiffs complain are truly representative.  Individual participation would be necessary here to determine, for example, the exact premium amount erroneously refunded and whether it can truly be claimed that large numbers of the organizations' membership do not have the means to repay that amount either in a lump sum or in monthly installments as offered by the Secretary.  Moreover, many beneficiaries have undoubtedly already repaid the erroneous premium refund or are in the process of repaying.  Of those, many may not want more process, even if they are entitled to it.  They may simply wish to repay that which never should have been remitted to them in the first place.  Again, based upon the scant facts that Plaintiffs have provided, there is simply no way to know whether, as they claim, that the entirety of their membership even desires the relief they are seeking on their behalf.  For numerous reasons, therefore, the "individual participation of each injured party" would be "indispensable to proper resolution of the case."  Warth v. Seldon, 422 U.S. 490, 511 (1975).  Representational standing simply does not exist where, as here, it is less than certain that the "claims are not common to the entire membership, nor shared by all in equal degree."  Lake Mohave Boat Owners Ass'n v. Nat'l Park Serv., 78 F.3d at 1367 (9th Cir. 1996).

### B.     Plaintiffs Also Lack Standing to Sue On Their Own Behalf.

For an organization to sue on its own behalf, it "must, like any other plaintiff, satisfy the constitutional and prudential considerations of standing." J.L. v. Social Sec. Admin., 971 F.2d 260, 268 n.8 (9th Cir. 1992). Plaintiffs in this case fail both tests. First, they have alleged no concrete injury to their organizations that is fairly traceable to conduct of the Secretary and likely to be redressed by a judgment in their favor. As a result, they lack Article III standing. Second, their interests are not within the zone of interests protected or regulated by Medicare Part D. Therefore, even if Plaintiffs could demonstrate constitutional standing, their claims should be dismissed as a prudential matter.

### 1.  Plaintiffs Have Alleged No Legally Cognizable Injury to Their Ability to Function as Organizations.

An organization may sue on its own behalf only if the challenged conduct directly conflicts with the organization's mission and has directly harmed its ability to provide its services. Frustration of an organization's objectives is the type of abstract concern that does not impart standing." National Treasury Employees Union v. United States, 101 F.3d 1423, 1427 (D.C. Cir. 1996)(citation and internal quotation marks omitted); see also Center for Law and Educ. v. Dep't of Educ. 396 F.3d 1152, 1157 (D.C. Cir. 2005). As with individuals, the injury suffered by the organization cannot be conjectural, hypothetical, speculative or abstract; it must be "'certainly impending.'" National Treasury Employees Union, 101 F.3d at 1427 (quoting Whitmore v. Arkansas, 495 U.S. 149, 158 (1990)). Furthermore, the organization's actual or threatened injury must be "'fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.'" Coho Salmon v. Pacific Lumber Co., 61 F. Supp. 2d 1001, 1009 n.3 (N.D. Cal. 1999)

14

(quoting Spann v. Colonial Village, Inc., 899 F.2d 24, 27 (D.C. Cir.1990)).

The leading case on an organization's standing to sue in its own right is Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79 (1982). In Havens, a nonprofit organization whose purpose was "to make equal opportunity in housing a reality in the Richmond Metropolitan Area," sued the owner of an apartment complex for engaging in racial steering in violation of the Fair Housing Act. Id. at 368. The organization alleged that the defendant's illegal housing practices frustrated its efforts to promote equal housing through counseling and other referral services. Id. at 379. It further alleged that it "had to devote significant resources to identify and counteract the defendant's" unlawful housing practices. Id. The Court held that the alleged impairment to the organization's ability to provide its services, caused by the defendant's conduct, constituted an injury-in-fact to the organization. The organization therefore had standing to sue for damages in its own right. Id.; see also Smith, 358 F.3d at 1105-06 (organization had standing to sue real estate developer where it alleged that developer's discriminatory practices negatively impacted its mission of helping to eliminate disability discrimination and caused it to redirect resources to combat developer's discrimination); Fair Housing of Marin v. Combs, 285 F.3d 899, 905 (9th Cir. 2002) (fair housing organization had direct standing to sue real estate owner where it alleged that defendant's discriminatory practices frustrated its mission and impaired its ability to provide outreach and education services).

In this case, Plaintiffs clearly attempt to craft the allegations of their complaint so as to pass muster under Havens. They thus allege that they will have "insufficient time in which to analyze information to help [their] members," and "will have to devote scarce time, effort, staff, and resources to analyze relevant information and provide effective assistance to their members," all of

15

which they allege "interfere[s] with and impede[s their] mandate, and . . . reduce[s] the overall effectiveness of [their] programs and efforts." Compl. ¶¶ 32, 37. These allegations are insufficient to support Plaintiffs' efforts to sue in their own right, as they amount to nothing more than allegations that Plaintiffs' might have to work harder to carry out their mission of informing their members regarding these erroneous premium refunds. But the same could surely be said of any new development in the Medicare program, which would also require Plaintiffs to generate information to be distributed to their members, perhaps to the detriment of other initiatives the organizations would prefer to undertake. All organizations wish they had more resources to devote to their efforts. But that certainly does not mean that such a change in the program has frustrated or rendered ineffective Plaintiffs' ability to advise its members. Plaintiffs are just as able today to "promote information about Medicare among [their] members," id. ¶¶ 28, 34, as they were before CMS informed beneficiaries of their obligation to repay the erroneously refunded premium amounts. That they now may have one more topic to transmit information about does not *frustrate* those information disseminating efforts or make them *ineffective.*

Part D is a large and complex new government program – the most significant change to Medicare since its inception. CMS itself has devoted enormous resources to educating beneficiaries and ensuring that those who are entitled to benefits receive them. As part of those efforts, the agency itself has worked intensively with many partners both within and outside of government, including organizations like those that have filed suit here. It is far from surprising that, with the introduction of this vast new program, these organizations also have chosen to devote resources to helping beneficiaries navigate the new law, make choices regarding benefits, and address any problems that arise. But that does not give them independent standing to sue the Secretary. The level and extent

of additional services, if any, that these organizations have provided or will provide regarding the Part D program stem from choices made by the organizations themselves rather than actions required by CMS.

Moreover, carefully read, other allegations in the Complaint call into question the allegations regarding the drain on resources Plaintiffs allege will occur by reason of their having to inform their members regarding the erroneous premium refund. Action Alliance alleges that it "has already heard that individuals in Pennsylvania have received the letter from CMS concerning incorrect payments and is assessing how best to help its members" and others understand Plaintiffs' view of their rights regarding the refund. Id. ¶ 30. Gray Panthers alleges that it "has been contacted about Part D problems often by its members and the general public" and "is trying to dispense information and advice to its members and others about what they should do" about such problems. Id. ¶ 35. But at the time this action was filed, neither organization could allege that it had been contacted specifically about the premium refund issue by any of its members or, for that matter, by any individual at all. As a result, it is difficult to credit their allegation that dispensing advice on this issue will cause such a drain on their resources as to render their advocacy efforts totally ineffective, especially since the letters to beneficiaries notifying them of their obligation to repay the erroneously refunded premium amounts went out beginning in late August and early September, several weeks before commencement of this action in many if not most cases. It thus seems that most of the assistance Plaintiffs might have provided to their members and others would already have been provided if needed. In fact, if Plaintiffs' allegations are to be taken as true, it appears that little if any assistance was actually requested.

Finally, Plaintiffs have not alleged facts sufficient to show that a judgment in their favor in

17

this action would provide redress for any injury they have suffered. Indeed, it is not clear what relief the Court could provide Plaintiffs for the claims they are asserting on their own behalf. Again, because of the timing of these events, any drain on the organizations' resources would seem to have already occurred. Moreover, the relief they seek – a preliminary injunction setting forth a notification of a right to waiver of recovery and a permanent injunction establishing a waiver procedure, would not end the diversion of resources allegedly caused by the Secretary's actions in erroneously refunding these premiums. If anything, it would seem to require additional resources from the plaintiff organizations to provide information to their members concerning that process.

## 2.  The Interests of Plaintiffs Are Not Within the Zone of Interests Protected by the Medicare Statute.

Even if Plaintiffs could show some injury to their ability to function as organizations that is fairly traceable to the actions of Defendant and would be remedied by a judgment in their favor, standing would still be lacking because their ability to function as advocacy organizations is not within the "zone of interests protected by the law invoked." Elk Grove Unified School Dist. v. Newdow, 542 U.S. 1, 12 (2004) (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)); see also PDK Laboratories Inc. v. United States Drug Enforcement Admin., 362 F.3d 786, 791 (D.C. Cir. 2004). A plaintiff cannot meet this test merely by alleging that a regulatory scheme protects or regulates *someone else's* interests in a way that might indirectly affect his own. See Air Courier Conference v. Am. Postal Workers Union, 498 U.S. 517, 522-31 (1991); Devlin v. Scardelletti, 536 U.S. 1, 7 (2002) (observing that prudential standing requirements include the "'general prohibition on a litigant's raising another person's legal rights. ...'") (quoting Allen v. Wright, 468 U.S. at 751). Although the prudential standing requirement is not meant to be "especially demanding," Clarke v.

18

<u>Securities Industry Ass'n</u>, 479 U.S. 388, 399 (1987), Plaintiffs have failed to allege facts sufficient to meet their burden.

The Medicare Act generally establishes a medical insurance program for "*individuals* who are age 65 and over and are eligible for retirement benefits," as well as certain disabled persons and persons suffering from end-stage renal disease. 42 U.S.C. § 1395c (emphasis added). Similarly, Medicare Part D is a prescription drug program for "eligible individual[s]." 42 U.S.C. § 1395w-101(a)(1); <u>see also</u> 42 U.S.C. §§ 1395w-101(b)(1)(C) (providing for auto-enrollment for "full-benefit dual eligible individual[s]"). These statutes make no "mention of advocacy organizations' interests." <u>Center for Law and Educ. v. Dep't of Educ.</u> 396 F.3d at 1157. Nor do they regulate conduct of advocacy groups. The concerns of Plaintiffs are therefore not within the zone of interests of the relevant law. <u>See</u> <u>INS v. Legalization Asst. Proj. of Los Angeles County Fed. of Labor</u>, 510 U.S. 1301, 1305 (1993) (O'CONNOR, J., in chambers) (granting stay of appellate ruling because Supreme Court likely "would grant certiorari and conclude that [organizations that provide legal help to immigrants] are outside of zone of interests" immigration law sought to protect; "fact that the INS regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect").

### II.  <u>Plaintiffs Are Not Entitled to a Preliminary Injunction</u>.

It is well settled that injunctive relief is an extraordinary remedy, and the party seeking it holds a substantial burden of proof. <u>American Coastal Line Joint Venture v. United States Lines, Inc.</u>, 580 F. Supp. 932, 935 (D.D.C. 1983); <u>see</u> <u>Sea Containers Ltd. v. Stena AB</u>, 890 F.2d 1205, 1208 (D.C. Cir. 1989); <u>Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n</u>, 259 F.2d 921, 925 (D.C. Cir. 1958). To be entitled to the extraordinary remedy of injunctive relief, Plaintiffs must

meet this strict burden by showing that: (1) there is a substantial likelihood of their prevailing on the merits of their claims; (2) a preliminary injunction is necessary to prevent irreparable injury; (3) the threatened injury to the plaintiff outweighs the possible harm to others; and (4) the public interest favors issuance of the injunction.  Sea Containers, 890 F.2d at 1208; Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977); Virginia Petroleum, 259 F.2d at 924-25.  These factors "interrelate on a sliding scale and must be balanced against each other. 'If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in the other areas are rather weak.'" Serono Laboratories, Inc. v. Shalala, 158 F.3d 1313, 1318 (D.C. Cir. 1999), quoting CifiFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995).  However, a plaintiff's burden is even greater when the requested injunctive relief, if granted, would interfere with governmental operations.  Yakus v. United States, 321 U.S. 414, 440 (1940); Virginia Railway Co. v. Systems Federation No. 40, 300 U.S. 515, 552 (1937).

"The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."  Wisconsin Gas Co. v. F.E.R.C., 758 F.2d 669, 674 (D.C. Cir. 1985). To constitute irreparable harm, "the injury must be both certain and great; it must be actual and not theoretical."  Id.  Applying this standard in this case plainly reveals that Plaintiffs are not entitled to the extraordinary remedy of emergency relief because they can show neither an imminent threat of irreparable harm nor a likelihood of success on the merits.

### A.    Plaintiffs Have Not Demonstrated Irreparable Harm.

For the same reasons Plaintiffs lack standing to maintain this action, as described above, they also have failed to demonstrate the irreparable harm necessary to support a successful request for emergency relief.  Again, Plaintiffs' claims of injury fall into two categories: injury to their members

and injury to the organization itself.  As to the first, Plaintiffs apparently argue that their members will be irreparably injured because some will repay the erroneously refunded premiums under circumstances in which they would be entitled to a waiver (even though no such right exists). Plaintiffs' Mem. at 10.  But, as explained above, Plaintiffs have failed to identify one individual who is threatened with any harm, let alone irreparable harm, due to the Secretary's actions at issue in this case.  Plaintiffs do not allege, for example, that any specific beneficiary is about to repay, or has recently repaid, and as a result is in imminent danger of not being able to obtain food or other living necessities.  Indeed, it is hard to imagine that Plaintiffs could ever credibly make such allegations when one considers that none of the enrollees expected to receive these refunds (from their perspective, they were financial obligations they already paid) and that they received the erroneous refunds only recently in August 2006 (raising the question whether they have yet to rely upon these funds as an income supplement).  Similarly, the complaint does not allege that the Secretary has taken any further actions to recoup the erroneously refunded amounts or compel their repayment or that any beneficiary's Medicare Part D coverage has been put in jeopardy by reason of the erroneous refund.  No such actions have been taken or even threatened.  Vague and speculative allegations that enrollees may not have the income necessary to both repay these erroneously refunded premiums and afford other living necessities cannot be said to rise to the level of a credible showing of "irreparable" injury.

Even if, contrary to fact, Plaintiffs had made such allegations, any injury in this case is entirely financial, involving the payment and repayment of money, and thus cannot be considered to be irreparable.  Sampson v. Murray, 415 U.S. 61, 90 (1974).  Some beneficiaries have already repaid the Secretary the erroneously refunded premium amounts or made arrangement for repayment

21

in monthly installments in response to the letters they received. Presumably those beneficiaries were able to afford repayment without subjecting themselves to any irreparable injury. Other beneficiaries who have not made any repayment to the Secretary have suffered no injury. At any rate, any injury a beneficiary may have suffered here is entirely reparable by repayment of any erroneously refunded premium amount the beneficiary may have repaid to the Secretary and therefore does not qualify for emergency relief. Indeed, part of the Plaintiffs' request for emergency and permanent relief – requiring the Secretary to "repay" any amounts enrollees have returned to the government – undercuts their argument that the Secretary's actions (asking for repayment of the erroneously refunded premiums) create "irreparable" injury.

The organizations' claims of irreparable injury are even less impressive. Plaintiffs contend that if the Secretary is permitted to continue to collect repayment of the erroneously refunded premiums, their organizations will expend time and resources informing beneficiaries about this issue. Plaintiffs' Mem. at 12. Indeed, in the case of Action Alliance, though they haven't yet expended these resources, they claim to be poised to provide this information any day now. Comp. ¶ 30. But the fact that Plaintiffs are voluntarily undertaking this campaign undercuts their claim that they will <u>necessarily</u> be "irreparably" harmed by the Secretary's actions in this case. Plaintiffs stand in the same position as any other organization or entity with limited resources – it must decide how best to expend those resources to best achieve its mission. Regardless of the Secretary's actions, Plaintiffs still have within their control the ability spend their resources as they best see fit. It cannot be that Plaintiffs are irreparably harmed every time the Secretary makes a policy decision or otherwise takes action regarding the Medicare program simply because they feel compelled to respond using their resources. For organizations with such broad mission statements – essentially,

to assist and inform their members about Medicare issues – every such action by the Secretary would create "irreparable" harm.  There is no support in the law for such a low standard for emergency relief.

        **B.**       **Plaintiffs Cannot Succeed on the Merits of Their Claims.**

              **1.**  **The Medicare Statutory Provisions Allowing The Secretary To Waive  Certain Overpayments to Beneficiaries Do No Apply to this Dispute.**

      Plaintiffs spend a substantial portion of their brief explaining why they believe their members are entitled to notice and a hearing as to whether they are entitled to waiver of recovery of the funds that were erroneously sent to them.  But this explanation misses one salient point: none of the statutory or regulatory provisions they cite applies to the recovery of erroneously refunded Part D premiums because they are not overpayments of "items or services" – the touchstone of a Medicare beneficiary's right to seek such relief.

      At the outset, Plaintiffs focus upon 42 U.S.C. § 1395gg(c) – otherwise known as the Medicare waiver provisions – as the focal point for their alleged right to notice and a hearing. Plaintiffs' Mem. at 4.  Much, but not all, of what Plaintiffs say about this statutory provision is true. In general, Medicare beneficiaries are statutorily entitled to a hearing before the Secretary may recover erroneous payments (for "items and services") awarded such beneficiaries.  These waiver provisions do, in fact, afford Medicare beneficiaries the right to a hearing to determine whether the beneficiary is without fault in the overpayment and whether recovery of the monies would "either (1) defeat the purposes of title II or title XVIII of the [Social Security] Act, or (2) be against equity and good conscience."  Id.  (citing 42 C.F.R. § 405.358).  And where it is determined that the beneficiary did not know and had no reason to know that the payment was improper, and one of the

other two conditions noted above are met, recovery of the overpayment (again, of the "item or service") will be waived. However, these provisions simply do not apply to this case because it is undisputed that these enrollees did not receive overpayments of "items or services" under Medicare; they received erroneous Part D premium refunds which are quite a different thing.

That the Medicare waiver provisions are limited to benefit overpayments – or more specifically in the Medicare context, the overpayment of items or services – is clear on the face of the statute. The statutory overpayment recovery restrictions discussed above for Medicare are part of a general Medicare overpayment provision that begins by stating that "any payment under this title to any provider of services or other person with respect to any items or services furnished any individual shall be regarded as a payment to such individual." 42 U.S.C. 1395gg(a) (emphasis added). The statute goes on to authorize adjustment or recovery from the beneficiary for incorrect payments for the items or services delivered to the beneficiary. 42 U.S.C. § 1395gg(b). However, the statute then imposes a limitation on such recovery. Subsection (c) provides that no adjustment or recovery of an incorrect payment will be instituted against an individual who is without fault "if (A) the incorrect payment was made for expenses incurred for items or services for which payment may not be made under this title by reason of the provisions of paragraph (1) to (9) of section 1395y(a) of this title . . . ." 42 U.S.C. § 1395gg(c) (emphasis added).

Clearly, the touchstone of the Medicare waiver provision rests in its repeated reference to payments for "items or services furnished." The statute and implementing regulations allow adjustments and recoveries to be waived where the improper payment relates directly to items and services furnished to a Medicare beneficiary. Indeed, the reference to section 1395y is a reference to specific items and services that are statutory excluded from Medicare coverage. See 42 U.S.C.

24

§ 1395y(a)(1)-(9) (e.g., items and services which are not "reasonable and necessary" to the diagnosis or treatment of an illness or injury).[3]  Thus, if an item or service is provided to a Medicare beneficiary, Medicare pays for that service and it is later determined that the payment was inappropriate under 1395y(a)(1)-(9), the waiver provisions may serve to relieve the beneficiary of his or her repayment obligation.  These statutory cross-references, linking the waiver provisions to overpayments for "items or services," are conspicuously absent from Plaintiffs' statutory quotations and discussions.

Obviously, the Medicare waiver provision on its face does not apply to the facts of this case as Plaintiffs have alleged them.  Indeed, the Plaintiffs admit that the instant dispute concerns an improper refunding of Medicare Part D enrollee premium payments.  These erroneous refunds do not relate to any improper payment for "items and services" furnished to any individual and certainly they have no connection to any payment denial pursuant to 1395(y)(a)(1)-(9).  Thus the Medicare waiver statute is, by its own terms, inapplicable to this case, and Plaintiffs' claims that the affected Part D enrollees are entitled to either notice or a hearing to determine whether the waiver provisions apply have no chance of succeeding.

Even if the statute were not clear on its face, Plaintiffs' reading would ultimately be rejected by this Court for another reason.  Section 1395gg(c) effectively crafts a limited waiver of sovereign immunity requiring the United States to forego collection of monies due it under certain limited circumstances.  To broadly read the statute as contemplating the waiver of premium payments, when

---

[3]  Indeed, subsection (a) of 1395y is entitled "Items or services specifically excluded" and states, in part: "Notwithstanding any other provision of the of this subchapter, no payment may be made under part A or part B of this subchapter for any expenses incurred for items or services . . . ."  42 U.S.C. § 1395y(a) (emphasis added).

the plain language of the statute says no such thing, flies in the face of longstanding judicial precedent requiring strict construction of such sovereign immunity waivers. Lehman v. Nakshian, 453 U.S. 156, 160 (1981). Moreover, the Supreme Court has held that, where a limited waiver of sovereign immunity has been provided by Congress, not only must that waiver be strictly construed but it must, in fact, be construed in favor of the sovereign. Library of Congress v. Shaw, 478 U.S. 310, 319 (1986); United States v. N.Y. Rayon Importing Co., 329 U.S. 654, 659 (1947). These precedents should guide this Court's review of the Medicare statute. When the statute is viewed in this light, it is clear that Plaintiffs' request for an expansion of the limited waiver of sovereign immunity contemplated by the Medicare statute at 42 U.S.C. § 1395gg(c) will be rejected and they have no likelihood of succeeding on this claim.

To support their claim on the merits, Plaintiffs erroneously rely upon various Social Security cases that remove certain Social Security recipients' obligations to refund overpaid Social Security benefits. See, e.g., Plaintiffs' Mem. at 5. It is true that the Social Security program has a provision that obviates a beneficiary's need to repay some erroneous benefit payments received in limited circumstances. See 42 U.S.C. § 404(b). In such instances, the enrollee may be entitled to a hearing and, if he or she is without fault and meets other requirements, the enrollee may be relieved from his or her repayment obligations. Id. However, as a threshold matter, this provision on its face is much broader than the waiver language contained at 42 U.S.C. § 1395gg(c) and, most importantly, by its own terms is applicable only to the Social Security program (Title II), not Medicare (Title XVIII). See 42 U.S.C. § 404(a) (requiring adjustments to be made when the Commissioner finds that "more or less than the correct amount of payment has been made to any person under this title" – i.e., Title II of the Social Security Act) and (b) (stating that no adjustments will be made where a waiver is

applicable).  Thus, section 404(b) is effectively irrelevant to this case.  The cases Plaintiffs cite are

also inapplicable for much the same reason that the Medicare waiver provision does not apply in this

case.  Each of the cases involves an SSA enrollee who received an overpayment in his or her benefit

payment.   These are just not the facts of this case.  Here, no erroneous benefit payment have been

made.  Rather, the Secretary erroneously refunded Medicare Part D premiums to Part D enrollees.

Nothing in the Social Security benefit provision or the attendant case law cited by the Plaintiffs

serves to apply this provision to the Medicare premium payments at issue here.   Thus, any

constitutional concerns raised by that case law are not implicated here

      Accordingly, the plain language of the Medicare waiver provisions do not apply to this case.

The Medicare waiver provisions and attendant notice and hearing requirements are engaged only in

the context of improper payments for specific items and services delivered to an individual

beneficiary.   42 U.S.C. §§  1395gg(a) and (c).   The premium payments that were erroneously

returned to Medicare beneficiaries, which are the subject of this action, are simply not covered by

the terms of the statutory waiver provision.  Plaintiffs cannot use this statutory provision to establish

the right to a notice or hearing as it is simply inapplicable to this dispute.  Congress has spoken here

and the plain meaning of the statute should control.  Chevron U.S.A. Inc. v. Natural Res. Def.

Council, Inc., 467 U.S. 837, 842-43 (1984).  Even if the Court were to find some ambiguity in the

statutory language, the Secretary's interpretation is permissible and should be upheld by the Court.

Id.;  County of Los Angeles v. Shalala, 192 F.3d 1005, 1016 (D.C.Cir. 1999) (reasonable statutory

interpretation by the Secretary, even in the absence of regulations, is entitled to deference.)

      **2.**  **The Social Security Administration's Program Operations Manual Is Irrelevant to The Medicare Part D Premiums at Issue in this Case.**

27

Plaintiffs suggest that the Social Security Administration's Program Operations Manuals ("POMs")[4] have extended the Medicare waiver provisions found at 42 U.S.C. § 1395gg(c) to all Medicare premium overpayments, including premiums collected under Part D of the Medicare program. Plaintiffs' Mem. at 5. This is erroneous. From the time of their creation, the POMs have applied only to the longstanding premiums payable under Medicare Part B. The POMs make no reference at all to 1395gg and its waiver authority, nor do they anywhere reference or impact the premiums that are payable under the new Prescription drug provisions of Medicare Part D. In point of fact, the POMs referenced by the Plaintiffs (POMs § HI 01001.330C) were put into place well before Medicare Part D was ever conceived.

Through the POMs, the Secretary sought to provide some potential relief for errors in premium payments experienced by Medicare beneficiaries enrolled in the Supplemental Medical Insurance (SMI) program provided for under Part B of the Medicare Statute. See Supplemental Medical Insurance Benefits for the Aged and Disabled (Medicare Part B), 42 U.S.C. §§ 1395j-1395w-4(j)(4). Part B is a health insurance program directly administered by the Secretary. It is a voluntary supplemental health insurance program (in addition to the Medicare Part A health insurance program focusing upon hospital care) available to beneficiaries willing to pay a premium set by statute. The Secretary uses these premiums in order to fund the reimbursement of health services to his Part B beneficiaries. Recognizing that premium errors in this Part B program could occur and place a burden on some enrollees, the Secretary exercised his discretion and allowed beneficiaries to be relieved from the repayment of premium errors in specific situations. POMs § HI

---

[4]A complete version of the current POMS can be found online at:
https://s044a90.ssa.gov/apps10/poms.nsf/partlist!OpenView

28

01001.330. In evaluating a beneficiary's eligibility for relief, the Secretary chose to use the standards already in place for evaluating benefit overpayments for Social Security. POMs § HI 01001.330C. However, the POMs make clear that a "premium refund is not a benefit overpayment." Id. Accordingly, the Secretary distinguished this relief from the statutorily required suspension of collection mandated by Congress for the Social Security program under 42 U.S. C. § 404(c).

A review of the POMs confirms that they provide relief from errors concerning premiums collected under Medicare Part B and were never intended to provide relief from repayment of premium errors in the context of the newly enacted Medicare Part D prescription drug program (42 U.S.C.§ 1395w-101) as Plaintiffs suggest.

The POMs which the Plaintiffs focus upon are contained within a broader discussion of premiums published by the Social Security Administration. POMs § HI 010. It is clear from the face of the POMs that the premiums under discussion are those mandated under Medicare Part B. For example, the caption of the POMs is "Supplemental Medical Insurance." POMs § HI 01001. Supplemental Medical Insurance (SMI) is the statutory title for Medicare Part B. 42 U.S.C. § 1395j. Furthermore, in discussing the "Supplemental Medical Insurance (SMI) Premium for 2002," the POMs reference only "Section 1839(b) of the Social Security Act." 42 U.S.C. § 1395r(b). POMs § HI 01001.001. This is the Medicare Part B premium provision of the Social Security Act. Indeed, the $54.00 premium that is discussed therein was the Medicare Part B premium for that period of time. Id. Similarly, the POMs go on to discuss the "Premium Increase for Late Enrollment." POMs § HI 01001.010. This section again references Section 1839(b) of the Social Security Act, which is the statutory basis for imposing a penalty for late enrollment in the Medicare Part B program. No reference to Part D, which has its own statutory basis for imposing a late enrollment penalty (42

U.S.C. § 1395w-113) is contained in the POM.  Id.  Similarly, in the POMs chapter entitled "Scope of Benefits (SMI)" only Medicare Part B is discussed.  No reference to Medicare Part D is contained in the POMs.  POMs § HI 00610.001.  Finally, the timing of the POMs puts to rest any suggestion that they were put in place contemplating relief from errors in the Part D premium payments.  The POMs relied upon by Plaintiffs in this action was put into place as early as March 1999, with minor changes added in 2001 ("TN 22(11-01)", almost four years before Medicare Part D was even conceived and more than six years before it would come into effect.  See Exhibit 1 attached hereto. There should be no dispute that the POMs were not intended to be applied to a program that did not even exist at the time the POMs became effective.

Clearly, the Secretary's interpretation of the POMs (HI 01001.330) as referring only to the Medicare Part B premiums is reasonable and should be upheld by the Court.  Your Home Visiting Nurse Services, Inc. v. Shalala, 525 U.S. 449, 452, 453 (1999) (deference required of the Secretary's interpretation of manual provisions).  Plaintiffs can point to no provision allowing Medicare beneficiaries relief from errors in the Medicare Part D premium.  Their reliance upon POMs § 01001.330 is misplaced.  Indeed, POMs related to the Part D program have been published, but they contain no such provision for relief from a recovery for a premium erroneously refunded.  See POMs §§ HI 03001-09034.  Therefore, Plaintiffs' request for a notice of the right to a hearing for the relief contemplated in the POMs is without basis in law or fact.

A review of the nature of the Medicare Part B and Medicare Part D programs further demonstrates the reasonableness of the Secretary's view that premium relief under POMs § HI 01001.330 is only available to the Part B program.  The crux of the distinction rests in the fact that while the Secretary may, under the POMs, be providing some relief from premium collections owed

30

the government under Medicare Part B (and where the Secretary uses these premiums to fund the Part B benefit), under Part D the Plaintiffs ask the Secretary to waive the payment of premiums owed not to the government but primarily to private insurers. This is relief falling outside any contemplation of the Medicare statute, rules, or guidelines.

Under the new Medicare prescription drug benefit, each Part D plan has a different premium – based upon the bid submitted by the plan's sponsoring organization (known as the Part D sponsor). See 42 U.S.C. § 1395w-113(a)(1) (computing the monthly beneficiary premium based upon the bid submitted under paragraph (a)(5) of that section). Organizations that wish to act as Part D sponsors are required to submit bids based upon what they believe it will cost on a per member per month basis to deliver benefits to a Medicare beneficiary of average health status for the upcoming calendar year. 42 U.S.C. § 1395w-111(b). The federal government then subsidizes a portion of the Part D sponsor's per member, per month bid. The share subsidized by the federal government is generally the same for all Part D sponsors and is referred to as the "direct subsidy." 42 U.S.C. § 1395w-115. In 2006, for example, the direct subsidy was $60.10 per month. The remainder of the Part D sponsor's bid must be paid by the beneficiary, and this share of the bid is known as the beneficiary premium. See 42 U.S.C. § 1395w-113.

Any Part D premium owed by the beneficiary is wholly the financial responsibility of the beneficiary. The law allows beneficiaries to choose among a number of different options for paying their premiums, including via credit or debit cards, through an automatic deduction from a bank account, or through withholding from the beneficiary's Social Security check. See 42 U.S.C. § 1395w-113(c)(1), incorporating 42 U.S.C. § 1395w-24(d). When the beneficiary chooses to pay his or her premium through withholding, the law makes clear that the withheld amounts inure to the

31

benefit of the Part D sponsors and not to the benefit of the Federal government.  The statute states that the beneficiary premium paid under Part D is for a "prescription drug plan."  42 U.S.C. § 1395w-113(a)(1).  Congress required that any premiums withheld be paid to the relevant Part D sponsors, stating "The Managing Trustee shall make payment to the PDP sponsor or MA organization involved of the premiums . . . that are collected in the manner described in 42 U.S.C. § 1395w-24(d)(2)(A) and that are payable under a prescription drug plan or MA-PD plan offered by such sponsor or organization."  42 U.S.C. § 1395w-116(b)(3).   In discussing the incorporated provision, section 1395w-24, Congress stated that "All premium payments deducted from Social Security benefits will be credited to the appropriate Trust Fund as specified by the Secretary . . . and shall be paid to the MA organization involved."  H.R. Conf. Rep. 108-391, 108th Cong., 1st Sess. at 547.

In addition, because the beneficiary premium is ultimately an amount that is owed to the private companies offering Part D plans – and not to the Federal government – the obligation for allowing withholding is an obligation placed upon the Part D sponsors.  42 U.S.C. § 1395w-24(d) (incorporated into Part D through  42 U.S.C. § 1395w-113(c)(1)) states that the "organization shall permit each enrollee, at the enrollee's option to make payment of premiums (if any) through . . . withholding from benefit payments in the manner provided under section 42 U.S.C. § 1395s with respect to monthly premiums under 42 U.S.C. § 1395r."  Similarly, CMS regulations require Part D sponsors to "permit each enrollee, at the enrollee's option, to make payment of premiums . . . . using any of the methods listed in § 422.262(f) of this chapter." 42 C.F.R. § 423.293(a) (section 422.262(f)(1) includes withholding as a premium payment option for payment to Medicare Advantage organizations).  Indeed, if beneficiaries fail to pay their premiums, CMS regulations

generally allow the Part D sponsor to disenroll the individual from the part D plan. 42 C.F.R.
§ 423.44(b)(1). Thus, unlike the Part B premiums – where the obligation to allow withholding is
an obligation placed upon the Federal government and where the amount withheld offsets
government obligations, the Part D beneficiary premium is an amount owed to a private company
offering a Part D prescription drug benefit. The obligation for allowing withholding is an obligation
placed upon the Part D sponsor, and the premium paid by the beneficiary through withholding is
used to pay the Part D sponsor – not to offset government entitlement obligations.

Accordingly, the nature of the Part B and Part D premiums are fundamentally different. For
the Secretary to read the POMs as contemplating waiver of the Part D premium payment would be
to prejudice the rights of the Part D plans. Such waiver is not contemplated by the Social Security
Act, federal regulations or the POMs. Plaintiffs' suggestions to the contrary have no basis in law
or fact. Therefore, they can demonstrate no likelihood of success on the merits of this issue and their
motion for preliminary injunctive relief should be denied.

**C.     The Government and the Public Would
Be Harmed by a Preliminary Injunction**.

The final two factors weighing heavily against granting the extraordinary relief sought by the
Plaintiffs are the harm to the government and the public interest. The public interest at stake in this
matter is closely aligned with the government's interest in ensuring that Medicare Part D drug plans
continue to be financed adequately so that, in turn, Part D can continue to function smoothly and
provide prescription drug coverage to millions of Americans who would not have coverage
otherwise. In contrast to the minimal harm alleged but not substantiated by Plaintiffs, then, both the
government and the public face real and substantial harm if the Secretary is prevented from

33

recovering erroneously refunded premium amounts needed to fund the Part D insurance of program beneficiaries. The dimensions of the Secretary's duties to oversee administration of the Medicare drug benefit far exceed any purported interest of Plaintiffs in having this Court interfere with governmental operations by requiring the Secretary to expend scarce administrative resources to advise Medicare beneficiaries of rights they do not have and that they may choose not to exercise in any event. See, e.g., Yakus, 321 U.S. at 440; Virginia Railway, 300 U.S. at 552.

## CONCLUSION

For the reasons stated herein, the Secretary respectfully requests that this Court dismiss Plaintiffs complaint for lack of subject matter jurisdiction. Alternatively, Plaintiffs are not entitled to emergency relief as they cannot meet any prong of the standard for the granting of such relief. Thus, Plaintiffs' Motion For Preliminary Injunction should be denied.


Respectfully submitted,


/s/
KENNETH L. WAINSTEIN, D.C. Bar # 451058
United States Attorney

/s/
MEGAN L. ROSE, N.C. Bar # 28639
Assistant United States Attorney
Civil Division
555 Fourth St., N.W.
Washington, D.C. 20530
202-514-7220

34

_/s/_____

MARCUS H. CHRIST

LAWRENCE J. HARDER

U.S. Department of Health and Human Services
    Office of the General Counsel

Centers for Medicare & Medicaid Services
    Division

7500 Security Blvd., C2-05-23

Baltimore, MD 21244

410-786-9304

OF COUNSEL:

DANIEL MERON
General Counsel

KATHLEEN H. McGUAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
  for Litigation

United States Department of
  Health and Human Services