UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————
ACTION ALLIANCE OF SENIOR CITIZENS,       )
GRAY PANTHERS                              )
                          Plaintiffs,      )
                                           )
                  I.                       )   Civil Action No.  06-1607 (HHK)
                                           )
MICHAEL LEAVITT, Secretary of Department   )
Of Health and Human Services              )
                                           )
                          Defendant.       )
———————————————————————  )

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**INTRODUCTION**

The defendant Secretary of Health and Human Services presents a vastly different picture than that painted by plaintiffs.  He premises his motion to dismiss on the theory that, out of 230,000 elderly and disabled Medicare beneficiaries who received an incorrect payment, of whom over half have incomes below 200% of the federal poverty level, none have been or will be harmed.  In addition, he contends in effect that organizations dedicated to assisting and advocating for the elderly and disabled on Medicare issues may never bring a lawsuit attempting to protect and assert their rights.  On the merits, he posits that, in contrast to virtually every federal benefit program, there exists no right to waiver of recovery to protect beneficiaries when an incorrect payment is made under Medicare Part D.  He underscores his extreme approach by his contention that *the public interest* favors his unchallenged recovery of the payments in order

to "ensur[e] that Medicare Part D drug plans continue to be financed adequately"[1] – even as drug companies increased their profits by $8 *billion* in the first six months of the Part D program.[2]

## II.    BRIEF HISTORY OF THE CASE.

Plaintiffs filed their complaint and their motion for a temporary restraining order and a preliminary injunction on September 15, 2006.  They challenge the Secretary's demand that, by September 30, 2006, 230,000 Medicare beneficiaries repay amounts mistakenly paid to them without informing them of their right to request waiver of recovery.[3]  On the following Monday, September 18, prior to the scheduled hearing on the TRO, the Secretary agreed to the two components of the requested TRO: that he would not send out any more written material to the affected beneficiaries demanding repayment, and that he would not post any more material on his websites about this issue and would withdraw any existing postings.

Remaining for resolution is plaintiffs' motion for a preliminary injunction, in which they request that (1) the Secretary send a letter to the 230,000 affected beneficiaries informing them (a) of their right to waiver of the recovery of the payments and the procedure for effecting that right, (b) that the deadline for the beneficiaries to take action (either by repaying or seeking waiver) is extended to the later of October 31, 2006 or thirty days from the date that the letter is sent out, and (c) that the Secretary is refunding any payments that have been made; and (2) that the Secretary refund any payments previously made and that will be made until beneficiaries

---

[1]  Defendant's Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss and Opposition to Plaintiffs' Motion for Preliminary Injunction (hereinafter, "Def. Mem."), at 33.

[2]  Rep. Henry Waxman, "Analysis: Pharmaceutical Industry Profits Increase by Over $8 Billion After Medicare Drug Plan Goes into Effect," posted at http://www.democrats.reform.house.gov/Documents/20060919115623-70677.pdf.

[3]  The complaint also challenges the Secretary's failure to provide pre-recoupment oral hearings, but that issue is not before the Court in the pending motion.

have the opportunity to request waiver.  The Secretary does not take issue with the requested

relief.  Rather, he attacks the premise of the case and of the motion for a preliminary injunction.

Â Â Â Â First, he has filed a motion to dismiss, in which he contends that the plaintiffs lack

standing, both associational and organizational.  In the alternative, he argues that plaintiffs are

not entitled to a preliminary injunction because they fail to meet any of the four factors that are

balanced in resolving such a motion.  The Secretary is wrong in both respects.

## II.    THE PLAINTIFFS HAVE STANDING.

Â Â Â Â The Secretary seeks to avoid facing the merits by arguing that the two plaintiff

organizations, Action Alliance of Senior Citizens ("Action Alliance") and the Gray Panthers,

lack both associational standing and organizational standing.

Â Â Â Â As an initial matter, the Court need only determine that one plaintiff has standing and,

having done so, need not consider the standing of the other plaintiff.  See, *e.g., Tozzi v. U.S.

Dept. of Health & Human Services*, 271 F.3d 301, 310 (D.C.Cir. 2001).  A similar basic rule in

this context is that, "[i]n considering a motion to dismiss for lack of standing, the Court must

accept as true all material allegations of the complaint, and must construe the complaint in favor

of [the plaintiff]."  *Renal Physicians Ass'n v. Department of Health & Human Services*, 422

F.Supp.2d 75, 81 (D.D.C. 2006) (citations and internal quotation marks omitted); see also, *e.g.,

National Treasury Employees Union v. United States*, 101 F.3d 1423, 1430 (D.C.Cir. 1996).

Â Â Â Â Action Alliance has a Pennsylvania-wide membership of over 110,000 people, of whom a

large percentage are Medicare beneficiaries enrolled in Part D.  Its annual budget is only

$80,000.  Complaint, ¶¶ 7, 27.  Its mandate is to accord to the elderly lives of dignity and

freedom from want and fear by providing education and advocacy.  *Id*., ¶ 7.  In this effort it seeks

to address both individual and systemic problems in the Medicare program, and it accomplishes

this through its newsletter, regular meetings, and collaborative advocacy with other organizations. *Id.*, ¶¶ 28-29.

The Gray Panthers is a national organization with 25 chapters around the country and about 20,000 members, of whom the large majority are Medicare beneficiaries enrolled in Part D. *Id.*, ¶ 8. Its specific focus is on health care issues that affect its membership, and it carries this out by trying to address the problems that its members and others have with Part D. One of its California chapters has a grant to provide outreach and education about Part D in that state. *Id.*, ¶ 34. It has frequently responded to its members and other beneficiaries' problems about Part D by dispensing advice and information as to what steps they should take. *Id.*, ¶ 35.

A.    **Plaintiffs meet the standards for associational standing.**

To have associational or representational standing,[4] an organization's members must have standing in their own right, the interests that it seeks to protect must be germane to its purpose, and neither the claim nor the relief requested must require the participation of individual members. *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); see also, *e.g., NRDC v. EPA*, --- F.3d ---, ---, 2006 WL 2472144, *3 (D.C.Cir. 2006).

The Secretary contends that plaintiffs cannot meet the first prong of the *Hunt* test because they cannot show that any members themselves would have standing, specifically, that they cannot satisfy the first of the Article III requirements that there be an injury.[5] He argues that plaintiffs have not shown any injury-in-fact because they "have failed to even identify a single individual as a member, much less a member who has suffered an injury-in-fact." Def. Mem. at

---

[4] Both terms are used, but plaintiffs will employ "associational" in this brief. See, *e.g., Center for Auto Safety, Inc. v. National Highway Traffic Safety Administration*, 342 F.Supp.2d 1, 9 n. 13 (D.D.C. 2004), aff'd, 452 F.3d 798 (D.C.Cir. 2006).

[5] The Secretary does not question the other two constitutional elements of standing for the organizations' members, causation and redressability.

11.  The Secretary is correct that plaintiffs need to show that only one member has been harmed in order to meet the injury-in-fact requirement, see, *e.g., Consumer Federation of America v. FCC*, 348 F.3d 1009, 1012 (D.C.Cir. 2003), but he is wrong that they must *identify* the individual.  Rather, their obligation is to "allege that its members, or one of them, are suffering immediate or threatened injury as a result of the challenged action …."  *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  Plaintiffs meet this obligation.

The nature of these organizations coupled with the sheer numbers involved demonstrates that many of their members have been harmed by the challenged policy, that is, by the failure of the Secretary's letter to alert them to their right to waiver, which is the injury-in-fact in this situation.  The organizations have memberships totaling over 130,000 people, most of whom are Medicare beneficiaries and are enrolled in Part D.  Action Alliance alone has 110,000 members.  The problem has been brought to the organization's attention and, as quickly as possible, it is attempting to determine how to help its members who have received the letter from the Secretary.  See Complaint, ¶ 30.  Gray Panthers has 20,000 members, of whom 90% are on Medicare and 80% of those are enrolled in Part D, which means that about 14,400 of its members are Part D enrollees.  See Declaration of Susan Murany, ¶ 2 (filed with this brief).

Of the 22.5 million Medicare beneficiaries now enrolled in Part D, 230,000 (about 1%) received the letter.[6]  Assuming that a comparable percentage of the organizations' members who are enrolled in Part D received the letter, hundreds of their members would have received it, including at least 140 in Gray Panthers alone.  Plaintiffs need not identify those individuals, as

---

[6] The 22.5 million includes only people who are enrolled in Part D plans, and does not include those who have drug coverage through their former employer.  "Total Medicare Beneficiaries with Drug Coverage. June 11, 2006."  See http://www.cms.hhs.gov/PrescriptionDrugCovGenIn/02_EnrollmentData.asp.  Site visited September 25, 2006.

the court can draw reasonable inferences from the available statistics.  See *NRDC*, 2006 WL

2472144, *4 (finding standing based on inference from available information that two to four of

the plaintiff organization's half a million members would be injured over their lifetimes as a

result of the challenged policy).

    In a similar situation, the Ninth Circuit made clear that allegations of this kind are

sufficient to demonstrate harm to an organization's members.  In *California Rural Legal*

*Assistance, Inc. v. Legal Services Corp.,* 917 F.2d 1171 (9th Cir. 1990), two unions challenged

the regulation of the Legal Services Corporation (LSC) that prohibited its grantees from using

LSC funds to provide legal services to resident aliens.  LSC argued that the unions lacked

standing because they "have not shown that any union member has actually sought or been

denied access to legal services."  *Id*. at 1174.  Quoting portions of the complaint in which the

unions indicated that many of their members were legal residents and that they either used legal

services programs or suffered from the legal problems of the working poor and were eligible for

legal services, the Ninth Circuit rejected LSC's standing argument.  *Id*. at 1174-1175.  Action

Alliance and the Gray Panthers have similarly alleged that many of their members are Part D

enrollees, and given the number of Part D members who received the challenged letter, the only

reasonable inference is that many members of these organizations were among those receiving

the letter.

    The Secretary also challenges plaintiffs' organizational standing on the ground that they

have not met the third prong of the *Hunt* standard, that is, that there is no need for the

participation of individual members in the lawsuit.  Def. Mem. at 12-13.  His argument appears

to be that only the facts of individual members' situations can demonstrate that there has been or

will be harm if beneficiaries are forced to return the money.  The Secretary misses the point of

this case, however.  The harm here at issue is the deprivation of the information necessary for

Part D enrollees to determine whether they can and should seek waiver in order to protect their

fixed incomes.  Some will not be entitled to waiver, whether or not they seek it, and some will

not seek it even if they do meet the standards.  But the ultimate resolution of each individual's

waiver claim is not the issue before the Court.  The issue, rather, is the propriety of the

Secretary's refusal to provide the information to which Medicare beneficiaries are entitled.  The

infringement of an individual's right to receive information can support standing.  *Pub. Citizen v.

Fed. Trade Comm'n*, 869 F.2d 1541, 1548 (D.C.Cir. 1989); *accord*, *Sugar Cane Growers

Cooperative of Florida v. Veneman*, 289 F.3d 89, 94 (D.C.Cir. 2002) ("plaintiff who alleges a

deprivation of a procedural protection to which he is entitled never has to prove that if he had

received the procedure the substantive result would have been altered").

This "merely prudential" third prong of associational standing under *Hunt* is "designed to

promote efficiency in adjudication." *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1113 (9th

Cir. 2003) (internal quotation marks and citation omitted); see also *United Food & Commercial

Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 557 (1996) ("third prong … is

best seen as focusing on these matters of administrative convenience and efficiency, not on

elements of a case or controversy within the meaning of the Constitution").  It does not dictate

the participation of individual members in this lawsuit, for the merits can be resolved and

effective relief provided without their participation.

Therefore, since all three of the *Hunt* factors for associational standing are met by the two

plaintiff organizations,[7] they have standing to proceed in this lawsuit on behalf of their members.

---

[7] The Secretary does not question plaintiffs' satisfaction of the second *Hunt* factor, that the
interests that the organizations seek to protect are germane to their purposes.

### B.    Plaintiffs also meet the standards for organizational standing.

The Secretary also contends that the plaintiff organizations do not have standing in their own right. First, he argues that they have not sufficiently alleged an injury to their own interest. Def. Mem. at 14-17. He attempts to distinguish the situations of these plaintiffs from the plaintiff in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), in which the Supreme Court held that a nonprofit organization dedicated to equal housing had standing to challenge the discriminatory rental practices of an apartment owner because the practices frustrated the effort to achieve the organization's goals and required it to devote scarce resources to the problem. That is precisely the nature of the allegations that the plaintiffs have made in this case.

With a budget of only $80,000 Action Alliance is being forced to take immediate action to attempt to resolve the problems created by the Secretary's inaction. And, because the Secretary has failed to acknowledge the right to waiver and to provide information about seeking it, Action Alliance will have to engage in additional advocacy just to assert its members' right to seek waiver. Moreover, because the Secretary has set an early deadline for affected beneficiaries to act, Action Alliance must undertake these efforts in a particularly short time period. The Secretary's attempt to collect the payments that he improperly made will harm the very people that Action Alliance is attempting to assist, thus frustrating its efforts to protect the elderly and ensure that Medicare works to their advantage, and, at the same time, Action Alliance will be required to devote its time and attention to this problem rather than to others. See Complaint, ¶¶ 27, 28, 30-32. The Gray Panthers, a national organization with a budget of only $225,000, is similarly under the gun to carry out its mandate to its members and to protect them from the Secretary's illegal actions, and, to do so, it will be forced to cut back on other needed efforts. *Id.*, ¶¶ 35-37; Declaration of Murany, ¶¶ 2, 4, 5, 7.

8

These are precisely the allegations that the plaintiff made in *Havens Realty*, yet the Secretary argues that they are insufficient. These are not mere setbacks to the organizations' social interests or are hypothetical. See *National Treasury Employees Union*, 101 F.3d at 1427. Rather, they strike directly at the goals that the organizations seek to achieve on behalf of elderly Medicare beneficiaries, and they will require an immediate and demanding response that will cut into their other activities. See *id.* at 1430 (noting the significance of the effect on an organization's activities and the conflict with the organization's mission)

The Secretary posits that any change in the Medicare program would have the same effect. Def. Mem. at 16. That is an irrelevant point, however. It is *this* action, taken by the Secretary in violation of the statute and the Constitution, that is at issue and that is having the adverse impact on the goals and operations of the plaintiff organizations. With hundreds or thousands of members suddenly receiving demand letters with a short deadline – and, ominously, no statement as to what will transpire if the deadline is not met – these organizations have to act now to protect their members. Their actions do not stem, as the Secretary urges, from their choices, Def. Mem. at 16-17, but, rather, are mandated by their goals and the need to respond to the Secretary's action. It is the same context in which organizational standing was found in *Havens Realty*.

Indeed, in a previous case against the Secretary, the D.C.Circuit held that Action Alliance had standing because it had suffered an injury in similar circumstances. *Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 937-938 (D.C.Cir. 1986). The Court observed that Action Alliance and the other plaintiff organizations "devote themselves to the service of senior citizens and rest their claims on programmatic concerns, not on wholly speculative or purely ideological interests in the agency's action." *Id.* at 937. The Court further

pointed out that, "[a]s in the case of other organizations whose standing this court has upheld, [Action Alliance] thus has adequately alleged a direct, adverse impact on its activities by reason of the agency decisions" at issue. *Id*. It then noted that Action Alliance was pleading the same type of injury as in *Havens Realty*: "Unlike the mere interest in a problem or ideological injury in [*Sierra Club v. Morton*, 405 U.S. 727, 735, 739 (1972)], the [Action Alliance] organizations have alleged inhibition of their daily operations, an injury both concrete and specific to the work in which they are engaged." *Action Alliance*, 789 F.2d at 938 (internal quotation marks omitted).

That analysis, and the reliance on *Havens Realty*, are fully applicable to Action Alliance and the Gray Panthers in the instant case as well. Plaintiffs have alleged sufficient facts to demonstrate injury-in-fact.

The Secretary also asserts that plaintiffs have not met the third prong of the Article III test for standing, redressability. Def. Mem. at 17-18. The relief that plaintiffs seek, however, would redress the problem because the Secretary would be required to send out a new letter setting out beneficiaries' rights, to refund any amounts already paid by beneficiaries, and to extend the time for action, all of which would give them the opportunity to seek waiver. The very fact that the Secretary was providing the information would take a considerable load off the plaintiffs' shoulders, as they would no longer be in the position of trying to advise their members and others as to what their true legal status was with respect to the incorrect payments. In addition, the requested relief would redress the fact that the Secretary's original letters demanding repayment directly contradicted the goals of the organizations, which was to ensure that their members' rights were protected and that they received the full benefits of the Medicare program. A notice setting out beneficiaries' right to waiver would correct the Secretary's undercutting of their missions.

Redressability would be met by the requested relief.

Finally, the Secretary contends that standing is lacking because the plaintiffs are not within the zone of interests protected by the law at issue. Def. Mem. at 18-19. This prudential standing requirement "is not demanding. The court should not inquire whether Congress intended to benefit or regulate the litigant. It is enough that the litigant's interest is arguably one regulated or protected by the statutory provision at issue." *PDK Laboratories v. U.S. Drug Enforcement Administration*, 362 F.3d 786, 791 (D.C.Cir. 2004) (citations and internal quotation marks omitted). As the Supreme Court has summarized the analysis: "[T]he test denies a right of review if the plaintiff's interests are *so marginally related to or inconsistent with the purposes implicit in the statute* that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987) (emphasis added).

The instant situation does not involve plaintiffs with interests only marginally related to or inconsistent with the purposes of the statute. To the contrary, the plaintiffs are working to ensure that their members and other Medicare beneficiaries can reap the full benefits of the Medicare statute and protect their rights and limited assets as well. "To satisfy the zone of interests requirement, all that is required is a rough correspondence of the plaintiff's interests with the statutory purposes." *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 870 (9th Cir. 2002) (citation omitted). Certainly that low threshold is satisfied here, as the Medicare statute, and its waiver provision in particular, are intended to protect the health and financial well-being of its beneficiaries, and these organizations have as their goal the similar determination to assist Medicare beneficiaries and to protect their rights. *Accord, Int'l Brotherhood of Teamsters v. Pena*, 17 F.3d 1478, 1483 (D.C.Cir. 1994) (because interest of truck drivers' union in highway

safety is one that a federal safety act seeks to advance, union has prudential standing to challenge a regulation allegedly violating that law).

In *Action Alliance*, Action Alliance and the other plaintiffs alleged that the regulations at issue made

> it more difficult for the organizations to assist elderly persons to know, enjoy, and protect their rights under the [Age Discrimination Act]. Such interests as promotion of the knowledge, enjoyment, and protection of the rights created by a statute are securely within the "zone of interests" protected by that statute.

789 F.2d at 939 (citation to record omitted). That analysis applies equally here, as these plaintiff organizations are also trying to ensure that the rights created by the waiver statute are known by and available to their constituency.

The Secretary argues, however, that because the Medicare statute speaks in terms of "individuals," advocacy organizations cannot be within the zone of interest. Def. Mem. at 19. The essence of this argument, though, is to prohibit any organization from ever acting on behalf of Medicare beneficiaries. It would contradict not just the *Action Alliance* holding discussed above, but numerous decisions throughout the years in which the rights of Medicare beneficiaries have been enforced through the efforts of advocacy organizations dedicated to their protection. See, *e.g., Gray Panthers v. Schweiker*, 652 F.2d 146 (D.C.Cir. 1980); *Gray Panthers Project Fund v. Thompson*, 273 F.Supp.2d 32 (D.D.C. 2002).

For a test that is supposedly not demanding, the logical conclusion of the Secretary's analysis would have a staggering impact on the ability of organizations to represent Medicare beneficiaries. The fact that the Medicare statute employs the term "individuals" does not suggest that Congress intended to preclude this and other lawsuits that attempt to enforce the law on behalf of Medicare beneficiaries from going forward. *Cf. Califano v. Yamasaki*, 442 U.S. 682, 700 (1979) (fact that Social Security Act review provision uses the singular does not indicate that

12

class actions are not permitted). Under the well developed case law of this Circuit, plaintiffs are easily within the zone of interests of the Medicare statute and its waiver provision.

Plaintiffs therefore meet the standards for organizational standing as well.

### III.    ALL THE FACTORS FAVOR THE ISSUANCE OF THE INJUNCTION.

The parties agree that the standard for a preliminary injunction requires consideration of four factors, and that, if one factor is particularly strong, that would justify issuance of the injunction even if another factor were weak. See Pl. Opening Mem. at 3-4; Def. Mem. at 19-20. The Secretary contends that plaintiffs fail at every step.

### A.    Plaintiffs have a very strong likelihood of success on the merits.

The Secretary argues that plaintiffs have "no chance" of prevailing on the merits. Def. Mem. at 8. He does not question their right to notice of the right to waiver of recovery. Rather, he contends that the underlying right to waiver of recovery does not exist for this one limited category of federal program beneficiaries, those Medicare Part D beneficiaries who have received payments incorrectly made that are not related to "items or services." *Id.* at 23-25. In fact, however, the right to waiver is *not* limited to incorrect payments made only in that context.

Initially, it is telling that the Secretary ignores the relevant part of the Medicare waiver statute, 42 U.S.C. § 1395gg(c).[8] Plaintiffs quoted that portion of the statute, the first sentence, in their opening brief, at 4. The Secretary, however, devotes his attention entirely to the second sentence of the statute, which refers to "items or services." But that sentence only informs a portion of the first sentence, as it explains that one of the factors for waiver set out in the first

---

[8] The Secretary does not dispute that the waiver statute is applicable to Part D. Since the provision is in Part E of the Medicare Act, which is titled Miscellaneous Provisions, it is applicable to all four of the other Parts.

sentence "shall be deemed" to be satisfied if the circumstances described in the rest of the sentence exist.

The first sentence, as plaintiffs explained, sets out the general rule for waiver and is not limited to mistaken payments made with regard to items and services. Rather, it states that there shall be no recovery "in any case where the incorrect payment has been made … with respect to an individual who is without fault … if such adjustment (or recovery) would defeat the purposes of subchapter II or subchapter XVIII of this chapter or would be against equity and good conscience." For recovery to be waived, therefore, requires an "incorrect payment," a lack of fault by the beneficiary, and the existence of one of the two equitable considerations. In turn, the second sentence explains, one of the two equitable considerations ("against equity and good conscience") is deemed to be met when the incorrect payment is derived from a mistake related to payment for items or services. Nothing in the first sentence, however, limits the right to waiver to an incorrect payment made for items or services. The terms of the relevant portion of the statute, therefore, describe exactly what transpired here: there was an incorrect payment not caused by the fault of the beneficiary, and, in all likelihood, most of those affected by that mistake will satisfy either the "defeat the purposes" or "against equity and good conscience" standard.[9]

This application of the Medicare waiver statute is, of course, consistent with the fact that waiver of recovery is virtually always available to the beneficiaries of federal programs. Although the Secretary focuses only on the waiver provision of Title II of the Social Security

_____

[9] Subsection (a) of § 1395gg is a statement that any mistaken payment for items or services made to a provider will be treated as if it were made to the beneficiary (the "individual"), while subsection (b) explains the circumstances in which recovery will be made for a mistaken payment. Those subsections, however, do not limit the first sentence of subsection (c), which covers any incorrect payment.

Act, see Def. Mem. at 26-27, in fact similar waiver provisions exist in most federal programs that provide benefits to individuals. See Pl. Opening Mem. at 5 n. 4; see also *Burns v. U.S. R.R. Retirement Board*, 701 F.2d 193, 200 n. 14 (D.C.Cir. 1983) (listing waiver provisions in various federal programs). There would be no logic in Congress mandating waiver of recovery in appropriate circumstances in virtually every other situation involving a beneficiary of a federal program but, for Medicare Part D beneficiaries who receive an incorrect payment that happens to be the amount of his or her premium, waiver does not apply. Such an exception would run counter to common sense.

In a previous waiver case, the court rejected the same argument in almost identical circumstances. In *Shannon v. U.S. Civil Service Commission*, 444 F.Supp. 354 (N.D.Cal. 1977), aff'd in part and rev'd in part on other grounds, 621 F.2d 1030 (9th Cir. 1980), Judge Spencer Williams[10] considered the Commission's contention that the relevant waiver statute, which is identical in relevant respects to the Medicare provision,[11] applied only to incorrect payments caused by miscalculation of the basic annuity amount but not to the failure of the Commission to fully deduct from the beneficiary's monthly payment the health benefit or life insurance charges that were owed to separate funds. The only difference between that situation and the instant one is that the mistaken payment in *Shannon* was caused by a failure to deduct for health insurance

---

[10] Judge Williams developed a considerable expertise in this area, as he not only was the district judge in *Shannon* and wrote both the preliminary injunction and summary judgment decisions, but, sitting by designation on the Ninth Circuit, authored the opinion on the Social Security Title II waiver case that became *Califano v. Yamasaki*, 442 U.S. 682 (1979). See *Elliott v. Weinberger*, 564 F.2d 1219 (9th Cir. 1977).

[11] "Recovery of payments under this subchapter may not be made from an individual when, in the judgment of the Civil Service Commission, the individual is without fault and recovery would be against equity and good conscience." 5 U.S.C. § 8346(b).

payments, while the mistaken payment here corresponded to the amount previously withheld to pay the health insurance premium.[12]

Relying on the remedial and protective purpose of a waiver provision, Judge Williams emphatically rejected the suggestion that the cause of the mistaken payment was relevant to whether the right to waiver was triggered: "The obvious purpose of § 8346(b) is to avoid the hardship that can result from recovering overpayments from a blameless annuitant. The cause of the overpayment is immaterial to the impact on the annuitant." 444 F.Supp. at 358. That reasoning applies equally here: no reason presents itself as to why the cause of the mistaken payment should have drastically different outcomes for Medicare beneficiaries. The statute does not distinguish between the causes of "the incorrect payment," and such a distinction would defy logic.

The Secretary also fails to respond to plaintiffs' argument that the relevant regulations have the same effect. See Pl. Opening Mem. at 5 & n. 3. Not only do the existing regulations repeat the standards for waiver, 42 C.F.R. § 405.358, but they expressly require notice of that right when "more than the correct amount of payment has been made." 42 C.F.R. § 405.357. Moreover, and significantly, these Medicare regulations "duplicate[d]" the Social Security Title II waiver regulations that had previously applied to Medicare as well. 61 F.R. 49269-49270 (Sept. 19, 1996). The Social Security regulation stating the right to notice of the right to waiver, 20 C.F.R. § 404.502a, had been in effect since 1972, see 37 F.R. 10553, 10554 (May 25, 1972), had expressly cited to the Medicare waiver statute (section "1870(c) of the Act", which is 42

---

[12] As plaintiffs will discuss in greater detail, *infra* at 19-20, this case is not really about premiums at all, even though both parties have used that terminology as a short-hand description. The only significance of the Part D premium is that the premium amount was the amount mistakenly paid to beneficiaries. It could have been any amount, but it happened to be the amount of the premium.

U.S.C. § 1395gg(c)), and at no point had suggested that it was not applicable to mistakes attributable to the amount of premiums (which, as the Secretary recognizes, existed in Medicare in Parts A and B before there was a Part D). The Secretary's failure even to mention the regulations is a tacit acknowledgment that, historically, no distinction was recognized in the right to waiver based on the cause of the incorrect payment.

In contrast to his studied indifference to the regulations, the Secretary devotes considerable attention to the POMs provision cited by plaintiffs that explicitly recognizes the applicability of waiver to mistaken premium refunds. See Def. Mem. at 27-33. First, he argues that its location indicates that it only applies to mistaken payments in Part B. This is not accurate, as it explicitly applies also to Part A. Section HI 01001.330A. of the POMS states in its concluding sentence: "Any rules applicable to incorrect SMI premium refunds are applicable to Premium-HI refunds, except as otherwise provided." "Premium-HI" is a reference to Hospital Insurance (as the POMS section explains earlier in the paragraph), which is Part A. Given its applicability to both Parts A and B, there is no reason that the provision should not apply to mistaken payments in Part D as well. Indeed, the fact that there is no comparable POMS provision expressly applicable to Part D only reinforces that impression.[13]

Again, the question must be asked: Why would recovery of a mistaken Part B payment be subject to waiver, but not recovery of a mistaken Part D payment? The Secretary himself notes that the POMS provision at issue "[r]ecogniz[es] that premium errors in this Part B program could occur and place a burden on some enrollees …." Def. Mem. at 28. But exactly the same

---

[13] The Secretary states that the portions of the POMS related to Part D "contain no such provision for relief from the recovery for a premium erroneously refunded. POMS §§ HI 03001-09034." Def. Mem. at 30. But this reference is irrelevant, as the POMS sections that he cites address only the implementation of Part D's low income subsidy and have nothing to do with other aspects of Part D.

logic applies to an error in Part D, and it is inexplicable that Congress would authorize waiver of recovery of one mistaken Medicare payment but not another.[14]

Moreover, the mere fact of the existence of the POMS provision is a recognition that the Medicare waiver statute has been and still is interpreted to apply to improper payments based on the premium amount. The Secretary states that he "exercised his discretion" to allow for waiver of recovery via the POMS section, *id.* at 26, but the Secretary only *has* that discretion if there is a statutory basis for it.[15] He is not free, without statutory authority, to give up money that belongs to the United States. The Medicare waiver statute, like all waiver statutes, is designed as an equitable remedy for governmental mistakes, see, *e.g., Zinman v. Shalala*, 67 F.3d 841, 843 n. 1 (9th Cir. 1995), but, in the absence of authorization from Congress, neither waiver nor any other equitable remedy is available against the federal government. See, *e.g., Office of Personnel Management v. Richmond*, 496 U.S. 414, 424-426 (1990) (Appropriations Clause prohibits the application of equitable estoppel to the government when the relief would invade the Treasury without statutory authority).

In an effort to explain why the POMS would support waiver of a mistaken Part B payment based on the premium, but not a Part D one, the Secretary argues that the money at stake belongs not to the government but to private insurers. Def. Mem. at 30-33; see also *id*. at 5-6. His lengthy description of how Part D premiums ultimately end up in the hands of private

---

[14] Nor is the Secretary's position helped by the fact that the POMS provision at issue was in effect before Part D existed. See Def. Mem. at 28. If anything, the fact that there was an existing provision mandating waiver in appropriate circumstances for mistaken premium refunds before Part D took effect only helps to explain why no such provision has been expressly adopted in Part D. There has been no need for one, because the existing one made it clear that the mistaken payments were subject to waiver of recovery.

[15] If the waiver provision is a waiver of sovereign immunity, as the Secretary argues (see Def. Mem. at 25-26), then only Congress may waive sovereign immunity. *United States v. Testan*, 424 U.S. 392, 399 (1976).

insurers ignores the crucial fact that the government, through the mechanism created by

Congress, is responsible both for collecting the premium by deducting from Social Security

checks and for paying the appropriate amount to the private insurer.  Whatever the nature of the

beneficiary's obligation to pay the premium, the fact is that the government, through the

Secretary and the Social Security Administration, is the entity that controls the premium by

deducting it from the Social Security benefit and passing it on.  The government made the

mistake, not the beneficiary, and neither logic nor law suggests that the Medicare beneficiary, in

that situation, should suffer.

In *Shannon,* the government made a similar argument, which was also rejected.  The

Commission argued that the mistaken under-deduction of health and life insurance payments did

not constitute an overpayment, and therefore did not trigger the right to waiver, because the

amounts not deducted were owed to specific funds and were not part of the annuity.  The court

rejected this as a meaningless distinction: "The debt is not owed to the respective fund in which

the deficit appears, but rather to the Commission.  The funds are merely accounts administered

by the Commission …."  444 F.Supp. at 358.  Similarly, the Part D premiums, when collected,

are "credited to the appropriate Trust Fund as specified by the Secretary … and shall be paid to

the MA organization involved."  Def. Mem. at 32 (quotation marks and citation omitted).  As in

*Shannon*, the Secretary is administering the money at issue, and the fact that it ultimately will be

passed on to another entity is irrelevant.

In fact, however, as the Secretary acknowledges (Def. Mem. at 6), in this situation there

is no question of the premium not being paid, as the issue here is not the failure to deduct and

pay the premium in the first place but, rather, the mistaken payment of the same amount as the

premium to the beneficiary.  It has nothing to do with the insurer.  The beneficiary has had the

premium amount deducted, that amount has been passed on to the insurer – thus fully satisfying the beneficiary's legal obligation to the insurer – and then the Secretary has mistakenly paid the *amount* of the premium to the beneficiary.  It is not as if the Secretary is taking the premium payment from the insurer and giving it to the beneficiary; rather, he simply pays that particular amount to the beneficiary.  It is not the insurer's money that is put in jeopardy, but the government's.  The Secretary's concern for the fiscal solvency of the insurers -- "read[ing] the POMS as contemplating waiver of the Part D premium payment would be to prejudice the rights of the Part D plans" (Def.Mem. at 33) – demonstrates a noble deference to these entities, but the premise is inaccurate.

The Secretary's attempt to depict the money here at issue as the insurer's, and therefore to distinguish the Part D premium from the Part B premium, is factually wrong.  The amount that the beneficiary mistakenly received is the amount that he or she has paid as a premium, but it is not the premium.  It is simply a mistaken payment that, because of whatever computer error occurred, is the same amount as the premium previously deducted from the beneficiary's Social Security check.

In short, the nature of the Part D premium, and whatever distinctions it has from the Part B premium, are irrelevant to the issues of this case.  However the error here is viewed, it has resulted in an incorrect payment by the Secretary to beneficiaries, and that triggers the right to waiver.

The statute, the regulations, the POMS, common sense, and the case law interpreting virtually identical waiver provisions all make clear that Medicare beneficiaries are entitled to seek waiver of recovery of payments incorrectly made, regardless of the reason for the mistake.

With that established, there is no dispute that the right to notice of that right exists.  Accordingly,

plaintiffs will succeed on the merits.

### B.    <u>Plaintiffs have established there will be irreparable harm in the absence of the injunction.</u>

The Secretary first contends that plaintiffs have not established irreparable harm because

they have not identified one individual who is threatened by this recovery.  Def. Mem. at 21.

The law does not require such a showing, for common sense and established case law demand

recognition of the harm that has been and is being visited on this group of people.  The D.C.

Circuit has stated that a

> significant percentage of Medicare claimants [are] disadvantaged by disability,
> illness and poverty, a substantially higher figure than is true of the population at
> large.  Indeed it was because of the special coincidence of medical needs and
> financial problems among elderly people that the Medicare program was
> established in the first place ….  That unfortunate coincidence is borne out by
> current statistics which indicate that the elderly still have lower incomes and
> higher medical expenses than other segments of the population.  Thus, though
> need is not an eligibility criteria for participation in Medicare, a
> disproportionately large percentage of elderly recipients hover near the poverty
> level.  Nonreimbursed medical bills of up to $100 represent a substantial loss to
> them ….  [T]he trial court here must give some explicit consideration to the
> unique disability problems and low economic status of large numbers of aged
> persons when evaluating their need for protections against unjustified denials of
> modest medical claims.

*Gray Panthers v. Schweiker*, 652 F.2d 146, 166-167 (D.C.Cir. 1980) (citation and footnote

omitted).

Framed in this context, it is clear that there has been irreparable harm when 230,000

elderly and disabled individuals have been told that they must refund payments made to them by

a date certain.  It defies logic to think that, when 230,000 elderly and disabled people receive a

notice from the government demanding almost immediate payment, none of those who repaid

will have suffered harm.  If only 5% of the 230,000 have repaid even though they cannot afford

the loss of income, then over 10,000 people have been subjected to this harm – and many thousands more are at risk.

By definition, waiver provisions are statutorily created attempts to alleviate the irreparable and inequitable harm that occurs when the government demands repayment of amounts incorrectly paid.  See *supra* at 18.  For that reason, recovery is not permitted until there has been an opportunity to request waiver and a decision has been made.  In effect, the very concept of the right to waiver is premised on the assumption that irreparable harm will be inflicted on elderly and disabled retirees if they are forced to pay back these amounts.    Plaintiffs explained this point in their opening brief, at 10, but the Secretary failed to respond. Plaintiffs also quoted (*id.* at 8) the D.C. Circuit's holding from a previous waiver case, in which it stated, *inter alia*, that

> the loss occasioned by recoupment should not be minimized.  The deprivation of a significant portion of fixed income can be a substantial loss indeed.  Retired individuals living on fixed income frequently can ill afford even a modest temporary decrease in their disposable income.

*Pope v. U.S. R.R. Retirement Board*, 672 F.2d 972, 975 (D.C.Cir. 1982) (internal quotation marks and citations omitted).

The rationale for waiver statutes, and the case law that has analyzed them, make it clear that retirees subject to recoupment are at risk of considerable harm.  Many of them live below or just above the federal poverty level.  See Pl. Opening Mem. at 10 n. 7.  The Secretary's suggestion that there is no indication of harm because some have repaid the amounts demanded ignores the reality of living from month-to-month on a small fixed income.  Refunding that repayment to them at a much later date will not make up for the loss of desperately needed income that they have sustained in the meantime.  As the D.C. Circuit indicated in *Pope* and *Gray Panthers*, for individuals living on fixed incomes the loss of even a small part of fixed

income is a significant harm. The general rule, parroted by the Secretary (at 21), that financial loss cannot rise to the level of irreparable harm, is inapplicable when that loss is of income needed to provide for basic subsistence, which is precisely the situation for many of those affected beneficiaries. See, *e.g., Nelson v. Likins*, 389 F.Supp. 1234, 1237 (D.Minn. 1974) ("While the loss of money is normally not considered irreparable, … in this case those affected are not average citizens but rather those who are in the grip of poverty"), aff'd, 510 F.2d 414 (8th Cir. 1975); *Buckhanon v. Percy*, 533 F.Supp. 822, 839 (E.D.Wis. 1982), aff'd in part, modified in part (on other grounds), 708 F.2d 1209 (7th Cir. 1982).

The Secretary also ignored plaintiffs' argument that irreparable harm automatically attaches to the deprivation of a constitutional right. See Pl. Opening Mem. at 10-11. Since denying notice of the right to waiver has previously been established as a violation of due process, this situation describes far more than the mere allegation of the denial of a constitutional right.

The Secretary also argues that the plaintiff organizations have not demonstrated irreparable harm. Def. Mem. at 22-23. He argues that they are in the same position as any other organization with limited resources, but this ignores the fact that their very purpose is to assist elderly and disabled people and to advocate on their behalf. In that context, when the federal government takes action adverse to the rights and financial security of tens of thousands of elderly and disabled people, the organizations devoted to those individuals' rights must take action. There is no real choice. The irreparable harm is the direct result of the Secretary's refusal to provide notice of the right to waiver. That refusal necessitated their action to protect their members and others and to provide them with the information that the Secretary has declined to provide.

**C.**   **The balance of hardships and the public interest favor the issuance of the preliminary injunction.**

The Secretary argues that the public interest would be harmed by the proposed injunction because it would affect the financing of Part D drug plans. Def. Mem. at 33. There is no evidence, however, that any harm will come to the plans. Indeed, as plaintiffs have explained, the plans are not harmed at all by what has transpired or could transpire. The deducted premiums have already been passed on to the plans. The amounts mistakenly paid to the beneficiaries come from the government, not the plans, and there will be no effect on the allegedly smooth functioning of the Part D program.

The public will be helped, not harmed, if the Secretary is directed to inform affected beneficiaries of their rights. The public interest is always served when people living at or near the poverty level are informed of their rights and of how they can protect their limited assets. Moreover, "[i]t is in the public interest for courts to carry out the will of Congress and for an agency to implement properly the statute it administers." *Mylan Pharmaceuticals, Inc. v. Shalala*, 81 F.Supp.2d 30, 45 (D.D.C. 2000). This is especially so when the law at issue is intended to protect the rights of vulnerable citizens.

**CONCLUSION**

For the reasons stated in this and in plaintiffs' opening memorandum, the Court should deny the motion to dismiss and grant plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

VICKI GOTTLICH
D.C. Bar No. 937185
PATRICIA B. NEMORE

D.C. Bar No. 204446
Center for Medicare Advocacy, Inc.
1101 Vermont Avenue, N.W., Suite 1001
Washington, D.C. 20005
(202) 216-0028

GILL DEFORD
D.C. Bar No. 459280
JUDITH STEIN
BRAD PLEBANI
Center for Medicare Advocacy, Inc.
P.O. Box 350
Willimantic, CT 06226
(860) 456-7790

SALLY HART
Center for Medicare Advocacy, Inc.
100 North Stone Ave., Suite 305
Tucson, AZ 85701
(520) 327-9547

Attorneys for Plaintiffs

DATED: September 25, 2006

## CERTIFICATE OF SERVICE

I, Jacqueline A. Bender, under the direction of counsel for the plaintiffs, Vicki Gottlich, certify that, on September 25, 2006, the Plaintiffs' Opposition to Defendant's Motion to Dismiss and Reply in Support of Plaintiffs' Motion for a Preliminary Injunction, and the Declarations of Plaintiffs, were filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

Jacqueline A. Bender