## DECLARATION OF LESLIE NORWALK

Leslie Norwalk, pursuant to 28 U.S.C. § 1746, declares the following under penalty of perjury:

1. I am the Deputy Administrator of the Centers for Medicare & Medicaid Services ("CMS"), United States Department of Health and Human Services ("HHS") and I will be serving as the Acting Administrator of CMS commencing October 15, 2006. As Deputy Administrator, I share with the Administrator of CMS the overall responsibility for the administration of all federal health care financing programs under Titles XI, XVIII, and XIX of the Social Security Act, including the Medicare and Medicaid programs. CMS is the federal agency responsible for administering the Medicare and Medicaid programs, and is therefore one of the largest payers of health care bills in the world. CMS pays approximately 40 percent of the hospital bills and approximately 25 percent of the physician bills incurred in the United States. The statements made in this Declaration are based on my personal knowledge, information contained in agency files, and information furnished to me by CMS staff.

2. One of the programs CMS administers is the newly created Medicare Part D prescription drug benefit. Part D was created with the enactment of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. 108-173, 117 Stat. 2066, 42 U.S.C. § 1395w-101 et seq. (2003). Part D went into effect on January 1, 2006.

3. Unlike traditional Medicare in which the government reimburses private hospitals and nursing homes (Part A) and private physicians (Part B), Medicare Part D is a unique private/public cooperative enterprise. Part D provides optional prescription drug insurance through private insurance plans – also known as Prescription Drug Plans or PDPs. See 42 U.S.C.

§ 1395w-101. PDPs compete for enrollees, and Medicare beneficiaries chose a Part D plan that meets their needs based primarily on the formulary (i.e., the drugs covered by the plan) and the premium charged. Once they enroll in a plan, beneficiaries pay the monthly premiums charged by the PDP they have selected. While the federal government underwrites a portion of the cost and risk borne by the Part D plans, the insurance is also funded through the monthly beneficiary premiums. 42 U.S.C. §§ 1395w-113(a), 1395w-115(a), (b), and (e). Thus unlike Medicare Part B, Part D premiums are not paid to the federal government to offset its obligations to pay health care providers on behalf of program beneficiaries. Rather, Part D premiums are paid to the Part D prescription drug plans themselves, which they then use to fund coverage of their enrollees' prescription drug needs. See 42 U.S.C. § 1395w-116(b)(3). Beneficiaries pay their premiums directly to the Prescription Drug Plan they have chosen. Enrollees can, however, elect to have the Social Security Administration withhold or deduct the amount of any monthly premium due to the Prescription Drug Plan from the beneficiary's monthly Social Security check. See 42 U.S.C. § 1395w-113(c)(1), incorporating 42 U.S.C. § 1395w-24(d). In such a case, the withheld premiums are credited to the appropriate Medicare Trust Fund and are paid to the relevant Part D Prescription Drug Plan. 42 U.S.C. § 1395w-116(b)(3).

4. I am familiar with the subject matter of the above captioned lawsuit, which involves the erroneous refund to approximately 230,000 Part D enrollees of the premium payments they paid through withholding from their Social Security checks. Specifically, these enrollees were erroneously removed from "withhold" status and, as a result, the Social Security Administration refunded premium payments to them in August 2006. Immediately after it was made aware of this error, CMS sent letters to each of these enrollees in August and early September 2006

informing them of the error and asking that they return the erroneously refunded premiums to CMS by September 30, 2006. The erroneous premium refunds were in an average amount of $215. The highest erroneous refunded amount was less than $750. The total amount of the erroneous premium refunds distributed to these enrollees was approximately $50 million. As explained more fully below, approximately 111,000 enrollees have already returned their premium refunds.

5. I have reviewed the District Court's Order dated September 27, 2006 in the above captioned lawsuit. For the reasons set out below, if that Order is implemented pending appeal of this case, CMS and the Medicare program will suffer irreparable harm.

6. First, the District Court's Order, if implemented, would lead to mass confusion on the part of the Part D enrollees involved, Part D drug plans, and other CMS partners. This confusion would cause long-lasting, irreparable harm to the Medicare Part D program. Soon after the 230,000 enrollees received the erroneous refunds, CMS quickly informed them that the refunds were a mistake and that they should be returned. CMS assured the beneficiaries that their Part D enrollment had not been affected by the premium error and that they could make repayment in a lump sum or over a period of up to seven months. Although CMS acted as quickly as possible to inform enrollees of the error, these circumstances alone no doubt caused confusion among many beneficiaries. Fortunately, this correspondence appears to have been largely successful. At this point they appear to understand that their Medicare Part D enrollment will continue uninterrupted, in spite of this mix-up. I believe that uninterrupted coverage in their selected Part D plan is the primary concern of these enrollees. These beneficiaries have already returned almost half of the overpaid premiums, approximately $25 million, with additional

amounts returning to CMS each day.

7. The District Court's Order, however, now requires CMS to send out another letter which informs the enrollees of the following: 1) that if the beneficiary has already repaid an amount it will be sent back to the enrollee (even though CMS previously told the beneficiary it was made in error and should be repaid); 2) that they "have a right under federal law to request that the recovery of the incorrect payment be waived;" 3) that the beneficiary can request a waiver by checking a box on a form (presumably to be sent with the letter) and returning it to the Secretary; and 4) that the enrollee can indicate his intent not to seek waiver by checking a different box and including the payment (for approximately half of the beneficiaries, this would be a payment which they had already returned to the Secretary, but which would now again be returned to the beneficiary due to the Court's Order, only to be refunded to CMS again). There seems little doubt that the Court's Order would greatly add to the confusion that the affected beneficiaries must already be feeling about this issue. Such confusion will certainly have many unanticipated harmful consequences – enrollees, for example, may not know whether they had paid their premiums or not, whether seeking waiver of the erroneous refund might put their enrollment in their Part D plan at risk, or whether this second return of their premium ordered by the Court means that they are no longer enrolled in the program. The relief sought by the plaintiffs and ordered by the Court, effectively compounds the original premium error by requiring the Secretary to refund the premium payments twice. The uncertainty created by such a second refund will unnecessarily create doubt and uncertainty in the minds of beneficiaries as to their enrollment status, their entitlement to this money, as well as potentially causing them to question the integrity of the Medicare Part D program in which they have enrolled.

8. Additionally, the Court's order imposes significant administrative costs upon the Medicare program that will never be recovered if the Secretary eventually prevails in this matter. The order contemplates additional mailings, apprising enrollees of waiver rights and attendant review mechanisms that are currently not in place and fall outside the current budget.

9. In sum, the Order will add to the confusion created by the original premium refund, make it extremely difficult, to recover much of the erroneous premium payments, even as to enrollees who have no desire to seek waiver or who have in fact already fully voluntarily repaid the requested amounts, and would impose unrecoverable administrative costs on CMS even if the Secretary were to ultimately prevail in this litigation.

Dated:     September 29, 2006
           Washington, D.C.

_____
LESLIE V. NORWALK, ESQ.