**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **ACTION ALLIANCE OF SENIOR CITIZENS, and GRAY PANTHERS,**<br><br>                    **Plaintiffs,**<br><br>          **v.**<br><br>**MICHAEL LEAVITT, Secretary of Department of Health and Human Services,**<br><br>                    **Defendant.** |

**Civil Action 06-01607 (HHK)**

**MEMORANDUM OPINION**

This action, accompanied by a motion for a preliminary injunction (#3), was filed by

Action Alliance of Senior Citizens and Gray Panthers (collectively "Plaintiffs") in response to

attempts by Michael Leavitt, Secretary of Department of Health and Human Services (the

"Secretary") to recover an erroneous premium refund sent to 230,000 Medicare beneficiaries who

participate in the Part D prescription drug plan ("Part D"). On September 21, 2006, the Secretary

filed a motion to dismiss [#6] and an opposition to the motion for preliminary injunction. On

September 27, 2006, after considering the motions, the oppositions thereto, the record of the

case, and the oral argument of counsel, the court issued an order denying the motion to dismiss

and granting the motion for preliminary injunction, indicating that an opinion articulating the

court's reasoning would follow.[1]  The court now issues its memorandum opinion.

---

[1] On October 2, 2006, the court granted the Secretary's motion for a temporary stay of the order pending resolution of his appeal filed with the Court of Appeals for the District of Columbia Circuit.

# I. BACKGROUND

Part D is the Medicare prescription drug insurance plan, which, effective January 1, 2006, allows beneficiaries to receive prescription drug coverage in exchange for a monthly premium. *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2416 (codified at 42 U.S.C. §§ 1395w *et seq.*) (the "MMA").  Medicare, which is administered by the Secretary, is divided into four parts: Part A provides hospital inpatient and related care; Part B provides supplemental outpatient coverage in exchange for monthly premiums; Part C provides an alternative managed-care plan; and Part D provides prescription drug coverage by private insurers in exchange for monthly premiums.   *See* 42 U.S.C. §§ 1395 *et seq*.  Medicare beneficiaries may have their premiums withheld or deducted from their monthly Social Security check, which will then be forwarded to the private insurer.  *Id.* § 1395w-113(c)(1).  Low-income beneficiaries who qualify may have their premiums subsidized in full, or in part, by the federal government.  *Id.* § 1395w-114.

In August 2006, a "processing error" caused the Secretary to erroneously issue refunds to approximately 230,000 Medicare beneficiaries who pay premiums through monthly deduction from their Social Security benefits.  Compl. ¶¶ 3, 19; Pls.' Mot. for Prelim. Inj., Ex. A (Secretary's "Tip Sheet" regarding "Premium Withhold Refund Issue").  The beneficiaries received the erroneous refunds as either a separate refund check, or included in the direct deposit of their August 2006 Social Security checks.  *See* Pls.' Mot. for Prelim. Inj., Ex. A; Compl., Ex. 1 (Sample Letter to Beneficiaries) at 1.  The Secretary sent a letter to the same beneficiaries in late August or early September 2006, informing them of the error and of "the steps you can take to return the incorrect payment, so that it can be used to pay your premiums as you intended."

2

Compl., Ex. 1 (Sample Letter to Beneficiaries) at 1. The letter further informed them that they "should return this payment by September 30, 2006," but if "returning the amount in full presents you with a hardship, you may request to make monthly installment payments for as many as seven months." *Id.* The Secretary represented at the hearing on the motions that the average refund was about $200 and no refund was higher than $800. *See also* Def.'s Mot. for Stay of Order, Ex. 1 ¶ 4 (Decl. of Leslie Norwalk).

On September 15, 2006, Plaintiffs filed the instant complaint for declaratory, injunctive, and mandamus relief, and a motion seeking a temporary restraining order and preliminary injunction against the Secretary.[2] Plaintiffs contend that each beneficiary had a right under federal law to seek a waiver of repayment if it would present a hardship, and that the Secretary had contravened that right in failing to notify the beneficiaries of their right to seek waiver. The Secretary, for his part, asserts that Plaintiffs do not have standing to bring this action; that no right to waiver exists under federal law for an erroneous refund of a premium; and that no irreparable harm has been established; thus, Plaintiffs' complaint should be dismissed and their motion for preliminary injunction denied.

Following the hearing on the motions, the court granted the motion for preliminary injunction and issued an order requiring the Secretary to (1) notify the 230,000 affected beneficiaries of their right under federal law to request that the recovery of the incorrect payment be waived if the beneficiary was not at fault and that it would either be against equity and good conscience to recover the overpayment, or would defeat the purposes of the Medicare program;

---

[2] On September 18, 2006, the parties reached an agreement regarding the temporary restraining order and submitted a proposed briefing schedule, which was adopted by the court.

(2) provide the beneficiaries with a mechanism for requesting or declining waiver; and (3) to

return any payments previously received, or received after the order, to the beneficiaries so that

they may decide whether to request waiver of repayment.[3]  On September 29, 2006, the Secretary

filed a motion for a temporary stay of that order pending resolution of his appeal filed with the

D.C. Circuit, which the court denied.  Upon reconsideration, on October 2, 2006, the court

granted the Secretary's motion for a temporary stay pending appeal.

## II. ANALYSIS

Plaintiffs contend that they have met the requisite four-part showing to secure a

preliminary injunction: (1) a substantial likelihood of success on the merits; (2) irreparable harm

if an injunction is not granted; (3) an injunction will not substantially injure the other party; and

(4) the public interest will be served by the injunction.  The Secretary contends that Plaintiffs do

not have standing to bring this action, that they have not alleged irreparable harm if an injunction

does not issue, and that they have failed to establish that they will succeed on the merits.  The

court will assess these contentions in turn.

**A.      Standing**

In order for a federal court to exercise jurisdiction under Article III of the Constitution, a

plaintiff must establish standing by alleging (1) injury-in-fact; (2) that the injury is fairly

traceable to the defendant's unlawful conduct; (3) that the injury will likely be redressed by a

---

[3]  On September 27, 2006, Plaintiffs filed an amended complaint, adding plaintiff Lucy Carolyn Loveall, a 65-year-old Medicare beneficiary in Franklin, Kentucky, who received a refund of $161.70, and later received a letter from the Secretary seeking repayment of the erroneous refund. First Am. Compl. ¶ 9.  The court notes that it issued its order granting a preliminary injunction prior to receipt of the amended complaint, and thus its decision does not rely upon any of the allegations contained therein.

4

favorable decision; and (4) the injury arguably represents an invasion of the zone of interests protected by the legal basis for the complaint. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Bhd. of Locomotive Eng'rs and Trainmen v. Surface Transp. Bd.*, 457 F.3d 24, 27 (D.C. Cir. 2006). The Secretary contends that Plaintiffs have not alleged facts sufficient to establish that they have the requisite standing to bring this case. Plaintiffs disagree, contending that they have both representational and organizational standing.

To establish representational standing, an organization must allege that (1) at least one of its members has standing in their own right; (2) the organization seeks to protect interests germane to its purpose; and (3) neither the claim nor the requested relief require the participation of individual members. *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977)). The Secretary contends that Plaintiffs have not alleged sufficient facts to demonstrate either the first or the third prong of the test.

With regard to the first prong, the Secretary contends that Plaintiffs have failed to allege an injury-in-fact on behalf of any specific organizational member in that they have failed to identify a single individual member who has suffered a concrete injury. Plaintiffs respond that they are not required to identify a particular individual because representational standing merely requires an allegation that an organization's "members, or *any one of them*, are suffering immediate or threatened injury." *Warth v. Seldin*, 422 U.S. 490, 511 (1975) (emphasis added). Plaintiffs are correct. As Plaintiffs point out, they are not required to identify a particular individual by name if that member's existence and injury can be reasonably inferred from the available statistics. *See Natural Res. Def. Council v. EPA*, 2006 WL 2472144, at *4 (D.C. Cir.

Aug. 29, 2006) (concluding that organization established standing because court "may infer from the statistical analysis that two to four of NRDC's nearly half a million members will develop cancer as a result of the rule"), *reh'g en banc denied, id.* (D.C. Cir. Aug. 29, 2006).

The undisputed facts here establish that 230,000 Medicare beneficiaries — or about one percent of the 22.5 million Medicare beneficiaries enrolled in Part D — received the letter regarding the erroneous premium refund.  The Gray Panthers allege that they have a membership of 20,000, a large majority of whom are enrolled in Part D.  Compl. ¶ 8.  Action Alliance alleges that it has a membership of more than 110,000 senior citizens, most of whom are enrolled in Part D.  *Id.* ¶ 27.  Assuming that at least seventy percent (or 14,000) of the Gray Panthers are enrolled in Part D, *see* Pls.' Opp'n, Ex. 1 ¶ 2 (Decl. of Susan Murany), and that they are affected in approximately the same proportion as all Medicare beneficiaries (one percent), then at least 140 members of the Gray Panthers alone were likely affected by the Secretary's actions in attempting to recover the premium refunds.  Thus, Plaintiffs have sufficiently alleged that at least one of their members would have standing to bring this case.

With regard to the third prong of the test, the Secretary contends that the resolution of the disputed issues here require the participation of individual members because the harm cannot be quantified otherwise.  Plaintiffs counter that the goal of their action is that the Secretary properly inform all Part D enrollees of their right to seek waiver, not to establish that any or all enrollees are entitled to such waiver.  As Plaintiffs rightly observe, the Secretary confuses the injury

6

alleged here (*failure to notify* beneficiaries of their right to *seek* waiver) with the underlying

substantive right to *obtain* waiver.  Moreover, the Secretary conflates the requirements of

standing (*allegations* of injury) with the burden of proof (*proof* of injury).  While the right to

obtain waiver for any particular member is a matter that will indeed require an individualized

determination based on her own circumstances, the issue of notice is one that may be redressed

on a group-wide basis, *see Pub. Citizen v. F.T.C.*, 869 F.2d 1541, 1548 (D. C. Cir. 1989)

(concluding that a deprivation of individuals' right to information was sufficient to establish

organizational standing), and has been properly alleged.

There can be no question that the interests here are germane to Plaintiffs' purposes, as

both are organizations that represent senior citizens, most of whom are Medicare beneficiaries

and participants in Part D.  Compl. ¶¶ 7-8, 27.   Plaintiffs have also sufficiently alleged that the

alleged injury is fairly traceable to the Secretary's conduct (failure to notify individuals of their

right to seek waiver), and that a favorable decision requiring the Secretary to provide such notice

would remedy the alleged harm.  Accordingly, the court concludes that Plaintiffs have alleged

facts sufficient to establish representational standing.[4]

---

[4] Organizational standing is only proper where the challenged conduct has directly harmed its ability to provide services.  *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995).  Frustration of an organization's objectives alone "is the type of abstract concern that does not impart standing."  *Id.*  Plaintiffs allege that they will have insufficient time, staff and resources to carry out their mandate as a result of the Secretary's alleged violation.  Compl. ¶¶ 32, 36-37.  The Secretary rightly points out, however, that having to juggle limited resources is a challenge faced by all organizations, and Plaintiffs are just as able to inform their members about Medicare now as they were prior to the erroneous refund.  Thus, the

**B.      Preliminary Injunction**

To demonstrate entitlement to a preliminary injunction, a litigant must show (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury absent the injunction; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered. *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998). These factors "interrelate on a sliding scale and must be balanced against each other." *Id.* at 1318. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). The court will consider each prong of the test for injunctive relief in turn.

**1.      Substantial Likelihood of Prevailing on the Merits**

Plaintiffs contend that their members are entitled to notice of their right to seek waiver of the repayment of the erroneous premium refunds prior to any recoupment. The Secretary does not dispute that if such a right to seek waiver existed, then the beneficiaries would be entitled to notice of such a right. Def.'s Mot. to Dismiss at 26. The Secretary contends, however, that no statutory or regulatory provision provides Medicare beneficiaries with the right to seek a waiver of repayment of premium refunds.

---

court rejects Plaintiffs' assertion that they have organizational standing as they have not alleged that their ability to provide services has been directly harmed.

### i.    Standard of Review

When reviewing an administrator's statutory interpretation, the court first inquires whether "the intent of Congress is clear" as to "the precise question at issue." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). If so, "that is the end of the matter." *Ibid.* But where "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. If the administrator's reading "fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, [the court gives] the administrator's judgment 'controlling weight.'" *NationsBank of N.C. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257 (1995) (quoting *Chevron,* 467 U.S. at 844). The court may disregard the administrator's interpretation, however, where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *Kent County v. EPA*, 963 F.2d 391, 393 (D.C. Cir. 1992). A federal court is obligated to ensure that the agency observed procedural and substantive requirements imposed by statute or regulation. 5 U.S.C. § 706(2)(C), (D); *see United States v. Larionoff*, 431 U.S. 864, 873 (1977).

### ii.    Statutory and Regulatory Framework

The first question is whether Congress has spoken to the precise issue here in the relevant statute. Plaintiffs rely on a provision of the Medicare statute which concerns "overpayments" to

9

beneficiaries.  *See* 42 U.S.C. § 1395gg (entitled "Overpayment on behalf of individuals and

settlement of claims for benefits on behalf of deceased individuals").  The provision gives the

Secretary general authority to recover from a beneficiary an overpayment "for items or services

furnished an individual" (usually due to a coverage error) by decreasing that beneficiary's

subsequent Social Security payments.  42 U.S.C. § 1395gg(b).  Subsection (c), however, provides

an exception to the Secretary's authority to recover from a beneficiary:

> There shall be no . . . recovery[] in any case where the incorrect payment has been
> made . . . with respect to an individual who is without fault . . . if such . . .
> recovery[] would defeat the purposes of subchapter II or subchapter XVIII of this
> chapter or would be against equity and good conscience.

42 U.S.C. § 1395gg(c).  The corresponding regulation provides that:

> [t]here shall be no adjustment or recovery in any case where an incorrect payment
> under title XVIII (hospital and supplementary medical insurance benefits) has
> been made . . . with respect to an individual:
> (a) Who is without fault, and
> (b) Adjustment or recovery would either:
>      (1) Defeat the purposes of title II or title XVIII of the Act, or
>      (2) Be against equity and good conscience.

42 C.F.R. 405.358.[5]  Finally, the Social Security Administration Program Operations Manuals

System ("POMS") provides that the same standards for Medicare benefit overpayments apply to

overpayments of Medicare premiums under Part A and Part B, thereby extending the right to

seek waiver to beneficiaries who erroneously receive an overpayment of their premiums.  POMS

§ HI 01001.330(A-C) (providing that "the same rules and procedures pertaining to recovery of a

monthly benefit overpayment . . . apply even though the incorrect premium refund is not a benefit

---

[5]  The regulations also require notice of the right to request waiver when "more than the
correct amount of payment has been made."  42 C.F.R. § 405.357.  As previously noted, the
parties do not dispute that notice would be required if the right to seek waiver exists; they only
differ as to the existence of the right.

overpayment" ).[6]  The POMS bases its waiver provision on the general waiver provision of the

Social Security Act (the "SSA").  *See* 42 U.S.C.A. § 404(b).[7]

Plaintiffs contend that the statute, regulations, and policy manual establish that a

Medicare beneficiary who receives an incorrect payment is entitled to request waiver of the

recovery.  The Secretary argues that the only "payment" contemplated by § 1395gg is one for

"items and services," and that it does not cover overpayment of premiums.  The statute does bear

the Secretary's interpretation.  Indeed, the first subsection provides:

> Any payment under this subchapter [XVIII. Health Insurance for Aged and
> Disabled] to any provider of services or other person *with respect to any items or
> services* furnished any individual shall be regarded as a payment to such
> individual.

42 U.S.C. § 1395gg(a) (emphasis added).  The entire framework of § 1395gg(a-c) seems to

concern only payments to providers for *items and services*.  As such, the court agrees with the

Secretary that the statute itself appears silent as to how to handle overpayment of premiums.

Consequently, the court must look to the Secretary's regulations and interpretations to determine

whether they are a reasonable implementation of Congress's intent.

---

[6]  The POMS represents "the internal operating instructions used by SSA field employees
when processing claims for Social Security benefits," which includes Medicare benefits.  *See*
SSA's Program Policy Information Site, https://s044a90.ssa.gov/apps10/.  The POMS itself is at
https://s044a90.ssa.gov/apps10/poms.nsf/partlist!OpenView.

[7]  The SSA's general waiver provision states in relevant part:

> In any case in which more than the correct amount of payment has been made, there shall
> be no adjustment of payments to, or recovery by the United States from, any person who
> is without fault if such adjustment or recovery would defeat the purpose of this
> subchapter or would be against equity and good conscience.

42 U.S.C.A. § 404(b).

### iii.    Reasonableness of Secretary's Interpretation

In the absence of an unambiguous statute, an agency is entitled to promulgate regulations and other interpretations to which the court must defer if they are "reasonable in light of the legislature's revealed design." *NationsBank,* 513 U.S. at 257 (citation omitted).[8]  An agency's interpretation of its own regulations is ordinarily given controlling weight unless plainly erroneous or inconsistent with the regulation.  *Kent County*, 963 F.2d at 393-94 (observing that administrator's actions will only be upheld if they are "consistent with the Act and the regulations promulgated thereunder, and is not arbitrary . . . or capricious.").  The weight of an agency's judgment will depend upon the thoroughness evident in its consideration, the validity of its reasoning, and its consistency with earlier and later pronouncements.  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  Thus, the question here is whether the Secretary's decision to extend the waiver provision to erroneous premium refunds under Part A and Part B — but not Part D — is reasonable.  The court concludes that such a distinction is arbitrary and capricious and therefore is not entitled to deference.

Although the statute does not provide Medicare beneficiaries with a right to seek waiver in the event of an erroneous premium refund, the Secretary has extended such a right, through the applicable policy manual (POMS), to participants in Part A and Part B.  *See* POMS § HI

---

[8] Congress provided the Secretary with the authority to "prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter" regarding Medicare.  42 U.S.C. § 1395hh(a)(1).  His authority includes the power to prescribe regulations, subject to notice and comment, as well as the authority to promulgate "manual instructions, interpretative rules, statements of policy, and guidelines of general applicability." *Id.* § 1395hh(b-c).  A list of such instructions, rules and policies must be published in the Federal Register at least one every three months if not formally promulgated as regulations.  *Id.* § 1395hh(c).

01001.330(A) (providing that Part A and B beneficiaries have a "right" to seek waiver of

repayment of erroneous premium refunds, which will be granted if repayment "would be against

equity and good conscience" or present a financial hardship).[9]  The right to seek waiver cannot,

however, be extended participants in Part D, according to the Secretary.  He explains that he has

extended the right to seek waiver to certain beneficiaries because he "exercised his discretion"

and "chose" to extend the SSA standards for benefit overpayments to Medicare premiums.

Def.'s Mot. to Dismiss at 28-29.  The Secretary asserts that he did so because he "recognize[d]

---

[9]  As the POMS explains, an "incorrect premium refund" may occur if an individual

> receive[s] a refund which is not actually due him/her with an explanation that this
> amount represents premiums not owed (or greater than the amount owed).  The
> refund may be made in a separate check or added to the individual's monthly
> benefit.  Such an erroneous refund may occur, for example, because of incorrect
> information supplied by a third party, a processing error, or because of incorrect
> data entered into the Direct Billing System.

POMS § HI 01001.330(A).  In the event of such an erroneous refund, the beneficiary "will be
notified of the amount he/she erroneously received, asked to return it, and told of his/her right to
request relief from repayment of the incorrectly refunded amount."  *Id.* § HI 01001.330(B).  If an
individual

> expressly requests relief from repayment or states that he/she does not have the
> means to repay the incorrectly refunded amount, a determination on his/her
> request must be made.  Whether or not the enrollee may be excused from
> repayment depends on whether repayment of this amount would be against equity
> and good conscience or deprive the individual of funds that are reasonably
> necessary for ordinary living expenses.  This is the same test used in determining
> whether recovery of a benefit overpayment would defeat the purpose of Title II
> (Social Security).

*Id.* § HI 01001.330(C).  The POMS explicitly recognizes that "the same rules and procedures
pertaining to recovery of a monthly benefit overpayment . . . apply even though the incorrect
premium refund is not a benefit overpayment."  *Id.*  "Any rules applicable to incorrect [Part B]
premium refunds are applicable to [Part A] refunds, except as otherwise provided."  *Id.* § HI
01001.330(A).

that premium errors in this Part B program could occur and place a burden on some enrollees."
*Id.*[10]   He insists, however, that the same waiver provision may not be extended to premium
refunds under Part D because Part D premiums are owed to private insurers, while Part B
premiums are owed to the government, and it would be inappropriate for him to waive repayment
of the insurers' funds.  *Id.* at 29-33.

This justification for treating Part D beneficiaries differently is untenable because it is
inconsistent with the "legislature's revealed design," *see NationsBank*, 513 U.S. at 257, as
evidenced by the statutory scheme of the SSA and Medicare program.  When Congress enacted
the waiver provision of the SSA, on which the POMS waiver provision is based, the legislative
history indicates that it intended to make recovery more equitable by authorizing the Secretary to
waive repayment in certain circumstances. H.R. Rep. No. 76-728, at 19 (1939) ("Provision is
made for making more equitable the recovery by the Federal Government of incorrect payments
to individuals."); Hearings on Social Security before the House Committee of Ways and Means,
76th Cong., 1st Sess. 2287-88 (1939) (acknowledging that provision is intended to prohibit
recovery from persons who "had been overpaid, and the people had since spent the money, and
were perfectly innocent of any wrong doing").  *See also Califano v. Yamasaki*, 442 U.S. 682, 694
n.9 (1979) (observing that "legislative history of § 204(b) indicates merely that Congress
intended to make recovery more equitable by authorizing waiver).

---

[10]   The Secretary asserts that the POMS provision concerning incorrect premium refunds
only applies to Part B (supplemental medical insurance).  Def.'s Mot. to Dismiss at 29.  The
POMS provision at issue, however, expressly indicates that its rules concerning premium refunds
are also applicable to Part A (health insurance).  *See* POMS § HI 01001.330(A).

Medicare was created in 1965 by amending the SSA.  *See* Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286 (1965).[11]  When creating the Medicare waiver provision, Congress expressly incorporated the same waiver standards as applied to Social Security.  *See id.* § 1870 (c) (codified as amended at 42 U.S.C. § 1395gg(c)) (providing that "[t]here shall be no . . . recovery" of overpayments where individual was without fault if it would defeat the purpose of the Act or be against equity and good conscience); S. Rep. No. 89-404, at 2132 (1965).  Based on Congress's concern about the hardship faced by Medicare beneficiaries, it explicitly provided that the Secretary *must* take into account "equity" and "fault" when determining whether to seek recovery from Medicare beneficiaries.  *See* 42 U.S.C. 1395gg(c); *see also Califano*, 442 U.S. at 693 (noting that similar provision in SSA is in "the imperative voice," indicating Congress's intent to mandate that agency consider equity and hardship).  Congress's legislative design, as indicated by the SSA waiver provision, was to provide Medicare beneficiaries with relief from the hardships of recovery, even if such relief would be at the expense of the government's ability to recover erroneous payments.

The Secretary contends that Part D is exempt from Congress's concerns about equity and hardship because it is a unique partnership between government and private companies (the insurers).  There is nothing in Congress's legislative design, however, that indicates that the funding source of an erroneous payment is a factor that would change the balance of equities.

---

[11]  As the D.C. Circuit has observed, "it was because of the special coincidence of medical needs and financial problems among elderly people that the Medicare program was established in the first place."  *Gray Panthers v. Schweiker*, 652 F.2d 146, 166 (D.C. Cir. 1980) (citing S. Rep. No. 92-1230, at 37 (1972) (group characteristics of "low incomes and high medical expenses . . . led Congress to provide health insurance for older people")).

When faced with a similar argument regarding a nearly identical waiver provision in the Civil

Service Retirement Act, another district court astutely observed that

> the obvious purpose of [§] 8346(b) is to avoid the hardship that can result from
> recovering overpayments from a blameless annuitant.  The cause of the
> overpayment is immaterial to the impact on the annuitant.  By the language of the
> statute, Congress did not differentiate the various funds within the Commission
> when it authorized waiver of recovery from an innocent retired employee.

*Shannon v. U.S. Civil Service Comm'n*, 444 F. Supp. 354, 358 (N.D. Cal. 1977) (requiring

retroactive notice to annuitants of right to waiver) (cited with approval in *Pope v. R.R.*

*Retirement Bd.*, 672 F.2d 972, 975 (D.C. Cir. 1982).  It is irrelevant to an individual beneficiary

facing a demand for repayment that she cannot afford whether the money will ultimately land in

the coffers of the government or a private company.  More importantly, it is not a factor that

Congress ever considered when determining when the right to waiver arises.

The Secretary contends that Congress could not have intended the waiver provision to

Part D because the government has no authority to waive the right to collect moneys ultimately

due to third parties (private insurers), and any waiver provision for Part D would result in the

government bearing the loss.  Contrary to the Secretary's assertion, this potential result does not

distinguish Part D from any other situation in which Congress has enacted a waiver provision.

Every waiver provision results in the government bearing a loss instead of the beneficiary.  For

example, under Part A and Part B, the government is responsible for turning over payment to

private third-party providers (such as doctors or hospitals).  Section 1395gg provides that if an

overpayment is made, the Secretary may waive the ability to recover that money from an

individual "when the excess over the correct amount cannot be recouped from [the] provider of

services." 42 U.S.C. § 1395gg(b)(1).  Thus, the statute expressly contemplates a situation in

16

which the government has paid out the money to the third party, but waives the individual's

obligation to return the overpayment, thereby forcing the government to accept the loss.[12]  In that

situation — as well as the one presented here — the government may, as a result of a

beneficiary's entitlement to waiver, find itself unable to recoup because of a beneficiary's right to

waiver.  As Congress has clearly contemplated that a beneficiary's fault and hardship should

outweigh the government's ability to recover erroneous benefit payments, there is no reason to

infer (as the Secretary urges) that Congress would not permit waivers for erroneous premiums

payments under Part D because it might result in a loss to the government.

The Secretary's justification for excluding Part D participants from his extension of the

waiver provision is also inconsistent with the regulatory framework surrounding Medicare.  To

be sure, "[a]n agency is free to discard precedents or practices it no longer believes correct."

*Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1296 (D.C. Cir. 2004).  However, if an agency

decides to change course, it must supply a "reasoned analysis indicating that prior policies and

standards are being deliberately changed, not casually ignored."  *Id.* (*quoting Greater Boston

Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970).  Administrative interpretations that

conflict with earlier pronouncements of the agency are less persuasive than those which are

longstanding.  *General Elec. Co. v. Gilbert*, 429 U.S. 125, 142-43 (1976) (invalidating agency

interpretation of Title VII because it "flatly contradicts" prior interpretations of the agency and by

other agencies); *see also North Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 522 n.12 (1982)

---

[12] Moreover, the government is not, as the Secretary would have it, acting solely as a middleman in Part D: The government subsidizes premiums and other costs for low-income participants who qualify.  *See* 42 U.S.C. § 1395w-114; *see also id.* § 1395w-116 (creating "Medicare Prescription Drug Account" within the "Federal Supplementary Medical Insurance Trust Fund" to receive premiums and pay for subsidies).

(observing that an inconsistent administrative interpretation of a statute is not entitled to as much deference as longstanding rule); *Kent County*, 963 F.2d at 397 (relying on agency memoranda to impeach agency's assertions regarding its interpretation of a legislative rule).

The waiver regulations that the Secretary has determined should be applied to Part A and Part B premiums are consistent with Congress's intent to consider equity and hardship, whereas the Secretary's proffered distinction of Part D flatly contradicts such legislative intent.  The waiver regulations for benefits (applied to premiums through the POMS) prohibit recovery if the individual is without fault, and recovery would either (1) defeat the purposes of either Title II of the SSA (providing social security benefits) or Title XVIII (providing Medicare benefits); or (2) be against equity and good conscience.  42 C.F.R. § 405.358.  When promulgating this regulation, the Secretary indicated that the "final rule duplicates . . . the content of two sections of the Social Security Administration's regulations concerning waiver of recovery of overpayments."  Medicare Program; Waiver of Recovery of Overpayments, 61 F.R. 49269 (Sept. 19, 1996).  Further, the regulations provide that it would "[d]efeat the purpose of title II" for the government "to deprive a person of income required for ordinary and necessary living expenses." 20 C.F.R. § 404.508(a).  A "necessary living expense" includes "food and clothing, rent, mortgage payments, utilities, maintenance, insurance (including e.g., life, accident, and health insurance including premiums for supplementary medical insurance benefits under title XVIII [Medicare]."  *Id.* § 404.508(a)(1).  Nowhere do the regulations contemplate that the Secretary should take into account the *source* of the funds that were incorrectly paid in determining whether waiver is appropriate.

While the Secretary is correct that these regulations were adopted prior to the existence of Part D, there is nothing to indicate that Congress intended to distinguish Part D premiums from other Medicare premiums as they relate to incorrect refunds. Indeed, when Congress added Part D to Medicare in 2003, it made no separate provision for erroneous premium refunds under Part D, *see* H.R. Rep. No. 108-391 (2003) (Conf. Rep.), despite the fact that it was the Secretary's interpretation at that time (as it is now) that he had the authority to provide waiver of repayment of incorrect premium refunds for Part A and Part B participants. Def.'s Mot. to Dismiss at 30; Ex. 1 (POMS from 2001 & 2003).

Finally, the Secretary's interpretation is inconsistent on its face. On the one hand, the Secretary explains that the insurers have already received their premiums and it is the government that is seeking repayment. Def.'s Mot. to Dismiss at 6.[13] On the other, the Secretary contends that the money at issue here belongs to the private insurers, so the Secretary cannot waive its recovery. Such a contradictory explanation does not meet the Secretary's burden of providing a "reasoned analysis" to support his interpretation of the relevant statute and regulations. *See Nuclear Energy Inst.,* 373 F.3d at 1296.

Having assessed the legislative design, the regulatory framework, and the Secretary's proffered justification, the court must conclude that the Secretary's distinction is arbitrary and does not deserve deference under these circumstances. Based on the language of the relevant regulations requiring that Medicare beneficiaries be notified of their right to seek waiver of

---

[13] Indeed, in the Secretary's motion to stay the order filed with the D.C. Circuit on September 29, 2006, he contends that Plaintiffs are seeking "a refund of moneys held by the treasury." *See Action Alliance v. Leavitt*, No. 06-5295 (D.C. Cir. filed Sept. 29, 2006) (Def.'s Mot. to Stay the Order at 10).

repayment of incorrect premium refunds, the court concludes that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim.[14]

### 2.    Irreparable harm

The Secretary contends that Plaintiffs have not demonstrated that they would be irreparably harmed if the injunction did not issue. Moreover, he contends that the alleged harm in this case is entirely financial, which is generally not considered irreparable.

As noted above, the Secretary misunderstands the nature of the injury that Plaintiffs claim, which is about the lack of notice, not the lack of money. The lack of notice of a right to request waiver cannot, in these circumstances, be repaired later by an award of damages. As the Secretary acknowledged at the motion hearing, there is no mechanism by which a beneficiary may prove entitlement to waiver after the money has been repaid. Moreover, as Plaintiffs point out, Congress implicitly recognized that the harm to beneficiaries was potentially irreparable — the waiver provisions require that beneficiaries be notified of their right to seek waiver, and that the government make a waiver determination, *prior* to recovery. *See Califano*, 442 U.S. at 693-694 (observing that the SSA § 204 requires that the Secretary make a pre-recoupment waiver decision). In a similar situation, the D.C. Circuit explained that the Railroad Retirement Board's failure to notify beneficiaries of their right to seek waiver of repayment of an erroneous overpayment was a significant harm that could not fully be repaired by damages:

---

[14] Plaintiffs also contend that Medicare beneficiaries have a constitutional right to notice of their right to seek waiver. Because the court concludes that a right to notice exists under the relevant regulations, the court need not reach their constitutional argument. *See Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring) ("[I]t is a cardinal principle that [a c]ourt will first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided." (internal quotation marks omitted)).

> Appellants, in the instant case, have been and are continuing to be subjected to a significant loss of income without any real opportunity to contest their loss. For many, a small reduction in their monthly annuities mandates that they seek monetary assistance elsewhere, possibly on the welfare rolls. As the district court in *Shannon* noted, "the loss occasioned by recoupment should not be minimized. The deprivation of a significant portion of fixed income can be a substantial loss indeed. Retired individuals living on fixed income frequently can ill afford even a moderate temporary decrease in their disposable income."

*Pope*, 672 F.2d at 975 (quoting *Shannon,* 444 F. Supp. at 363) (certifying class and requiring the Board to retroactively notify beneficiaries of their right to a hearing on waiver of recoupment).

The Secretary contends that Medicare is not a means-tested program and that beneficiaries who enroll in Part D have to pay premiums and thus cannot be presumed to suffer a hardship here. To make such a contention is to blink reality: As the D.C. Circuit has aptly observed, "though need is not an eligibility criteria for participation in Medicare, a disproportionately large percentage of elderly recipients hover near the poverty level." *Gray Panthers*, 652 F.2d at 166. Plaintiffs point out that in 2003, the most recent year for which such statistics are available, over half of Medicare beneficiaries had incomes below 200 percent of the federal poverty guideline. Pls.' Mot. for Prel. Inj. at 10.[15] Thus, the court concludes, Plaintiffs have sufficiently demonstrated irreparable harm.

**3.      Harm to the Government and Public Interest**

Finally, the Secretary contends that the harm to the government and the public interest are so great as to outweigh the harm caused to Plaintiffs by failing to issue a preliminary injunction.

---

[15]  The poverty guideline in 2003 for an individual was an annual income of $8,980, *see* Annual Update of the the Department of Health and Human Services Poverty Guidelines, 68 F.R. 6456 (Feb. 7, 2003), which means that half of all Medicare beneficiaries had an annual income of less than $18,000.

The court certainly appreciates the administrative challenges of remedying the error here. Having taken such difficulties into account, however, the court concludes, for the reasons discussed above, that the harm to Plaintiffs outweighs the Secretary's difficulty of complying with the order. *Cf. Pope*, 672 F.2d at 975 ("This burden [to the government] . . . cannot outweigh the harm and deprivation suffered by an annuitant who has been wrongfully recouped in the past."). Moreover, the public interest here is best served by informing the affected Medicare beneficiaries of their rights and to enable them a meaningful opportunity to assert them.

### III.  CONCLUSION

For the aforementioned reasons, the court granted Plaintiffs' motion for a preliminary injunction [#3] and denied the Secretary's motion to dismiss [#6].


                                          Henry H. Kennedy, Jr.
                                          United States District Judge


Dated: October 4, 2006