IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ACTION ALLIANCE OF SENIOR CITIZENS | ) | |
| GREY PANTHERS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-1607-HHK |
| | ) | |
| MICHAEL LEAVITT, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT'S EXHIBIT A**

[SCHEDULED FOR ORAL ARGUMENT ON JANUARY 18, 2007]

No. 06-5295

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

ACTION ALLIANCE OF SENIOR CITIZENS, et al.,
Plaintiffs-Appellees,
v.

MICHAEL O. LEAVITT, SECRETARY OF HEALTH AND HUMAN SERVICES
Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

BRIEF FOR THE APPELLANT

Of Counsel:

DANIEL MERON
  General Counsel

KATHLEEN H. McGUAN
  Associate General Counsel

MARK D. POLSTON
  Deputy Associate General
    Counsel for Litigation

MARCUS H. CHRIST
LAWRENCE J. HARDER

U.S. Department of Health
  and Human Services Office
  of the General Counsel

PETER D. KEISLER
  Assistant Attorney General

JEFFREY A. TAYLOR
  United States Attorney

JEFFREY S. BUCHOLZ
  Principal Deputy Assistant
    Attorney General

JONATHAN F. COHN
  Deputy Assistant Attorney General

MARK B. STERN
ALISA B. KLEIN
  (202) 514-1597
  Attorney, Appellate Staff
  Civil Division, Room 7235
  Department of Justice
  950 Pennsylvania Ave., N.W.
  Washington, D.C.  20530-0001

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

A.  <u>Parties And Amici</u>:

Plaintiffs-appellees are Action Alliance of Senior Citizens and Gray Panthers.  The amended complaint (which was not relied on by the district court) added Lucy Carolyn Loveall as a plaintiff.  Secretary of Health and Human Services Michael O. Leavitt is defendant-appellant.  There were no amici in district court.

B.  <u>Ruling Under Review</u>:  The preliminary injunction under review was issued on September 27, 2006 by Judge Henry H. Kennedy, Jr., United States District Court for the District of Columbia, in Civ. No. 06-1607.  The district court's opinion was issued on October 4, 2006.

C.  <u>Related Cases</u>:  We are not aware of any related cases.


ALISA B. KLEIN
Attorney

## TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

GLOSSARY

STATEMENT OF JURISDICTION ................................... 1

STATEMENT OF THE ISSUE ...................................... 1

STATUTES AND REGULATIONS .................................... 2

STATEMENT OF THE CASE ....................................... 2

STATEMENT OF FACTS .......................................... 3

    A.    Statutory Background .............................. 3

    B.    Factual Background and Proceedings Below ........... 6

SUMMARY OF ARGUMENT ........................................ 11

STANDARD OF REVIEW ......................................... 14

THE PRELIMINARY INJUNCTION SHOULD BE VACATED ............... 14

    I.    The Injunction Is Premised On An Error
          Of Law ........................................... 14

          A.    The Medicare statute does not
               provide for a hardship waiver
               in these circumstances ...................... 15

          B.    The Social Security Administration's
               Program Operations Manual System
               does not provide for a hardship
               waiver in these circumstances ............... 20

    II.    There Is No Basis For The "Preliminary"
          Relief Ordered By The District Court .............. 25

          A.    The Injunction Does Not Preserve
               The Status Quo .............................. 26

        B.    There Was No Showing Of Irreparable
               Harm That Could Warrant The Costly,
               And Confusing Measures Ordered By
               The District Court ........................... 27

CONCLUSION .................................................. 30

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(c)
   OF THE FEDERAL RULES OF APPELLATE PROCEDURE

ADDENDUM

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES*

**Cases:**                                                                   **Page**

Bowen v. Massachusetts, 487 U.S. 879 (1988) ............... 26

California v. Settle, 708 F.2d 1380 (9th Cir. 1983) ........ 23

Consolidated Edison Co. of New York, Inc. v.
    Department of Energy, 247 F.3d 1378 (Fed. Cir.),
    cert. denied, 534 U.S. 1054 (2001) ..................... 27

* Chaplaincy of Full Gospel Churches v. England,
    454 F.3d 290 (D.C. Cir. 2006) .................. 14, 26, 27

Lee v. Thornton, 420 U.S. 139 (1975) ...................... 27

Norton v. Southern Utah Wilderness Alliance,
    542 U.S. 55 (2004) ................................... 22

University of Texas v. Camenisch, 451 U.S. 390
    (1981) ............................................... 26

Visiting Nurses Ass'n of S.W. Ind., Inc. v.
    Shalala,  213 F.3d 352 (7th Cir. 2000) ................ 18

**Statutes:**

28 U.S.C. § 1292(a)(1) ...................................... 1
28 U.S.C. § 1331 ........................................... 1
28 U.S.C. § 1361 ........................................... 1

42 U.S.C. § 404(b) ........................................ 19
42 U.S.C. §§ 1395 et seq .................................. 3
42 U.S.C. § 1395gg(c) ............................... 7, 16-20
42 U.S.C. § 1395hh(a)(1) ................................. 23
42 U.S.C. § 1395hh(c) .................................... 23
42 U.S.C. § 1395s ............................... 15, 23, 24
42 U.S.C. § 1395w-23 ...................................... 4

_____

* Authorities on which we chiefly rely are marked with
asterisks.

iii

42 U.S.C. § 1395w-24(d) ............................. 4, 5, 24
42 U.S.C. § 1395w-24(d)(2) ................................ 24
42 U.S.C. § 1395w-24(d)(2)(A) ...................... 5, 15, 24
42 U.S.C. § 1395w-25(b) .................................... 4
42 U.S.C. § 1395w-101(a)(1)(A) ............................. 5

42 U.S.C. § 1395w-112(a)(2) ................................ 4
42 U.S.C. § 1395w-113(a) ................................... 5
42 U.S.C. § 1395w-113(c) .......................... 4, 15, 24
42 U.S.C. § 1395w-113(c)(1) ................................ 5
42 U.S.C. § 1395w-114(a)(1) ............................... 28
42 U.S.C. § 1395w-114(a)(2) ............................... 28
42 U.S.C. § 1395w-114(a)(3)(B)(v)(I) ...................... 28
42 U.S.C. § 1395w-114(a)(3)(B)(v)(II) ..................... 28
42 U.S.C. § 1395w-115 ..................................... 4
42 U.S.C. § 1395w-116(b)(3) ........................ 5, 16, 24

The Social Security Independence and Program
    Improvements Act of 1994, Pub. L. No. 103-296,
    108 Stat. 1464 ....................................... 21

Medicare Prescription Drug, Improvement, and
    Modernization Act of 2003, Pub. L. No. 108-173,
    117 Stat. 2066 ...................................... 4-5


**Regulations:**

70 Fed. Reg. 4197 (2005) .................................. 5

42 C.F.R. § 405.355 ...................................... 18
42 C.F.R. § 405.358 ...................................... 18
42 C.F.R. § 422.262(f) .................................... 5
42 C.F.R. § 423.293(a) .................................... 5
42 C.F.R. § 423.773(c)(1)(iii) ........................... 28


**Legislative Materials:**

H.R. Conf. Rep. No. 108-391, reprinted in
    2004 U.S.C.C.A.N. 1808 ............................. 5, 15

## GLOSSARY

APA       Administrative Procedure Act

HHS       Department of Health and Human Services

POMS      Social Security Administration's Program Operations
          Manual System

SSA       Social Security Administration

[SCHEDULED FOR ORAL ARGUMENT ON JANUARY 18, 2007]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 06-5295

ACTION ALLIANCE OF SENIOR CITIZENS, et al.,
Plaintiffs-Appellees,

v.

MICHAEL O. LEAVITT, SECRETARY OF HEALTH AND HUMAN SERVICES,
Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

BRIEF FOR THE APPELLANT

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under
28 U.S.C. §§ 1331 and 1361. The preliminary injunction on review
was issued on September 27, 2006. The government filed a timely
notice of appeal on September 29, 2006. This Court has
jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

This case concerns premium refunds that the federal
government issued, in error, to roughly 230,000 Medicare Part D
participants. The district court entered a preliminary
injunction directing the Secretary of Health and Human Services
to return the funds that participants have already repaid, and to
notify all 230,000 participants that they have a right to request
that repayment be waived if repayment would be a hardship. The
question presented is whether the injunction should be vacated.

## STATUTES AND REGULATIONS

Pertinent statutory and regulatory provisions are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

This case concerns premiums that were mistakenly refunded to about 230,000 participants in the Medicare Part D prescription drug program. There is no dispute that the refunds were made in error. The average amount of the refund was $215 and the total amount was about $47 million.

Within weeks of the erroneous refunds, the Department of Health and Human Services (HHS) sent letters to the affected participants asking for repayment. The letters stressed that prescription drug coverage would not be affected, and explained that repayment in installments could be requested if repayment would pose a hardship.

The premise of this lawsuit is that a Part D participant would have a right to keep the erroneous premium refund if the participant could show that repayment would constitute a hardship. A motion for a preliminary injunction was filed along with the complaint. The government opposed the motion and moved to dismiss the complaint, explaining that the statutory and policy manual provisions on which plaintiffs relied have no application to Part D premiums. The government also explained that the plaintiff organizations had not identified a single Part D participant who claimed that repayment would constitute a hardship.

2

On September 27, 2006, the district court issued what it styled a "preliminary" injunction.  The order requires the Secretary to return all of the money that participants have repaid – about $25 million as of the date the government filed its stay motion, and more than $39 million to date.  The order also requires the Secretary to send notices to all 230,000 participants, advising them that they have a right to request a waiver of the repayment obligation if repayment would pose a hardship.  The order indicated that an opinion would follow.  The opinion was issued on October 4, 2006.

On October 4, 2006, this Court granted the government's motion to stay the district court's order pending appeal.

## STATEMENT OF FACTS

### A.  Statutory Background.

Title XVIII of the Social Security Act, commonly known as the Medicare Act, establishes a program of federally subsidized health insurance for the elderly and disabled.  42 U.S.C. §§ 1395 et seq.  Medicare is divided into four parts.  Part A covers hospital inpatient and related care.  Part B provides supplemental coverage for outpatient services such as doctor visits.  Parts A and B are traditional fee-for-service programs under which the government makes direct payment to health care providers (such as doctors and hospitals) that furnish services to Medicare participants.  The premiums that participants pay to

3

enroll in Part A and Part B belong to the government and are used
to offset the cost of providing health care coverage.[1]

Part C and Part D are not fee-for-service programs, but
managed care programs.  Part C is a managed care alternative to
the fee-for-service coverage available under Parts A and B (i.e.,
hospital and outpatient services).  Part D, which is directly at
issue here, is a managed care program that provides prescription
drug coverage through voluntary enrollment in prescription drug
plans sponsored by private insurers.  Under the Part C and D
managed care programs, the government does not pay providers
directly, but instead enters into contracts with private
insurance companies that arrange coverage through their own
networks of providers.  The government subsidizes this coverage
by making periodic payments to the private insurance companies.
42 U.S.C. § 1395w-23 (Part C); id. § 1395w-115 (Part D).  The
insurance companies assume the risk of unsubsidized coverage.
Id. § 1395w-25(b) (Part C); id. § 1395w-112(a)(2) (Part D).  The
premiums that participants pay to enroll in Part C and D do not
belong to the government (as under Part A and B), but to the
private insurance companies that sponsor the plans.  Id. § 1395w-
24(d) (Part C); id. § 1395w-113(c) (Part D).

Before January 1, 2006, prescription drug coverage was
generally not available under Medicare.  In 2003, Congress
enacted the Medicare Prescription Drug, Improvement, and

---

[1] As a practical matter, very few people pay premiums under
Medicare Part A.

4

Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066,
"to provide for a voluntary program for prescription drug
coverage under the Medicare Program." H.R. Conf. Rep. No.
108-391 at 1, reprinted in 2004 U.S.C.C.A.N. at 1808. The new
Medicare Part D, which took effect on January 1, 2006, is "the
most significant change to the Medicare program since its
inception in 1965." 70 Fed. Reg. 4197 (2005).

Medicare Part D allows participants to "obtain qualified
prescription drug coverage through enrollment in a prescription
drug plan." 42 U.S.C. § 1395w-101(a)(1)(A). Medicare
beneficiaries who choose to enroll in a Part D drug plan must pay
a monthly premium. Id. § 1395w-113(a). As explained above,
these Part D premiums are not owed to the federal government, but
to the private insurers that sponsor the prescription drug plans.
Id. § 1395w-113(c)(1) (incorporating § 1395w-24(d)).

Most Part D participants pay premiums directly to the
private insurers that sponsor their prescription drug plans.
However, the Social Security Administration will, at a
participant's request and for the convenience of the participant,
deduct the amount of a monthly premium from the participant's
monthly Social Security check. The government then transmits
payment on the participant's behalf to the private plan sponsor.
See id. §§ 1395w-116(b)(3) & 1395w-24(d)(2)(A); see also 42
C.F.R. §§ 423.293(a) & 422.262(f).[2]

_____

[2] About 4.8 million of the 23 million Part D participants
nationwide pay premiums through this Social Security-deduction

5

**B.  Factual Background and Proceedings Below**.

1.  The relevant facts are not in dispute.  In early
August 2006, as the result of a processing error, about 230,000
individuals who paid their Medicare Part D premiums via a
deduction in their monthly Social Security checks received a
refund for those premiums in the form of checks or direct
deposits from the Social Security Administration.  Complaint ¶19
(JA 12).  The average amount of the refund was $215 and the total
amount was about $47 million.  Declaration of Leslie Norwalk, ¶4
(JA 71).[3]  There is no dispute that these refunds were made in
error and that the participants had no right to the moneys
received.

The government promptly sought to rectify the error by
requesting repayment.  In letters sent in late August or early
September, 2006, HHS asked participants to repay the amounts that
were incorrectly refunded.  Complaint ¶20 & Exhibit A (sample
letter) (JA 12-13, 22-23).  The letters indicated that the
repayment should be made by September 30, 2006, but also
explained that payment could be made in monthly installments if
returning the amount in full would present a hardship.
Complaint, Exhibit A (JA 23) ("If returning the amount in full
presents you with a hardship, you may request to make monthly

method.

[3] Although the declaration estimated that the total amount
was about $50 million, on further examination it was determined
that the total amount is about $47 million.

6

payments for as many as seven months."). The letters reassured participants that their benefits would not be affected by the erroneous premium refund. Ibid. (JA 22) ("Most importantly, we want to make certain that you understand that your prescription drug coverage will continue uninterrupted.") (emphasis omitted).

As of the date that the government's stay motion was filed, HHS had received about $25 million in response to its letters, reflecting payment from about 111,000 participants. Norwalk Decl. ¶¶4, 6 (JA 71). To date, HHS has received more than $39 million, reflecting payment from more than 196,000 participants. An additional 2,350 participants have arranged to make repayment in installments.

2. The premise of this lawsuit is that, if a Part D participant could show that repayment of the erroneous premium refund would constitute a hardship, the participant would be entitled to have the repayment obligation waived. Although the complaint is framed in terms of "notice" of this putative waiver right, there is no dispute that if the waiver right exists, notice would be required. See Op. 8 & 10 n.5 (JA 84, 86 n.5). The question is whether there exists any right to a hardship waiver in the context of an erroneous Part D premium refund.

In support of the allegation that there is such a waiver right, plaintiffs invoked a provision of the Medicare statute, 42 U.S.C. § 1395gg(c) (as well as its implementing regulations). Complaint ¶15 (JA 11). In addition, plaintiffs invoked a section of the Social Security Administration's Program Operations Manual

7

System (POMS), which states that when there is an erroneous
refund of a Medicare Part A or B premium, the recipient may
request that the repayment obligation be waived due to hardship.
Complaint ¶17 (JA 11-12).[4]

The complaint seeks to compel the Secretary to return all
amounts that the Part D participants have already repaid; to
notify all 230,000 participants of the putative right to request
a hardship waiver; and to provide any participants who request
such a waiver with an oral hearing.  Complaint p.14 (JA 20).
Along with the complaint, plaintiffs filed a motion for a
preliminary injunction.[5]

The government opposed the motion and moved to dismiss the
complaint, explaining that the provisions on which plaintiffs
rely have no application in this context.  The government
explained that 42 U.S.C. § 1395gg, by its terms, applies only to
overpayments for "items and services" furnished to individuals –
i.e., overpayments of benefits – and has no application to
erroneous Part D premium refunds.  The government explained that
the POMS provision, by its terms, applies only to erroneous
premium refunds under Medicare Parts A and B.

_____

    [4] A copy of the relevant POMS section is reproduced in the
addendum to this brief.  The full text of the POMS is available
at:  https://s044a90.ssa.gov/apps10/poms.nsf/aboutpoms.

    [5] The preliminary injunction motion carved out the question
of whether an "oral hearing" on a waiver request is required.
See Docket Entry 3, at 1 n.1.

8

The government also explained that plaintiffs had not
identified a single plan participant who claimed that repayment
of the erroneous Part D premium refund would constitute a
hardship. Because the plaintiff organizations had not even
alleged that any of their members had received an erroneous
refund (much less that repayment would be a hardship), the
government urged that they lacked organizational standing to
bring suit.[6]

3. On September 27, 2006, after a hearing, the district
court entered what it styled a "preliminary" injunction. The
order requires the Secretary to return all funds that
participants have already repaid. See Order at 3 (JA 38) ("Any
payments previously received, or received after the date of this
order, must be immediately returned to the beneficiaries so that
they may decide whether to request waiver."). The order also
requires the Secretary to send letters to all of the 230,000 drug
plan participants who received an erroneous premium refund,
informing the participants that they have a right to request a
hardship waiver. Order at 1-2 (JA 36-37). The order indicated
that an opinion would follow. Order at 3 (JA 38).

_____

[6] In an apparent attempt to cure the standing defect,
plaintiffs filed an amended complaint that added as a plaintiff a
single plan participant, Lucy Loveall, who received an erroneous
refund of $161.70. Amended Complaint ¶9 (JA 41). The amended
complaint alleges that Ms. Loveall cannot afford to repay this
amount but does not address the installment option offered by the
Secretary. Id. ¶45 (JA 51). The district court indicated that
its ruling did not rely on the allegations of the amended
complaint, which the court did not receive until after it issued
the preliminary injunction. Op. 4 n.3 (JA 80 n.3).

9

On October 4, 2006, the district court issued its opinion.
The court recognized that the "entire framework of § 1395gg(a-c)
seems to concern only payments to providers for <u>items and
services</u>." Op. 11 (JA 87) (court's emphasis). Accordingly, "the
court agree[d] with the Secretary that the statute itself appears
silent as to how to handle overpayment of premiums." <u>Ibid</u>.

The court also recognized that the policy manual (POMS)
provision on which plaintiffs relied applies only to erroneous
premium refunds under Medicare Parts A and B. Op. 12-13 (JA 88-
89). However, the court declared that it was "arbitrary and
capricious" to draw a distinction between Part A and B premiums,
on the one hand, and Part D premiums, on the other. Op. 12
(JA 88). The court recognized that Part A and B premiums are
owed to the government, whereas Part D premiums are owed to the
private insurers that sponsor prescription drug plans. Op. 14
(JA 90). Nonetheless, it believed that "[t]his justification for
treating Part D beneficiaries differently is untenable because it
is inconsistent with the 'legislature's revealed design,'
[citation], as evidenced by the statutory scheme of the [Social
Security Act] and Medicare program." <u>Ibid</u>. In the court's view,
"Congress's legislative design, as indicated by the [Social
Security Act] waiver provision, was to provide Medicare
beneficiaries with relief from the hardships of recovery, even if
such relief would be at the expense of the government's ability
to recover erroneous payments." Op. 15 (JA 91).

10

**4.** On October 4, 2006, this Court granted a stay of the district court's order pending appeal.

## SUMMARY OF ARGUMENT

The material facts are not in dispute. Some participants in the Medicare Part D prescription drug program elect to pay their premiums by having the Social Security Administration deduct the premium amounts from their Social Security benefits and transmit payment to the private drug plans on their behalf. In August 2006, the Social Security Administration mistakenly issued premium refunds to about 230,000 such participants. There is no dispute that these refunds were issued in error. The average amount of the refund was $215 and the total amount was about $47 million. Within weeks of the error, the Department of Health and Human Services sent letters to the participants asking for repayment. The letters stressed that benefits would not be affected, and explained that repayment in installments could be arranged if repayment would pose a hardship. As of the date the government filed its stay motion, roughly $25 million had been repaid, reflecting payment from about 111,000 participants. To date, more than $39 million has been repaid, reflecting payment from more than 196,000 of the 230,000 participants. An additional 2,350 participants have arranged to make repayment in installments.

Plaintiffs believe that the installment plan offered by the Secretary was an inadequate way to address whatever hardship might have been caused by the erroneous premium refunds. In

11

their view, repayment must be waived in its entirety if a participant can show that repayment would constitute a hardship. On plaintiffs' motion, the district court entered what it called a "preliminary" injunction, directing the Secretary to return all of the funds that participants have repaid, and to send letters to all 230,000 participants advising them of the right to request a hardship waiver. This Court stayed the injunction pending appeal.

The injunction rests on an error of law. The mistaken premise is that there is a right to a hardship waiver for Part D participants who receive premium refunds in error. The statutory waiver provision on which plaintiffs rely, by its terms, applies to an overpayment of benefits, not to an erroneous premium refund. This distinction is unsurprising, given the risk that individuals will rely on benefits determinations and the burden that unreimbursed medical bills might pose. Premiums are small in comparison to individual benefits payments, and they are an obligation that an individual undertakes to enroll in one of the voluntary Medicare programs.

Although no statute requires a hardship waiver in connection with erroneous premium refunds, the Social Security Administration has chosen to allow hardship waivers for erroneous premium refunds under Medicare Parts A and B. The district court believed that it could compel the expansion of this waiver program if it perceived no good reason for excluding Medicare Part D. As an initial matter, there is no authority to compel

12

the Department of Health and Human Services to expand a
discretionary program implemented by the Social Security
Administration.  But even assuming that such authority exists,
the court was wrong to declare it "arbitrary" to allow hardship
waivers under Parts A and B, but not under Part D.  Part D (like
Part C) is a managed care program and premiums are not owed to
the government, but to the private insurance companies that
sponsor the prescription drug plans.  Although some participants
pay premiums via the Social Security-deduction method, most
participants pay premiums directly to their private plan
sponsors.  Even plaintiffs do not contend that when a private
plan sponsor itself issues a mistaken premium refund to a Part D
participant, the private sponsor must waive repayment of the
premium if the participant can show hardship.  There is plainly
no basis for a court to confer waiver rights not available to the
Part D population at large on the subset of Part D participants
that happens to pay premiums via the Social Security-deduction
method.

     Even apart from the legal defects in the district court's
ruling, there would be no basis for the "preliminary" relief
ordered by the district court.  There is no authority to order
the government to re-issue upwards of $39 million in premium
refunds that never should have been issued in the first place.
Likewise, there is no basis for ordering the government to notify
participants of a putative right to a hardship waiver before that
right has been definitively established and its contours defined.

13

Nor is there a showing of irreparable harm that could justify these disruptive, costly and confusing measures. The original complaint did not identify a single Part D participant who claimed that repayment would constitute irreparable harm, and it would defy reality to make such a claim on behalf of the more than 196,000 participants who repaid the money without even requesting the installment option offered by the Secretary.

## STANDARD OF REVIEW

Although the decision to issue a preliminary injunction is reviewed for abuse of discretion, the legal conclusions that underlie a preliminary injunction, including the question whether the movant has demonstrated irreparable injury, are reviewed de novo. Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).

## ARGUMENT

### THE PRELIMINARY INJUNCTION SHOULD BE VACATED

## I.   The Injunction Is Premised On An Error Of Law.

The district court's injunction rests on an erroneous legal premise. In the court's view, procedures governing overpayments of benefits or premium refunds under Parts A and B must apply to the repayment of premiums by participants in Medicare Part D, even though, as the court recognized, the statute and policy manual provision at issue here do not apply to Part D.

The court's reasoning finds no basis in any statute or regulation and fails to recognize the underlying distinctions between Medicare Part D and Medicare Parts A and B.

14

## A.    The Medicare statute does not provide for a hardship waiver in these circumstances.

Under Medicare Parts A and B, the government makes direct payment to health care providers under a traditional fee-for-service model.  Under those programs, the premiums paid by enrollees belong to the government.  Congress has required that the premiums be deducted from Social Security and other benefit payments (when applicable).  See 42 U.S.C. § 1395s.[7]

Medicare Part D is "a voluntary program for prescription drug coverage under the Medicare Program."  H.R. Conf. Rep. No. 108-391 at 1, reprinted in 2004 U.S.C.C.A.N. at 1808.  Under Part D, the government contracts with private insurers who agree to provide prescription drug coverage through their networks of pharmacies, and who bear the risk of providing such coverage.  Premiums are not owed to the government, but to the private insurers that sponsor the prescription drug plans.  In general terms, Part D resembles Part C, which is a managed care alternative to the traditional fee-for-service programs under Parts A and B.  Individuals who enroll in Medicare Parts C and D are not required to make premium payments though Social Security deductions.  If they find it convenient to do so, however, such deductions will be made "at the enrollee's option."  See 42 U.S.C. § 1395w-113(c) (Part D); id. § 1395w-24(d)(2)(A) (Part C).

---

[7] As noted above, very few people pay premiums under Medicare Part A.

Most Part D participants elect to pay premiums directly to the private insurers that sponsor their plans, and do not make use of the Social-Security deduction option. However, about 4.8 million of the roughly 23 million Part D participants nationwide elect to pay their premiums via the Social Security-deduction method. The government transmits the premium payments to the private insurer on the participant's behalf. See 42 U.S.C. § 1395w-116(b)(3).

This case concerns about 230,000 Part D participants who pay premiums via the Social Security-deduction method. In August 2006, these participants received premium refunds because of a processing error. The average amount of the refund was $215 and the total amount was about $47 million. The Department of Health and Human Services promptly notified recipients of the error and requested that they return the money (which they indisputably should not have received). The HHS letter stressed that Part D benefits would not be interrupted and urged participants to contact HHS if repayment would pose a hardship, explaining that repayment could be made on an installment basis.

Plaintiffs nevertheless filed suit, urging that HHS is required by 42 U.S.C. § 1395gg(c) to waive the premium repayment in its entirety if a participant can show that repayment would pose a hardship.

Even a cursory review of the statute makes clear that it is inapplicable to the present case. Section 1395gg(c) provides for a hardship waiver where the government has made an overpayment

16

for "items and services furnished an individual" - <u>i.e.</u>, an
overpayment of <u>benefits</u>.  It has no relevance where <u>premiums</u> were
refunded in error.

Section 1395gg codifies the government's right to recover
payments made to third parties on behalf of Part A and B
participants.  It is thus entitled "Overpayment on behalf of
individuals and settlement of claims for benefits on behalf of
deceased individuals."

Subsection (a) makes the individual accountable for benefits
payments that the government makes to a provider of health care
services on the individual's behalf.  It states:  "Any payment
under this subchapter to any provider of services or other person
with respect to any items or services furnished any individual
shall be regarded as a payment to such individual."

Subsection (b) provides that in some circumstances, the
Secretary shall recoup, from the individual, overpayments made to
providers for such items or services.  It directs the Secretary
to make offsetting adjustments to other benefits payments when
"more than the correct amount is paid under this subchapter to a
provider of services or other person <u>for items or services</u>
<u>furnished an individual</u>" and certain other conditions are met.

Subsection (c) provides for an "Exception to subsection (b)
payment adjustment."  It states, in pertinent part:

> There shall be no adjustment <u>as provided in</u>
> <u>subsection (b)</u> of this section (nor shall there be
> recovery) in any case where the incorrect payment has
> been made * * * with respect to an individual who is
> without fault * * * if such adjustment (or recovery)

17

> would defeat the purposes of subchapter II or
> subchapter XVIII or would be against equity and good
> conscience.

(Emphasis added.)  See also 42 C.F.R. §§ 405.355, 405.358
(implementing regulations).

By its terms, the hardship waiver established by
Subsection (c) applies only to the overpayments to providers for
"items and services" (i.e., benefits payments) that are the
subject of Section 1395gg.  Indeed, the district court recognized
that the "entire framework of § 1395gg(a-c) seems to concern only
payments to providers for items and services."  Op. 11 (JA 87)
(court's emphasis), and "agree[d] with the Secretary that the
statute itself appears silent as to how to handle overpayment of
premiums."  Ibid.  See also Visiting Nurses Ass'n of S.W. Ind.,
Inc. v. Shalala, 213 F.3d 352, 357 (7th Cir. 2000) ("Subsection
1395gg(c) explicitly applies only to the waiver of 'adjustment[s]
as provided in subsection (b).'").

It is unsurprising that Congress established a right to a
hardship waiver for benefits overpayments, without establishing a
corresponding right for erroneous premium refunds.  Benefits are
a statutorily created entitlement.  They are paid to the provider
of services, rather than to the individual, and repayment thus
requires the individual to return money that the individual never
received.  The amount of money at stake is often substantial, and
the process of benefit determination (and later reevaluation) may
span significant periods of time.  See 42 U.S.C. § 1395gg(c)
(providing that it is "against equity and good conscience" to

18

1

er7

The reasoning is untenable.  The "legislative design" is the
"design" established by the provisions of the Medicare statute,
which, as the district court acknowledged, do not provide a right
to a hardship waiver where premiums have been improperly
refunded.  Section 404(b), cited by the district court, has no
application here; it applies to overpayments of benefits
authorized under Title II of the Social Security Act (old-age,
survivor, and disability insurance benefits), not to Medicare
payments under Title XVIII.  (Indeed, that point is not in
dispute.  See Complaint ¶13 (JA 10).)  To the extent that
Congress incorporated § 404(b) when it enacted the Medicare
statute in 1965, it did so with express limitations.
Section 1395gg makes clear, as the district court recognized,
that hardship waivers are required only in the context of
recoupment of overpayments for "items and services."  42 U.S.C.
§ 1395gg(c).

**B.    The Social Security Administration's Program**
       **Operations Manual System does not provide for**
       **a hardship waiver in these circumstances.**

The district court's analysis of the Social Security
Administration's Program Operations Manual System (POMS) suffers
from an error similar to that which underlies its analysis of
Section 1395gg.  As the district court recognized, the POMS
provision applies only to erroneous premium refunds under
Medicare Parts A and B.  See Op. 12-13 (JA 88-89); see also POMS
HI 01001.330 (addressing the premium payments for "Supplemental
Medical Insurance" – i.e., Medicare Part B – and "Hospital

20

Insurance" - i.e., Medicare Part A). By its terms, the provision establishes no right to a waiver of erroneous Part D premium refunds, and the district court did not suggest otherwise.

The court concluded, however, that it is "arbitrary and capricious" to distinguish between Part A and B premiums, on the one hand, and Part D premiums, on the other. Op. 12 (JA 88). On its face, this mode of analysis fundamentally misconceives the district court's role. SSA was not required to institute the particular hardship provisions governing Medicare Part A and B premiums in the first instance. A discretionary decision of this kind does not limit the agency's exercise of discretion with respect to other programs, even when the programs are in some respects similar.

Here, the court is not only reviewing provisions governing two different programs but is also considering the discretionary authority of two different agencies. The Social Security Administration has not been a part of HHS since 1995. See The Social Security Independence and Program Improvements Act of 1994, Pub. L. No. 103-296, 108 Stat. 1464. The Secretary of HHS is not required to exercise his discretion in the same manner as the Commissioner of SSA, and the court had no authority to compel HHS to expand a program that is implemented by SSA.

The court's order fundamentally mistakes the nature of its mandamus authority, invoked by plaintiffs in their complaint on the ground that there is "a clear right to the relief sought" and that the Secretary "has a plainly defined and nondiscretionary

21

duty to provide the relief which plaintiffs seek." Complaint ¶¶39, 40 (JA 18). Plaintiffs urged that the hardship waivers they demand are required by Section 1395gg and the POMS itself, not that any "distinction" between the various Medicare parts is "arbitrary and capricious." Plaintiffs did not even advance the theory adopted by the district court, presumably because they recognized that it would not meet the standard for mandamus. See Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 63 (2004) (mandamus remedy is limited to the enforcement of "a specific, unequivocal command, * * *, the ordering of a precise, definite act * * * about which [an official] had no discretion whatever") (quotation marks and citations omitted).

The court's "arbitrary and capricious" analysis reflects additional legal errors. The court appeared to believe that the only possible source of authority for the POMS provision is Section 1395gg(c), and that the POMS provision therefore represents an "interpretation" or "implementation" of Section 1395gg(c). See, e.g., Op. 11 (JA 87) (declaring that "the statute itself appears silent as to how to handle overpayment of premiums" and that, "[c]onsequently, the court must look to the Secretary's regulations and interpretations to determine whether they are a reasonable implementation of Congress's intent").

But the court was wrong in believing that the federal government would have no authority to waive collection of erroneous Part A and B premium refunds if that authority were not

22

supplied by Section 1395gg.  Section 1395gg(c) establishes the
circumstances in which hardship waivers <u>must</u> be made available.
It does not limit the circumstances in which hardship waivers <u>may</u>
be made available.  An agency is not required to seek refunds of
all monies incorrectly paid out even when doing so would not
further the interests of the government program, would offend
equity and good conscience, or might simply be wildly
inefficient.  To the contrary, an agency's broad power to
administer a benefits program carries with it power to determine
the circumstances under which erroneous payments will be
recouped.  <u>See</u> 42 U.S.C. § 1395hh(a)(1) (Secretary's authority to
"prescribe such regulations as may be necessary to carry out the
administration of the insurance programs under this subchapter");
<u>id</u>. § 1395hh(c) (Secretary's authority to promulgate "manual
instructions, interpretive rules, statements of policy, and
guidelines of general applicability"); <u>id</u>. § 1395s (authority of
the Commissioner of Social Security, in consultation with the
Secretary, to issue regulations addressing the deduction of
Medicare premiums from Social Security benefits); <u>California</u> v.
<u>Settle</u>, 708 F.2d 1380, 1384 (9th Cir. 1983) (Secretary has
complete discretion to set tolerance levels for recoupment of
erroneous payments to states).

     Finally, the court was mistaken in believing that the nature
of Parts A and B is so similar to that of Part D that
distinctions between the programs are inherently unreasonable.
As discussed above, Medicare Part A and Part B are traditional

fee-for-service programs under which the federal government makes direct payment to health care providers. The premiums that are paid under Parts A and B belong to the government (and are used to offset the cost of providing health care coverage). Individuals who receive Social Security or certain other benefits are required to pay their premiums via deductions from those benefits. See 42 U.S.C. § 1395s. Because the premiums are owed to the government, this payment method inures directly to the government's benefit.

By contrast, Medicare Part C and Part D are managed care programs. The government contracts with private insurers who agree to provide health care services or prescription drugs through their networks of providers or pharmacies. Whereas Part A and B premiums are owed to the government, Part C and D premiums are owed to the private insurers who bear the risk of providing the health care or prescription drug coverage. See 42 U.S.C. § 1395w-24(d) (Part C); id. § 1395w-113(c) (Part D). Payment of Part C and D premiums via the Social Security-deduction method is not mandatory, but a convenience that is offered "at the enrollee's option." See id. § 1395w-24(d)(2)(A) (Part C); id. § 1395w-113(c) (Part D). This payment method does not benefit the government, which simply transmits the premium payments to the private insurer on the enrollee's behalf. See id. § 1395w-24(d)(2) (Part C); id. § 1395w-116(b)(3) (Part D).

These distinctions preclude the conclusion that it would be arbitrary to adopt procedures governing recovery of erroneous

24

premium refunds under Part D that differ from those existing under Parts A and B. Most Part D participants do not elect to pay premiums via the Social Security-deduction method, but pay premiums directly to the private insurer. Even plaintiffs do not contend that when Part D participants receive mistaken premium refunds from the private insurers themselves, they have a right to keep the money if repayment would be a hardship. The premiums are, after all, the condition of enrollment. And there is absolutely no basis for insisting that the subset of Part D participants electing payment via Social Security-deduction be given rights not available to Part D participants at large. The extension of the POMS program envisioned by the district court would just substitute one distinction for another.

As the district court recognized, Op. 3 (JA 79), the Secretary explicitly sought to address potential hardships in this case by offering repayment by installment. There is no authority for a court to substitute its judgment for that of the agency about the precise mechanism to address hardship in this context.

## II.  There Is No Basis For The "Preliminary" Relief Ordered By The District Court.

As we have shown, the injunction rests on an error of law and should be vacated on that basis. Even apart from the fundamental legal defects underlying the court's ruling, there would be no basis for the preliminary relief ordered by the district court or, indeed, for preliminary relief of any kind.

## A.    **The Injunction Does Not Preserve The Status Quo**.

"'The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting University of Texas v. Camenisch, 451 U.S. 390, 395 (1981)). The district court's injunction does not meet even that threshold criterion. The order would require the Secretary to return all of the money that has been repaid (about $25 million as of the date of the stay and more than $39 million to date), a ruling that plainly does not preserve the status quo.

Nor does the requirement that the Secretary to notify 230,000 persons of a right to a hardship waiver preserve the status quo in any meaningful sense. The existence of a waiver right is the very subject matter of this litigation. Moreover, the contours of the putative waiver right (assuming that it exists) have not yet been determined. Plaintiffs' request for a preliminary injunction expressly carved out the question whether an "oral hearing" would be required for those participants who requested a waiver. See Docket Entry 3, at 1 n.1. Even if there were a right to request a waiver, notice could not properly be sent before such issues were resolved.

Insofar as the court ordered return of money, the relief would be outside its authority even following final judgment. Although, under certain circumstances, a claim for specific moneys may proceed under the Administrative Procedure Act, a

26

necessary prerequisite is that the payment be required by
statute.   See Bowen v. Massachusetts, 487 U.S. 879, 900 (1988)
(allowing an APA suit "to enforce the statutory mandate itself,
which happens to be one for the payment of money").[8]   It is
conceded that the 230,000 Part D participants had no right to the
premium refunds in the first place, Complaint ¶3 (JA 7), and
plaintiffs do not contend that participants with the ability to
repay would have any right to keep the money.   There is thus no
basis for ordering a re-refund.

   B.   There Was No Showing Of Irreparable Harm That
        Could Warrant The Costly, Disruptive, And
        Confusing Measures Ordered By The District Court.

        Plaintiffs signally failed to carry their burden of showing
that the preliminary injunction was required to prevent
irreparable harm.   See Chaplaincy of Full Gospel Churches, 454
F.3d at 297.   The Secretary's letters asked Part D participants
to repay amounts that, only weeks earlier, they had received in
error.   The letters expressly accommodated the possibility of
hardship by allowing participants to repay the money in
installments:   "If returning the amount in full presents you with
a hardship, you may request to make monthly installment payments
for as many as seven months."   See Complaint, Exhibit A (JA 23).
In addition, the letters stressed that benefits would not be

_____

   [8] A claim for a refund of moneys held by the treasury
ordinarily falls within the scope of the Tucker Act, which
provides no authority for equitable relief.   See Consolidated
Edison Co. of New York, Inc. v. Department of Energy, 247 F.3d
1378, 1384-85 (Fed. Cir.), cert. denied, 534 U.S. 1054 (2001);
Lee v. Thornton, 420 U.S. 139, 140 (1975).

27

affected: "Most importantly, we want to make certain that you understand that your prescription drug coverage will continue uninterrupted." Ibid. (emphasis omitted) (JA 22).

The original complaint did not identify a single Part D participant who claimed that repayment would constitute a hardship. The amended complaint identified one such participant, but she does not address the installment option offered by the Secretary. See Amended Complaint ¶¶9, 45 (JA 9, 51). Even if this allegation were considered, it could not provide a basis for ordering sweeping relief to more than two hundred thousand Part D participants not before the court.

Although the district court recognized that Medicare is not a means-tested program, it suggested that financial hardship could be "presumed" in light of statistics about the Medicare population at large. Op. 21 (JA 97). Even if such a presumption could substitute for evidence, it would reveal nothing about the 230,000 Part D participants who received premium refunds in error. Indeed, it would be particularly anomalous to suggest that the participants who repaid without even requesting the installment option – about 111,000 as of the date of the stay motion, and more than 196,000 to date – are suffering imminent irreparable injury. And as the district court recognized, see Op. 2 (JA 78), the neediest members of the Medicare population either do not pay Part D premiums at all, or qualify for premium subsidies. See 42 U.S.C. § 1395w-114(a)(2), (a)(3)(B)(v)(I) (full premium subsidies for individuals eligible under both the

28

Medicaid and Medicare programs); id. § 1395w-114(a)(3)(B)(v)(II); 42 C.F.R. § 423.773(c)(1)(iii) (full premium subsidies for individuals enrolled in State Medicare savings programs); 42 U.S.C. § 1395w-114(a)(1) & (2) (premium subsidies for other low-income individuals).

The district court declared that the "nature of the injury" is "the lack of notice, not the lack of money." Op. 20 (JA 96). But as the court acknowledged, there is no dispute that notice would be required if a waiver right exists. Op. 8 & 10 n.5 (JA 84, 86 n.4). The question is whether any waiver right exists. That is the subject matter of this litigation, and notice could not properly be required before the existence and contours of the right have been definitively resolved.

The injunction entered by the district court would require the government to re-issue premium refunds that were previously issued in error, and to notify plan participants of a waiver right that is contested and has not been defined. Even if there were authority for such costly, disruptive, and confusing measures, there is plainly no showing of harm that could justify them.

29

## CONCLUSION

For the foregoing reasons, this Court should vacate the order of September 27, 2006.

Respectfully submitted,

Of Counsel:

DANIEL MERON
  General Counsel

KATHLEEN H. McGUAN
  Associate General Counsel

MARK D. POLSTON
  Deputy Associate General
  Counsel for Litigation

MARCUS H. CHRIST
LAWRENCE J. HARDER

U.S. Department of Health
 and Human Services Office
 of the General Counsel

PETER D. KEISLER
  Assistant Attorney General

JEFFREY A. TAYLOR
  United States Attorney

JEFFREY S. BUCHOLZ
  Principal Deputy Assistant
    Attorney General

JONATHAN F. COHN
  Deputy Assistant Attorney General

MARK B. STERN
ALISA B. KLEIN
  (202) 514-1597
  Attorney, Appellate Staff
  Civil Division, Room 7235
  Department of Justice
  950 Pennsylvania Ave., N.W.
  Washington, D.C.  20530-0001

NOVEMBER 2006

30

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(c)
## OF THE FEDERAL RULES OF APPELLATE PROCEDURE

I hereby certify pursuant to Fed. R. App. P. 32(a)(7)(C) that the foregoing brief contains 6,861 words, according to the count of Corel WordPerfect 12.

ALISA B. KLEIN

ADDENDUM

42 U.S.C.A. § 1395gg

**§ 1395gg. Overpayment on behalf of individuals and settlement of claims for benefits on behalf of deceased individuals**

(a) Payments to providers of services or other person regarded as payment to individuals

Any payment under this subchapter to any provider of services or other person with respect to any items or services furnished any individual shall be regarded as a payment to such individual.

(b) Incorrect payments on behalf of individuals; payment adjustment

Where–

> (1) more than the correct amount is paid under this subchapter to a provider of services or other person for items or services furnished an individual and the Secretary determines (A) that, within such period as he may specify, the excess over the correct amount cannot be recouped from such provider of services or other person, or (B) that such provider of services or other person was without fault with respect to the payment of such excess over the correct amount, or

> (2) any payment has been made under section 1395f(e) of this title to a provider of services or other person for items or services furnished an individual,

proper adjustments shall be made, under regulations prescribed (after consultation with the Railroad Retirement Board) by the Secretary, by decreasing subsequent payments–

> (3) to which such individual is entitled under subchapter II of this chapter or under the Railroad Retirement Act of 1974 [45 U.S.C.A. § 231 et seq.], as the case may be, or

> (4) if such individual dies before such adjustment has been completed, to which any other individual is entitled under subchapter II of this chapter or under the Railroad Retirement Act of 1974 [45 U.S.C.A. § 231 et seq.], as the case may be, with respect to the wages and self-employment income or the compensation constituting the basis of the benefits of such deceased individual under subchapter II of this chapter.

As soon as practicable after any adjustment under paragraph (3) or (4) is determined to be necessary, the Secretary, for purposes of this section, section 1395i(g) of this title, and section 1395t(f) of this title, shall certify (to the Railroad Retirement Board if the adjustment is to be made by decreasing subsequent payments under the Railroad Retirement Act of 1974 [45 U.S.C.A. § 231 et seq.]) the amount of the overpayment as to which the adjustment is to be made. For purposes of clause (B) of paragraph (1), such provider of services or such other person shall, in the absence of evidence to the contrary, be deemed to be without fault if the Secretary's determination that more than such correct amount was paid was made subsequent to the third year following the year in which notice was sent to such individual that such amount had been

paid; except that the Secretary may reduce such three-year period to not less than one year if he finds such reduction is consistent with the objectives of this subchapter.

(c) Exception to subsection (b) payment adjustment

There shall be no adjustment as provided in subsection (b) of this section (nor shall there be recovery) in any case where the incorrect payment has been made (including payments under section 1395f(e) of this title) with respect to an individual who is without fault or where the adjustment (or recovery) would be made by decreasing payments to which another person who is without fault is entitled as provided in subsection (b)(4) of this section, if such adjustment (or recovery) would defeat the purposes of subchapter II or subchapter XVIII of this chapter or would be against equity and good conscience. Adjustment or recovery of an incorrect payment (or only such part of an incorrect payment as the Secretary determines to be inconsistent with the purposes of this subchapter) against an individual who is without fault shall be deemed to be against equity and good conscience if (A) the incorrect payment was made for expenses incurred for items or services for which payment may not be made under this subchapter by reason of the provisions of paragraph (1) or (9) of section 1395y(a) of this title and (B) if the Secretary's determination that such payment was incorrect was made subsequent to the third year following the year in which notice of such payment was sent to such individual; except that the Secretary may reduce such three-year period to not less than one year if he finds such reduction is consistent with the objectives of this subchapter.

* * *

Social Security Administration Policy Site: POMS Section HI 01001.330

Table of Contents | Search | Previous | Next

**TN 22 (11-01)**

# HI 01001.330 Incorrect Premium Refunds

## A. POLICY--INCORRECT PREMIUM REFUND DISTINGUISHED FROM PREMIUM ARREARAGE

An individual may receive a refund which is not actually due him/her with an explanation that this amount represents premiums not owed (or greater than the amount owed). The refund may be made in a separate check or added to the individual's monthly benefit. Such an erroneous refund may occur, for example, because of incorrect information supplied by a third party, a processing error, or because of incorrect data entered into the Direct Billing System. The amount incorrectly paid him/her represents an incorrect premium refund, not a premium arrearage, although it may have been received and treated as such on the direct billing record. The significance of this distinction is that a premium arrearage, which is not paid by the end of the grace period, requires termination of an individual's Supplementary Medical Insurance (SMI) or Premium-Hospital Insurance (HI). An incorrect premium refund, on the other hand, has to be repaid unless the individual may be relieved of the responsibility for repayment of the erroneously refunded amount, but it cannot cost the enrollee his/her SMI or Premium-HI coverage. If termination of his/her Medicare coverage results from recording the erroneous premium refund as a premium arrearage, the termination is erroneous and must be reversed.

An enrollee meets his/her premium obligation when he/she pays his/her premiums. In the case of a beneficiary, premiums are paid when they are deducted from his/her benefits. If his/her benefits are in suspense or he/she is an uninsured beneficiary, premiums are paid when a payment is made by him/her (or by someone on his/her behalf). If SSA mistakenly sends him/her a "refund" after he/she has paid his/her premiums and this mistake results in termination of his/her Medicare coverage, this termination is erroneous and will be reversed when identified. Thus, if after receipt of a premium payment, the premium payment is inadvertently returned to the enrollee, he/she owes Centers for Medicare & Medicaid Services (CMS) the amount incorrectly returned but his/her Medicare coverage is not endangered by the administrative error. When an enrollee submits a "bad check" or one that is unsigned, he/she has not, in fact, paid his/her premiums. However, such a mistake, if made in good faith, may be reason for granting a 3-month good cause extension of the grace period for payment of premiums. (See HI 01001.355.)

Where an incorrect premium refund (regardless of the amount) cannot be recovered, the SMI or (in the case of Premium-HI), the HI Trust Fund rather than the Old-Age and Survivors Insurance Trust Fund is charged. Any rules applicable to incorrect SMI premium refunds are applicable to Premium-HI refunds, except as otherwise provided.

## B. POLICY--WHEN RELIEF FROM REPAYMENT WILL

# BE CONSIDERED

When an individual receives a premium refund which is not due, he/she has not received a benefit overpayment nor has a true premium arrearage been created. However, he/she does owe CMS the excess amount received. Accordingly, when a premium refund is identified as incorrect or erroneous, the program service center (PSC) will compare the erroneously refunded amount with the enrollee's SMI premium rate to determine if it exceeds the tolerance amount in HI 01001.330 and thus requires recovery action. Where the amount does not exceed the tolerance, action will be taken to adjust SSA's record for the amount of the refund but no attempt will be made to recover from the individual. If the amount does exceed the tolerance, the individual will be notified of the amount he/she erroneously received, asked to return it, and told of his/her right to request relief from repayment of the incorrectly refunded amount.

# C. POLICY--DEVELOPMENT OF RELIEF

If the individual expressly requests relief from repayment or states that he/she does not have the means to repay the incorrectly refunded amount, a determination on his/her request must be made. Whether or not the enrollee may be excused from repayment depends on whether repayment of this amount would be against equity and good conscience or deprive the individual of funds that are reasonably necessary for ordinary living expenses. This is the same test used in determining whether recovery of a benefit overpayment would defeat the purpose of Title II (Social Security). Therefore, the same rules and procedures pertaining to recovery of a monthly benefit overpayment (see GN02250.150 - GN 02250.425) apply even though the incorrect premium refund is not a benefit overpayment.

If an individual has received an incorrect premium refund and requests relief from repayment of the erroneously refunded amount, the field office (FO) is responsible for the development and the determination. The FO should identify for special handling and forward the following to the appropriate PSC:

1. The appropriate documents used in the development (including SSA-632-F4);

2. A determination made on a report of contact as to whether the individual may be excused from repaying the incorrectly refunded amount.

   Favorable decisions should be forwarded to the Post Office Box number address shown in HI 01005.802.

   Unfavorable decisions should be forwarded in a separate envelope to the appropriate PSC. These cases will be reviewed in the PSC and if there is concurrence with the initial FO decision, a denial notification which includes the reconsideration paragraph will be sent to the enrollee. If the decision is questionable, the file will be returned to the FO for further consideration. However, if the FO reaffirms its prior decision, the decision will not be questioned further.

   In order to avoid confusion and uncertainty as to the amount of premiums owed, the FO and reviewing office should develop and process these cases as soon as possible.

# D. POLICY--TOLERANCE AMOUNT

In the interest of efficient administration, SSA will not attempt to recover an incorrect premium refund if the cost of recovery exceeds the collectible amount. Accordingly, if the incorrect refund does not exceed 3 months of SMI premiums, no recovery action should be taken under B. and C. above.

EXAMPLE 1:

John Dough is paying $316 per month for Premium-HI and $58.70 for SMI. He received an incorrect refund of $316. The tolerance is $176.10 (3 times his SMI premium). Since the amount of the erroneous refund is greater than the tolerance amount, SSA must notify Mr. Dough that he owes $316, and inform him of his right to request relief from repayment of the erroneously refunded amount.

EXAMPLE 2:

Alice Johnson pays $64.60 for SMI (including a 10% premium increase). She received an incorrect refund of $129.20. The tolerance in this case is $193.80 (3 times her SMI premium). Since the amount of the refund is less than the tolerance amount, SSA will not take any action to recover the erroneous refund from the enrollee, but will adjust its records for the amount erroneously refunded and remove any additional premium liability generated by the incorrect premium refund.

HI 01001.330 - Incorrect Premium Refunds - 12/05/2003

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of November, 2006, I caused copies of the foregoing brief and accompanying appendix to be sent to the Court by hand delivery and to the following counsel by federal express, overnight mail.  In addition, I caused a copy of the brief to be sent to the following counsel by email:

Gill Deford, Esq.
Center for Medicare Advocacy
11 Ledgebrook Drive
Mansfield, CT  06250
(860) 456-7790
gdeford@medicareadvocacy.org


ALISA B. KLEIN