IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ACTION ALLIANCE OF SENIOR CITIZENS    )
GREY PANTHERS,                        )
                                      )
         Plaintiffs,                  )
                                      )
    v.                                )    Civil Action No. 06-1607-HHK
                                      )
MICHAEL LEAVITT,                      )
                                      )
         Defendant.                   )
                                      )

**DEFENDANT'S EXHIBIT B**

ORAL ARGUMENT SCHEDULED FOR JANUARY 18, 2007

## NO. 06-5295

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ACTION ALLIANCE OF SENIOR CITIZENS, GRAY PANTHERS, and LUCY CAROLYN LOVEALL,

Plaintiffs-Appellees,

v.

MICHAEL O. LEAVITT, Secretary of Health and Human Services,

Defendant-Appellant.

On Appeal from the United States District Court for the District of Columbia

## BRIEF FOR THE APPELLEES

GILL DEFORD
JUDITH STEIN
BRAD PLEBANI
WEY-WEY KWOK
Center for Medicare Advocacy, Inc.
P.O. Box 350
Willimantic, CT 06226
(860) 456-7790

VICKI GOTTLICH
PATRICIA B. NEMORE
Center for Medicare Advocacy, Inc.
1101 Vermont Ave., N.W., Suite 1001
Washington, D.C. 20005
(202) 216-0028

SALLY HART
Center for Medicare Advocacy, Inc.
100 North Stone Ave., Suite 305
Tucson, AZ 85701
(520) 3279547

Attorneys for Plaintiffs-Appellees

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

(A) **Parties and Amici.** The plaintiffs in the district court were Action Alliance of Senior Citizens, the Gray Panthers, and Lucy Carolyn Loveall, and they are the appellees in this court. The amended complaint that included plaintiff-appellee Lucy Carolyn Loveall as a plaintiff was filed before the Order by the district court that is the subject of this appeal. There were no intervenors or amici in the district court. There are no intervenors in this court, and AARP will appear in this court as an amicus supporting the position of plaintiffs-appellees.

(B) **Rulings Under Review.** References to the rulings at issue appear in Appellant's Certificate as to Parties, Rulings, and Related Cases. The Order of September 27, 2006 is found in the Joint Appendix at 36. The Memorandum Opinion of October 4, 2006 appears in the Joint Appendix at 77 and is reported at --- F.Supp.2d ---, 2006 WL 2848614.

(C) **Related Cases.** Counsel for the plaintiffs-appellees are not aware of any related cases.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

GLOSSARY

JURISDICTIONAL STATEMENT ..........................................................................1

STATEMENT OF THE ISSUE.............................................................................1

STATEMENT OF THE CASE AND OF THE FACTS ..........................................2

STATUTES AND REGULATIONS......................................................................11

SUMMARY OF ARGUMENT ...........................................................................11

ARGUMENT ....................................................................................................15

I.  THE DISTRICT COURT CORRECTLY EXERCISED ITS
    DISCRETION TO ISSUE THE PRELIMINARY INJUNCTION. ................15

    A.  Because the district court applied the correct standard and
        did not abuse its discretion in granting the preliminary injunction,
        this Court should affirm.......................................................................15

    B.  The district court correctly concluded that the waiver rules
        apply to Part D beneficiaries who receive an erroneous
        payment based on the amount of their withheld premiums....................16

        i. Congressional authorization is necessary for a federal
           agency to waive recovery of erroneous payments. ...........................18

        ii. The  authorization for waiver of recovery lies in either the
            Social Security waiver statute or the Medicare waiver statute. .........22

        iii. Offering the right to seek waiver of recovery is the only
             logical response to the mistaken payment in this situation. ...............34

    C.  The beneficiaries established the threat of irreparable harm.................37

D.    The Secretary does not question the district court's
      determinations that the balance of hardships and the
      public interest support the preliminary injunction...................................43

II.    THE INJUNCTION WAS AN APPROPRIATE EXERCISE
       OF THE DISTRICT COURT'S DISCRETION..............................................44

CONCLUSION........................................................................................................48

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(C)

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. American Civil Liberties Union,*
  542 U.S. 656 (2004) .................................................................................16

*Banks v. Trainor,*
  525 F.2d 837 (7th Cir. 1975) ..................................................................46

*Burns v. U.S.R.R. Retirement Board,*
  701 F.2d 193 (D.C.Cir. 1983)..................................................................18

*\*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ................................................... 17, 36, 38, 40, 45

*California v. Settle,*
  708 F.2d 1380 (9th Cir. 1983) ...............................................................22

*Catanzano v. Dowling,*
  847 F.Supp. 1070 (W.D.N.Y. 1994) .......................................................46

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C.Cir. 2006)................................................... 15, 16, 40

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) ................................................................................25

*Christian Civic League of Maine, Inc. v. FEC,*
  433 F.Supp.2d 81 (D.D.C. 2006)............................................................40

*Conn. Dept. of Environmental Protection v. OSHA,*
  356 F.3d 226 (2d Cir. 2004) ...................................................................40

*Consarc Corp. v. United States Treasury Dept., Office of Foreign Assets Control,*
  71 F.3d 909 (D.C.Cir. 1995)....................................................................44

*District 50, United Mine Workers v. Int'l Union, United Mine Workers,*
  412 F.2d 165 (D.C.Cir. 1969)..................................................................45

*Elliott v. Weinberger,
   371 F.Supp. 960 (D.Haw. 1974), aff'd in part, rev'd in part,
   564 F.2d 1219 (9th Cir. 1977), aff'd in part, rev'd in part *sub nom.*
   *Califano v. Yamasaki*, 442 U.S. 682 (1979) ................................17, 35, 40

Environmental Defense Fund, Inc. v. Costle,
   657 F.2d 275 (D.C.Cir. 1981)............................................................42

Febus v. Gallant,
   866 F.Supp. 45 (D.Mass. 1994)........................................................46

Goland v. C.I.A.,
   607 F.2d 339 (D.C.Cir. 1978)...........................................................42

Goldie's Bookstore, Inc. v. Superior Court,
   739 F.2d 466 (9th Cir. 1984) ............................................................40

Gray Panthers v. Schweiker,
   652 F.2d 146 (D.C.Cir. 1980)...........................................................39

Groseclose v. Bowen,
   809 F.2d 502 (8th Cir. 1987) ............................................................17

Haymons v. Williams,
   795 F.Supp. 1511(M.D.Fla. 1992) ...................................................46

Kimble v. Solomon,
   599 F.2d 599 (4th Cir. 1979) ............................................................46

Londrigan v. F.B.I.,
   670 F.2d 1164 (D.C.Cir. 1981).........................................................43

Mattern v. Mathews,
   582 F.2d 248 (3d Cir. 1978) .............................................................18

NationsBank of N.C. v. Variable Annuity Life Ins. Co.,
   513 U.S. 251 (1995) ........................................................................25

Natural Res. Def. Council v. EPA,
   464 F.3d 1 (D.C.Cir. 2006)................................................................9

*Office of Personnel Management v. Richmond*,
   496 U.S. 414 (1991) ...................................................................................... 19, 20

*Pope v. Railroad Retirement Board*,
   672 F.2d 972 (D.C.Cir. 1982)............................................................ 18, 39, 47, 48

*Public Citizen, Inc. v. U.S. Dept. of Health and Human Services*,
   332 F.3d 654 (D.C.Cir. 2003)..................................................................................26

*Quinlivan v. Sullivan*,
   916 F.2d 524 (9th Cir. 1990) ...................................................................................17

*Serono Labs., Inc. v. Shalala*,
   158 F.3d 1313 (D.C.Cir. 1998).........................................................................  15, 16

*Sierra Club v. EPA*,
   292 F.3d 895 (D.C.Cir. 2002).....................................................................................8

*Shannon v. U.S. Civil Service Comm'n*,
   444 F.Supp. 354 (N.D.Cal. 1977), aff'd in part, rev'd in part,
   621 F.2d 1030 (9th Cir. 1980) ...................................................... 18, 27, 36, 37, 39

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ...............................................................................................25

*United States v. West*,
   392 F.3d 450 (D.C.Cir. 2004)...................................................................................42

*Westinghouse Electric Corp. v. Free Sewing Machine Co.*,
   256 F.2d 806 (7th Cir. 1958) ...................................................................................45

*Zinman v. Shalala*,
   67 F.3d 841 (9th Cir. 1995) .....................................................................................18

## Constitution

Art. 1, § 9, cl. 7 …………………………….............................................................19

**Statutes**

5 U.S.C.
  § 8346(b)..................................................................................... 18, 36

28 U.S.C.
  § 1292(a)(1) ....................................................................................1

42 U.S.C.
  *§ 404(b)…......……………………………………11, 12, 13, 18, 22, 23, 24, 26, 29, 31, 35
  § 405(g)..........................................................................................1
  § 1395s.........................................................................................21
  § 1395w-22(g)(5)...........................................................................1
  § 1395w-24(d)(2)...........................................................................4
  § 1395w-24(d)(2)(A) ......................................................................3
  § 1395w-104(h)(1)..........................................................................1
  § 1395w-113(a).............................................................................3
  § 1395w-113(c)(1)..........................................................................4
  § 1395w-115 .................................................................................3
  § 1395w-116(b)(3)..........................................................................3
  § 1395ff(b)(1)(A)............................................................................1
  § 1395gg …………………………………………………………………30
  § 1395gg(a)..................................................................................30
  § 1395gg(b)..................................................................................30
  *§ 1395gg(c) ......................................................... 13, 18, 22, 27, 29, 30, 31, 34
  § 1395hh(a)(1) .............................................................................21
  § 1395hh(c)..................................................................................21

45 U.S.C.
  § 231i .........................................................................................18

**Regulations**

20 C.F.R.
  § 404.501(a)................................................................................23
  § 404.502a .................................................................................31
  § 404.506 ...................................................................................31
  § 404.508 ...................................................................................17
  § 404.509 ...................................................................................17

42 C.F.R.
   § 405.357 ........................................................................................32
   § 405.358 ...........................................................................11, 31, 32
   § 408.110(c) ....................................................................................47

## Miscellaneous

Federal Register
   32 F.R. 18026 (Dec. 16, 1967) ........................................................31
   37 F.R. 10553 (May 25, 1972) ........................................................31
   61 F.R. 49269 (Sept. 19, 1996) .......................................................32

11A Charles A. Wright *et al., Federal Practice and Procedure* (2d ed. 1995) ......40

D.C. District Court Clerk's Office General Instructions and Filing Procedures,
   ¶ II.F.2 and 3 .................................................................................8

Medicare Payment Advisory Commission,
   "A Data Book, Healthcare Spending and the Medicare Program June 2006"....38

Merriam-Webster OnLine,
   http://www.m.com/dictionary/managed%20care.................................3

*Program Operations Manual System,
   § HI 01001.330A ........................................................... 4, 18
   § HI 01001.330C ........................................................... 17, 24, 26
   § HI 01001.330D ...........................................................47

**\* Authorities upon which we chiefly rely are marked with asterisks.**

# **GLOSSARY**

CMS        Centers for Medicare & Medicaid Services

HCFA       Health Care Financing Administration

HHS        Department of Health and Human Services

POMS       Program Operations Manual System

SSA        Social Security Administration

## JURISDICTIONAL STATEMENT

In addition to the provisions cited by the defendant-appellant Secretary of Health and Human Services ("the Secretary"), plaintiffs also asserted jurisdiction in the district court pursuant to 42 U.S.C. § 405(g), which is incorporated into the Medicare statute by 42 U.S.C. §§ 1395ff(b)(1)(A), 1395w-22(g)(5), and 1395w-104(h)(1).  See Complaint, ¶ 6, and First Amended Complaint, ¶ 6 (Joint Appendix (JA) 9, 41).  The plaintiffs agree that this Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

After the Social Security Administration erroneously paid about $50 million to 230,000 Medicare Part D participants, the Secretary, through the agency responsible for the Medicare program, the Centers for Medicare & Medicaid Services (CMS) in the Department of Health and Human Services, demanded return of those payments without informing the recipients of their right to seek waiver if recovery would be a hardship.  The plaintiffs-appellees, two organizations whose memberships include thousands of beneficiaries enrolled in Part D, and an individual Medicare beneficiary (hereinafter referred to collectively as "the beneficiaries" or "the participants"), filed this lawsuit to enforce the rights to seek waiver of recovery of the erroneous payments and to notice of that right. The Secretary's position has been that, unlike in other instances of a mistaken

payment to the beneficiary of a federal program, no authority exists for waiver of recovery in this one discrete situation.

Disagreeing with the Secretary, the district court concluded that the beneficiaries met all four factors for the issuance of a preliminary injunction, including a substantial likelihood of success on the merits. See Memorandum Opinion (Mem. Op.) at 8-22 (JA 84-98). Accordingly, in the Order of September 27, 2006 (JA 36), the court required the Secretary to cease his collection efforts until he had notified the affected beneficiaries of their right to seek waiver and had given them an opportunity to act on that right.

Therefore, the issue presented on this appeal is whether the district judge abused his discretion in concluding that a preliminary injunction was warranted.

## STATEMENT OF THE CASE AND OF THE FACTS

This case raises a significant issue about the government's handling of the new Medicare Part D program. The particular context in which it arises is itself important, as the Secretary's actions are injuring about 230,000 beneficiaries, most of whom have fixed and limited incomes, because of a mistake attributed solely to the government. Moreover, the Secretary's decision not to notify these beneficiaries of their right to seek waiver of recovery indicates that he will not apply hardship waiver rules to the inevitable future mistakes as well. As a consequence, it is critical that the courts repudiate the Secretary's position in order

to protect the millions of vulnerable elderly and disabled people who are and will be enrolled in the Part D program.

1. Legal background: The Medicare program is now divided into four substantive parts (labeled A through D), which provide, respectively, for insurance coverage of inpatient hospital and related care, of outpatient services, of a managed care program, and of a prescription drug program. See generally Mem. Op. at 2 (JA 78); Appellant's Br. at 3-4. The Secretary's description of Part D as a "managed care program" (Appellant's Br. at 4) is a novel view of Part D, not previously expressed. The fact that the insurance companies that contracted to cover prescription drugs under Part D are partially reimbursed by premiums from the enrolled Medicare beneficiaries does not transform it into managed care. See, e.g., 42 U.S.C. §§ 1395w-113(a), 1395w-115 (establishing the portions of the Part D premium paid by beneficiaries and the government, respectively).[1]

As with premiums paid for coverage under Parts A, B, and C, Congress determined that Part D beneficiaries should have the option of having their premiums withheld from their Social Security checks. Id., §§ 1395w-116(b)(3), 1395w-24(d)(2)(A). When a beneficiary selects that option, the Social Security

---

[1] Managed care is defined as "a system of health care (as by an HMO or PPO) that controls costs by placing limits on physicians' fees and by restricting the patient's choice of physicians." Merriam-Webster OnLine, http://www.m.com/dictionary/managed%20care.

Administration (SSA) credits the withheld amount to the Medicare Prescription Drug Account, from which it is paid to the prescription drug plan in which the beneficiary is enrolled. *Id.*, § 1395w-113(c)(1), incorporating *id.*, § 1395w-24(d)(2). SSA's withholding of the premium payment satisfies the beneficiary's obligation to pay the premium: "In the case of a beneficiary, premiums are paid when they are deducted from his/her benefits." Program Operations Manual System (POMS), § HI 01001.330A (reprinted in addendum to Brief for the Appellant). Accordingly, the beneficiary's obligation to the insurance company is met at the point of withholding. Correspondingly, as the Secretary acknowledged below, the transfer of the withheld portion of the Social Security benefit to the insurance company means that the private insurer has been paid. See Mem. Op. at 19 (JA 95); Memorandum of Points and Authorities in Support of Def. Motion to Dismiss and Opposition to Pl. Motion for Preliminary Injunction (docket # 6), at 6.

2. <u>Factual background</u>: There is no dispute that this general process of withholding Social Security benefits and payments to the insurer took place correctly in this instance. The event that triggered the Secretary's determination to ignore the beneficiaries' right to waiver occurred after the withholding of premiums and therefore after the beneficiaries' obligation to pay the premium had been satisfied.

In early August 2006, SSA, apparently believing that 230,000 Part D
enrollees no longer wished to have their premiums withheld, paid to them the
amount of one or more monthly premiums previously withheld, either by direct
deposit or by check.  See Appellant's Br. at 6; CMS "Tip Sheet" (discussed *infra*
at 6).  This mistake was entirely a governmental error, and no suggestion has been
made that any of the beneficiaries were at fault.  See First Amended Complaint, ¶
26 (JA 46).

The mistake was compounded by SSA's sending of a letter to the affected
beneficiaries explaining that "[t]his is the money that you are due."  Ex. B to First
Amended Complaint (JA 61).  The payments made by SSA were not the actual
premiums intended for the insurance companies, which, as noted, had already been
passed on to the insurers.  Rather, they reflected the amounts of those premiums.
SSA instructed the Treasury Department to pay these amounts, in the mistaken
belief that these portions of the beneficiaries' Social Security payments should not
have been withheld.

When the Secretary later discovered the error, he also sent a letter to the
beneficiaries, contradicting the letter previously sent by SSA and explaining that
there had been a mistake.[2]  The Secretary then took steps to recover the estimated

---

[2]  That letter is referred to in the first sentence of the Secretary's demand letter
to the beneficiaries.  See Exs. A and C to the First Amended Complaint (JA 58,
64).

$50 million that had been erroneously paid out. He posted on his website, and sent to his Part D "partners", a "Tip Sheet" entitled "Information Partners Can Use to Help Beneficiaries with: PREMIUM WITHHOLD REFUND ISSUE." It explained that beneficiaries had to repay the amounts erroneously paid to them and that they would be receiving a letter in early September "letting them know the process for returning the overpayment." The Secretary also posted and distributed a release that newsletters and other publications could publish in which similar information appeared.[3]

In late August or early September 2006, the Secretary sent the demand letter to the affected beneficiaries. See JA 58, 64. In this letter, the Secretary stated the amount of the mistaken payment and explained how it could and should be returned. Beneficiaries were told that they "should return this payment by September 30, 2006," and, in an ominous omission, the letter did not state the consequences for failing to meet that deadline. Because the letter acknowledged that repayment might cause a "hardship," beneficiaries were told that they could request to make monthly installment payments instead, but the Secretary did not offer or explain the right to seek waiver of recovery.

---

[3] Copies of the Tip Sheet and the release were attached as Exs. A and B to Pls. Motion for a Temporary Restraining Order and for a Preliminary Injunction (docket # 3).

3. <u>Proceedings in court</u>: On September 15, 2006, plaintiffs Action Alliance and Gray Panthers filed the original complaint and their Motion for Temporary Restraining Order and a Preliminary Injunction. JA 7, 24. The plaintiff organizations, which provide advocacy and assistance to elderly and disabled Medicare beneficiaries and include thousands of Part D participants among their members, contended that the Secretary is obligated to provide Part D beneficiaries -- like the beneficiaries of other federal benefit programs, including Part A and B participants who receive erroneous premium refunds -- with the right to seek waiver of recovery when they receive incorrect payments, with notice of that right, and with the right to pre-recovery oral hearings on a waiver request. The Secretary agreed to the terms of the proposed TRO, that he not send out more demand letters to the beneficiaries and that he delete postings on this issue from his website. Docket # 5.

In response to the motion for a preliminary injunction, the Secretary filed a motion to dismiss contending that the plaintiffs lacked standing. His opposition to their motion argued that Part D beneficiaries receiving erroneous premium refunds were not entitled to waiver of recovery. He did not contend, however, that the contours of the requested relief were inappropriate. Moreover, he offered no evidence in support of his opposition to the motion for a preliminary injunction. When the district judge ruled on that motion, therefore, the only evidence before

him was the undisputed allegations of the complaint and the declarations of the directors of the plaintiff organizations. JA 31, 34. The Declaration of Leslie Norwalk (JA 69) was not introduced until the Secretary filed his stay motion and thus was not before the district court when it granted the preliminary injunction.

On the morning of September 27, 2006, plaintiffs filed their First Amended Complaint, which substantially replicated the original complaint but added Lucy Carolyn Loveall as a plaintiff. Although Judge Kennedy himself apparently did not receive the amended complaint before he ruled later that day, it was in fact filed prior to the issuance of the preliminary injunction order.[4] The district court's rejection of the Secretary's standing argument was explicitly not based on the participation of plaintiff Loveall. See Mem. Op. at 4 n. 3 (JA 80).

The district judge held that the beneficiary organizations met the standards for associational or representational standing as set out in *Sierra Club v. EPA*, 292 F.3d 895, 989 (D.C.Cir. 2002). Mem. Op. at 5-7 (JA 81-83). He determined that at least one "member's existence and injury can be reasonably inferred from the

---

[4] Following the procedure for filing amended complaints (see D.C. District Court Clerk's Office General Instructions and Civil Filing Procedures, ¶ II.F.2., 3.), the beneficiaries filed the First Amended Complaint by e-mail, on the morning of September 27. (A paper copy of the cover e-mail is attached as the exhibit to the Opposition of Plaintiffs-Appellees to Defendant-Appellant's Emergency Motion for a Stay Pending Appeal (filed Oct. 3, 2006 in this Court)). The district court docket sheet accurately reflects the amended complaint's filing on September 27, but is chronologically wrong in listing its filing after issuance of the preliminary injunction order. See docket #s 12, 13.

available statistics. *See Natural Res. Def. Council v. EPA*, [464 F.3d 1, 7]
(D.C.Cir. August 29, 2006)." Mem. Op. at 5 (JA 81). The Secretary does not
question standing in this appeal.

On the beneficiaries' request for injunctive relief, the district court first
recognized that a preliminary injunction could issue if the arguments for one of the
four factors was particularly strong even if the arguments for the other factors were
weak. Mem. Op. at 8 (JA 84). Having said that, however, the court then
determined that the beneficiaries satisfied all four factors.

First, the beneficiaries "demonstrated a substantial likelihood of success on
the merits of their claim." Mem. Op. at 20 (JA 96). The court explained that the
waiver rules set out in the POMS apply to erroneous payments in the Part D
program, for "there is nothing to indicate that Congress intended to distinguish Part
D premiums from other Medicare premiums as they related to incorrect refunds."
Mem. Op. at 19 (JA 95). Second, irreparable harm existed both in the lack of
notice, which could not be corrected by a later award of damages, and in the very
nature of the waiver right, which, by requiring the decision on waiver to be made
before recovery is commenced, recognizes the severe harm that would otherwise
accrue. Mem. Op. at 20-21 (JA 96-97). This Court's prior decisions, including in
a case involving another federal waiver law, further reinforced the threatened
harm. Mem. Op. at 20-21 (JA 96-97).

In addition, the district court concluded that the potential harm to the beneficiaries outweighed any possible harm to the Secretary, and that "the public interest is best served by informing the affected Medicare beneficiaries of their rights and to enable them a meaningful opportunity to assert them." Mem. Op. at 21-22 (JA 97-98).

In fashioning an appropriate order, the district judge exercised his discretion to conclude that the relief suggested in the beneficiaries' proposed order (see docket # 3) offered the most effective approach. His Order (JA 36-38) therefore sought to put the parties back into their respective positions prior to the Secretary's mailing of the demand letter, which is the crux of the contested action and which triggered the participants' claims in this case. Since the right to waiver requires a decision on whether recovery should be waived prior to recovery, the Order prohibited further recovery and required the Secretary to repay any amounts refunded by beneficiaries. If the Secretary then elected to recover the erroneous payments, the beneficiaries were to be notified of their right to waiver, and no recovery could be effected unless a beneficiary either failed to request waiver within a specified time period or was denied the right to waiver.

On September 29, the Secretary filed a notice of appeal and sought stays of the Order of September 27 in both the district court and this Court. JA 74; docket # 16. The district court denied the requested stay, but on reconsideration granted a

temporary stay until this Court could rule on the stay motion pending before it. Docket #s 18, 19.  On October 4, the district court issued its decision explaining the basis for the September 27 Order.  Also on October 4 this Court granted a stay pending appeal and set an expedited briefing schedule.

## STATUTES AND REGULATIONS

Except for 42 U.S.C. § 404(b) and 42 C.F.R. § 405.358, which are reproduced in the addendum attached to this brief, the applicable provisions appear in the addendum to the Brief for the Appellant.

## SUMMARY OF ARGUMENT

Determining that the beneficiaries had satisfied all four of the traditional factors for a preliminary injunction, the district court correctly exercised its discretion in granting their motion.

On the merits, the beneficiaries dispute the Secretary's contention that the "safety valve" of waiver is not available to Medicare Part D participants who receive incorrectly refunded premium amounts.  Recognition of the right to waiver for mistakenly refunded premium amounts in Medicare Parts A and B demonstrates that statutory authorization for waiver exists, for the Appropriations Clause prohibits payment from the Treasury that is not authorized by Congress. Since this prohibition applies to actions by both of the other two branches of government, an executive agency may not waive recovery in the absence of

11

enabling legislation. Accordingly, the Secretary does not have the discretion to permit the right to seek waiver and may only do so when authorization exists.

The Social Security waiver provision, 42 U.S.C. § 404(b), applies in this instance because SSA, which is responsible for withholding part of the Social Security benefit to pay the Part D premium, made the erroneous payments to the beneficiaries. This is the same context in which the POMS provision for erroneous Part A and B premium refunds applies, and that provision draws its authority from 42 U.S.C. § 404(b). Moreover, since subsection 404(b) precludes any entity of the United States from recovering an incorrect payment without providing the right to seek waiver, it is irrelevant that an agency other than SSA has taken responsibility for recovering the erroneous payments. As the court below concluded, the "legislature's revealed design" indicates that Congress could not have intended diametrically opposite rules on waiver to apply depending on under which Part of Medicare the erroneously refunded premium amount was made.

Furthermore, no relevant distinction exists between Part A or B premiums, and Part D premiums. Although Part D premiums ultimately belong to the contracting insurance company, the insurers are not affected by the erroneous refund of the premium amounts because the insurers have already received the premium payments. The only tension is between the government, which made the incorrect payments, and the beneficiaries, who received it. The district court was

12

correct to hold that 42 U.S.C. § 404(b) authorizes the right to waiver for mistaken payments in Part D as well as in Parts A and B.

Authorization also can be found in the Medicare waiver statute, 42 U.S.C. § 1395gg(c), which does not preclude the right to waiver in circumstances not involving items and services. The Medicare waiver regulations originally were part of the Social Security waiver regulations and did not limit the right to waiver to the items and services context. Significantly, when they were reissued just for Medicare, the Secretary "duplicated" the previous regulations and again did not limit their applicability to erroneous payments for items and services. The relevant regulation – then and now – demonstrates that the Secretary has not read § 1395gg(c) in the restrictive terms which he now ascribes to it.

The courts have recognized the remedial and protective purposes of waiver provisions, and that, when the waiver standards are met, the ownership interest in the incorrect payment shifts to the beneficiary. The Secretary's attempt to deny waiver in this one isolated context is contrary to congressional intent, common sense, and the need of vulnerable beneficiaries for protection. The district court therefore correctly concluded that the beneficiaries were substantially likely to succeed on the merits.

As the district court determined, irreparable harm is apparent in two ways. First, the deprivation of notice of the right to seek waiver is a harm that cannot be

remedied by damages. Second, the very essence of waiver is premised on avoiding irreparable harm by providing a statutory safety valve in response to governmental mistakes. This Court's prior recognition of the vulnerability of the Medicare population, and of the harm that is visited upon those living on fixed and generally low incomes when they are denied the right to waiver, further emphasizes the extent of the harm in the instant situation. The Secretary ignores reality to suggest that harm will not befall a large percentage of the 230,000 people subjected to his mistake, and his post-ruling statistics, which are not properly part of the record on appeal, demonstrate only the harsh impact of his intimidating demand for immediate repayment.

As the Secretary does not dispute the district court's determination that the balance of hardships and the public interest favor the beneficiaries, all four factors are aligned in their support and preliminary relief was therefore appropriate.

The district court was also well within its discretion to return the parties to the *status quo* prior to the Secretary's demand letter, as only that approach allows the waiver standard to be applied prior to recovery of the erroneous payment, which is a critical element of the waiver concept. It is also consistent with the case law recognizing that beneficiaries should be returned to the benefit status in existence before the agency sent the defective notice. Only when a proper notice is then sent may the agency carry out its intended action.

## ARGUMENT

## I.    THE DISTRICT COURT CORRECTLY EXERCISED ITS DISCRETION TO ISSUE THE PRELIMINARY INJUNCTION.

### A.    <u>Because the district court applied the correct standard and did not abuse its discretion in granting the preliminary injunction, this Court should affirm.</u>

The district court examined the traditional four factors to determine the

beneficiaries' entitlement to a preliminary injunction, that is,

> whether: (1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction.

*Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-1318 (D.C.Cir. 1998); see also,

*e.g., Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C.Cir.

2006).  An applicant need not show that he satisfies all factors with equal strength,

as they "interrelate on a sliding scale and must be balanced against each other. If

the arguments for one factor are particularly strong, an injunction may issue even if

the arguments in other areas are rather weak." *Serono Labs.*, 158 F.3d at 1318

(quotation marks and citation omitted).

The district court determined that the beneficiaries had satisfied all four

factors and therefore were entitled to preliminary relief.  This Court reviews "the

weighing of the preliminary injunction factors under the abuse of discretion

standard, and its findings of fact under the 'clearly erroneous' standard …. To the

15

extent the district court's decision hinges on questions of law, ... our review is essentially *de novo*." *Serono Labs.*, 158 F.3d at 1318 (internal quotation marks and citations omitted); see also, *e.g., Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. As the Supreme Court has recently summarized in reviewing a preliminary injunction, the abuse of discretion standard requires affirmance if the plaintiffs' argument on the merits is a legitimate one and the other factors support their position:

> This Court, like other appellate courts, has always applied the abuse of discretion standard on the review of a preliminary injunction .... *If the underlying constitutional question is close, therefore, we should uphold the injunction* and remand for trial on the merits.

*Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 664 (2004) (quotation marks and citations omitted; emphasis added).

As the district court concluded, the beneficiaries have a strong likelihood of succeeding on the merits. The other three factors also favor the beneficiaries. Accordingly, the district court was correct, upon weighing these considerations, to conclude that the preliminary injunction should issue, and, as it did not abuse its discretion in that resolution, this Court should affirm.

## B.   The district court correctly concluded that the waiver rules apply to Part D beneficiaries who receive an erroneous payment based on the amount of their withheld premiums.

The Secretary's argument hinges on asserting that Congress decided that Medicare Part D participants who receive an erroneous payment based on the

amount of their withheld premiums, alone among virtually all federal program beneficiaries, are not entitled to waiver of recovery of that payment. In light of the remedial purposes underlying waiver, such a proposition makes no sense.

The two traditional requirements for waiver are (1) that the beneficiary not be at fault and (2) that to demand repayment would "defeat the purposes" of the benefit scheme or would be "against equity and good conscience." See, *e.g.*, *Califano v. Yamasaki*, 442 U.S. 682, 686 (1979); POMS, § HI 01001.330C. The first alternative prong of the second part of the test looks to whether the beneficiary would be deprived of needed income if recovery is carried out, see 20 C.F.R. § 404.508, while the "equity and good conscience" test represents "a broad concept of fairness." *Quinlivan v. Sullivan*, 916 F.2d 524, 527 (9th Cir. 1990); see also *Groseclose v. Bowen*, 809 F.2d 502, 505-506 (8th Cir. 1987) ("equity and good conscience" goes beyond the detrimental reliance concept set out in the regulation, 20 C.F.R. § 404.509).

The right to waiver, which has been repeatedly analyzed and explained by the courts, requires the relevant agency to decide whether a beneficiary is entitled to waiver *before* any recovery of the erroneous payment is made. *Yamasaki*, 442 U.S. at 694-695.[5] Waiver rules "act as a safety valve to provide relief from an

---

[5] See also *Elliott v. Weinberger*, 371 F.Supp. 960 (D.Haw. 1974), aff'd in part, rev'd in part, 564 F.2d 1219 (9th Cir. 1977), aff'd in part, rev'd in part *sub nom. Califano v. Yamasaki*, 442 U.S. 682 (1979) (discussing the Social Security

otherwise harsh or inequitable result," *Zinman v. Shalala*, 67 F.3d 841, 843 n. 1 (9th Cir. 1995), and it defies logic that Congress would have deprived this one category of federal program beneficiaries of that right.

> i.    *Congressional authorization is necessary for a federal agency to waive recovery of erroneous payments.*

The POMS provides the explicit basis for the Secretary to waive recovery of erroneous payments based on Parts A and B premiums. POMS, § HI 01001.330A; see Mem. Op. at 14 n. 10 (JA 90). The existence of that provision is highly significant for this case: it necessarily means that there exists statutory authority for waiver of recovery, whether it be 42 U.S.C. § 404(b) or 42 U.S.C. § 1395gg(c). Without such enabling legislation, no federal agency has the discretion to waive recovery. This is critical, and contrary to the Secretary's argument, because if there is authority for waiver of recovery of erroneous Part A and Part B premium refunds, the same authority must exist for waiver of erroneous Part D premium refunds.

---

Title II waiver statute, 42 U.S.C. § 404(b)); *Mattern v. Mathews*, 582 F.2d 248 (3d Cir. 1978) (same); *Pope v. Railroad Retirement Board*, 672 F.2d 972 (D.C.Cir. 1982) (discussing the Railroad Retirement waiver statute, 45 U.S.C. § 231i); *Shannon v. U.S. Civil Service Comm'n*, 444 F.Supp. 354 (N.D.Cal. 1977), aff'd in part, rev'd in part, 621 F.2d 1030 (9th Cir. 1980) (discussing the Civil Service waiver statute, 5 U.S.C. § 8346(b)). See generally *Burns v. U.S.R.R. Retirement Board*, 701 F.2d 193, 200 n. 14 (D.C.Cir. 1983) (listing waiver provisions in other federal programs).

That only a waiver statute can authorize the Secretary or any other agency head to waive recovery is dictated by the Appropriations Clause of the Constitution, Art. I, § 9, cl. 7, which provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." In its most recent analysis of that provision, the Supreme Court left no doubt that neither the judicial nor executive branch possesses the power to order the payment of funds from the Treasury in the absence of congressional authorization.

In *Office of Personnel Management v. Richmond*, 496 U.S. 414 (1991), the Court held that equitable estoppel did not apply to the federal government when the relief required a financial payment: "Our cases underscore the straightforward and explicit command of the Appropriations Clause. It means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Id.* at 424 (citation and internal quotation marks omitted). Accordingly, the Court held that the judiciary lacked the power to "grant ... a money remedy that Congress has not authorized." *Id.* at 426. Significantly, the Court also made clear that the same prohibition applied to the executive branch. *Id.* at 425.

The Court also noted that congressional authorization provides the antidote for governmental errors:

> Congress may always exercise its power to expand recoveries for those who rely on mistaken advice should it choose to do so. In

> numerous other contexts where Congress has been concerned at the
> possibility of significant detrimental reliance on the advice of
> Government agents, it has provided appropriate legislative relief.

*Id.* at 428.  Waiver statutes represent exactly that kind of congressional response.

Just as providing erroneous information may result in beneficiaries relying to their

detriment, so may a federal agency's erroneous payment have that result.  The right

to waiver before recovery provides the congressionally authorized "safety valve"

that was absent in the equitable estoppel context of *Richmond*.

*Richmond* and its predecessors make it clear that the Secretary could not,

without enabling legislation, allow waiver of recovery.  The Appropriations Clause

does not permit such discretionary action and spending by an executive agency.

*Id.*  Since the Secretary has consistently exercised the authority to waive recovery

of erroneous Medicare payments, the only conceivable basis for that authority is a

waiver statute.

Implicitly recognizing the relevance of the Appropriations Clause to this

case, but determined to avoid relying on a waiver statute that would mandate a

right to waiver, the Secretary attempts on appeal to divine some basis for his

alleged discretionary exercise of the waiver authority.  He contends that "an

agency's broad power to administer a benefits program carries with it power to

determine the circumstances under which erroneous payments will be recouped."

Appellant's Br. at 23.  This statement runs directly contrary to *Richmond*, however.

An executive agency does not possess some vague right to pay money out of the Treasury that Congress has not explicitly authorized, and waiving recovery of an erroneous payment is precisely that: payment out of the Treasury.

The Secretary offers three statutes and one decision for his erroneous proposition. He points to 42 U.S.C. §§ 1395hh(a)(1) and 1395hh(c), the provisions authorizing him to prescribe necessary regulations and other guidance to administer the Medicare program. But if these were interpreted so broadly as to allow him to pay out or not recover money as he chose, he would have virtually unfettered discretion over Medicare coverage and payment. Subsections 1395hh(a)(1) and 1395hh(c) are no more than what they appear to be: authorizations to promulgate regulations and guidelines for administering Medicare. See Mem. Op. at 12 n. 8 (JA 88). They do not provide a substantive basis for the Secretary to exercise blanket authority over the distribution of Medicare dollars.

Similarly, 42 U.S.C. § 1395s merely allows the SSA Commissioner to issue appropriate regulations on deducting Medicare premiums from Social Security benefits. It too provides no substantive authority for the Secretary to decide when benefits can be paid out of the Treasury or when erroneous payments need not be returned.

21

Finally, the Secretary cites one case, *California v. Settle*, 708 F.2d 1380 (9th Cir. 1983), which was decided pre-*Richmond*. The most that can be said about the relevance of *Settle* is that the Ninth Circuit read the *Medicaid* statute at that time to allow the Secretary to set (or not set) tolerance levels for states making erroneous payments. *Id.* at 1384. The Secretary offers no explanation as to how that decision would apply to the issues of this case, or as to what authority would support its application to the Medicare program. The Secretary would appear to infer from *Settle* that, in all instances and all programs, the Secretary has unfettered discretion over how to handle erroneous payments. In light of *Richmond*, however, that is certainly not the case now, if it ever was.

> ii.    *The authorization for waiver of recovery lies in either the Social Security waiver statute or the Medicare waiver statute.*

1. The court below concluded that the Social Security statute, 42 U.S.C. § 404(b), supplied the authorization for waiver of recovery of Part D premium amounts erroneously refunded. Mem. Op. at 15 (JA 91). Although the beneficiaries contend that the Medicare waiver statute, 42 U.S.C. § 1395gg(c), also provides the necessary endorsement (see *infra* at 29), they agree that section 404(b) authorizes waiver of recovery in this context.

First, the payments at issue and the entity responsible for making them are Social Security benefits and SSA. The moneys erroneously sent to the

beneficiaries were paid under the mistaken belief that these beneficiaries had opted

not to have their Part D premiums withheld from their Social Security checks.

Consequently, SSA believed that the portion of the Social Security benefit that it

had withheld should be returned to the beneficiary. This was a mistaken payment

by SSA and therefore implicates the Social Security waiver provision in § 404(b),

which applies "[i]n any case in which more than the correct amount of payment

has been made ...." See also 20 C.F.R. § 404.501(a).

Perhaps because CMS, not SSA, has sought to recover the erroneously made

payments, the Secretary takes the position that only the Medicare waiver statute

could conceivably apply. The record does not reflect why CMS took charge of the

recovery, but that fact is irrelevant: SSA and CMS have established, as the POMS

confirms, that an erroneous premium refund is subject to the Social Security

waiver provision. And that provision not only prohibits the Social Security

Administration from recovering without offering the right to seek waiver, but it

precludes "recovery *by the United States* from any person" who satisfies the

waiver standards. 42 U.S.C. § 404(b) (emphasis added). In short, once SSA has

made an incorrect payment, no government agency has the authority to recover that

payment without extending the right to waiver.

The determinative factor for purposes of the right to waiver is the source of

the erroneous payment, and, in this instance, there is no dispute that SSA was that

source. The fact that another agency takes responsibility for recovering the erroneous payments does not alter the fact that SSA incorrectly made the payments to Social Security beneficiaries. That triggers the waiver statute of Title II, 42 U.S.C. § 404(b).

The above discussion explains why the POMS provision derives its authority from the Social Security waiver provision. POMS, § HI 01001.330C states that the test to be applied for waiver of the recovery of erroneous Part A and B premium refunds is

> the same test used in determining whether recovery of a benefit overpayment would defeat the purpose of Title II (Social Security). Therefore, the same rules and procedures pertaining to recovery of a monthly benefit overpayment apply even though the incorrect premium refund is not a benefit overpayment.

(Citation omitted.) See also Mem. Op. at 11 (JA 87) ("The POMS bases its waiver provision on the general waiver provision of the Social Security Act").[6] Since the Social Security Act waiver provision applies to erroneous premium refunds in Parts A and B, the Secretary cannot avoid the same application of the waiver rules

---

[6] Although the POMS states that a mistaken premium refund is not "a benefit overpayment," CMS referred to it by that terminology in e-mails sent to its listserv recipients when explaining how it would effect recovery. This is not surprising since it is a distinction without a difference. The beneficiary is receiving more from SSA than she should have received, and the Social Security waiver statute applies because it is applicable not just to "benefit overpayments" but to all situations where "more than the correct amount of payment has been made." 42 U.S.C. § 404(b).

24

for erroneous premium refunds in Part D simply by asserting CMS' right to recover the erroneous payments.

The district court's analysis charts a similar course and reaches the same result (though without specifically noting that SSA made the incorrect payments). The court determined that the "legislature's revealed design," see *NationsBank of N.C. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257 (1995), led necessarily to the conclusion that Congress must have intended that the same waiver rules would apply to erroneous Part D premium refunds as to those in Parts A and B. The history of the Social Security waiver statute, in light of the congressional decision to use the same standards when Medicare and its waiver statute were later adopted, demonstrates that Congress could not have intended differential treatment:

> Congress's legislative design, as indicated by the [Social Security Act] waiver provision, was to provide Medicare beneficiaries with relief from the hardships of recovery, even if such relief would be at the expense of the government's ability to recover erroneous payments.

Mem. Op. at 15 (JA 91). It is irrational to treat erroneous payments based on premium amounts differently in one Medicare Part than in another.[7]

---

[7] Applying *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) and *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), the district court concluded that the Secretary's interpretation was not entitled to deference because of internal inconsistencies and impoverished reasoning. Mem. Op. at 12 (JA 88). For an additional reason, no deference is due: the policy of not applying the waiver rules in this situation is not the product of notice-and-comment rulemaking or, in fact, of any written analysis at all. Even if the POMS provision

The Secretary rejects the district court's approach partly on the ground that 42 U.S.C. § 404(b) applies only to errors in the payment of Social Security benefits. Appellant's Br. at 20. That is incorrect for two reasons. First, as noted, the incorrect payments were made by SSA out of Social Security funds. The reason for the incorrect payment is irrelevant; subsection 404(b) adheres because SSA made the erroneous payment. Second, the POMS provision is clear that, regardless of the terminology applied to the erroneous payment, the basis for the waiver rule in incorrect premium refunds is that from Title II, 42 U.S.C. § 404(b). See *supra* at 24 (quoting § HI 01001.330C).

The Secretary also faults the district court's analysis on the ground that comparison to Parts A and B is inappropriate. He contends that imposing a waiver provision for erroneous Part A and B premium refunds was a "discretionary decision [that] does not limit the agency's exercise of discretion with respect to other programs ...." Appellant's Br. at 21. This argument, however, falters on its premise that the Secretary or SSA has the discretion to have or not have a waiver rule. As has been explained, *supra* at 18-21, waiver of recovery is a payment from the Treasury, and the Appropriations Clause only allows that pursuant to explicit

---

is viewed as stating the policy against waiver in the Part D context, it is not entitled to *Chevron* deference because agency manuals and guidelines do not warrant that deference. See, *e.g., Public Citizen, Inc. v. U.S. Dept. of Health and Human Services*, 332 F.3d 654, 660 (D.C.Cir. 2003).

congressional authorization. Consequently, neither SSA nor the Secretary has the discretion to pick and choose when and where they will apply a waiver rule. If waiver is applicable to erroneous Part A and B premium refunds, it must be applicable for Part D as well.[8]

The Secretary also contends that it is logical to apply different rules to erroneous premium refunds in Parts A and B on the one hand, and to those in Part D on the other. Appellant's Br. at 23-25. He contends that, "[w]hereas Part A and B premiums are owed to the government, Part C and D premiums are owed to the private insurers ...." *Id*. at 24. This is a meaningless distinction, as the district court explained. First,

> [i]t is irrelevant to an individual beneficiary facing a demand for repayment that she cannot afford whether the money will ultimately land in the coffers of the government or of a private company. More importantly, it is not a factor that Congress ever considered when determining when the right to waiver arises.

Mem. Op. at 16 (JA 92); see also *Shannon*, 444 F.Supp. at 358 (quoted in Mem. Op. at 16 (JA 92)).

---

[8] For the same reasons, the Secretary is wrong to claim that, although 42 U.S.C. § 1395gg(c) "establishes the circumstances in which waivers *must* be made available[, i]t does not limit the circumstances in which hardship waivers *may* be made available." Appellant's Br. at 23. The Secretary does not have the discretion to make waiver available (or not available), and, as previously noted, *supra* at 21-22, the authorities cited on page 23 of his brief do not provide the authorization to do so.

Second, it is immaterial that the premiums ultimately become the property of the insurers, as the insurers are not affected by the erroneous payment of premium refunds, by their recovery, or by the failure to recover them. See Mem. Op. at 19 & n. 13 (JA 95). As the beneficiaries have explained and as the Secretary has acknowledged, see *supra* at 4, the premiums had already been withheld and paid to the insurers when SSA sent the erroneous premium refunds to the beneficiaries. In reality, the "premium refunds" were not that at all; they were simply payments based on the amount of the premium. The mistaken payment of these amounts to the beneficiaries did not affect the insurers, to whom the withheld premium had been passed on, nor did it affect the beneficiaries' right to Part D coverage, because withholding of the premium completed their obligation to the insurers.

The insurance companies have nothing to do with this case, and provide no basis for distinguishing between erroneous Part A or B premium refunds and erroneous Part D refunds. The conflict at issue is solely between the government, which mistakenly paid out Social Security benefits, and the beneficiaries, who received these payments. Accordingly, any harm will attach only to one or the other – depending on whether there is a right to waiver. The Secretary's insertion of the insurers into this issue is a red herring.[9]

---

[9] The Secretary misses the point in comparing the beneficiaries in this case to hypothetical beneficiaries who do not opt for Social Security withholding and who might "receive mistaken premium refunds from the private insurers themselves ...."

The district court was therefore correct to conclude that the right to waiver of recovery of erroneous premium refunds in Parts A and B requires the same right for mistaken payments in Part D. The recognized existence of that right for Parts A and B necessarily means that there exists statutory authorization for waiver of these incorrect payments based on withheld premiums. Since, in both situations, the agency that withholds the premium and then mistakenly refunds is SSA, the Title II waiver provision, 42 U.S.C. § 404(b), provides the source for waiver, as the POMS states. Consequently, no agency of the government may recover the incorrect payments without first providing the right to seek waiver. No logical reason presents itself – and the Secretary has offered none – why reliance on that statute for the POMS provision applicable to Parts A and B does not dictate the identical result in the Part D context.

2. The Medicare waiver statute, 42 U.S.C. § 1395gg(c), provides an alternative source of the beneficiaries' right to waiver. As an initial matter, there is no dispute that subsection 1395gg(c) applies to Part D. Its placement in Part E of the Medicare statute, which is titled Miscellaneous Provisions, renders it applicable

---

Appellant's Br. at 25. It is irrelevant whether the latter – if they exist – would have access to waiver of recovery. The point is that *these* beneficiaries have received erroneous payments from a governmental agency and therefore have a right to waiver. Those who opt for the private route to pay premiums may be subject to different rules, but those individuals are not before this Court.

to all four substantive Parts. The only issue is whether subsection 1395gg(c) applies to the erroneous payments that were made in this instance. In other words, would Congress have authorized waiver of recovery of improper payments made in the Medicare program in most situations but not in this one?

The Secretary argues that section 1395gg applies only to payments improperly made for "items and services." Appellant's Br. at 16-19. It is true that the treatment of erroneous payments for items and services is a focus of the section. Accordingly, the statute establishes that mistaken payments for items and services made to providers are treated as payments to beneficiaries and that, in specified circumstances, those payments should be recovered from the beneficiaries. 42 U.S.C. §§ 1395gg(a), (b). Not surprisingly, therefore, the waiver provision refers to subsection (b). *Id.*, § 13955gg(c). By its terms, however, subsection 1395gg(c) does not preclude its applicability to other situations; indeed, by its location in the sentence the reference to subsection (b) applies only to "adjustments", not to recoveries. Except for this ambiguous reference to subsection (b), the waiver provision describes precisely the situation that transpired here: there was an "incorrect payment" for which the beneficiaries were "without fault," and many of them will satisfy either the "defeat the purposes" or "against equity and good conscience" standards.

30

Significantly, this common sense reading of the statute is consistent with the regulations that were originally issued pursuant to the statute and that became, in substantially the same form, the present-day regulations. Promulgated in 1967 and 1972, the original regulations establishing the rights to seek waiver and to notice of the right to waiver for erroneous payments in both Social Security and Medicare (20 C.F.R. §§ 404.506 and 404.502a, respectively) cited both the Title II (Social Security) and Title XVIII (Medicare) waiver provisions as their source. 32 F.R. 18026 (Dec. 16, 1967) and 37 F.R. 10553, 10554 (May 25, 1972) (both citing "sections 204(b) and 1870(c) of the [Social Security] Act," 42 U.S.C. §§ 404(b) and 1395gg(c), as the basis for waiver). They included no suggestion that the provisions were limited to erroneous payments for items and services or otherwise restricted the right to waiver by conditioning it on the source or cause of the incorrect payment. See Mem. Op. at 18 (JA 94).[10]

When SSA became independent from the Department of Health and Human Services (HHS), CMS's predecessor, the Health Care Financing Administration (HCFA), had to issue regulations applicable only to Medicare. In announcing their promulgation, HCFA stated that the final version of the new regulations, codified

---

[10] The Medicare waiver regulation then and now defines "title II" and "title XVIII" by referring to the types of benefits available under those titles, so that the latter is described as "hospital and supplementary medical insurance benefits." 20 C.F.R. § 404.506 (32 F.R. at 18026); 42 C.F.R. § 405.358. It does not suggest a limitation on the right to waiver.

as 42 C.F.R. §§ 405.357 and 405.358, "duplicates … the content of two sections of the Social Security Administration's regulations concerning waiver of recovery of overpayments." 61 F.R. 49269 (Sept. 19, 1996). HCFA emphasized that the Medicare-only waiver regulations represented no change: "This is a technical regulation and no changes in Medicare policies concerning waiver result from this action." *Id.* at 49270.

Thus, the Secretary has consistently interpreted the Medicare waiver statute as applicable when any incorrect payment has been made. The regulations have never limited the right to waiver to mistakes arising from payments for items and services, which is particularly significant since HCFA had the perfect opportunity to do so when it was crafting the "new" regulations after SSA separated from HHS. By deciding to "duplicate" the original regulations, the Secretary was corroborating that the Medicare waiver statute did not restrict the right to waiver based on the cause of the erroneous payment.

The Secretary contends that differential application of the right to waiver is logical. Appellant's Br. at 18-19. The beneficiaries have previously explained, however, that the alleged distinguishing characteristic in the premium refund context -- governmental ownership of the premium in Parts A and B, and private insurers' ownership in Part D -- does not explain the contrasting right to waiver because the private insurer received the premium in any event and was unaffected

regardless of the outcome. See *supra* at 28. As the Court below summarized it: "[T]here is nothing to indicate that Congress intended to distinguish Part D premiums from other Medicare premiums as they relate to incorrect refunds." Mem. Op. at 19 (JA 95). The harm to beneficiaries is the same regardless of which Part of Medicare is implicated.[11]

The purported rationale for not allowing waiver of premium refunds in Part D, while allowing waiver in the benefit overpayment context, is that the amount at issue in the former situation is relatively small, and, "[i]f a premium is refunded in error, repayment requires only that the individual repay a sum that the individual paid once before." Appellant's Br. at 19. That is no answer, however, for the effect is the same as with a benefit overpayment or a mistaken premium refund in Parts A or B: the beneficiary receives an amount to which she is not entitled, relies on it and spends it, and then must return it. It is precisely because beneficiaries often use the money that they erroneously receive -- whether through a benefit overpayment or the mistaken refund of the premium amount -- that the waiver provisions were established.

---

[11] In the district court, the Secretary explained that the POMS waiver provision "[r]ecogniz[es] that premium errors in this Part B program could occur and place a burden on some enrollees ...." Def. Mem. in Support of Def. Motion to Dismiss and Opposition to Pl. Motion for Preliminary Injunction (docket # 6), at 28. The same harm and burden accrue in the Part D context.

In light of the regulatory gloss that the Secretary has placed on the Medicare waiver statute, waiver of recovery of refunded premium payments under Part D should be available to the same extent as for those incorrectly paid under Parts A and B. Any suggestion that the Medicare waiver statute's applicability is limited to erroneous payments for items and services has been consistently repudiated by the Social Security and then HCFA/CMS regulations that do not condition the right to waiver on the reason for the erroneous payment. The applicable waiver regulations have stated since 1967 that recovery of "an incorrect payment under title XVIII" is not permitted when the fault and equitable prongs of the waiver standard are met, and that undercuts the Secretary's present attempt to limit 42 U.S.C. § 1395gg(c).

> iii.    *Offering the right to seek waiver of recovery is the only logical response to the mistaken payment in this situation.*

Because of the likelihood of mistakes in programs of this size and the need to protect the disabled and elderly people who are dependent on them and who may suffer through no fault of their own, Congress has consistently included the right to waiver as a component of federal benefit programs. See *supra* at 17 & n. 5. The Secretary's overly technical reading of the statutes and guidelines runs directly contrary to this overriding congressional purpose and, specifically, to

"Congress's concern about the hardship faced by Medicare beneficiaries." Mem. Op. at 15 (JA 91); see also *id.* at 15 n. 11 (JA 91).

Indeed, the Secretary's aggressive response to the erroneous payments – while perhaps explicable in light of the embarrassment that it must have caused – betrays a genuine misunderstanding of the concept of waiver. The Secretary's web postings and letters to the beneficiaries incorrectly suggested that they had no rights beyond those benevolently bestowed upon them by the Secretary. In fact, however, waiver of recovery is a recognition that, when the standards are met, the beneficiary need not repay because ownership in the erroneous payment has been transferred to the beneficiary:

> Waiver is not a matter of "governmental beneficence," as the Secretary puts it. Under § 404(b) waiver is not discretionary, but mandatory, under the conditions specified. Thus, the statute creates a property interest in retention of overpayments if the conditions of waiver are met, even if there was no right to receive the overpayments in the first place.

*Elliott*, 564 F.2d at 1230. This motivating logic behind waiver provisions is no less applicable when the cause of the erroneous payment and the potential harm to the beneficiary is refund of a premium amount. Yet that is precisely what the Secretary is forced to argue: the improper repayment of the premium amount under Part D should preclude the right to waiver although it is available in other erroneous payment situations.

In *Shannon*, the court rejected the same argument in similar circumstances. Judge Spencer Williams[12] considered the Civil Service Commission's contention that the relevant waiver statute (5 U.S.C. § 8346(b)) applied only to incorrect payments caused by miscalculation of the basic annuity amount but not to those caused by the Commission's failure to deduct from the beneficiary's monthly benefit payment the health benefit or life insurance charges that were owed. The only difference between that situation and the instant one is that the incorrect payment in *Shannon* was caused by a failure to deduct the insurance premiums, see 444 F.Supp. at 357-358, while the mistaken payment here was the amount previously withheld to pay the insurance premiums.

Relying on the remedial and protective purposes of a waiver provision, Judge Williams emphatically rejected the suggestion that the cause of the mistaken payment was relevant to whether the right to waiver was triggered: "The obvious purpose of § 8346(b) is to avoid the hardship that can result from recovering overpayments from a blameless annuitant. The cause of the overpayment is immaterial to the impact on the annuitant." *Id.* at 358. That reasoning applies equally here: the Secretary has been able to offer no reason why the cause of the

---

[12] Judge Williams had considerable expertise on waiver issues, as he not only was the district judge in *Shannon* and wrote both the preliminary injunction and summary judgment decisions, but, sitting by designation on the Ninth Circuit, he also authored the panel's opinion in *Elliott*, the Social Security waiver case that became *Califano v. Yamasaki*, 442 U.S. 682 (1979).

36

mistaken payment should occasion diametrically different outcomes for Part D

participants receiving an erroneous premium refund, on the one hand, and virtually

all other federal program beneficiaries, including Medicare beneficiaries receiving

incorrect Parts A or B premium refunds, on the other. As noted in *Shannon*: "It

would be a strange rule indeed if the right to be considered for waiver depended on

the category into which a bureaucratic error falls." *Id.* at 359. The lines that the

Secretary attempts to draw defy logic.

The district judge in this case properly determined that the Secretary was

obligated to offer the beneficiaries the right to waiver of recovery. He was

therefore correct to conclude that they "demonstrated a substantial likelihood of

success on the merits of their claim." Mem. Op. at 20 (JA 96).

## C.    The beneficiaries established the threat of irreparable harm.

The Secretary briefly contends that the district court erred in finding

irreparable harm, Appellant's Br. at 27-29, but that court was correct in

recognizing the irreparable harm caused by the challenged action.

First, the real harm at issue is "the lack of notice, not the lack of money.

The lack of notice of a right to request waiver cannot, in these circumstances, be

repaired later by an award of damages." Mem. Op. at 20 (JA 96). The lack of

notice means that affected beneficiaries do not even know that they may be entitled

to keep the money, and therefore they may return it despite the extreme hardship that is caused and without the opportunity to exercise the right to request waiver.[13]

In addition, the waiver rules by their very nature are intended to prevent irreparable harm, as they recognize that forcing people in these circumstances to repay the erroneous amounts will have that effect:

> Congress implicitly recognized that the harm to beneficiaries was potentially irreparable – the waiver provisions require that beneficiaries be notified of their right to seek waiver, and that the government make a waiver determination *prior* to recovery.

Mem. Op. at 20 (JA 96) (citing *Yamasaki*, 442 U.S. at 693-694).

This analysis is particularly applicable in this situation, where the beneficiaries at risk are among the nation's most fragile: elderly and disabled people with illnesses and relatively small fixed incomes.[14] This Court has previously recognized the precarious financial positions of many Medicare

---

[13] Plaintiff Loveall illustrates the problem. She received the erroneous payment and the letter from SSA explaining (incorrectly) why she was entitled to it, had it confirmed that it was hers, spent it, and now is subject to a demand for its return even though she cannot afford to. See First Amended Complaint, ¶¶ 41-45 (JA 50-51).

[14] The financial profile of Medicare beneficiaries demonstrates why, for so many, waiving recovery of incorrect payments can be so crucial. The latest figures, for 2003, show that 19% have incomes below the federal poverty line, 11% are at 100-125% of the poverty line, 21% are at 125-200%, and 29% are at 200-400%. Medicare Payment Advisory Commission (MedPAC), "A Data Book, Healthcare Spending and the Medicare Program June 2006," Chart 1-5. Thus, over half (51%) of all Medicare beneficiaries have incomes below 200% of the federal poverty line. See also Mem. Op. at 21 & n. 15 (JA 97).

beneficiaries and the importance of catering to their vulnerability, physically and

financially, in the application of Medicare's procedural and substantive rules.

*Gray Panthers v. Schweiker*, 652 F.2d 146, 166-167 (D.C.Cir. 1980). In addition,

this Court has held that the failure to notify beneficiaries of the right to waiver was

a critical failing because

> "the loss occasioned by recoupment should not be minimized. The
> deprivation of a significant portion of fixed income can be a
> substantial loss indeed. Retired individuals living on fixed income
> frequently can ill afford even a moderate temporary decrease in their
> disposable income."

*Pope*, 672 F.2d at 975 (quoting *Shannon*, 444 F.Supp. at 363). Quoting this

passage, the court below concluded that the failure to provide the right to waiver

"was a significant harm that could not fully be repaired by damages." Mem. Op. at

20 (JA 96).

This Court's action in *Pope* is instructive for this case. Although the

Railroad Retirement Board made changes to its waiver policies during the course

of the litigation, it refused to inform annuitants retroactively of their rights. This

Circuit found that failure so significant in light of the harm that, in reversing the

district court's denial of class certification and a preliminary injunction, it ordered

the Board retroactively to apply the new notice and waiver rights to all annuitants

for whom recovery began after the commencement of the lawsuit, a period of

several years prior to the appellate decision. 672 F.2d at 413-414. This Court's

recognition of, and response to, the harm caused by an agency's failure to properly apply the waiver rules is sufficient in and of itself to support the holding below of irreparable harm.[15]

It cannot seriously be doubted that there has been, and continues to be, irreparable harm when 230,000 elderly and disabled individuals have been directed to refund payments within a month. It defies logic to think that, when hundreds of thousands of elderly and disabled people receive a notice from the government demanding immediate payment, none of those who repay will have suffered harm. If only 5% of the 230,000 have repaid even though they cannot afford to, then over 10,000 people have been subjected to this harm – and many thousands more are at risk. The Secretary's complaint that the beneficiaries have failed to identify more than one individual harmed by the Secretary's actions (Appellant's Br. at 28) betrays an ignorance of the reality of living on fixed incomes for this vulnerable

---

[15] Although the court below did not reach the constitutional question, see Mem. Op. at 20 n. 14 (JA 96), the denial of notice violated the beneficiaries' due process rights as well, a point established in *Elliott*, 564 F.2d at 1235-1236, and not challenged by the Secretary in the Supreme Court. See *Yamasaki*, 442 U.S. at 692. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." 11A Charles A. Wright *et al., Federal Practice and Procedure*, § 2948.1 at 161 (2d ed. 1995); see, *e.g., Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C.Cir. 2006); *Conn. Dept. of Environmental Protection v. OSHA*, 356 F.3d 226, 231 (2d Cir. 2004); *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984). The instant situation describes an ongoing constitutional violation, not merely an allegation of one. *Cf. Christian Civic League of Maine, Inc. v. FEC*, 433 F.Supp.2d 81, 90 (D.D.C. 2006) (3-judge court).

population and fails to acknowledge the extensive case law in this and other courts that has repeatedly recognized the irreparable nature of the harm caused by recovering erroneous payments.[16]

The Secretary's contention that repayment of the amounts demanded indicates that there neither has been, nor will be, any harm (Appellant's Br. at 28) also ignores the reality of living from month to month on a small fixed income. Merely because some beneficiaries have repaid the money does not demonstrate that they are not suffering; the only certain inference that can be drawn is that the Secretary's demand letter had the desired coercive effect. Again, as this Court held in *Pope* and *Gray Panthers*, for individuals living on fixed incomes the loss of even a small part of fixed income is a significant harm. Refunding that amount to them at a much later date will not make up for the loss of desperately needed income that they have sustained in the meantime. This is precisely the harm that waiver statutes were designed to prevent.

Furthermore, it is irrelevant that the very poorest of Medicare beneficiaries may not have been subject to recovery. See Appellant's Br. at 28. The fact

---

[16] The Secretary's suggestion that any harm accruing is fully mitigated by his offer of installment repayments, see Appellant's Br. at 27-28, only demonstrates a recognition that hardship is the necessary effect of his recovery demand. It does not negate the harm caused by that demand; as the case law cited by the beneficiaries bears out, even small reductions in fixed income do not alleviate the extreme nature of the harm.

remains, as the statistics and case law demonstrate, that Medicare beneficiaries generally have relatively low incomes (including many not eligible for the Part D subsidy that relieves them of the obligation to pay premiums), and, as a consequence, many cannot afford or absorb these repayments. See *supra* at 38-39 & n. 14.

Finally, the Secretary's effort to undercut beneficiaries' claims of irreparable harm by citing statistics from the Declaration of Leslie Norwalk and by making unsupported statements of fact in his appellate brief should be rejected. See Appellant's Br. at 28. The Norwalk Declaration was filed with the Secretary's motion for a stay, on September 29, after the district court had issued the preliminary injunction on September 27. See docket sheet #s 12, 16. Thus, it was not part of the record on which the district court based its decision and cannot be considered when this Court reviews that decision: "The record on appeal should consist of the record before the district court, and *should not include information made available subsequent to the date of the decision below*." *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 284 n. 32 (D.C.Cir. 1981) (emphasis supplied).[17] Furthermore, it should go without saying that relying on

---

[17] See also, *e.g., United States v. West*, 392 F.3d 450, 455 n. 2 (D.C.Cir. 2004) ("We need not consider these affidavits because they were not part of the record before the court when it denied West's motion to withdraw his plea"); *Goland v. C.I.A.*, 607 F.2d 339, 370 (D.C.Cir. 1978) ("Appellate review is ordinarily unaffected by matters not contained in the record.") (footnote omitted).

unsubstantiated statistics about alleged developments subsequent to the decision under review is inappropriate.[18]

In any event, even if the Secretary's improperly offered statistics are considered, they do not cast doubt on the validity of the findings and conclusions of the district court. The fact that many beneficiaries have responded to the Secretary's heavy-handed demand does not undercut the fact that they represent a relatively poor segment of the population and that many are seriously harmed by his recovering the erroneous payment – in direct contravention of the remedial purposes of waiver statutes. The Secretary cannot make that reality disappear by relying on the frightened reactions of this defenseless population to his intimidating repayment directive.

> **D.    The Secretary does not question the district court's determinations that the balance of hardships and the public interest support the preliminary injunction.**

Relying on this Court's *Pope* decision and its recognition of the harm occasioned by recovery of erroneous payments, the district court concluded that the balance of hardships favored the beneficiaries. Mem. Op. at 22 (JA 98). Since the Secretary presented no evidence to the district court on this issue, it would have

---

[18] Even if the Norwalk Declaration had been timely filed and properly part of the record on appeal, it should be stricken, as it largely consists of unsupported speculation and is not based on the personal knowledge of the declarant. See, *e.g., Londrigan v. F.B.I.*, 670 F.2d 1164, 1174-1175 (D.C.Cir. 1981).

been difficult to conclude otherwise. The Secretary does not here argue to the contrary, apparently acquiescing in the finding that the balance of hardships favored issuance of the preliminary injunction.

Nor does the Secretary question the district court's determination that "the public interest is best served by informing the affected Medicare beneficiaries of their rights and to enable them a meaningful opportunity to assert them." Mem. Op. at 22 (JA 98). Given the "safety valve" purpose of waiver statutes, and in light of *Pope* and the other authorities enforcing beneficiaries' right to the protections accorded by waiver rules, there can be no doubt that the public interest supports protecting this vulnerable population by enjoining the Secretary's actions.

## II.   THE INJUNCTION WAS AN APPROPRIATE EXERCISE OF THE DISTRICT COURT'S DISCRETION.

For the first time in this litigation, the Secretary disputes the scope of relief. Appellant's Br. at 26-27. This is striking because the district court largely chose to follow the proposed order filed by the beneficiaries, but the Secretary never questioned the terms of that proposed order in the district court. Although he now contends that the Order does not meet even the "threshold criterion" for a preliminary injunction, he offers neither decisions in which an order has been rejected for that alleged rationale nor any basis to reject it.

The *status quo* is "'the last uncontested status which preceded the pending controversy.'" *Consarc Corp. v. United States Treasury Dept., Office of Foreign*

*Assets Control*, 71 F.3d 909, 913 (D.C.Cir. 1995) (quoting *Westinghouse Electric*

*Corp. v. Free Sewing Machine Co.*, 256 F.2d 806, 808 (7th Cir. 1958)); see also,

*e.g., District 50, United Mine Workers v. Int'l Union, United Mine Workers*, 412

F.2d 165, 168 (D.C.Cir. 1969). The Secretary's contention that returning payments

refunded by the beneficiaries goes beyond the *status quo* misunderstands the nature

of this lawsuit and the right to waiver. Preserving the relative positions of the

parties in this instance requires restoring the beneficiaries to the position they were

in before the Secretary demanded repayment. Without that restoration, the

beneficiaries will lose the right to obtain a decision on waiver prior to recovery.

Since that circumstance is the essence of the right to waiver, it is imperative that

beneficiaries be returned to their position prior to the deprivation of their rights

effected by the Secretary's actions. See, *e.g.*, *Yamasaki*, 442 U.S. at 694 ("the

mandated act – waiver of recoupment … – is to precede other action").

Restoration also reflects the practical reality of this litigation. Until the

Secretary sent out the defective notice and demand letter, the beneficiaries' claims

were not ripe, and they could not have acted to stop the Secretary prior to sending

out the letter. Once the letter was sent out, the beneficiaries moved as quickly as

possible to commence the litigation and to obtain temporary relief. They were able

to file the complaint and the motion for a temporary restraining order and a

preliminary injunction only two weeks after the offending letter was sent and

should not be penalized because the Secretary acted with atypical speed to force the return of the erroneous payments.

Furthermore, the district court's order is consistent with the case law, which supports restoring beneficiaries to the position they occupied before defective notices were sent out. [19] It is the only available means for assuring full protection of their rights.

The decisions cited in footnote 19 also recognize that an agency cannot take adverse action until it sends out a proper notice setting out the beneficiaries' rights. That is the nature of the notice here at issue, as it seeks to provide the necessary information on which the beneficiaries may make an informed decision and avoid the harm that would be occasioned by returning the money without knowing of the potential to have recovery waived. Consistent with this case law, the Secretary's obligation to send out the notice only attaches in the event that he seeks to recover

---

[19] See, *e.g.*, *Kimble v. Solomon*, 599 F.2d 599, 605 (4th Cir. 1979) (court of appeals directs injunctive relief requiring Medicaid coverage to be restored to earlier levels until proper notice of reduction is sent out); *Banks v. Trainor*, 525 F.2d 837, 840 (7th Cir. 1975) (affirming preliminary injunction "reinstat[ing] the food stamp benefits ... to the original benefit level" until adequate notice is provided); *Febus v. Gallant*, 866 F.Supp. 45, 47 (D.Mass. 1994) (preliminary injunction ordering reinstatement to welfare rolls pending sending of proper notice); *Catanzano v. Dowling*, 847 F.Supp. 1070, 1086 (W.D.N.Y. 1994) (preliminary injunction restoring plaintiffs to Medicaid-covered home health care until notice and other procedural rights are provided); *Haymons v. Williams*, 795 F.Supp. 1511, 1525 (M.D.Fla. 1992) (permanent injunction restoring plaintiffs to Medicaid-covered home health care until notice and other procedural rights are provided).

the erroneous payments, because only in that scenario would the beneficiaries need the information in the notice. See Order at 3 (JA 38) (Secretary "preliminarily enjoined from collecting or holding any payment returned by any of the beneficiaries unless and until he has sent out the letter described above and has received the form back indicating a desire to pay with accompanying payment").[20]

Furthermore, court-ordered notice was the approach adopted by this Court as the necessary relief in *Pope*, 672 F.2d at 975-976, in which the responsible federal agency had not provided notice explaining the right to waiver.

The district judge correctly exercised his discretion to return the parties to the position that they occupied before the Secretary's challenged action and that will most fairly allow the opportunity to seek waiver. Not to refund the amounts that participants have paid back would be to reward the Secretary for his illegal action. It was precisely the failure of the district judge in *Pope* to order preliminary relief as a means of preventing the agency's unjust enrichment that

---

[20] The Secretary could decide not to send the notice to some or all of the participants by determining that recovery should be waived without further consideration. See POMS, § HI 01001.330D (no recovery for "an incorrect premium refund if the cost of recovery exceeds the collectible amount"). This "tolerance level" is set at three times the monthly Part B premium, *id.*, which would amount to $280.50 in 2007 (3 x $93.50), well above the average refund in this case of about $215. See also 42 C.F.R. § 408.110(c) (Secretary does not collect unpaid premiums when specified conditions are met including that "the cost of collection exceeds the amount of overdue premiums"). Waiver is a particularly appropriate resolution in this situation because it is undisputed that none of the beneficiaries is at fault.

motivated this Court to take action. See *id.* at 975. The beneficiaries in this case should not be subject to the same unfairness merely for the Secretary's convenience.

## CONCLUSION

For the reasons stated, the Order of the district court granting a preliminary injunction should be affirmed in all respects.

Respectfully submitted,

_____

Gill Deford
Judith Stein
Brad S. Plebani
Wey-Wey Kwok
Vicki Gottlich
Patricia B. Nemore
Sally Hart

Dated: December 4, 2006

48

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(C)

I certify that the foregoing Brief for the Appellees contains 10,253 words, as determined by the word count of the MicrosoftWord word-processing system on my office computer (and subject to the exclusions set out in F.R.A.P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(2)).

_____

Gill Deford
Attorney for Plaintiffs-Appellees
December 4, 2006

## CERTIFICATE OF SERVICE

I, Elizabeth Maldonado, under the direction of counsel for the plaintiffs-appellees, Gill Deford, certify that, on December 4, 2006, I served two copies of the Brief for the Appellees, by overnight mail, on counsel for the defendant-appellant at the following address:

> Alisa Klein
> Civil Division, Room 7235
> Department of Justice
> 950 Pennsylvania Ave., N.W.
> Washington, D.C. 20530-0001

I also sent Ms. Klein the Brief via e-mail.

Pursuant to Rule 25(d)(2), I also certify that, on the same date, I sent the original and 14 copies of the Brief for the Appellees, by overnight mail, to

> Mark J. Langer, Clerk
> U.S. Court of Appeals for the District of Columbia Circuit
> E. Barrett Prettyman United States Courthouse, Room 5423
> 333 Constitution Ave., N.W.
> Washington, D.C. 20001-2866.

_____
Elizabeth Maldonado