IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ACTION ALLIANCE OF SENIOR CITIZENS | ) | |
| GREY PANTHERS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-1607-HHK |
| | ) | |
| MICHAEL LEAVITT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S EXHIBIT C**

[SCHEDULED FOR ORAL ARGUMENT ON JANUARY 18, 2007]

No. 06-5295

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

ACTION ALLIANCE OF SENIOR CITIZENS, et al.,
Plaintiffs-Appellees,
v.

MICHAEL O. LEAVITT, SECRETARY OF HEALTH AND HUMAN SERVICES
Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

REPLY BRIEF FOR THE APPELLANT

Of Counsel:

DANIEL MERON
  General Counsel

KATHLEEN H. McGUAN
  Associate General Counsel

MARK D. POLSTON
  Deputy Associate General
    Counsel for Litigation

MARCUS H. CHRIST
LAWRENCE J. HARDER

U.S. Department of Health
  and Human Services Office
  of the General Counsel

PETER D. KEISLER
  Assistant Attorney General

JEFFREY A. TAYLOR
  United States Attorney

JEFFREY S. BUCHOLTZ
  Principal Deputy Assistant
    Attorney General

JONATHAN F. COHN
  Deputy Assistant Attorney General

MARK B. STERN
ALISA B. KLEIN
  (202) 514-1597
  Attorney, Appellate Staff
  Civil Division, Room 7235
  Department of Justice
  950 Pennsylvania Ave., N.W.
  Washington, D.C.  20530-0001

**TABLE OF CONTENTS**

Page

INTRODUCTION AND SUMMARY ...................................... 1

ARGUMENT ...................................................... 3

    THE PRELIMINARY INJUNCTION SHOULD BE VACATED ............. 3

        I.    The Injunction Is Premised On
             Errors of Law ................................. 3

            A.    No Statutory or Regulatory Provision
                 Requires The Government To Provide
                 The Waiver Proceedings Plaintiffs Seek .... 3

                 1.    The Medicare statute does not
                      provide for a hardship waiver
                      in these circumstances .............. 4

                 2.    The Social Security Administration's
                      Program Operations Manual System
                      (POMS) does not provide for a hardship
                      waiver in these circumstances ........ 8

                 3.    Section 404(b) does not provide
                      for a hardship waiver in these
                      circumstances ...................... 13

            B.    The District Court Lacked Legal Authority
                 To Compel Repayment of Money ............. 16

        II.   There Is No Basis For The "Preliminary"
            Relief Ordered By The District Court .......... 18

CONCLUSION .................................................. 21

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

TABLE OF AUTHORITIES*

Cases:                                                                  Page

  Bowen v. Massachusetts, 487 U.S. 879 (1988) ............... 16

  Consolidated Edison Co. of New York, Inc. v.
     Department of Energy, 247 F.3d 1378 (Fed. Cir.),
     cert. denied, 534 U.S. 1054 (2001) ..................... 17

  Lee v. Thornton, 420 U.S. 139 (1975) ...................... 17

* Norton v. Southern Utah Wilderness Alliance,
     542 U.S. 55 (2004) ..................................... 4

  Pope v. Railroad Retirement Board, 672 F.2d 972
     (D.C. Cir. 1982) ................................... 17, 18


Statutes:

  42 U.S.C. § 404(a)(1) ................................. 13, 16
  42 U.S.C. § 404(b) ...................... 2, 8, 13, 14, 15, 16
  42 U.S.C. § 1395gg(a-c) ................................... 4
  42 U.S.C. § 1395gg(b) .................................. 4, 10
  42 U.S.C. § 1395gg(c) ...................... 2, 4, 5, 8, 10, 12
  42 U.S.C. § 1395s ...................................... 9, 16
  42 U.S.C. § 1395w-24(d)(2) ............................... 10
  42 U.S.C. § 1395w-24(d)(2)(A) ........................ 9-10, 16
  42 U.S.C. § 1395w-101 .................................... 10
  42 U.S.C. § 1395w-113(c) ................................. 10
  42 U.S.C. § 1395w-113(c)(1) .............................. 16
  42 U.S.C. § 1395w-115 .................................... 10
  42 U.S.C. § 1395w-116(b)(3) .............................. 10

* Authorities on which we principally rely are marked with asterisks.

**Regulations:**

20 C.F.R. § 404.501(a) ..................................... 15
20 C.F.R. § 404.509 ......................................... 7
20 C.F.R. § 404.512 ......................................... 7

42 C.F.R. § 405.350(a) ...................................... 7
42 C.F.R. § 405.350(b) ...................................... 7
42 C.F.R. § 405.355 ......................................... 7
42 C.F.R. § 405.358 ......................................... 7
42 C.F.R. § 408.110(c) ..................................... 20

31 Fed. Reg. 13537 (1966) ............................... 6, 7

61 Fed. Reg. 49269 (1996) ................................... 7

iii

[SCHEDULED FOR ORAL ARGUMENT ON JANUARY 18, 2007]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 06-5295

ACTION ALLIANCE OF SENIOR CITIZENS, et al.,
Plaintiffs-Appellees,

v.

MICHAEL O. LEAVITT, SECRETARY OF HEALTH AND HUMAN SERVICES,
Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

REPLY BRIEF FOR THE APPELLANT

## INTRODUCTION AND SUMMARY

The material facts are simple and not in dispute.  In
August 2006, the Social Security Administration mistakenly issued
premium refunds to about 230,000 participants in Medicare Part D
prescription drug plans.  The average amount of the refund was
$215 and the total amount was about $47 million.  Within weeks,
the Department of Health and Human Services sent letters to the
participants asking for repayment.  The letters stressed that
benefits would not be affected, and explained that repayment in
installments could be arranged if repayment would pose a
hardship.  By the time the district court issued its opinion,
roughly $25 million had been repaid, reflecting payment from
about 111,000 participants.

The district court believed that the installment plan
offered by the Secretary was an inadequate way to address

whatever hardship might have been caused by the erroneous premium
refunds.  It held that repayment must be waived in its entirety
if a participant can show that repayment would constitute a
hardship.  It issued a "preliminary" injunction, directing the
Secretary to repay all of the money that had already been repaid,
and to send letters to all 230,000 participants advising them of
the right to request a hardship waiver.

Plaintiffs' brief confirms that the injunction is premised
on an error of law.  Their filing all but admits that the
provisions invoked in the complaint - 42 U.S.C. § 1395gg(c), and
the Social Security Administration's Program Operations Manual
System (POMS) - do not require a hardship waiver in this context.
Instead, plaintiffs argue, for the first time in the litigation,
that the waiver they seek is required by 42 U.S.C. § 404(b).

Plaintiffs' new argument is no better than their old.  The
new argument requires the Court to ignore crucial language of
Section 404, which provides that its waiver applies only to
overpayments of benefits paid under Title II of the Social
Security Act.  As the POMS explains, an improper refund of a
Medicare premium is not an overpayment of Title II benefits.

Plaintiffs also fail to identify a legal basis for an order
compelling the government to make payments to plan participants
who have returned the mistakenly issued refunds.  As plaintiffs
acknowledge, "neither the judicial nor the executive branch
possesses the power to order the payment of funds from the
Treasury in the absence of congressional authorization."

2

Pl. Br. 19.  The order would thus be impermissible even in connection with a final judgment.

The order is even more plainly improper as an aspect of preliminary relief.  Plaintiffs have identified only one participant who claimed that repayment would pose a hardship, and she did not address the installment option offered by the Secretary to accommodate cases of hardship.  Moreover, by the time the district court issued its opinion, nearly half of the affected participants had repaid the money without even requesting an installment plan.  Under these circumstances, the issuance of preliminary relief would have been an abuse of discretion even if there were merit to the underlying claim.

### ARGUMENT

**THE PRELIMINARY INJUNCTION SHOULD BE VACATED**

I.  **The Injunction Is Premised On Errors Of Law.**

A.  **No Statutory or Regulatory Provision Requires The Government To Provide The Waiver Proceedings Plaintiffs Seek.**

Plaintiffs believe that the installment option offered by the Secretary was an inadequate means of addressing whatever hardship might have been caused by the erroneous refunds of Part D premiums.  Their suit seeks to compel the Secretary to waive repayment in its entirety, if a participant can show that repayment would constitute a hardship.

As our opening brief explained and as plaintiffs do not dispute, this suit invokes the district court's mandamus authority and thus cannot succeed unless there is "a clear right

3

to the relief sought" and the Secretary "has a plainly defined
and nondiscretionary duty to provide the relief which plaintiffs
seek."  Complaint ¶¶39, 40 (JA 18); First Amended Complaint ¶¶47,
48 (JA 51-52) (same).  Accordingly, the only question is whether
any provision of law compels the Secretary to provide the waiver
that plaintiffs seek.  See Norton v. Southern Utah Wilderness
Alliance, 542 U.S. 55, 63 (2004) (mandamus remedy is limited to
the enforcement of "a specific, unequivocal command, * * *, the
ordering of a precise, definite act * * * about which [an
official] had no discretion whatever") (quotation marks and
citations omitted).

### 1. The Medicare statute does not provide for a hardship waiver in these circumstances.

As our opening brief explained in detail, the Medicare
waiver provision invoked in the complaint, 42 U.S.C. § 1395gg(c),
has no application here.  Section 1395gg provides for a hardship
waiver where the government has made an overpayment of Medicare
benefits, i.e., where "more than the correct amount is paid under
this subchapter to a provider of services or other person for
items or services furnished an individual[.]"  See 42 U.S.C.
§ 1395gg(b); 1395gg(c) (cross-referencing subsection (b)).  It
has no relevance where Medicare premiums were refunded in error.
Indeed, the district court recognized that the "entire framework
of § 1395gg(a-c) seems to concern only payments to providers for
items and services," Op. 11 (JA 87) (court's emphasis), and

4

"agree[d] with the Secretary that the statute itself appears silent as to how to handle overpayment of premiums." Ibid.

Plaintiffs now acknowledge that "[i]t is true that the treatment of erroneous payments for items and services is a focus of the section." Pl. Br. 30. Nonetheless, they contend that "subsection 1395gg(c) does not preclude its applicability to other situations[,]" ibid., and suggest that the original implementing regulations would have encompassed erroneous premium refunds, id. at 31.

However, the question is not what the statute might "preclude," but what it requires. By its terms, the statute requires a hardship waiver only in connection with overpayment of benefits. As our opening brief explained, Congress's focus on benefits overpayments is unsurprising, given the evident potential for hardship that they create. Benefits are paid to the provider of services, not to the individual, and repayment generally requires the individual to return money that the individual never received. The amount of money can be substantial, and benefits determinations may be made years after the treatment at issue. By contrast, premiums are a statutorily created obligation that an individual undertakes to enroll in one of the voluntary Medicare programs. They are small in comparison with benefits payments and predictable in amount. If a premium is refunded in error, repayment requires only that the individual repay a sum that the individual voluntarily agreed to pay when he enrolled in the program and, indeed, has already paid once

5

before. Compared to benefits overpayments, there is far less reason to expect that repayment of erroneous premium refunds will pose a hardship, and Congress thus established a waiver right in the benefits context that has no counterpart when a participant receives a premium refund to which he is not entitled.

Plaintiffs suggest that the scope of the waiver right depends on whether the government seeks recoupment of an erroneous payment through "adjustment" of benefits (i.e., offset) or through some other means of "recovery," such as by sending a letter asking for repayment. Pl. Br. 30 (urging that the cross-reference to subsection (b) "applies only to 'adjustments', not to recoveries"). They argue that such a reading of the statute would be consistent with the original implementing regulations. Pl. Br. 31.

As an initial matter, although plaintiffs declare that this would be a "common sense reading" of the statute, Pl. Br. 30, they make no effort to explain why such a distinction would be natural or logical. In any event, the 1966 regulations provide no support for plaintiffs' view and, indeed, make clear that it is untenable.

The 1966 regulations confirm that the right to a hardship waiver exists only in connection with an overpayment of benefits, regardless of whether recoupment is sought through adjustment or some other means of recovery. See 31 Fed. Reg. 13537 (1966) (§ 405.355) ("The provisions of § 405.352, may not be applied and there may be no adjustment or recovery of an overpayment

6

(§ 405.350(a)) or payment (§ 405.350(b)) in any case where
overpayment has been made with respect to an individual who is
without fault, and where such adjustment or recovery would defeat
the purpose of title II of the Act, or of the Railroad Retirement
Act of 1937, or would be against equity and good conscience.")
(emphasis added).  Sections 405.350(a) and (b) referred to
benefits payments to providers of services or other persons.  See
id. at 13536.

The current regulations are in relevant respects the same.
See 42 C.F.R. § 405.355 ("The provisions of § 405.352 may not be
applied and there may be no adjustment or recovery of an
incorrect payment (i.e., a payment made under § 405.350(a) or
§ 405.350(b)) in any case where such incorrect payment has been
made with respect to an individual who is without fault, * * *
where such adjustment or recovery would defeat the purpose of
title II or title XVIII of the Act or would be against equity and
good conscience.  (See 20 CFR 404.509 and 404.512.)") (emphasis
added).  Sections 405.350(a) and (b) refer to benefits payments
to providers of services or other persons.[1]

In short, Section 1395gg requires a hardship waiver only in
connection with an overpayment of benefits, and provides no basis

---

[1] Copies of the 1966 and current regulations are reproduced
in the addendum to this brief.  As plaintiffs acknowledge, the
regulation currently found at 42 C.F.R. § 405.358 was intended to
"'duplicate the content'" of 42 C.F.R. § 405.355.  Pl. Br. 32
(quoting 61 Fed. Reg. 49269 (1996)).

7

to compel the Secretary to waive recovery when premiums were
refunded in error.

### 2.   The Social Security Administration's Program Operations Manual System (POMS) does not provide for a hardship waiver in these circumstances.

As plaintiffs do not dispute, the waiver provision they cite
from the Social Security Administration's Program Operations
Manual System (POMS) applies only to erroneous premium refunds
under Medicare Parts A and B.  See, e.g., Pl. Br. 18.

The district court believed that it could compel the
expansion of the POMS waiver program if it perceived no
reasonable justification for the program's actual scope.  Op. 12
(JA 88).  As our opening brief explained, that approach mistakes
the relevant inquiry.  The court has no authority to require a
waiver for mistaken Part D premium refunds absent a "plainly
defined and nondiscretionary duty to provide" such a waiver.
Complaint ¶¶39, 40 (JA 18).  The court's approach is particularly
anomalous because it was considering provisions issued under the
discretionary authority of two different agencies.

Plaintiffs do not defend the district court's mode of
analysis, arguing instead that both the POMS provision and the
Part D waiver they seek are compelled by statute – either
42 U.S.C. § 1395gg(c) or 42 U.S.C. § 404(b).  We have already
explained that they are wrong with respect to Section 1395gg(c);
and we explain in section 3 below that their invocation of
Section 404(b) is equally unavailing.

8

Although plaintiffs do not defend the district court's analytic approach, they echo the district court in insisting that "no relevant distinction exists between Part A or B premiums, and Part D premiums." Pl. Br. 12; see also Pl. Br. 28-29. As our opening brief explained, however, the scope of the POMS provision reflects the differences between the Medicare fee-for-service programs (Parts A and B) and the managed care programs (Parts C and D).

As our opening brief discussed, under fee-for-service programs – Part A and Part B – the federal government makes direct payment to providers of health care services. The premiums belong to the government. Individuals who receive Social Security or certain other benefits are required to pay their premiums via deductions from those benefits. See 42 U.S.C. § 1395s. Because the premiums are owed to the government, this payment method inures directly to the government's benefit.

By contrast, under the managed care programs – Part C and Part D – the government does not make payment to health care providers. Instead, the government makes periodic payments to private insurers, which agree to provide health care services (Part C) or prescription drugs (Part D) through their networks of providers or pharmacies, and which bear the risk of providing such coverage. Premiums are not owed to the government, but to the private insurers. Payment of premiums via the Social Security-deduction method is not mandatory, but a convenience that is offered "at the enrollee's option." 42 U.S.C. § 1395w-

9

24(d)(2)(A) (Part C); id. § 1395w-113(c) (Part D). This payment
method does not benefit the government, which simply transmits
the premium payments to the private insurer on the enrollee's
behalf. See id. § 1395w-24(d)(2) (Part C); id. § 1395w-116(b)(3)
(Part D).[2]

These differences have direct consequences for the
availability of hardship waivers, both in the benefits context
and in connection with erroneous premium refunds. Plaintiffs
declare that, "[a]s an initial matter, there is no dispute that
subsection 1395gg(c) applies to Part D." Pl. Br. 29. But as we
have already explained, Section 1395gg(c) applies when the
government makes an overpayment to "a provider of services or
other person for items or services furnished an individual[.]"
42 U.S.C. § 1395gg(b). Under Parts C and D, the government does
not make payments to providers of services or other persons for

_____

[2] Although plaintiffs declare that the description of Part D
as a "managed care program" is a "novel view of Part D, not
previously expressed," Pl. Br. 3, our district court brief
explained that Part D is not a fee-for-service program and
stressed the similarities between Parts C and D. See, e.g.,
Docket Entry 7, at 4-5 ("Like Medicare Part C coverage, Medicare
Part D coverage must generally be elected by the beneficiary and
is offered through private insurance plans – known as
Prescription Drug Plans or PDPs – operating in various regions of
the country. See 42 U.S.C. § 1395w-101. Thus, in one important
respect, Part D insurance is like Part C. Under Part D Medicare
does not directly pay providers of prescription drugs, such as
pharmacies, under a fee-for-service model. Rather Medicare makes
periodic capitated payments to the PDPs who share in the risk of
providing prescription drug coverage. See 42 U.S.C. § 1395w-115.
In turn, the PDPs are responsible for reimbursing their network
pharmacies for their services.") (footnote omitted). In any
event, the similarities cannot be denied because the Part D
provisions incorporate many of the provisions of Part C.

10

items or services furnished an individual.  Parts C and D are not
fee-for-service programs.  Instead, the government makes periodic
payments to private insurance plans, which contract to provide
coverage through their own networks of providers and pharmacies
and which assume the risk of providing coverage.

The different premium structures of the fee-for-service and
managed care programs likewise explain the different treatment of
erroneous premium refunds.  As our opening brief explained,
Part C and D participants are not required to pay premiums via
the Social Security-deduction method, but may pay premiums
directly to the private insurer.  Indeed, of the 23 million
Part D participants nationwide, only about 4.8 million elect to
pay premiums via the Social-Security deduction method.

As plaintiffs do not dispute, when a private plan issues a
mistaken premium refund, the plan may recover the mistaken
payment without regard to hardship.  The premiums are, after all,
the condition of enrollment.  Indeed, plaintiffs concede that
"[t]hose who opt for the private route to pay premiums may be
subject to different rules[.]"  Pl. Br. 29 n.9.  Although
plaintiffs deem these differences "irrelevant," ibid., the regime
that they envision would confer waiver rights not enjoyed by the
Part D population at large on the subset that happens to pay
premiums via the Social Security-deduction method.  There can be
no contention that Congress, in enacting the Part D provisions,
required such differential treatment.

11

Finally, plaintiffs cannot alter the meaning of the POMS provision by invoking the Appropriations Clause. Plaintiffs (1) note that the POMS provision allows hardship waivers in the case of mistaken refunds of Part A and B premiums; (2) declare that this POMS provision would violate the Appropriations Clause if the waiver were not required by statute; and (3) conclude that the POMS provision therefore must be authorized by either Section 1395gg(c) or Section 404(b). Pl. Br. 18-22.

As an initial matter, plaintiffs' understanding of the Appropriations Clause is incorrect. An agency's decision to forego recovery is not the same as a decision to make payment, and no court has suggested that the Appropriations Clause compels an agency to pursue every penny in overpayment without regard to whether recovery would be cost-effective or would pose a hardship. But even assuming that plaintiffs' unorthodox view of the Appropriations Clause were correct, it would establish only that the POMS waiver program is unauthorized, not that its expansion may be compelled. As we have already shown, Section 1395gg(c) does not require the government to provide a hardship waiver when Medicare premiums are refunded in error. And, as we show below, Section 404(b) imposes no such requirement. Thus, whether or not the POMS provision is a permissible exercise of the Social Security Administration's administrative power (an issue not presented here), there is no basis to compel the government to waive mistaken refunds of Part D premiums.

12

3.    **Section 404(b) does not provide for a hardship waiver in these circumstances.**

Neither the complaint nor the first amended complaint alleges a violation of 42 U.S.C. § 404(b).  Complaint ¶¶41-44 (JA 18-19); First Amended Complaint ¶¶49-52 (JA 52-53).  Nor have plaintiffs named as a defendant the Commissioner of Social Security, who by statute is responsible for making hardship waiver determinations under Section 404(b).  See 42 U.S.C. § 404(b).  Nonetheless, plaintiffs now contend that the waiver right they seek is compelled under Section 404(b).  Pl. Br. 22-29.

Even assuming that this argument is properly before the Court, it is unavailing.  Plaintiffs can make their argument only by omitting key language from Section 404, which makes clear that the waiver right applies only in connection with overpayments of benefits under Title II.[3]

Section 404(a)(1) states:  "Whenever the Commissioner of Social Security finds that more or less than the correct amount of payment has been made to any person under this subchapter [Title II], proper adjustment or recovery shall be made, under regulations prescribed by the Commissioner of Social Security," as set out in subparagraphs that follow.  42 U.S.C. § 404(a)(1) (emphasis added).  Subparagraph (A) provides that the Commissioner "shall" recover overpayments of benefits by making

---

[3] Section 404 is reproduced in the addendum to plaintiffs' brief.

13

adjustments against Title II or other benefits or tax refunds.
Section 404(b), the hardship waiver provision, qualifies this
obligation to recover overpayments of benefits. It provides, in
relevant part: "In any case in which more than the correct
amount of payment has been made, there shall be no adjustment of
payments to, or recovery by the United States from, any person
who is without fault if such adjustment or recovery would defeat
the purposes of this subchapter or would be against equity and
good conscience."

As the underscored language makes clear, Section 404 applies
only to overpayments of benefits authorized under Title II of the
Social Security Act (old-age, survivor, and disability insurance
benefits), not to mistaken refunds of Medicare premiums owed
under Title XVIII. Indeed, in district court, there was no
dispute on this point. The complaint discusses Section 404(b) in
one paragraph only, as an example of how various federal benefits
programs provide for hardship waivers: "For instance, when
Social Security benefits authorized pursuant to Title II of the
Social Security Act are overpaid, recovery is prohibited by the
waiver provision of that Title (42 U.S.C. § 404(b)) when
beneficiaries satisfy the criteria set out" in that statute.
Complaint ¶13 (JA 10) (emphasis added); see also First Amended
Complaint ¶14 (JA 43) (same).

There is no basis for plaintiffs' present contention that a
mistaken refund of Medicare premiums constitutes an overpayment
of Title II benefits. Although plaintiffs declare that the POMS

14

waiver provision governing Medicare premium refunds "derives its authority" from Section 404(b), Pl. Br. 24, the contention is contradicted by the plain terms of the POMS provision that they invoke. In that provision, SSA notes that it uses, in connection with mistaken Medicare premium refunds, the same test for hardship that it uses in determining whether recovery of a Title II benefits overpayment should be waived. See POMS HI 01001.330, Part C. SSA explains that "the same rules and procedures pertaining to recovery of a monthly benefit overpayment (see GN02250.150 - GN02250.425) apply even though the incorrect premium refund is not a benefit overpayment." Ibid. (emphasis added).[4]

This provision leaves no doubt that a mistaken Medicare premium refund is not an overpayment of Title II benefits and, indeed, that overpayments of Title II benefits are not governed by the Medicare Part A and B premium provisions, but rather through a different set of POMS provisions (GN02250.150 - GN02250.425).[5] Likewise, the Social Security Administration's regulations define an overpayment of Title II benefits in a manner that does not include a mistaken Medicare premium refund. See 20 C.F.R. § 404.501(a).

---

[4] A copy of this POMS provision is reproduced in the addendum to our opening brief.

[5] Although plaintiffs purport to quote from the POMS, they omit the cross-reference to "GN02250.150 - GN02250.425." See Pl. Br. 24.

15

Indeed, it would be particularly anomalous to conclude that the Social Security Administration's rules governing recovery of Title II benefits overpayments apply in the context of mistaken Part D premium refunds. The Commissioner of Social Security is vested with the authority to issue regulations governing Title II overpayments, see 42 U.S.C. § 404(a)(1), and with the responsibility for determining when such overpayments should be waived, see id. § 404(b). The Commissioner likewise has the authority (in consultation of the Secretary of Health and Human Services) to regulate the manner in which Medicare Part B premiums are withheld from Social Security benefits. See 42 U.S.C. § 1395s. By contrast, under Medicare Parts C and D, it is the Secretary of Health and Human Services who is authorized to regulate the manner in which premiums are withheld from Social Security benefits. See 42 U.S.C. § 1395w-24(d)(2)(A); id. § 1395w-113(c)(1).

## B.   The District Court Lacked Legal Authority To Compel Repayment of Money.

Insofar as the district court ordered the payment of money, the relief would be outside its authority even at final judgment. As plaintiffs acknowledge, "neither the judicial nor executive branch possesses the power to order the payment of funds from the Treasury in the absence of congressional authorization." Pl. Br. 19. Although, under certain circumstances, a claim for specific moneys may proceed under the Administrative Procedure Act, a necessary prerequisite is that the payment be required by

16

statute.  See Bowen v. Massachusetts, 487 U.S. 879, 900 (1988)
(allowing an APA suit "to enforce the statutory mandate itself,
which happens to be one for the payment of money").[6]  Here, there
is no contention that the 230,000 Part D participants had any
right to the premium refunds in the first instance.  Nor is there
any contention that those with the ability to pay are entitled to
keep the money.

      Plaintiffs do not answer these points, although they were
made in our opening brief.  Instead, they declare that "[n]ot to
refund the amounts that participants have paid back would be to
reward the Secretary for his illegal action."  Pl. Br. 47.  This
is a startling characterization of the Secretary's effort to
recover for the public fisc money that was paid out in error.
The question whether there was any "illegal" action is, after
all, the issue in dispute.  Plaintiffs' principal authority, Pope
v. Railroad Retirement Board, 672 F.2d 972 (D.C. Cir. 1982), only
underscores the error in their position.  In Pope, the government
had reduced monthly benefits to recover alleged overpayments from
the Railroad Retirement Board, without providing notice of the
procedures available to contest the overpayment determinations.
This Court did not order the government to return the money

_____

      [6] A claim for a refund of moneys held by the Treasury
ordinarily falls within the scope of the Tucker Act, which
provides no authority for equitable relief.  See Consolidated
Edison Co. of New York, Inc. v. Department of Energy, 247 F.3d
1378, 1384-85 (Fed. Cir.), cert. denied, 534 U.S. 1054 (2001);
Lee v. Thornton, 420 U.S. 139, 140 (1975).

                              17

already collected; it directed the government to provide class members with notice of their rights.

As our opening brief explained, the government does not dispute that if a right to a hardship waiver exists in this context, the participants would be entitled to notice of that right.  Pope, which addressed issues of notice, provides no support for the extraordinary directive to re-issue refunds that were issued in error in the first place and that participants have already repaid.[7]

## II.  There Is No Basis For The "Preliminary" Relief Ordered By The District Court.

As we have shown, no provision compels the waivers ordered by the district court, and the court was without authority to order the payment of money.

Even apart from these fundamental flaws, there was no showing of irreparable harm that could justify the issuance of preliminary relief.

The Secretary's letters asked Part D participants to repay amounts that, only weeks earlier, they had received in error. The letters expressly accommodated the possibility of hardship by allowing participants to repay the money in installments, and stressed that benefits would not be affected.

The original complaint did not identify a single participant who claimed that repayment would constitute a hardship.  The

---

[7]   The cases that plaintiffs cite in a footnote (Pl. Br. 46 n.19) involved the restoration of statutory benefits, not a payment order unsupported by any statute.

18

amended complaint identified one such participant, but she did not address the installment option offered by the Secretary. Even if her allegation were considered, it could not provide a basis for ordering sweeping relief to more than two hundred thousand Part D participants not before the court. As our opening brief explained and as plaintiffs do not dispute, the neediest members of the Medicare population either do not pay Part D premiums at all or qualify for premium subsidies. Pl. Br. 41. Indeed, even plaintiffs' amicus, the American Association of Retired Persons, expects that "few" Part D participants will request a hardship waiver. AARP Br. 3.

The AARP's prediction has been borne out by the response to the Secretary's letters. By the time the district court issued its October 4 opinion, more than 111,000 participants had repaid the mistaken refund, without even requesting the installment plan offered by the Secretary to accommodate cases of hardship. Although plaintiffs contend that this Court must ignore this reality because the declaration was not part of the record when the district court issued its injunction on September 27, Pl. Br. 42, the declaration was before the district court when it issued its October 4 opinion and indeed, it was cited by the court. Op. 3 (JA 79).[8]

---

[8] Although the government's opening brief updated these numbers for the Court's information, nothing turns on the precise number of participants who have repaid the refunds that were refunded in error.

19

Under these circumstances, there is no basis for preliminary relief of any form. As discussed above, the government does not dispute that notice would be required if a waiver right exists. But as our opening brief explained and as plaintiffs do not dispute, the court ordered preliminary "notice" before even defining the contours of the putative right at issue. <u>See</u> Pl. Br. 7 (noting their allegation that "oral hearings" on waiver requests are required). The district court's approach thus would require a series of costly and potentially confusing notices. Plaintiffs suggest that, if "'the cost of collection exceeds the amount of overdue premiums,'" the Secretary should simply writeoff the debt in its entirety. Pl. Br. 47 n.20 (quoting 42 C.F.R. § 408.110(c)). The public interest is plainly not served by an injunction so burdensome as to compel the government to writeoff nearly $50 million in debt.

**CONCLUSION**

For the foregoing reasons and for the reasons stated in our opening brief, this Court should vacate the order of September 27, 2006.

Respectfully submitted,

Of Counsel:

DANIEL MERON
  General Counsel

KATHLEEN H. McGUAN
  Associate General Counsel

MARK D. POLSTON
  Deputy Associate General
    Counsel for Litigation

MARCUS H. CHRIST
LAWRENCE J. HARDER

U.S. Department of Health
  and Human Services Office
  of the General Counsel

PETER D. KEISLER
  Assistant Attorney General

JEFFREY A. TAYLOR
  United States Attorney

JEFFREY S. BUCHOLTZ
  Principal Deputy Assistant
    Attorney General

JONATHAN F. COHN
  Deputy Assistant Attorney General

MARK B. STERN
ALISA B. KLEIN
  (202) 514-1597
  Attorney, Appellate Staff
  Civil Division, Room 7235
  Department of Justice
  950 Pennsylvania Ave., N.W.
  Washington, D.C.  20530-0001

DECEMBER 2006

21

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(c) OF THE FEDERAL RULES OF APPELLATE PROCEDURE

I hereby certify pursuant to Fed. R. App. P. 32(a)(7)(C) that the foregoing reply brief contains 4,618 words, according to the count of Corel WordPerfect 12.

ALISA B. KLEIN

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of December, 2006, I caused copies of the foregoing reply brief to be sent to the Court by hand delivery and to the following counsel in the manner indicated:

Gill Deford, Esq.                    By overnight mail and email
Center for Medicare Advocacy
11 Ledgebrook Drive
Mansfield, CT  06250
(860) 456-7790
gdeford@medicareadvocacy.org

Bruce Vignery, Esq.                  By first class mail and email
AARP
601 E Street, N.W.
Washington, D.C.  20049
BVignery@aarp.org


                              _____
                              ALISA B. KLEIN

ADDENDUM

entitled to a special payment under section 228 for any month, the special payment, after any reduction under paragraph (a) of this section, is further reduced (but not below zero) by the excess (if any) of (1) the total amount of any periodic benefits under governmental pension systems for which the entitled individual's spouse is eligible for such month, over (2) $17.50.

(c) *Husband and wife entitled.* In the case of a husband and wife both of whom are entitled to a special payment under section 228 for any month:

(1) The special payment of the wife, after any reduction under paragraph (a) of this section, is further reduced (but not below zero) by the excess (if any) of (i) the total amount of any periodic benefits under governmental pension systems for which the husband is eligible for such month, over (ii) $35, and

(2) The special payment of the husband, after any reduction under paragraph (a) of this section, is further reduced (but not below zero) by the excess (if any) of (i) the total amount of any periodic benefits under governmental pension systems for which the wife is eligible for such month, over (ii) $17.50.

(d) *Determining whether individual is eligible for periodic benefits.* For purposes of this section, in determining whether an individual is eligible for periodic benefits under a governmental pension system:

(1) Such individual is deemed to have filed application for such benefits,

(2) To the extent that entitlement depends on an application by such individual's spouse, such spouse is deemed to have filed application, and

(3) To the extent that entitlement depends on such individual or his spouse having retired, such individual and his spouse are deemed to have retired before the month for which the determination of eligibility is being made.

(e) *Periodic benefit payable on basis other than calendar month.* For purposes of this section, if any periodic benefit is payable on any basis other than a calendar month, the amount of such benefit is allocated to the appropriate calendar months.

(f) *Amount payable less than $1.* If, under this section, the amount payable for any month is less than $1, such amount is reduced to zero. In the case of a husband and wife both of whom are entitled to a special payment under section 228 for the month, the preceding sentence is applied with respect to the aggregate amount payable. Thus, if the aggregate amount payable is less than $1, such amount is reduced to zero. However, if the aggregate amount payable to a husband and wife is $1 or more it is not so reduced.

(g) *Special payment not a multiple of $0.10.* If any special payment computed under the foregoing provisions of this section is not a multiple of $0.10, it is raised to the next higher multiple of $0.10.

(h) *Special payments of less than $5.* If, under this section, special payments due an individual (or aggregate pay-

ment in the case of a husband and wife) amount to less than $5, such special payments may be accumulated until they equal or exceed $5.

(i) *"Governmental pension system" defined.* The term "governmental pension system" means the insurance system established by title II of the Social Security Act or any other system or fund established by the United States, a State, any political subdivision of a State, or any wholly owned instrumentality of any one or more of the foregoing which provides for payment of (1) pensions, (2) retirement or retired pay, or (3) annuities or similar amounts payable on account of personal services performed by any individual (not including any payment under any workmen's compensation law or any payment by the Veterans' Administration as compensation for service-connected d i s a b i l i t y or death).

§ 404.378  Nonpayment of special payments under section 228 for months in which cash payments are made under public assistance.

(a) *General.* Except as provided in paragraph (b) of this section, no special payment under section 228 may be paid to an individual for any month if:

(1) Such individual receives aid or assistance in the form of money payments in such month under a State plan approved under title I, IV, X, XIV, or XVI of the Social Security Act (which titles relate to (i) old-age assistance and medical assistance for the aged, (ii) aid to dependent children, (iii) aid to the blind, (iv) aid to the permanently and totally disabled, and (v) aid to the aged, blind, or disabled, or for such aid and medical assistance for the aged, respectively), or

(2) Such individual's husband or wife receives such aid or assistance in such month, and under the State plan the needs of such individual were taken into account in determining eligibility for (or amount of) such aid or assistance.

(b) *State agency notification of termination of aid or assistance.* No special payment with respect to which paragraph (a) of this section applies may be paid for a month in the absence of receipt by the Social Security Administration of a notice from the State agency administering or supervising the administration of the applicable State plan that the aid or assistance referred to in such paragraph (a) has been or will be terminated with the payment or payments made in such month. To be effective for this purpose the notice shall identify the name of the individual age 72 or over on whose behalf aid or assistance was paid, his social security account number, and the last month in which the aid or assistance was or will be paid to him or on his behalf. The notice also should show the individual's date of birth or age, his current address, that the notice is being filed in compliance with section 228(d) of the Act as amended, and, where the State agency has the information, whether the individual has filed an application for social security benefits. To permit prompt

payment of the special payments under section 228, such notice should be filed as soon as it is determined that the pertinent aid or assistance will be terminated. The notice should be sent to the social security district office servicing the area in which the individual age 72 or over resides. The special payment under section 228 may be paid for the last month in which the aid or assistance was paid.

§ 404.379  Suspension where individual is residing outside the United States.

No special payment under section 228 for any month may be paid if, during such month, the individual entitled to such special payment is not a resident of one of the 50 States or the District of Columbia.

§ 404.380  When special payment treated as monthly insurance benefits.

A special payment under section 228 is treated as a monthly insurance benefit payable under section 202 of the Act for purposes of section 202(t) of the Act, relating to suspension of benefits of aliens who are outside the United States, for purposes of section 202(u) of the Act, relating to conviction of subversive activities and other offenses, and for purposes of section 1840 of the Act, relating to payment of premiums of individuals enrolled under Part B of title XVIII of the Act. However, a special payment under section 228 is not treated as a monthly insurance benefit under section 202 of the Act for purposes of entitlement to hospital insurance benefits under Part A of title XVIII of the Act (see § 404.367), for purposes of section 202(m) of the Act, relating to minimum benefits, or for purposes of section 1843(b) or section 1843(d) (3) (B) of the Act pertaining to State agreements for coverage under Part B of title XVIII of the Act of certain public assistance recipients.

2. The foregoing amendments shall become effective on the date of publication in the FEDERAL REGISTER.

(Secs. 205, 228, and 1102, 52 Stat. 1368, as amended, 80 Stat. 67, 49 Stat. 647, as amended; sec. 5 of Reorg. Plan No. 1 of 1953, 67 Stat. 18, 631; 42 U.S.C. 405, 428, and 1302)

Dated: October 4, 1966.

[SEAL]          ROBERT M. BALL,
          *Commissioner of Social Security.*

Approved: October 11, 1966.

WILBUR J. COHEN,
*Acting Secretary of Health,
Education, and Welfare.*

[F.R. Doc. 66-11424; Filed, Oct. 19, 1966;
8:48 a.m.]

[Reg. 5]

PART 405—FEDERAL HEALTH INSURANCE FOR THE AGED (1965—  )

Subpart C—Exclusions, Recovery of Overpayment, and Liability of a Certifying Officer

1. Chapter III, Title 20, is amended by adding thereto Subpart C of new Part 405 to read as follows:

HeinOnline -- 31 Fed. Reg. 13534 1966

RULES AND REGULATIONS 13535

Sec.
405.301  Scope of subpart.
405.310  Types of expenses not covered.
405.311  Nonreimbursable expenses; individual has no legal obligation to pay for items or services.
405.312  Nonreimbursable expenses; items or services paid for by governmental entity.
405.313  Nonreimbursable expenses; items or services not provided in United States.
405.314  Nonreimbursable expenses; items or services required as a result of war.
405.315  Nonreimbursable expenses; charges imposed by immediate relatives or members of beneficiaries' household.
405.316  Nonreimbursable expenses; payment for services made under workmen's compensation law.
405.317  Effect of workmen's compensation payment.
405.318  Responsibility of the individual concerning workmen's compensation payments.
405.319  Responsibility of intermediary concerning workmen's compensation payments.
405.320  Effect of lump-sum workmen's compensation settlement.
405.350  Individual's liability for payments made to providers and other persons for items and services furnished the individual.
405.351  Incorrect payments for which the individual is not liable.
405.352  Adjustment of title XVIII overpayments.
405.353  Certification of amount that will be adjusted against individual title II or railroad retirement benefits.
405.355  Waiver of adjustment or recovery.
405.359  Liability of certifying or disbursing officer.

AUTHORITY: The provisions of this Subpart C issued under secs. 1102, 1842, 1862, 1870, 1871, 42 Stat. 647, as amended, 79 Stat. 309, 79 Stat. 325, 79 Stat. 331; 42 U.S.C. 1302, 1395 et seq.

§ 405.301  Scope of subpart.

Sections 405.310 to 405.320 describe certain exclusions from coverage applicable to hospital insurance benefits (Part A of title XVIII) and supplementary medical insurance benefits (Part B of title XVIII). The exclusions in this subpart are applicable in addition to any other conditions and limitations in this Part 405 and in title XVIII of the Act. Sections 405.350 to 405.359 relate to the adjustment or recovery of an incorrect payment, or a payment made under section 1814(e) of the Health Insurance for the Aged Act.

§ 405.310  Types of expenses not covered.

Notwithstanding any other provisions of this Part 405, no payment may be made for any expenses incurred for the following items or services:

(a) Routine physical checkups—such as examinations performed not for the purpose of treatment or diagnosis of a specific illness, symptom, complaint, or injury, or examinations required by third parties, such as insurance companies;

(b) Eyeglasses or contact lenses for refractive error only—however, payment may be made for postsurgical eyeglasses customarily used during convalescence from eye surgery, or prosthetic lenses for aphakic patients;

(c) Eye examinations for the purpose of prescribing, fitting, or changing eyeglasses or contact lenses for refractive error only (however, examinations in conjunction with eye diseases, such as glaucoma or cataracts, are covered);

(d) Hearing aids or examinations for the purpose of prescribing, fitting, or changing hearing aids;

(e) Immunizations—no payment is made for vaccinations or innoculations unless directly related to the treatment of an injury or direct exposure such as antirabies treatments, tetanus antitoxin or booster vaccine, botulin antitoxin, antivenom sera, or immune globulin;

(f) Orthopedic shoes or other supportive devices for the feet—except when shoes are integral parts of leg braces;

(g) Custodial care;

(h) Cosmetic surgery, or in connection therewith, except as required for the prompt repair of accidental injury or for the improvement of the functioning of a malformed body member;

(i) Routine dental services in connection with the care, treatment, filling, removal, or replacement of teeth, or structures directly supporting the teeth;

(j) Personal comfort items and services (for example, a television set, or telephone service, etc.) ;

(k) Which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member (thus, payment could not be made for the rental of a special hospital bed to be used by an individual in his home if it was not a reasonable and necessary part of the individual's treatment).

§ 405.311  Nonreimbursable expenses; individual has no legal obligation to pay for items or services.

Payment may not be made under title XVIII of the Act for expenses incurred for items or services for which the individual who is furnished such items or services has no legal obligation to pay, and which no other person (by reason of the individual's membership in a prepayment plan or otherwise) has a legal obligation to provide or pay for. For example, no payment may be made for items or services, such as a chest X-ray, that are rendered free of charge by health organizations without regard for the individual's ability to pay. This exclusion does not prevent payment for items or services furnished by a group health prepayment plan to a member of the plan. Neither does it apply to items or services paid for by a governmental entity (with respect to such items or services, see § 405.312).

§ 405.312  Nonreimbursable expenses; items or services paid for by governmental entity.

Payment may not be made under title XVIII of the Act for expenses incurred for items or services that are paid for directly or indirectly by a governmental entity, except:

(a) Payment may be made for items or services furnished under a health insurance plan established for employees of the governmental entity.

(b) Payment may be made for items or services furnished an individual under a program based on one of the titles of the Social Security Act.

(c) Payment may be made for items and services furnished an individual in or by a participating hospital operated by a State or local governmental entity, where such hospital is a general or special hospital serving the general community, including a mental or tuberculosis hospital or a hospital for treatment of infectious disease.

(d) Payment may be made for items and services paid for by a State or local governmental entity and furnished an individual as a means of controlling infectious diseases or because of the individual's medical indigency, whether or not such services are furnished in a hospital.

(e) Payment may be made to a participating Federal hospital for items and services which it furnishes to the general public as a community institution or agency, but not for any items or services which it is required to furnish at public expense under a law of, or contract with, the United States.

(f) Payment may be made in other cases as specified by the Secretary under authority of section 1862(a)(3) of the Act.

§ 405.313  Nonreimbursable expenses; items or services not provided in United States.

Payment may not be made under title XVIII of the Act for expenses incurred for items or services which are not provided within the United States (that is, the States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and American Samoa), except for emergency inpatient hospital services furnished in accordance with the provisions of section 1814(f) of the Act.

§ 405.314  Nonreimbursable expenses; items or services required as a result of war.

Payment may not be made under title XVIII of the Act for expenses incurred for items or services which are required as a result of war, or of an act of war, occurring after the effective date of such individual's current coverage for hospital insurance benefits or supplementary medical insurance benefits.

§ 405.315  Nonreimbursable expenses; charges imposed by immediate relatives or members of beneficiaries' household.

Payment may not be made under title XVIII of the Act for expenses which constitute charges imposed by immediate relatives of the individual or members of his household.

(a) The term "immediate relatives" means spouse, father, mother, son, daughter, brother, or sister—by blood, marriage or adoption.

(b) The term "members of his household" means those persons sharing a common abode as part of a single family unit, including those related by blood,

2

HeinOnline -- 31 Fed. Reg. 13535 1966

· 13536

## RULES AND REGULATIONS

marriage, or adoption as well as domestic employees and others who live together as part of this family unit, but not including a mere roomer or boarder.

(c) The exclusion refers to the person imposing the charges, who might not be the person rendering the services. For example, where the charges are imposed by a:

(1) Physician or other practitioner in practice by himself, the exclusion would apply if the physician or other practitioner has the excluded relationship to the beneficiary.

(2) Partnership, the exclusion would apply only if all of the partners have the excluded relationship to the beneficiary.

(3) Corporation, the exclusion would not apply, regardless of the beneficiary's relationship to the directors, officers, stockholders of the corporation, or person rendering the services.

(4) Individual proprietorship, the exclusion applies if the individual who owns and operates the business has the excluded relationship to the beneficiary.

### § 405.316 Nonreimbursable expenses; payment for services made under workmen's compensation law.

(a) Payment may not be made under title XVIII of the Act with respect to any item or service to the extent that payment has been made, or can reasonably be expected to be made, under a workmen's compensation law or plan of the United States or a State.

(b) Any payment under title XVIII of the Act with respect to any item or service shall be made on the condition that repayment will be made to the appropriate fund if information is received that a workmen's compensation payment for the item or service has been made.

(c) For purposes of this exclusion, a workmen's compensation plan or system of the United States includes the workmen's compensation plans of the 50 States, the District of Columbia, and Puerto Rico, as well as the systems provided under the Federal Employees' Compensation Act and the Longshoremen's and Harbor Workers' Compensation Act.

### § 405.317 Effect of workmen's compensation payment.

(a) *Spell of illness.* Even though inpatient hospital or extended care services received by an individual are (or are expected to be) completely paid for under a workmen's compensation plan, rather than under title XVIII because of the provisions described in § 405.316(a), the services will be considered in determining whether a spell of illness (see sec. 1861 (a) of the Act) has started.

(b) *Expenses paid in full by workmen's compensation.* Where an injury or illness is covered under a workmen's compensation plan that pays all hospital and medical expenses, the services so paid for in full are not counted towards:

(1) The 90-day limitation on inpatient hospital services in each spell of illness (see § 405.110(c)).

(2) The 100-day limitation on posthospital extended care services in each spell of illness (see § 405.120(b)).

(3) The 190-day lifetime limitation for inpatient psychiatric hospital services (see § 405.110(d)).

(4) The 100 home health visits limitation under Part A or Part B of title XVIII (see § 405.130).

(5) Determining the first day for which payment for inpatient hospital or extended care services is reduced by the applicable coinsurance amount (see §§ 405.115 and 405.124).

(c) *Limited workmen's compensation payments.* Certain workmen's compensation plans specify limits on the number of days of hospitalization for which payment may be made or the total amount that can be paid under workmen's compensation. Services provided after these limits have been exhausted may be paid for under title XVIII, but the days of service or home health visits so paid for under title XVIII are included in applying the respective limitations under title XVIII.

(d) *Deductibles and coinsurance.* Payments made under workmen's compensation cannot be counted toward the deductibles or coinsurance provisions of title XVIII. Thus, if an individual is hospitalized twice in the same spell of illness and the first hospitalization is completely paid for under workmen's compensation, the inpatient hospital deductible would apply to the second hospitalization. In the same way, medical expenses otherwise reimbursable under Part B must first be reduced by any workmen's compensation payment before applying the deductible and coinsurance provisions.

### § 405.318 Responsibility of the individual concerning workmen's compensation payments.

The individual is responsible for taking whatever action is necessary to obtain payment under workmen's compensation where payment under that system can reasonably be expected. Failure to take proper and timely action, under such circumstances will preclude payment under title XVIII to the extent that payment could have been made under workmen's compensation if such action had been taken. Thus, so long as the facts indicate a reasonable expectation that payment may be made under a workmen's compensation statute, the individual must exhaust his administrative remedies under that system before any payment may be made under title XVIII. Where the time limit for taking action under workmen's compensation has expired and the intermediary determines payment could reasonably have been expected if timely action had been taken, payment under title XVIII will be denied to the extent that payment could have been made under workmen's compensation.

### § 405.319 Responsibility of intermediary concerning workmen's compensation payments.

Since title XVIII payments are precluded not only where payments have

been made under workmen's compensation but also where they can reasonably be expected to be made, it is the responsibility of the intermediary to determine that neither of these conditions apply before making payment where there is possible workmen's compensation involvement. Where the intermediary has information that a claim may be work related (either directly or from the nature of the injury or illness), and where the injury is of a type compensable under pertinent State or Federal law, the intermediary will immediately ascertain whether a workmen's compensation claim has been filed. Where such a claim has been filed, the claimant will be notified that no payment can be made under title XVIII until a determination as to liability under workmen's compensation is made.

### § 405.320 Effect of lump-sum workmen's compensation settlement.

Where a lump sum is awarded as payment of a workmen's compensation claim, payment for hospital and medical expenses may or may not be included in such a settlement. It is not necessary, however, to examine the settlement to determine what items or services for which payment has been made. Since in these cases an award has in fact been made, no payment may be made under title XVIII for items and services for which payment could have reasonably been expected to be made. Thus, in those States where there is no limitation on payment for hospital and medical expenses, no payment may be made for such services.

### § 405.350 Individual's liability for payments made to providers and other persons for items and services furnished the individual.

Any payment made under title XVIII of the Act to any provider of services or other person with respect to any item or service furnished an individual shall be regarded as a payment to the individual, and adjustment shall be made pursuant to § 405.352, where:

(a) More than the correct amount is paid to a provider of services or other person and the Secretary determines, that within a reasonable period of time, the excess over the correct amount cannot be recouped from the provider of services or other person, or

(b) A payment has been made under the provisions described in section 1814 (e) of the Act, to a provider of services or other person for items and services furnished the individual.

### § 405.351 Incorrect payments for which the individual is not liable.

Where an incorrect payment has been made to a provider of services or other person, the individual is liable only to the extent that he has benefited from such payment.

### § 405.352 Adjustment of title XVIII overpayments.

Where an individual is liable for an overpayment (as described in § 405.350 (a)) or a payment (as described in § 405.-

HeinOnline -- 31 Fed. Reg. 13536 1966

3

350(b)) adjustment is made (to the extent of such liability) by:

(a) Decreasing any payment under title II of the Act, or under the Railroad Retirement Act of 1937, to which the individual is entitled; or

(b) In the event of the individual's death before adjustment is completed, by decreasing any payment under title II of the Act, or under the Railroad Retirement Act of 1937 payable to the estate of the individual or to any other person, that are based on the individual's earnings record (or compensation).

§ 405.352  Certification of amount that will be adjusted against individual title II or railroad retirement benefits.

As soon as practicable after any adjustment is determined to be necessary, the Secretary, for purposes of this subpart, shall certify the amount of the overpayment or payment (see § 405.350) with respect to which the adjustment is to be made. If the adjustment is to be made by decreasing subsequent payments under the Railroad Retirement Act of 1937, such certification shall be made to the Railroad Retirement Board.

§ 405.355  Waiver of adjustment or recovery.

The provisions of § 405.352, may not be applied and there may be no adjustment or recovery of an overpayment (§ 405.350 (a)) or payment (§ 405.350(b)) in any case where the overpayment has been made with respect to an individual who is without fault, and where such adjustment or recovery would defeat the purpose of title II of the Act, or of the Railroad Retirement Act of 1937, or would be against equity and good conscience.

§ 405.359  Liability of certifying or disbursing officer.

No certifying or disbursing officer shall be held liable for any amount certified or paid by him to any provider of services or other person:

(a) Where the adjustment or recovery amount is waived (see § 405.355); or

(b) Where adjustment (see § 405.352) or recovery is not completed prior to the death of all persons against whose benefits such adjustment is authorized.

2. *Effective date.* The addition of Subpart C to Part 405 of Chapter III, Title 20, shall become effective on the date of publication in the FEDERAL REGISTER.

Dated: October 4, 1966.

[SEAL]        ROBERT M. BALL,
    *Commissioner of Social Security.*

Approved: October 11, 1966.

WILBUR J. COHEN,
    *Acting Secretary of Health,
    Education, and Welfare.*

[F.R. Doc. 66–11423; Filed, Oct. 19, 1966;
    8:48 a.m.]

# Title 21—FOOD AND DRUGS

Chapter I—Food and Drug Administration, Department of Health, Education, and Welfare

## SUBCHAPTER A—GENERAL

## PART 3—STATEMENTS OF GENERAL POLICY OR INTERPRETATION

### Oral Prenatal Drugs Containing Fluorides for Human Use

A number of vitamin-mineral preparations containing fluorides for prenatal use and intended or represented to be beneficial to tooth development in the fetus or in the prevention of dental caries in the offspring have appeared on the market in the last few years. These preparations and any other fluoride-containing drugs offered for the same uses are not generally recognized as effective for these purposes by experts qualified by scientific training and experience to evaluate the effectiveness of drugs.

Accordingly, under the authority vested in the Secretary of Health, Education, and Welfare by the Federal Food, Drug, and Cosmetic Act (secs. 502 (a), (f), 505, 701(a), 52 Stat. 1050, 1051, 1052, as amended, 1055; 21 U.S.C. 352 (a), (f), 355, 371(a)) and delegated by him to the Commissioner of Food and Drugs (21 CFR 2.120; 31 F.R. 3008), Part 3 is amended by adding thereto a new statement of policy, as follows:

§ 3.53  Oral prenatal drugs containing fluorides intended for human use.

(a) The Food and Drug Administration finds that there is neither substantial evidence of effectiveness nor a general recognition by qualified experts that prenatal drug preparations containing fluorides are beneficial to tooth development in the fetus or in the prevention of dental caries in the offspring.

(b) Any such drug preparation that is so labeled, represented, or advertised will be regarded as misbranded and subject to regulatory proceedings unless such recommendations are covered by a new-drug application, including substantial evidence of effectiveness, approved pursuant to section 505 of the Federal Food, Drug, and Cosmetic Act.

(c) A completed and signed "Notice of Claimed Investigational Exemption for a New Drug," Form FD–1571 set forth in § 130.3 of this chapter, must be submitted to cover clinical investigations to obtain evidence that such preparations are effective for such uses.

(d) Regulatory proceedings may be initiated with respect to drug preparations labeled contrary to the provisions of this statement and shipped within the jurisdiction of the act after 60 days from the date of publication of this statement in the FEDERAL REGISTER.

(Secs. 502 (a), (f), 505, 701(a); 52 Stat. 1050, 1051, 1052, as amended, 1055; 21 U.S.C. 352 (a), (f), 355, 371(a))

Dated: October 12, 1966.

JAMES L. GODDARD,
    *Commissioner of Food and Drugs.*

[F.R. Doc. 66–11422; Filed, Oct. 19, 1966;
    8:48 a.m.]

# Title 22—FOREIGN RELATIONS

Chapter I—Department of State

SUBCHAPTER F—NATIONALITY AND PASSPORTS
[Departmental Reg. 108.541]

### REVISION OF SUBCHAPTER

By the authority of Executive Order 11295 and Presidential Proclamation 3004 I hereby revoke the present regulations appearing as Part 50, Nationality Procedures under the Immigration and Nationality Act; Part 51, Passports; Part 52, Births and Marriages; and Part 53, Travel Control of Citizens and Nationals in Time of War or National Emergency. I prescribe the following regulations on these subjects:

## PART 50—NATIONALITY PROCEDURES

Sec.
50.1    Definitions.

Subpart A—Procedures for Determination of United States Nationality of a Person Abroad

50.2    Determination of U.S. nationality of persons abroad.
50.3    Application for registration.
50.4    Application for passport.
50.5    Application for registration of birth abroad.
50.6    Registration at the Department of birth abroad.
50.7    Report of birth.
50.8    Certification of birth.
50.9    Certificate of identity and registration.
50.10   Certificate of nationality.
50.11   Certificate of identity for travel to the United States to apply for admission.

Subpart B—Retention and Resumption of Nationality

50.20   Retention of nationality.
50.30   Resumption of nationality.

Subpart C—Loss of Nationality

50.40   Revocation of naturalization under section 340(d).
50.41   Certification of loss of United States nationality.
50.42   Determination of loss of nationality abroad in connection with application for passport in the United States.
50.50   Renunciation of nationality.
50.51   Certification of expatriation.

Subpart D—Board of Review on Loss of Nationality

50.60   Appeal by nationality claimant.
50.61   Organization of the Board of Review on Loss of Nationality.
50.62   Chairman.
50.63   Functions of the Board.
50.64   Scope of review on appeal.

4

**42 C.F.R. § 405.350**  Individual's liability for payments made to providers and other persons for items and services furnished the individual.

Any payment made under title XVIII of the Act to any provider of services or other person with respect to any item or service furnished an individual shall be regarded as a payment to the individual, and adjustment shall be made pursuant to §§ 405.352 through 405.358 where:

(a) More than the correct amount is paid to a provider of services or other person and the Secretary determines that:

> (1) Within a reasonable period of time, the excess over the correct amount cannot be recouped from the provider of services or other person, or

> (2) The provider of services or other person was without fault with respect to the payment of such excess over the correct amount, or

(b) A payment has been made under the provisions described in section 1814(e) of the Act, to a provider of services for items and services furnished the individual.

(c) For purposes of paragraph (a)(2) of this section, a provider of services or other person shall, in the absence of evidence to the contrary, be deemed to be without fault if the determination of the carrier, the intermediary, or the Centers for Medicare & Medicaid Services that more than the correct amount was paid was made subsequent to the third year following the year in which notice was sent to such individual that such amount had been paid.


**42 C.F.R. § 405.351**  Incorrect payments for which the individual is not liable.

Where an incorrect payment has been made to a provider of services or other person, the individual is liable only to the extent that he has benefited from such payment.


**42 C.F.R. § 405.352**  Adjustment of Title XVIII incorrect payments.

Where an individual is liable for an incorrect payment (i.e., a payment made under § 405.350(a) or § 405.350(b)) adjustment is made (to the extent of such liability) by:

(a) Decreasing any payment under title II of the Act, or under the Railroad Retirement Act of 1937, to which the individual is entitled; or

(b) In the event of the individual's death before adjustment is completed, by decreasing any payment under title II of the Act, or under the Railroad Retirement Act of 1937 payable to the estate of the individual or to any other person, that are based on the individual's earnings record (or compensation).

**42 C.F.R. § 405.355**  Waiver of adjustment or recovery.

 (a) The provisions of § 405.352 may not be applied and there may be no adjustment or recovery of an incorrect payment (i.e., a payment made under § 405.350(a) or § 405.350(b)) in any case where such incorrect payment has been made with respect to an individual who is without fault, or where such adjustment or recovery would be made by decreasing payments to which another person who is without fault is entitled as provided in section 1870(b) of the Act where such adjustment or recovery would defeat the purpose of title II or title XVIII of the Act or would be against equity and good conscience.  (See 20 CFR 404.509 and 404.512.)

(b) Adjustment or recovery of an incorrect payment (or only such part of an incorrect payment as may be determined to be inconsistent with the purposes of title XVIII of the Act) against an individual who is without fault shall be deemed to be against equity and good conscience if the determination that such payment was incorrect was made subsequent to the third year following the year in which notice of such payment was sent to such individual.  (See §§ 405.330- 405.332 for conditions under which payment may be made for items or services furnished after October 30, 1972 which are noncovered by reasons of § 405.310 (g) and (k).)

---

**20 C.F.R. § 404.501**  General applicability of section 204 of the Act.

 (a) In general.  Section 204 of the Act provides for adjustment as set forth in §§ 404.502 and 404.503, in cases where an individual has received more or less than the correct payment due under title II of the Act.  As used in this subpart, the term overpayment includes a payment in excess of the amount due under title II of the Act, a payment resulting from the failure to impose deductions or to suspend or reduce benefits under sections 203, 222(b), 224, and 228(c), and (d), and (e) of the Act (see Subpart E of this part), a payment pursuant to section 205(n) of the Act in an amount in excess of the amount to which the individual is entitled under section 202 or 223 of the Act, a payment resulting from the failure to terminate benefits, and a payment where no amount is payable under title II of the Act.  The term underpayment as used in this subpart refers only to monthly insurance benefits and includes nonpayment where some amount of such benefits was payable.  An underpayment may be in the form of an accrued unpaid benefit amount for which no check has been drawn or in the form of an unnegotiated check payable to a deceased individual.  The provisions for adjustment also apply in cases where through error:

   (1) A reduction required under section 202(j)(1), 202(k)(3), 203(a), or 205(n) of the Act is not made, or

   (2) An increase or decrease required under section 202(d)(2), or 215 (f) or (g) of the Act is not made, or

   (3) A deduction required under section 203(b)(as may be modified by the provisions of section 203(h)), 203(c), 203(d), 203(i), 222(b), or 223(a)(1)(D) of the Act or section 907 of the Social Security Amendments of 1939 is not made, or

6

(4) A suspension required under section 202(n) or 202(t) of the Act is not made, or

(5) A reduction under section 202(q) of the Act is not made, or

(6) A reduction, increase, deduction, or suspension is made which is either more or less than required, or

(7) A payment in excess of the amount due under title XVIII of the Act was made to or on behalf of an individual (see 42 CFR 405.350-405.351) entitled to benefits under title II of the Act, or

(8) A payment of past due benefits is made to an individual and such payment had not been reduced by the amount of attorney's fees payable directly to an attorney under section 206 of the Act (see § 404.977).

(9) A reduction under § 404.408b is made which is either more or less than required.

(b) Payments made on the basis of an erroneous report of death. Any monthly benefit or lump sum paid under title II of the Act on the basis of an erroneous report by the Department of Defense of the death of an individual in the line of duty while such individual was a member of the uniformed services (as defined in section 210(m) of the Act) on active duty (as defined in section 210(l) of the Act) is deemed a correct payment for any month prior to the month such Department notifies the Administration that such individual is alive.

(c) Payments made by direct deposit to a financial institution. When a payment in excess of the amount due under title II of the Act is made by direct deposit to a financial institution to or on behalf of an individual who has died, and the financial institution credits the payment to a joint account of the deceased individual and another person who was entitled to a monthly benefit on the basis of the same earnings record as the deceased individual for the month before the month in which the deceased individual died, the amount of the payment in excess of the correct amount will be an overpayment to the other person.

7