IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ACTION ALLIANCE OF SENIOR CITIZENS, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 06-1607-HHK |
| MICHAEL LEAVITT, | ) ) | |
| Defendant. | ) ) ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE
TO FILE SUPPLEMENTAL AND SECOND AMENDED COMPLAINT**

OF COUNSEL:
DANIEL MERON
General Counsel

MARK D. POLSTON
Acting Associate General Counsel

MARCUS H. CHRIST
Acting Deputy Associate
General Counsel for Litigation

LAWRENCE J. HARDER
Attorney
United States Department of
Health and Human Services

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

RICHARD G. LEPLEY
PETER ROBBINS
United States Department of Justice
20 Massachusetts Avenue, N.W., Room 7142
Washington, D.C.  20530
Tel:  (202) 514-3953

Attorneys for Defendant

## TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   A.  Overview of the Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   B.  Social Security. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      1.  The authority of the Commissioner of Social Security. . . . . . . . . . . . . . . . . . 5

      2.  Benefits under Title II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      3.  How overpayments of Title II benefits are recovered. . . . . . . . . . . . . . . . . . 6

      4.  When a notice of a right to request a waiver of recovery is needed.. . . . . . . . . . . 7

   C.  Medicare. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      1.  The authority of the Secretary of Health and Human Services. . . . . . . . . . . . . 9

      2.  Medicare Parts A-B and Parts C-D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      3.  Recovery of overpayments under Medicare.. . . . . . . . . . . . . . . . . . . . . . . . . . 10

   C.  Medicare Premiums and Payment Methods.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

   D.  The Government's Authority to Recover Erroneous Refunds of Medicare Premiums. . . 15

   E.  Recovery Waivers for Erroneous Refunds of Premiums under Part B and Parts C-D. . . 16

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

   A.  Motion for Leave to File Amended Complaint under Fed. R. Civ. P. 15(a). . . . . . . . . . 23

   B.  Motion for Leave to File Supplemental Complaint under Fed. R. Civ. P. 15(d). . . . . . . 24

   C.  Standards for Determining Whether Plaintiffs' Amended/Supplemental
      Complaint Would Survive a Motion to Dismiss. . . . . . . . . . . . . . . . . . . . . . . . . . . 26

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

I.  PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE THEIR PROPOSED
    AMENDED/SUPPLEMENTAL COMPLAINT COULD NOT SURVIVE A
    MOTION TO DISMISS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    A.  The Recovery-Waiver Provision in 42 U.S.C. § 404(b) Does Not Apply
        to Erroneous Refunds of Medicare Premiums Because Medicare Premiums
        Are Not Title II Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        1.  The Commissioner's view is consistent with the plain statutory
            language. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        2.  The legislative history does not support plaintiffs' construction. . . . . . . 32

        3.  Plaintiffs' reading makes absurd distinctions among prescription-drug
            enrollees and perversely discourages self-reliance. . . . . . . . . . . . . . . . . 34

    B.  Notice of Waiver-Request Rights Is Not Required under 20 C.F.R.
        § 404.502a Because Erroneous Refunds of Medicare Premiums are not
        Overpayments Subject to Waiver Protection under Title II Regulations. . . . . . . 36

    C.  The POMS Manual Provision Does Not Apply to Erroneous Refunds of
        Prescription-Drug Premiums under Medicare Parts C and D. . . . . . . . . . . . . . . 37

    D.  Plaintiffs' Due Process Claim Lacks Merit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    E.  The Commissioner's Instructions to Extend Waiver Protections to Erroneous
        Refunds of Part B Premiums Does Not Compel Him to Extend Protections to
        Part D Refunds. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

II. PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE IT CHANGES THE
    NATURE OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

## INTRODUCTION

This action seeks to impose extra-statutory fetters on the ability of the federal government to recover millions of dollars in insurance premiums that were erroneously returned to some Medicare beneficiaries newly enrolled in prescription-drug plans last year.  Plaintiffs claim that one particular minority of enrollees – those who opt to pay their prescription-drug premiums to a private insurer through deductions from their monthly Social Security checks – enjoy special protections against the recovery of erroneous refunds that are not enjoyed by other enrollees who pay their premiums by more direct means.  Plaintiffs have been unable, however, to identify any statute or regulation that supports, let alone mandates, such a curious policy preference.

In their original complaint, plaintiffs claimed that the special anti-recovery rights they seek were mandated somewhere in the penumbra of 42 U.S.C. § 1395gg.  As this Court will recall, that statute authorizes the Secretary of Health and Human Services to require beneficiaries to return certain overpayments made to health-care providers for medical "items and services" under the Medicare program.  42 U.S.C. § 1395gg(a).  But, in circumstances where the beneficiary is not at fault, the statute prohibits recovery where it "would defeat the purposes" of the Social Security Act or "would be against equity and good conscience."  42 U.S.C. § 1395gg(c).  Although plaintiffs initially persuaded this Court that this statute could be broadened to mandate the same recovery protections in situations where prescription-drug premiums were not properly deducted from Social Security checks,[1] their theory was subsequently rejected in near-summary fashion by the Court of Appeals for this Circuit.  Action Alliance of Senior Citizens v. Leavitt, 483 F.3d 852, 859-61 (D.C. Cir. 2007).  "[B]y its plain

---

[1] Action Alliance of Senior Citizens v. Leavitt, 456 F. Supp. 2d 11, 17-23 (D.D.C. 2006), rev'd, 483 F.3d 852 (D.C. Cir. 2007).

terms," the Court held, the language of 42 U.S.C. § 1395gg simply "has nothing to do with erroneous refunds of Medicare premiums." <u>Id</u>.

Undaunted by this setback, plaintiffs now are back in this Court, asking for leave to amend and/or supplement their complaint so that they can pursue a variation on the same unsuccessful theme. In its current incarnation, plaintiffs' theory is that the anti-recovery rights which they had originally thought were placed in 42 U.S.C. § 1395gg actually can be found within the penumbra of 42 U.S.C. § 404, which requires the Commissioner of Social Security to effect recovery where "more . . . than the correct amount" of old-age, survivor or disability benefits has been paid to a beneficiary under Title II of the Social Security Act, 42 U.S.C. § 404(a)(1), but likewise forbids recovery from a blameless beneficiary where recovery "would defeat the purpose" of Title II or "would be against equity and good conscience." 42 U.S.C. § 404(b).

Plaintiffs' new claim is as untenable as its predecessor. Both theories share a common flaw in that they confuse the payment of <u>an insurance premium</u> – which the beneficiary of the policy is trying to <u>have transferred</u> to a private insurer in satisfaction of his contractual obligation <u>to the insurer</u> – with the overpayment of a <u>statutory entitlement</u> – which the beneficiary might <u>receive</u> from the government in putative satisfaction of the government's legal obligation to <u>him</u>. Because plaintiffs' new claims cannot withstand a motion to dismiss, their motion to amend and/or supplement their complaint should be denied as futile. The Court should simply enter judgment in favor of defendant.

# BACKGROUND

### A. Overview of the Issue

The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("Medicare Prescription Drug Act"), Pub. L. No. 108-173, 117 Stat. 2066 (2003), created a new prescription-drug benefit that went into effect last year.  Under the program, beneficiaries do not obtain insurance coverage from the federal government as they do in traditional Medicare.  Rather, they purchase drug coverage from an array of private plans that are subsidized by the government and compete with each other for the beneficiary's business.  Most (but emphatically not all) prescription-drug enrollees are required to pay a premium in return for this private insurance.  The premium money, in turn, belongs to the insurer, not to the federal government.

The beneficiary has three options for making his premium payment to the private insurer.  First, he can pay the money directly, such as by mail.  Second, he can have the payment made for him by means of an electronic funds-transfer from a bank or credit-card company.  Finally, he can have the money deducted for him from his monthly Social Security check and transferred by the government to the private insurer.  The insurer is expressly prohibited from offering any financial incentives to influence the enrollee's choice of payment method.  The issue in this case concerns what happens if a premium payment is returned to the beneficiary because of a mistake made by one of the actors in the payment process.

The common-sense answer, of course, is that the beneficiary still owes the premium money to the insurer.  If the mailman mistakenly returns the envelope bearing the premium check, for instance, the beneficiary obviously still owes the money to the insurer, and the insurer has a right to demand it.  Similarly, if the insurer itself mistakenly refunds the premium, it can recover the money to correct the error.  Recovery is also available where the entity that failed to

make the correct deduction of funds was the bank or the credit-card company.  In the absence of

a contract clause that anticipates the problem and expressly requires the creditor to waive

recovery of the funds in hardship circumstances, it would be up to the discretionary judgment of

the creditor whether to forgive the debt or to make arrangements for repayment on an installment

plan.

The question in this case is whether an enrollee in a prescription-drug plan has any

special rights to keep erroneous refunds of premium payments where the entity that made the

mistake is the federal government, not acting in the capacity of a payer of a statutory entitlement,

but merely acting as a helpful conduit of the premium money from the hands of the beneficiary to

the hands of the private insurer.  Once again, the common-sense answer is no.  Where a mistaken

refund has been made in this setting and the government has transferred the appropriate sum into

the rightful hands of the private insurer, the government logically should have just as much right

to recover the erroneous refund as the bank, or the credit-card company, or the insurer (if the

insurer had been left unpaid).  Plaintiffs' contention that prescription-drug enrollees who rely on

the government to help transfer payment money should be entitled to greater anti-recovery

protections than are enjoyed by other enrollees is simply illogical.  The remainder of this

memorandum merely shows why the Social Security and Medicare statutes can reasonably be

read as eschewing that illogical result.

### B.  Social Security

Title II of the Social Security Act, 42 U.S.C. §§ 401-434, establishes an insurance

program for the elderly and disabled, commonly known simply as Social Security.  The features

of the program relevant here are set forth below.

### 1.  The authority of the Commissioner of Social Security

Since 1995, the administration of the Title II benefit programs has been entrusted exclusively to the Social Security Administration ("SSA").[2]  The Commissioner of Social Security has broad responsibility for the "exercise of all powers and the discharge of all duties" of the Social Security Administration, 42 U.S.C. § 902(a)(4), including the power to "prescribe such rules and regulations as the Commissioner determines necessary or appropriate to carry out functions of the Administration."  42 U.S.C. § 902(a)(5); see also 42 U.S.C. § 405(b). Regulations governing Title II benefits are published at 20 C.F.R. Part 404.  Informal instructions on how to administer the Title II program are published in a Program Operations Manual System ("POMS Manual").[3]

### 2.  Benefits under Title II

The Social Security program established by Title II has two primary parts.  The first part consists of old-age and survivor benefits.  42 U.S.C. § 402.  The second consists of disability benefits.  42 U.S.C. § 423.  The "total monthly benefits to which beneficiaries may be entitled" under these programs, 42 U.S.C. § 403(a)(1), are determined according to an extraordinarily complicated set of calculations, definitions, reductions, penalties and credits.  See 42 U.S.C. §§ 402- 403, 409-425, 428-31.  The "Byzantine construction" of these statutes "is among the most intricate ever drafted by Congress" and has been famously characterized as being "'almost unintelligible to the uninitiated.'"  Schweiker v. Gray Panthers, 453 U.S. 34, 43 (1981) (quoting

---

[2] SSA became independent of the Department of Health and Human Services in §110 of the Social Security Independence and Program Improvements Act of 1994, Pub. L. No. 103-296, 108 Stat. 1464, 1490 (1994).

[3] https://s044a90.ssa.gov/apps10/poms.nsf/partlist!OpenView (with hyperlinks to specific manuals).

<u>Friedman v. Berger</u>, 547 F.2d 724, 727 n.7 (2d Cir. 1976) (per Friendly, J.)).  In light of the fact

that "[m]illions of Americans receive benefits under these programs," it is not surprising that

"inevitably, some beneficiaries occasionally receive more than their entitlement."  <u>Sullivan v.</u>

<u>Everhart</u>, 494 U.S. 83, 85 (1990).  Section 204 of the Social Security Act, 42 U. S.C. § 404,

addresses what the Commissioner is required to do when he determines that an overpayment of

Title II benefits has been made to a Social Security beneficiary.

### 3.   How overpayments of Title II benefits are recovered

The statute provides, in relevant part, that, "[w]henever the Commissioner of Social

Security finds that more . . . than the correct amount of payment has been made to any person

under this subchapter [that is, Title II of the Social Security Act], proper adjustment or recovery

shall be made, under regulations prescribed by the Commissioner."  42 U.S.C. § 404(a)(1).  To

bring about the recovery of overpayments of Title II benefits, the Commissioner may "decrease

any payment under this subchapter" [that is Title II], or he may demand a "refund" directly from

the beneficiary, or he may take various other offset measures.  42 U.S.C. § 404(a)(1)(A).

However, "[i]n any case in which more than the correct amount of payment" of Title II benefits

"has been made, there shall be no adjustment of payments to, or recovery by the United States

from, any person who is without fault if such adjustment or recovery would defeat the purpose of

this subchapter [that is Title II] or would be against equity and good conscience."  42 U.S.C.

§ 404(b).

Pursuant to his rulemaking authority, the Commissioner has established an administrative

procedure by which the recipient of an overpayment of Title II benefits can seek a waiver of

recovery.  The process includes an opportunity for the beneficiary to present an application for

the waiver, 20 C.F.R. § 404.506(b); furnish information in support of the request, 20 C.F.R.

§ 404.506(c); make his argument to an SSA official, 20 C.F.R. §§ 404.506(c)-(f); receive a

decision from that official, 20 C.F.R. § 404.506(g); and, if the beneficiary wishes, challenge that

decision through further administrative appeals.  20 C.F.R. § 404.506(h).  See 20 C.F.R.

§§ 404.907-404.913, §§ 404.919-404.922 (reconsideration), §§ 404.929-404.961 (administrative

law judge hearing), §§ 404.966-404.981 (Appeals Council review).  Informal instructions for

making the waiver determinations also are set forth in §§ GN 02250.001-GN 02250.425 of the

POMS Manual.  To ensure that beneficiaries are able to avail themselves of this process, the

regulations provide that, where a beneficiary has a right to request a waiver, the beneficiary must

receive a notice, 20 C.F.R. § 404.502a, which, among other things, includes an "explanation of

the right to request a waiver of adjustment or recovery," 20 C.F.R. § 404.502a(e), instructions

about the availability of waiver-request forms, 20 C.F.R. § 404.502a(g), and a statement that the

beneficiary should notify SSA "promptly" if a waiver is desired.  20 C.F.R. § 404.502a(j).

### 4.   When a notice of a right to request a waiver of recovery is needed

The purpose of the recovery protections in 42 U.S.C. § 404(b) was to make "more

equitable the recovery by the Federal Government of incorrect payments to individuals," H.R.

Rep. No. 76-728 at 19 (1939) (emphasis added), which, at the time those words were written,

meant the incorrect payments of old-age and survivor benefits established in Title II.  Id. at 8-9.

Accordingly, the regulations promulgated by the Commissioner make clear that a notice of a

right to request a waiver of recovery exists only where (a) "an initial determination is made that

more than the correct amount of payment" of Title II benefits "has been made," and (b) the

Commissioner seeks "adjustment or recovery of the overpayment."  20 C.F.R. § 404.502a.  For

purposes of these provisions, "the term overpayment" is defined to include

> a payment in excess of the amount due under title II of the Act, a payment resulting from the failure to impose deductions or to suspend or reduce benefits under [42 U.S.C. §§ 403, 422(b), 424, and 428(c)-(e)], a payment pursuant to [42 U.S.C. § 405(n)] in an amount in excess of the amount to which the individual is entitled under [42 U.S.C. § 402 or § 423], a payment resulting from the failure to terminate benefits, and a payment where no amount is payable under title II of the Act.

20 C.F.R. § 404.501(a) (emphasis in original).  Under this regulatory scheme, the Commissioner is not required to afford waiver protections with respect to any erroneous transfers of money that do not fit within the definition of an overpayment of Title II benefits.  And, obviously, he is not required to give notice of the right to request a waiver in circumstances where no right to request a waiver of recovery exists.[4]

The gravamen of plaintiffs' new legal theory in this case is that the waiver protections in 42 U.S.C. § 404(b) should be stretched to also include circumstances where the Secretary of Health and Human Services has undertaken to recover erroneous refunds of Medicare prescription-drug premiums.  The discussion therefore now turns to the Medicare program.

### C.  Medicare

Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh, establishes a program of health insurance for the elderly and disabled, commonly known as Medicare.  The relevant portions of Medicare are set forth below.

---

[4] The regulation also lists nine other kinds of payments for which an adjustment may be made.  20 C.F.R. §§ 404.501(a)(1)-(9).  The only one that involves Medicare is 20 C.F.R. § 404.501(a)(7), and it merely involves execution of the deduction that the Secretary of Health and Human Services is authorized to utilize under 42 U.S.C. § 1395gg to recovery Medicare overpayments .  Those adjustments are subject to separate Medicare recovery-waiver regulations, 42 C.F.R. §§ 405.351-405.358, and requests for waivers therefore are referred to the Secretary.  POMS Manual § GN 02250.290.

### 1.   The authority of the Secretary of Health and Human Services

The Medicare program is administered by the Secretary of Health and Human Services, who is empowered to "prescribe such regulations as may be necessary to carry out the administration" of the program entrusted to his care. 42 U.S.C. § 1395hh(a)(1). These powers have been delegated to the Centers for Medicare & Medicaid Services ("CMS"), which administers the program on behalf of the Secretary. Regulations governing the administration of the Title XVIII program are set forth in 42 C.F.R. Parts 400-426.

### 2.   Medicare Parts A-B and Parts C-D

Although Medicare is commonly described as consisting of four parts, it is more useful to think of it here as being divided into two regimes. The first regime is the traditional fee-for-service program originally established by Congress in the Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286 (1965). It consists of two parts. Part A is a mandatory program that covers hospital inpatient services and related aftercare. 42 U.S.C. §§ 1395c-1395i-5. Part B is a supplemental program that covers other medical expenses, such as physician visits and outpatient services. 42 U.S.C. §§ 1395j-1395w-4. The money used to fund Part A and Part B is paid out from separate federal accounts. 42 U.S.C. §§ 1395i, 1395t. Insurance benefits are paid from these accounts to the beneficiary or, more commonly, to a health-care provider that takes an assignment of the beneficiary's claim. Under Medicare Parts A and B, the insurer is the federal government, and the beneficiary's insurance relationship is exclusively with his government.

The second Medicare regime consists of two recently-created programs designed to involve the private sector more directly in the provision of insurance coverage to the elderly and disabled. Medicare Part C, which was added by Congress in the Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 276 (1997), allows beneficiaries to purchase Part A-B coverage

from a private managed-care organization.  42 U.S.C. §§ 1395w-21-1395w-28.  These private

plans were originally called Medicare+Choice plans and are now called Medicare Advantage

plans ("MA").  Under Part C, the managed-care organization is the insurer, and the beneficiary's

insurance relationship is with that private organization.  Apart from setting standards for the

approval of managed-care organizations, see 42 U.S.C. §§ 1395w-25-1395w-27, the role of the

federal government is largely limited to making payments to managed-care organizations to

reimburse them for providing Medicare-covered services.  42 U.S.C. § 1395w-23.

     As was discussed above, Part D is the newest addition to the Medicare program.  It

permits beneficiaries to purchase prescription-drug coverage from private sponsors of insurance

plans, 42 U.S.C. §§ 1395w-101-152, in a manner similar to the way they may purchase Part A

and Part B coverage from private managed-care organizations under Part C.  Indeed, managed-

care organizations are required to give enrollees the option of adding Part D drug coverage to

their Part C coverage.  42 U.S.C. § 1395w-131(a).  Under Part D, the insurer is a private entity,

and the beneficiary's insurance relationship is with that private sponsor.  Apart from setting

standards for the approval of drug-plan sponsors, see 42 U.S.C. § 1395w-112, the role of the

federal government is largely limited to providing subsidies to private drug plans to enhance their

economic viability.  42 U.S.C. § 1395w-115.  These subsidies are paid from a separate Medicare

account.  42 U.S.C. § 1395w-116.

### 3.  Recovery of overpayments under Medicare

     Like the Social Security statutes in Title II, the Medicare statutes in Title XVIII have been

characterized as both "massive," Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1,

13 (2000), and "extremely 'complex.'"  Palisades Gen. Hosp. Inc. v. Leavitt, 426 F.3d 400, 401

(D.C. Cir. 2005) (quoting Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 404 (1993)).  As in

the case of Title II, Congress recognized when it enacted the Medicare program that there was a possibility that overpayments of Title XVIII benefits might be erroneously made. Section 1870 of the Social Security Act, 42 U.S.C. § 1395gg, addresses the situations in which the Secretary is required to seek recovery of Medicare-benefit overpayments from an individual beneficiary.

In pertinent part, the statute provides that "[a]ny payment under this subchapter [that is, Title XVIII of the Social Security Act] to any provider of services or other person with respect to any items or services furnished any individual shall be regarded as a payment to such individual," 42 U.S.C. § 1395gg(a), and adjustments to such payments shall be made where (a) "more than the correct amount is paid under this subchapter [that is, Title XVIII of the Social Security Act] to a provider of services or other person for items or services furnished an individual," 42 U.S.C. § 1395gg(b)(1), and (b) the Secretary determines that "the excess over the correct amount cannot be recouped from such provider" (or other person) within a specified time frame, id., and (c) the provider of services (or other person) "was without fault" for the overpayment. Id. In that setting, recovery can be made from the individual beneficiary "under regulations prescribed" by the Secretary. 42 U.S.C. § 1395gg(b).[5] However, the statute goes on to stipulate that "[t]here shall be no adjustment" nor "shall there be recovery" where, among other things, the beneficiary was "without fault" for the overpayment and recovery would "defeat the purposes of subchapter II or subchapter XVIII," or "would be against equity and good conscience." 42 U.S.C. § 1395gg(c).

As was discussed earlier, the Court of Appeals for this Circuit has now determined, as a matter of law, that 42 U.S.C. § 1395gg – the statute in which Congress identified the

---

[5] One example of where this statute might apply would be if a beneficiary had presented a phony Medicare card to a solo-practice chiropractor, who had since gone out of business.

circumstances where the Secretary is required to recover Medicare overpayments from individual

beneficiaries – has "nothing to do" with the recovery of erroneous refunds of Medicare Part D

premiums. Action Alliance, 483 F.3d at 860-61. In an effort to revive their case, plaintiffs now

seek to amend and/or supplement their complaint to allege that the provision in the Social

Security Act dealing with the recovery of Title II overpayments, 42 U.S.C. § 404, has something

to do with erroneous refunds of Part D premiums, at least where the beneficiary has chosen a

deduction from his Social Security check as the means of transferring his premium payment to

his private insurer. To see why this theory is wrong, it is first necessary to examine two more

aspects of the statutory scheme:  how premiums are collected under Medicare Part B and Parts C-

D, and the authority of the federal government to recover erroneous refunds in both settings.

### D.  Medicare Premiums and Payment Methods

Beneficiaries who choose to purchase supplemental insurance coverage from the federal

government under Medicare Part B are charged a premium, the amount of which is determined

according to a formula that may entail increased premiums for wealthier individuals, but does not

have any reductions based on a beneficiary's limited financial resources. 42 U.S.C. § 1395r.

Because the federal government is the insurer, the premium is owed to the government.

Generally, the amount of the premium is automatically deducted from the beneficiary's monthly

Social Security check, "in such manner and at such times as the Commissioner of Social Security

shall by regulation prescribe" after "consultation with the Secretary" of Health and Human

Services. 42 U.S.C. § 1395s(a)(1). The Part B premium money withheld by the Commissioner

is then transferred into the appropriate Medicare account. 42 U.S.C. § 1395s(a)(2).[6]

--------

[6] Beneficiaries who qualify for Medicare Part A generally are automatically enrolled in
that part of the program and are not charged a premium. A relatively small number of persons

Most beneficiaries who choose to purchase the prescription-drug coverage available from private insurers under Medicare Part D are also charged a premium, 42 U.S.C. § 1395w-113, the amount of which varies depending on the extensiveness of the drug coverage.  With rare exceptions, beneficiaries with limited assets and with incomes below 135 percent of the federal poverty level are entitled to have their entire premiums paid to the private plan for them by the federal government.  42 U.S.C. §§ 1395w-114(a)(1)(A), (3)(D).  Beneficiaries with limited assets and incomes between 135 percent and 150 percent of the poverty level are entitled to receive premium subsidies from the government on a sliding scale, 42 U.S.C. §§ 1395w-114(a)(2)(A), (3)(D), (3)(E), and the premium itself must be the lowest one available amongst approved prescription-drug plans in that region of the country.  42 U.S.C. § 1395w-114(b).  Low-income beneficiaries also may qualify for premium subsidies furnished by state programs.  42 U.S.C. § 1395w-133.  As a result of these provisions, about 10 million of the 23 million Part D enrollees are not required to pay a premium.  HHS News at 2 (June 14, 2006).[7]  The obligation to pay a premium to obtain Part D coverage therefore falls only on the remaining 13 million enrollees who are not poor, at least not as Congress and the states have defined poverty through their elected representatives.

As was discussed above, the insurance coverage available under Medicare Parts C and D is purchased from a private entity, and the beneficiary pays premiums to that private entity, not the federal government.  In the case of both programs, the beneficiary "may opt to make a direct

---

(who do not meet Part A eligibility requirements) are permitted to purchase Part A coverage, 42 U.S.C. § 1395i-2a(a), in return for a premium.  42 U.S.C. § 1395i-2a(d).  These premium payments must be made directly to the Secretary.  42 CFR § 406.32(e).

[7] http://www.hhs.gov/news/press/2006pres/20060614.html.

payment of the premium to the plan," 42 C.F.R. §§ 422.262(f)(1) (incorporated by reference in 42 C.F.R. § 423.293(a)), by, for instance, mailing in a check every month.  "In accordance with regulations" promulgated by the Secretary of Health and Human Services (not the Commissioner of Social Security), the private insurer must also make at least two additional payment options available to the beneficiary.  42 U.S.C. § 1395w-24(d)(2) (incorporated by reference in 42 U.S.C. § 1395w-113(c)(1)).[8]  First, the private insurer must permit the beneficiary to make payment by means of "an electronic funds transfer mechanism (such as automatic charges of an account at a financial institution or a credit or debit card account)."  42 U.S.C. § 1395w-24(d)(2)(B) (incorporated by reference in 42 U.S.C. § 1395w-113(c)(1)).  Second, the private insurer must permit "withholding from benefit payments in the manner provided" under 42 U.S.C. § 1395s. 42 U.S.C. § 1395w-24(d)(2)(A) (incorporated by reference in 42 U.S.C. § 1395w-113(c)(1)).  In the latter case, all premium payments withheld must be credited to the appropriate Medicare account and then paid by the Secretary to the private insurer.  42 U.S.C. § 1395w-24(d)(2); 42 U.S.C. § 1395w-113(c)(1).  The insurer may not impose a charge on the beneficiary to influence him to choose one payment option over another.  42 C.F.R. § 422.262(f)(3)(i) (incorporated by reference in 42 C.F.R. § 423.293(a)).  If a premium payment is not received by the private drug plan from any of these enrollees (including those who pay through Social Security deductions), the private insurer has a legal right to terminate him from the plan.  42 U.S.C. § 1395w-24(d)(1) (incorporated in 42 U.S.C. § 1395w-113(c)(1)).

---

[8] The statutory text erroneously cross-references 42 U.S.C. § 1394w-24(d).  This is clearly a typographical error.

**E. The Government's Authority to Recover Erroneous Refunds of Medicare Premiums**

As was discussed above, neither 42 U.S.C. § 404 nor 42 U.S.C. § 1395gg addresses erroneous refunds of Medicare premiums.  In the absence of a statute that expressly <u>forbids</u> recovery, however, it "is beyond dispute," <u>Bechtel v. PBGC</u>, 781 F.2d 906, 907 (D.C. Cir. 1985) (per curiam), that the federal government has a common-law right to take "appropriate action" to recover any funds "which its agents have wrongfully, erroneously, or illegally paid." <u>United States v. Wurts</u>, 303 U.S. 414, 415 (1938) (citations omitted); <u>see also</u> <u>Clearfield Trust Co. v. United States</u>, 318 U.S. 363, 368 (1943); <u>Wis. Cent. R.R. v. United States</u>, 164 U.S. 190, 212 (1896).  In addition, in the case of erroneous Part D refunds where the Secretary has already transferred the premium funds to the insurer (to prevent an interruption in the beneficiary's coverage), the Secretary has a common-law right to stand "'in the place of [the] one whose claim he has paid,'" <u>United States v. California</u>, 507 U.S. 746, 747 (1993) (quoting <u>Unites States v. Munsey Trust Co.</u>, 332 U.S. 234, 242 (1947)), and exercise the common-law recovery rights of the insurer.  The government, then, clearly has a common-law right to recover erroneous refunds of Medicare premiums, regardless of whether there is any statute that expressly authorizes it.  <u>See Mount Sinai Hosp. v. Weinberger</u>, 517 F.2d 329, 336-38 (5th Cir. 1975) (applying common-law recovery rights to Medicare program); <u>Wilson Clinic & Hosp., Inc. v. Blue Cross of S.C.</u>, 494 F.2d 50, 52 (4th Cir. 1974) (same).

It is equally well settled that, in the absence of express statutory guidelines, an agency has "complete discretion" to "decide how and when" its enforcement powers "should be exercised" in particular circumstances.  <u>Heckler v. Chaney</u>, 470 U.S. 821, 835 (1985).  Thus, in the absence of a "federal statutory provision that 'either explicitly authorizes or in terms forbids recoupment for overpayments,'" <u>Johnson v. Likins</u>, 568 F.2d 79, 84 (8th Cir. 1977) (quoting <u>Swasey v. Whalen</u>,

562 F.2d 831, 833 (1ˢᵗ Cir. 1977)), a federal agency has the discretion to establish recovery rules as it deems appropriate.  See California v. Settle, 708 F.2d 1380, 1392-84 (9ᵗʰ Cir. 1983); cf. Laskowski v. Spellings, 443 F.3d 930, 940 (7ᵗʰ Cir. 2006) (Sykes, J., dissenting) (government cannot be compelled to recoup payments made to a university), vacated and remanded to reconsider standing issue, 127 S. Ct. 3051 (2007).  In addition, 31 U.S.C. § 3711(a)(2) expressly authorizes every federal agency to compromise monetary claims, including common-law ones.

### F.  Recovery Waivers for Erroneous Refunds of Premiums under Part B and Parts C-D

The Commissioner of Social Security and the Secretary of Health and Human Services have exercised that authority differently with respect to the premium deductions for which they are authorized to establish rules.  The regulations promulgated by the Commissioner do not expressly authorize SSA to entertain requests from beneficiaries to waive recovery of erroneous refunds of Part B premiums that might occur due to a failure to make the deduction from Social Security checks required by 42 U.S.C. § 1395s(a)(1).  However, manual instructions published by the Commissioner recognize that "[s]uch an erroneous refund may occur, for example, because of incorrect information supplied by a third party," or because of "a processing error, or because "incorrect data" has been entered into billing systems.  POMS Manual § HI 01001.330.A.[9]  These errors may result in the beneficiary receiving "a refund which is not actually due him/her," either in the form of "a separate check" or in the form of an amount "added to the individual's monthly [Title II] benefit."  Id.  When such erroneous refunds occur, the POMS Manual instructs that "the same rules and procedures pertaining to recovery of a

---

[9] https://s044a90.ssa.gov/apps10/poms.nsf/lnx/0601001330.

monthly benefit overpayment (see GN 02250.150- GN 02250.425) apply even though the incorrect premium payment is not a benefit overpayment." Id. at § HI 01001.330.C.

The POMS Manual provision does not apply to erroneous refunds of Part C or Part D premiums, and the Secretary of Health and Human Services has chosen not to issue such instructions to his employees.  As result, recipients of erroneous refunds of Part C and Part D premiums (which were supposed to be transferred to the private insurer) enjoy no more right to resist recovery of the funds by the Secretary than the beneficiary would enjoy if the right to recovery were being asserted by the private insurer.  The gravamen of the claim that plaintiffs seek leave to assert here is that a distinction between Part B and Part C-D premiums cannot reasonably be maintained, and that this proposition somehow leads to the conclusion that there must be some statute somewhere that mandates recovery-waiver protections for recipients of erroneous Part D premium refunds where the method of payment chosen by the beneficiary happens to be a deduction from his Social Security check.

## STATEMENT OF THE CASE

The facts that give rise to this legal argument are already well known to this Court and will be summarized only briefly here.  As the Court will recall, the Part D prescription-drug benefit that went into effect in 2006 was "the most significant change to the Medicare program since its inception in 1965."  70 Fed. Reg. 4194, 4197 (Jan. 29, 2005).  About 23 million beneficiaries receive prescription-drug coverage through a Part D plan.  HHS News at 2.  Of these, about 13 million are required to pay premiums.  Id.  The remaining 10 million errollees pay no premium because of their low-income status.  Id.  Only about 20 percent of enrollees pay premiums by means of Social Security deductions.  Action Alliance, 483 F.3d at 854.

-17-

Because of a government computer-processing error in August 2006, some $47 million in premium refunds were sent to about 230,000 beneficiaries enrolled in Part D plans. Id. The erroneous refunds averaged about $215 per beneficiary. Id. Some refunds were sent by check and some were sent by electronic deposit. Upon learning of the mistake, the Secretary continued to make the transfer payments to the private insurers (so as to prevent an interruption in the enrollees' coverage caused by the government's mistake) and immediately wrote to the recipients of the erroneous refunds asking them to return the money. Id. The letter "requested repayment of the funds by the end of that month, but indicated that '[i]f returning the amount in full presents you with a hardship, you may request to make monthly installment payments for as many as seven months.'" Id. (citation omitted). About $38 million has now been recovered as a result of this letter.

On September 15, 2006, plaintiffs brought suit in this Court seeking to block the recovery effort and force the Secretary to return the funds that had been recovered to date. The original plaintiffs were two advocacy organizations, Action Alliance of Senior Citizens and the Gray Panthers. They later amended their complaint to add an individual plaintiff, Lucy C. Loveall, who had been asked to return $161.70 in seven monthly installments. Then as now, the gravamen of plaintiffs' argument was that recovery efforts were unlawful unless the recipients of the erroneous refunds were first given a chance to pursue a putative right to a waiver of recovery based on hardship.

As was discussed above, the original complaint alleged that the putative recovery-waiver rights were mandated in the only place they logically might appear – the Medicare statutes. In ruling on plaintiffs' motion for a preliminary injunction, the Court initially found that the language of 42 U.S.C. § 1395gg – the Medicare statute that expressly mandates the recovery of

-18-

overpayments and expressly mandates waiver protections in certain instances – does not, on its face, reach to erroneous refunds of Medicare premiums.  Action Alliance, 456 F. Supp. 2d at 18-19.  However, it construed Congress' failure to mention erroneous premium refunds as a form of ambiguous silence, rather than as an instance of unambiguous clarity.  Id.  The Court then went on to grant a preliminary injunction, reasoning that the denial of waiver protections to recipients of erroneous Part D refunds would not be "reasonable in light of the legislature's revealed design."  Id. at 17 (quoting NationsBank of N.C. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 257 (1995)).

       The centerpiece of the analysis was the Court's belief that it was not fair for the Secretary to deny recovery-waiver opportunities to the recipients of erroneous refunds of Part D premiums when the Commissioner of Social Security, through his manual instructions, had accorded the recovery-waiver opportunities to the recipients of erroneous refunds of Part B premiums.  In reaching this conclusion, however, the Court did not address the fact that Part B premiums have no exemption for low-income persons, while Part D premiums are charged only to those whose incomes rise substantially above the poverty line.  Nor did the Court address the fact that its holding would create the strange circumstance that Part D enrollees who choose to rely on the government to transfer premium payments to the private insurer would enjoy erroneous-refund protections completely unavailable to enrollees who choose to make the payments directly to the private insurer themselves (by mail or electronic funds-transfer).  The Court merely found that it should make no legal difference that the ultimate recipient of Part B premiums is the government and the ultimate recipient of Part D premiums is a private insurer.  Action Alliance at 456 F. Supp. 2d at 19-23.

The Court of Appeals for this Circuit reversed the preliminary injunction, finding that the scope of recovery-waiver rights under 42 U.S.C. § 1395gg(c) was not ambiguous on its face and that the clear and precise language in the statute "has nothing to do with erroneous refunds of Medicare premiums." Action Alliance, 483 F.3d at 860-61. Because the meaning of the statute could be determined solely "by its plain terms," id. at 860, the Court of Appeals did not address any of the policy rationales found persuasive by this Court. This was, the Court of Appeals stated, "the easy part of the case." Id.

Perhaps sensing the deficiencies in their original theory, plaintiffs devoted most of their appellate memorandum to a new argument, raised for the first time on appeal, that the right to request a recovery waiver could be found in the language of 42 U.S.C. § 404(b), as well as the language in 42 U.S.C. § 1395gg(c). The Court of Appeals declined to address either the merits of this argument or the propriety of its being raised for the first time on appeal. Instead, the Court held that federal subject-matter jurisdiction to even entertain the new legal theory would not exist until at least one beneficiary had presented a demand for a waiver to the Commissioner of Social Security and received a "final decision" from him, Action Alliance, 483 F.3d at 857 (quoting Weinberger v. Salfi, 422 U.S. 749, 763-64 (1975)), with respect to whether recipients of erroneous refunds of Part D premiums were entitled to recovery-waiver protections under 42 U.S.C. § 404(b).

On May 4, 2007, the individual plaintiff in this action, through counsel, wrote to the Commissioner asking whether she could obtain consideration of a recovery-waiver request with respect to the refund-recovery effort initiated by the Secretary of Health and Human Services in 2006. Letter of Brad S. Plebani dated May 4, 2007 at 1-2 (Def. Ex. A) (attached to this

memorandum).[10]  Plaintiffs then moved to lift a stay of proceedings, which had previously been

entered by this Court pending final resolution of the preliminary-injunction appeal.  (Because

plaintiffs had filed a motion for reconsideration in the appellate court, the mandate of the Court

of Appeals had not yet issued, and therefore the stay remained in effect.)  Without waiting for

this Court to determine whether the stay should be terminated prematurely, plaintiffs

simultaneously moved to amend their complaint, so that they could allege their new theory based

on 42 U.S.C. § 404(b) and name the Commissioner as a defendant.  This Court denied both

motions.  Order dated July 24, 2007 at 1 (Doc. 35).

By letter dated August 13, 2007, the Commissioner denied plaintiff's request for waiver

consideration on the ground that the anti-recovery protections in 42 U.S.C. § 404(b) do not apply

to erroneous refunds of Part D premiums received by Medicare beneficiaries.  Noting that the

statute, in relevant part, applies only in circumstances where "more . . . than the correct amount"

has been paid under Title II of the Social Security Act, the Commissioner concluded that "[t]he

erroneous Part D premium refund that Ms. Loveall received did not cause her to receive more

than the correct amount of her monthly title II Social Security benefits."  Letter of Beatrice M.

Disman dated August 13, 2007 ("Disman Letter") at 2 (Def. Ex. B) (attached to this

memorandum).  "Rather, she received the correct amount of monthly title II benefits due her."

Id.  What was deposited in her bank account, the Commissioner explained, was not a sum of

money to which she had erroneously been deemed to be entitled under Social Security, but a

premium payment to which she claimed no entitlement and which she wanted to have transferred

---

[10] The two organizational plaintiffs wrote similar letters on behalf of their members.  See
Pl. Ex. B (attached to plaintiffs' proposed second amended complaint and/or supplemental
complaint) (attached to plaintiffs' motion for leave to amend and/or supplement their complaint).

(for her) to the private insurer. As result, the Commissioner noted, the Secretary's recovery request "does not result in an obligation to repay a title II overpayment" made to Ms. Loveall. Id. (emphasis added). Rather, it "results in an obligation to pay her Part D premiums . . . in order to retain her prescription drug coverage." Id. (emphasis added). Finally, the Commissioner observed that there would be "no justification" for giving "those Part D beneficiaries who opt to pay premiums by way of title II benefit deductions greater rights than are enjoyed by Part D beneficiaries who pay premiums directly to the private insurance plans." Id. For these reasons, the Commissioner found that "the erroneous premium refund that Ms. Loveall received does not constitute an overpayment of title II benefits." Id.[11]

On the day the stay ended, plaintiffs filed the present motion, asking for a second time for leave to file an amended complaint, pursuant to Fed. R. Civ. P. 15(a), or in the alternative, for leave to file a supplemental complaint, pursuant to Fed. R. Civ. P. 15(d). The proposed pleading claims that the individual plaintiff and members of the plaintiff organizations have a right to request a waiver of recovery under 42 U.S.C. § 404(b), under 42 C.F.R. §§ 404.501, et seq., and under § HI 01001.330B of the POMS Manual, Plaintiffs' proposed Supplemental and Second Amended Complaint for Declaratory, Injunctive and Mandamus Relief at ¶ 52 (attached to plaintiffs' present motion), and that they therefore have the corresponding right to be notified of

---

[11] Prior to the Commissioner's decision, the SSA sent out an erroneous response that was immediately retracted. See Defendant's Memorandum in Opposition to Plaintiffs' Motion to Vacate Stay ("Def. Stay Mem.") at 15-16 (Doc. 30). Apparently, the same erroneous letter went out accidentally a second time. Plaintiffs' Motion for Leave to File Supplemental and Second Amended Complaint ("Pl. Second Motion to Amend") at 5-6 (Doc. 37). That minor mix-up, however, does not support plaintiffs' assertion that the Secretary and the Commissioner have "gone back and forth" as to which agency should respond to plaintiffs' letters. Id. at 5. As the Court of Appeals instructed, the Social Security Administration was the agency to which the question should have been addressed, and the answer received by plaintiff in response to her inquiry was that there is no recovery right under 42 U.S.C. § 404(b).

the opportunity to request a waiver proceeding. Id. at ¶ 50. Plaintiffs also claim waiver-request

rights under the due process clause of the Fifth Amendment. Id. at ¶¶ 51, 53. They seek both

injunctive and mandamus relief to prevent either the Commissioner or the Secretary (it is not

clear which) from continuing to recover the Part D premium refunds and to force one or the other

to return the refunds recovered to date. Id. at pp. 16-17.

## STANDARD OF REVIEW

For purposes of this memorandum, defendant assumes that this Court intended the denial

of plaintiffs' first motion for leave to amend to be without prejudice to refiling after the stay

ended. To the extent the Court intended its denial of the previous motion to amend to be without

prejudice, the standards for reviewing the present motion are set forth below. If the Court

intended the denial to be with prejudice, of course, no further discussion is necessary.

### A.  Motion for Leave to File Amended Complaint under Fed. R. Civ. P. 15(a)

Rule 15(a) of the Federal Rules of Civil Procedure states that leave to amend a complaint

"shall be freely granted when justice so requires." Fed. R. Civ. P. 15(a). Although this has been

described as a "generous standard," Harris v. Sec'y of Veterans Affairs, 126 F.3d 339, 344 (D.C.

Cir. 1997), the rationale behind it is that, "'[i]f the underlying facts or circumstances relied upon

by a plaintiff may be a proper subject of relief,'" then the plaintiff "'ought to be afforded an

opportunity to test h[er] claim on the merits.'" Kidd v. Howard Univ. Sch. of Law, 2007 WL

1821159 at *1 (D.D.C. June 25, 2007) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962))

(brackets added in Kidd) (emphases added). It follows that a court should "deny a motion to

amend a complaint as futile" where "the proposed claim would not survive a motion to dismiss."

James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1099 (D.C. Cir. 1996).[12]  In addition, "leave to amend should be denied if 'the complaint, as amended, would radically alter the scope and nature of the case and bears no more than a tangential relationship to the original action.'" Coleman v. Unknown Cent. Intelligence Agents, 2006 WL 2506631 at *3 (D.D.C. Aug. 28, 2006) (quoting Miss. Ass'n of Coops. v. FHA, 139 F.R.D. 542, 544 (D.D.C. 1991)).

### B.  Motion for Leave to File Supplemental Complaint under Fed. R. Civ. P. 15(d)

Rule 15(d) provides that a court may, "upon such terms as are just," permit a party to serve "a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." Fed. Civ. P. 15(d).  As a threshold matter, defendant has no quarrel with the proposition that a supplemental complaint can be used as a vehicle to allege later events in an effort to cure a "jurisdictional bar," Judicial Watch, Inc. v. DOE, 191 F. Supp. 2d 138, 139 (D.D.C. 2002) (citations omitted), such as a failure to exhaust administrative remedies.  Wallace v. Lynn, 507 F.2d 1186, 1191 n.30 (D.C. Cir. 1974); Lodge 1858, AFGE v. Paine, 436 F.2d 882, 898 n.103 (D.C. Cir. 1970).  To the extent that plaintiffs' proposed pleading merely alleges that the plaintiffs sought to secure a decision from the Commissioner on the scope of 42 U.S.C. § 404(b), it is unobjectionable.  But a supplemental complaint cannot go beyond this, so as to be "used to introduce a 'separate, distinct and new cause of action,'" Planned Parenthood of S. Ariz. v. Neely, 130 F.3d 400, 402 (9th Cir.

---

[12] Accord 1613 Harvard Ltd. P'ship v. District of Columbia, 2007 WL 2071665 at *5 (D.D.C. July 19, 2007); Moore v. Motz. 437 F. Supp. 2d 88, 94 (D.D.C. 2006); Harrison v. Norton, 429 F. Supp. 2d 83, 85 n.2 (D.D.C. 2006); see also 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d §1487 at 637 (1990) ("the court may deny leave to amend" where the amended complaint "advances a claim or defense that is legally insufficient on its face"); id. at 643 ("if a complaint as amended could not withstand a motion to dismiss, then the amendment should be denied as futile").

1997) (per curiam) (citation omitted), at least where, as here, the original complaint has
essentially been resolved and "the supplemental pleading could be the subject of a separate
action."  Id. (quoting 6A Federal Practice § 1509 at 206).[13]

In any event, the purpose of allowing supplemental pleadings, like the purpose of
allowing amended complaints, "'is to facilitate a proper decision on the merits' and avoid the
dismissal of potentially meritorious claims due to procedural missteps."  Aftergood v. CIA, 225
F. Supp. 2d 27, 30 (D.D.C. 2002) (citation omitted) (emphasis added).  Thus, where a proposed
supplemental complaint would not "survive a motion to dismiss" because the claims alleged in it
"fail as a matter of law," the motion to file the supplemental complaint should be denied.
Howard v. Evans, 193 F. Supp. 2d 221, 226 n.2 (D.D.C. 2002) (citing James Madison, 82 F.3d at
1099).[14]  In that setting, the motion to supplement the complaint should be treated as if it were,
"in reality" a motion to amend that should have "been properly made under Rule 15(a) . . . in the
first instance."  6A Federal Practice § 1510 at 209-10.[15]

---

[13] Compare Health Ins. Ass'n of Am. v. Goddard Claussen Porter Novelli, 213 F.R.D. 63,
66 (D.D.C. 2003) (recognizing that new claims can be asserted in some circumstances but
denying motion to file supplemental complaint where its timing would not promote judicial
economy).

[14] Accord Miller v. Jack, 2007 WL 1169179 at *1-2 (N.D. W. Va. Apr. 19, 2007)
(denying motion to file supplemental complaint where it "cannot withstand a motion to dismiss"
for failure to state a claim); Rohm Co. v. Nichia Corp., 2003 WL 22844207 at *2 (E.D. Pa. Nov.
26, 2003) ("courts need not allow supplemental pleadings if the efforts would be futile"); Green
v. Kadilac Mortgage Bankers, Ltd., 936 F. Supp. 108, 118 (S.D.N.Y. 1996) (court "need not
permit plaintiffs to supplement their pleading in order to set forth allegations that could not, by
any stretch of the imagination, be construed to state a claim"); Cohen v. Reed, 868 F. Supp. 489,
497 (E.D.N.Y. 1994) (motion to file supplemental pleading should be denied as "futile if it fails
to state a claim").

[15] See Campbell v. Meredith Corp., 260 F. Supp. 2d 1087, 1108 n.109 (D. Kan. 2003)
(where plaintiff "is seeking to add an entirely new cause of action based on facts that existed at
the time he filed his original complaint, the Court will consider his Rule 15(d) motion as a

**C. Standards for Determining Whether Plaintiffs' Amended/Supplemental Complaint Would Survive a Motion to Dismiss**

Under either standard of review, the proposed amended or supplemental complaint must be able to survive a motion to dismiss for failure to state a claim. To meet that test, in turn, plaintiffs must do more than merely express their opinion that their new theory of the case is "legitimate" or that they "are confident that they will prevail" on the merits of their claims. Pl. Second Motion to Amend at 11; see Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 n.2 (2007) ("bare averment" plaintiff "wants relief and is entitled to it" is not enough) (quoting 5 Federal Practice § 1202 at 94, 95). The pleading must "possess enough heft to 'sho[w] that the pleader is entitled to relief'" under the applicable law. Id. at 1966 (quoting Fed. R. Civ. P. 8(a)(2)). In this case, that would mean establishing a right to injunctive or mandamus relief on the basis of some instruction in 42 U.S.C. § 404(b) or regulations promulgated thereunder that commands the Commissioner of Social Security to give recovery-waiver protection to recipients of erroneous refunds of Medicare Part D premiums in circumstances where the Secretary of Health and Human Services, pursuant to his separate authority, has undertaken to recover the money. The demanding standards under which this Court must evaluate agency interpretations of statutes and regulations committed to their administration, as well as the even more demanding standards under which it must review a claim for mandamus relief, are set forth below.

---

motion to amend under Rule 15(a)"); Peterson v. Santa Clara Valley Med. Ctr., 2000 WL 98262 at *1 n.1 (N.D. Cal. 2000) (Rule 15(d) motion treated as Rule 15(a) motion where "[p]laintiffs are seeking to add claims based upon facts already existing as of the date of the pleading sought to be amended"); Hassoun v. Cimmino, 126 F. Supp. 2d 353, 360 (D.N.J. 2000) (parts of proposed supplemental complaint which contain "new allegations that concern events that preceded the filing of the original Complaint" should be treated as a proposed amended complaint).

Under the familiar principles in Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 843-44 (1984), a court reviewing an agency's construction of a statute does not "sit in review to substitute [its] judgment for that of the agency," Organo Carballo v. Reich, 11 F.3d 186, 192-93 (D.C. Cir. 1993), but rather must defer to the agency's reading unless the statutory language "unambiguously forbids" it or the interpretation "exceeds the bounds of the permissible" for some other reason. Barnhart v. Walton, 535 U.S. 212, 218 (2002). To meet this deferential test, the agency's reading of the statute "need not be the only reasonable one," Conn. Dep't of Income Maint. v. Heckler, 471 U.S. 524, 532 (1985), or even "the best or most natural one by grammatical or other standards." Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702 (1991). Rather, the agency's construction is entitled to deference so long as it falls "within the bounds of reasonable interpretation." Your Home Visiting Nurse Servs., Inc. v. Shalala, 525 U.S. 449, 453 (1999).

The rationale for deference only increases in the case of "a complex and highly technical regulatory program," Wis. Dep't of Health & Family Servs. v. Blumer, 534 U.S. 473, 497 (2002) (citation omitted), where "resolution of ambiguity in a statutory text is often more a question of policy than of law." Pauley, 501 U.S. at 696; see also Walton, 535 U.S. at 222 (emphasizing importance of deference in light of "the related expertise of the Agency, the importance of the question to the administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question."). Nowhere do these principles of deference apply with more force than in the case of the Social Security Act, Sullivan v. Everhart, 494 U.S. at 89; Gray Panthers, 453 U.S. at 43; Batterton v. Francis, 432 U.S. 416, 425 (1977), the "Byzantine construction" of which has long been recognized as being "among the most

intricate ever drafted by Congress" and "'almost unintelligible to the uninitiated.'" Gray Panthers, 453 U.S. at 43 (quoting Friedman v. Berger, 547 F.2d at 727 n.7 (per Friendly, J.).[16]

"When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." Udall v. Tallman, 380 U.S. 1, 16 (1965). The task of a court reviewing an agency's reading of its own regulations "is not to decide which among several competing interpretations best serves the regulatory purpose," Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994), but rather "the agency's interpretation must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Id. (citation omitted). And "[t]his broad deference [to the administrative agency] is all the more warranted when, as here, the regulation concerns a 'complex and highly technical regulatory program.'" Id.

Finally, the standards for determining whether plaintiffs are entitled to the remedy of mandamus are the most demanding of all. "The common law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only after he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty." Heckler v. Ringer, 466 U.S. 602, 616 (1984). Mandamus relief applies only in the case of a "specific, unequivocal command" that orders "a precise, definite act," Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 63 (2004) (citations omitted), in a manner "so plainly prescribed as to be from doubt and equivalent to a positive command." Consol. Edsion Co. of N.Y., Inc. v. Ashcroft, 286 F.3d 600, 605 (D.C. Cir. 2002) (quoting Wilbur v. United States ex rel. Kadrie, 281 U.S. 206, 218 (1930)). Where "the duty is not thus plainly prescribed," but rather "depends on a statute or statutes the construction or application of which is not free from

---

[16] The same deference applies to constructions of the Medicare statutes. See, e.g., Illinois Council, 529 U.S. at 21; Regions Hosp., 522 U.S. at 457; Good Samaritan, 508 U.S. at 414.

doubt, it is regarded as involving the character of judgment or discretion which cannot be controlled by mandamus." Id. (quoting Kadrie, 281 U.S. at 219). Under any of these standards, plaintiffs bear a daunting burden of showing that the recovery-waiver right for which they contend is plainly set forth in a statute or regulation.[17]

## ARGUMENT

### I.    PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE THEIR PROPOSED AMENDED/SUPPLEMENTAL COMPLAINT COULD NOT SURVIVE A MOTION TO DISMISS.

The foregoing is a long introduction to what needs to be only a short legal analysis. Whether couched as a claim under the Social Security Act or as a claim for mandamus relief, plaintiffs' proposed amended/supplemental complaint could not possibly survive a motion to dismiss because it is based on a meritless legal theory. Indeed, plaintiffs' latest argument – that recovery-waiver protections are mandated by 42 U.S.C. § 404(b) – is, if anything, even more tenuous than the theory premised on 42 U.S.C. § 1395gg(c). Their motion to amend and/or supplement the complaint should therefore be denied on the ground of futility.

### A.    The Recovery-Waiver Provision in 42 U.S.C. § 404(b) Does Not Apply to Erroneous Refunds of Medicare Premiums Because Medicare Premiums Are Not Title II Benefits.

The analysis begins, "as always, with the language of the statute," Duncan v. Walker, 533 U.S. 167, 172 (2001), and with "the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt.

---

[17] Although the Supreme Court has yet to rule on the question, see Ringer, 466 U.S. at 616, the Court of Appeals for this Circuit has held that mandamus relief may be available, in some circumstances, to compel procedural requirements of the Social Security Act, notwithstanding the limitations on judicial review in 42 U.S.C. § 405(h). Ganem v. Heckler, 746 F.2d 844, 848 (D.C. Cir. 1984). Defendant respectfully reserves that issue for appeal.

Dist., 541 U.S. 246, 252 (2004) (quoting Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S.

189, 194 (1985)).  "[W]here, as here, the statute's language is plain," that is "also where the

inquiry should end."  United States v. Ron Pair Enters, Inc., 489 U.S. 235, 241 (1989).  In that

setting, the "sole function" of the court is simply to follow the statute "according to its terms."

Id.  As was the case with 42 U.S.C. § 1395gg, the clarity of 42 U.S.C. § 404(b) makes this an

"easy" question of statutory construction.  Action Alliance, 483 F.3d at 860.

### 1. The Commissioner's view is consistent with the plain statutory language.

The terms of 42 U.S.C. § 404 could not be plainer.  The statute begins by mandating, in

pertinent part, that, "[w]henever the Commissioner of Social Security finds that more . . . than the

correct amount of payment has been made to any person under this subchapter, proper adjustment

or recovery shall be made." 42 U.S.C. § 404(a)(emphasis added).  It then goes on to provide that

"there shall be no adjustment of payments to, or recovery by the United States" from a

beneficiary who is without fault for the overpayment "if such adjustment or recovery would

defeat the purpose of this subchapter or would be against equity and good conscience." 42

U.S.C. § 404(b) (emphasis added).  The subchapter to which the statute refers is 42 U.S.C.

§§ 401-434, and the payments to which it refers are payments of the old-age, survivor and

disability benefits that are mandated by Title II.  42 U.S.C. §§ 402, 423.  This is how the statute

has been interpreted by the Commissioner in regulations, 42 C.F.R. § 404.501(a), and that it is

how it was interpreted in the Commissioner's letter to plaintiff.  Disman Letter at 2.  That is the

only manner in which it can be read.

The absence of Part D prescription-drug premiums from the list of transactions that fall

within the scope of 42 U.S.C. § 404 does not make the statute silent or ambiguous.  It makes the

statute absolutely clear.  "The logic that invests the omission with significance" is the familiar rule of <u>expressio unius est exclusio alterius,</u> under which "the mention of some implies the exclusion of others."  <u>United Dominion Indus., Inc. v. United States</u>, 532 U.S. 822, 836 (2001); <u>see also</u> <u>Rowland v. Cal. Men's Colony</u>, 506 U.S. 194, 200 (1993) ("It is presumble that Congress legislates with knowledge of our basic rules of statutory construction") (citation omitted).  By its plain terms, 42 U.S.C. § 404 – like 42 U.S.C. § 1395gg – simply has nothing to do with erroneous refunds of Medicare Part D premiums.  It concerns only overpayments of Title II entitlements.  Because the statute "speaks clearly 'to the precise question at issue," this Court "'must give effect to the unambiguously expressed intent of Congress'."  <u>Walton</u>, 535 U.S. at 217 (quoting <u>Chevron</u>, 467 U.S. at 842-43).  To carry the analysis any further would merely replicate the error into which this Court was led at the preliminary-injunction stage and would invite reversal in exactly the same terms.

Interestingly, when they argued their case before the Court of Appeals, plaintiffs candidly admitted that their position with respect to both 42 U.S.C. § 1395gg and § 404(b) would necessarily fail unless the Court accepted their contention that, "[i]n reality, the 'premium refunds' were not that at all," but rather "were simply payments based on the amount of the premium."  Brief for the Appellees at 28 (Ex. B to Def. Stay Mem) (Doc. 30).[18]  In rejecting plaintiffs' § 1395gg theory, the Court of Appeals refused plaintiffs' invitation to word-play, expressly characterizing the transactions at issue as being exactly what they were:  "erroneous refunds of Medicare premiums" that had "nothing to do" with the <u>payments</u> of Medicare benefits

---

[18] Plaintiffs came to this position somewhat late in the litigation.  In moving for a temporary restraining order and preliminary injunction, they themselves characterized the relevant transactions as "refunds."  Plaintiffs' Motion for a Temporary Restraining Order and for a Preliminary Injunction at 2 (Doc. 3).

for medical items or services.  Action Alliance, 483 F.3d at 860-61.  In their present motion to amend and/or supplement their complaint, plaintiffs merely repeat the characterization that the Court of Appeals rejected:

> Although the government persists in referring to this as an erroneous or mistaken 'premium refund' . . . that terminology is not accurate.  The mistaken payments were based on the amounts of premiums withheld from their Social Security checks in the past, but they were not refunds of the premiums.

Pl. Second Motion to Amend at 2 n.1 (( emphasis in original).  That alone is a flag of distress.

### 2.  The legislative history does not support plaintiffs' construction.

Where the language in a statute is "straightforward," there "is no reason to resort to legislative history" for further clarification of its meaning.  United States v. Gonzales, 520 U.S. 1, 6 (1997).  However, an examination of the histories of the Title II overpayment provision and the legislation in which Congress created the Part D prescription-drug benefit only reinforces the conclusion that 42 U.S.C. § 404 has nothing to do with erroneous refunds of prescription-drug premiums.

The legislative history of 42 U.S.C. § 404, which was added by the Social Security Act Amendments of 1939, 53 Stat. 1360, 1368 (1939), merely states that "[p]rovision is made for making more equitable the recovery by the Federal Government of incorrect payments to individuals." H.R. Rep. No. 76-728 at 19 (1939).  The payments to which the passage refers are the payments of original old-age and survivor benefits described eleven pages earlier in the report.  Id. at 8-9.  Thus, as the Supreme Court has stated, "[t]he legislative history" of 42 U.S.C. § 404 "indicates merely that Congress intended to make recovery more equitable by authorizing waiver." Califano v. Yamasaki, 442 U.S. 682, 694 n.9 (1979).  It does not suggest that the kind of recovery Congress was making more equitable was anything other than the recovery of

overpayments of Title II entitlements. Indeed, it would have required the powers of prophet for a legislative draftsman in 1939 to envision that, three decades later, Congress would establish a Medicare program, and that, four more decades later, Congress would create a prescription drug benefit, and that, in that new program, enrollees would purchase coverage from private insurers and be given the option of having premiums deducted from Social Security checks.

If Congress had wanted to extend recovery-waiver protections to beneficiaries who had premium money mistakenly returned to them under any set of circumstances, the logical place to find an expression of that intent would be in the legislative history of the Medicare Prescription Drug Act of 2003. That history, in turn, merely states that an enrollee who is required to pay a premium under a Part D prescription-drug plan "has the option of having the amount withheld from his or her Social Security payment or having payment made through an electronic funds transfer mechanism." H.R. Rep. No. 108-391 at 468 (2003) (Conf. Rep.), reprinted in 2004 U.S.C.C.A.N. 1808, 1846. The payment options outlined in Part D were extended in the same legislation to the payment of Part C premiums. The purpose of the Part C options was similarly to allow enrollees "to have their [managed care] premiums deducted from their Social Security benefits," or "through electronic funds transfer," id. at 547, reprinted in 2004 U.S.C.C.A.N. at 1917, at their option. There is nothing in either passage that remotely suggests that enrollees who choose the deduction method of payment were intended to have greater protections against the recovery of erroneous premium refunds than enrollees who choose the direct-payment or electronic funds-transfer methods. On the contrary, the drafters plainly envisioned that the three payment methods were co-equal ways of accomplishing the same result: the payment of premiums to a private insurer. Nor did the drafters express any desire to revise the meaning of 42 U.S.C. § 404(b) in any way, let alone to expand the recovery-waiver protections to include

erroneous refunds of Part D premiums where such premiums were supposed to be deducted from Social Security checks. There is nothing in the legislative history that suggests that Social-Security deductions were anything other than an alternative way for enrollees to make payments to a private insurer.

### 3. Plaintiffs' reading makes absurd distinctions among prescription-drug enrollees and perversely discourages self-reliance.

The reason why Congress thought premium payment by Social-Security deduction was nothing special is not hard to see: there is nothing special about it. As was explained at the beginning of his memorandum, there is no legally-significant difference between enrollees who pay premiums by means of the United States mail, enrollees who pay premiums by means of electronic funds-transfers, and enrollees who pay premiums by means of deductions from Social-Security checks. Each is simply a different method of accomplishing exactly the same thing: getting a premium payment transferred out of the hands of an insurance beneficiary and into the hands of the private insurer, so that the enrollee can enjoy the benefits of the insurance coverage without interruption. As was discussed earlier, if the mailman returned an envelope bearing a premium check, the beneficiary would scarcely be able to claim hardship as a reason for keeping the premium money for himself. Nor would hardship be a defense against an erroneous refund by the bank, or the credit-card company, or the insurer itself. There is no logical reason to give preferential treatment to enrollees who choose the Social Security deduction.

In fact, there is at least one very good policy reason not to. A beneficiary who chooses the direct-mail or electronic funds-transfer method of payment has effectively made a statement that, all other things being equal, he would rather make sure himself that the premium gets paid to the private insurer than rely on the good offices of government agencies to get the job done.

-34-

To give preferential rights to enrollees who choose the Social-Security deduction method would make things no longer equal, and, to that extent, create a disincentive to be self-reliant. And it would be particularly anomalous to do so in light of regulations that prohibit the private insurer from doing exactly the same thing: giving beneficiaries a financial incentive to choose one payment option over another. 42 C.F.R. § 422.262(f)(3)(i) (incorporated in 42 C.F.R. § 423.293(a)). Thus, the result urged by plaintiffs conflicts with 'the common mandate of statutory construction to avoid absurd results." Rowland, 506 U.S. at 200.

There are also perfectly logical reasons to give greater hardship protections in the case of erroneous overpayments of Social Security old-age, survivor and disability benefits under Title II of the Social Security Act than in cases of erroneous refunds of premiums under Medicare Part D. Old-age, survivor and disability benefits are received by everyone who meets eligibility requirements, and they are intended to provide for basic necessities of life. Prescription-drug premiums are paid only by those whose assets exceed statutory limits or whose income at least exceeds 135-percent of the poverty level. 42 U.S.C. § 1395w-114(a)(1)(A). And premiums are paid only by persons who, by choosing to enroll in a plan in the first place, have already made the judgment that they can afford to pay the premiums each month. Administrative procedures, in turn, cost money (money that could be used for many other purposes, including assistance programs for low-income families). In balancing the trade-offs, Congress could certainly have made a reasoned judgment that there was considerably more need to ensure that impoverished Social Security beneficiaries had a chance to explain hardship circumstances where they had spent overpayments of Title II benefits than there would be to give a similar opportunity to a non-poor enrollee in an insurance plan who had merely miscalculated the affordability of premiums that he agreed to pay when he voluntarily signed up for prescription-drug coverage. If plaintiffs

believe that judgment was incorrectly made, their arguments should be addressed to the elected branches of government.[19]

**B.  Notice of Waiver-Request Rights Is Not Required under 20 C.F.R. § 404.502a Because Erroneous Refunds of Medicare Premiums are not Overpayments Subject to Waiver Protection under Title II Regulations.**

Plaintiffs' contention that beneficiaries who receive an erroneous refund of prescription-drug premiums have a right to a recovery-waiver hearing under regulations promulgated by the Commissioner at 20 C.F.R. 404.501, et seq., is equally without merit.  As was explained earlier, the regulatory scheme requires notice of a right to request a waiver only where "an initial determination is made that more than the correct amount of payment has been made" and the Commissioner "seek[s] adjustment or recovery of the overpayment."  20 C.F.R. § 404.502a.  The term "overpayment includes a payment in excess of the amount due under title II" of the Social Security Act, "a payment resulting from the failure to impose deductions or to suspend or reduce benefits" under various Title II provisions, a payment made pursuant to 42 U.S.C. § 405(n) in excess of the amount to which the individual is entitled under 42 U.S.C. §§ 402 or 423, "a payment resulting from the failure to terminate benefits," and "a payment where no amount is

---

[19] The factual circumstances alleged by the individual plaintiff nicely illustrate the point. Plaintiff's proposed amended/supplemental complaint alleges that Lucy C. Loveall received an erroneous refund of $161.70, which she was asked to return in monthly installments over a seven- month period.  Supp. Compl. at ¶ 43 and attached Pl. Ex. J.  She further alleges that she is a member of a two-person household with an income of $2,214.12 a month, Supp. Compl. at ¶ 41, which is almost twice the federal poverty level.  72 Fed. Reg. 3147, 3147 (Jan. 24, 2007). Even if the matter were within his purview to begin with, the Commissioner could certainly make a reasoned judgment that it is not a reasonable expenditure of public resources to hold a multi-step hearing process, 20 C.F.R. §§ 404.501, et seq., solely to determine whether the unlikely circumstance exists that a non-poor person genuinely cannot afford to repay such a small sum of money at the rate of what amounts to less than $1 a day.  This is not to say that it is inconceivable that a Part D enrollee could have a legitimate hardship case, only that such cases can reasonably be expected to be sufficiently rare as to make the administrative cost of conducting hearings with regard to such small amounts of money cost-inefficient.

payable under title II of the Act." 20 C.F.R. § 404.501 (emphasis in original). An erroneous

refund of a Part D prescription-drug premium is not on that list. The regulations cannot be

stretched even to authorize waiver-recovery protection in that circumstance, let alone construed

to unambiguously mandate it. Indeed, the recovery effort in this case was not even undertaken by

the Commissioner. It was undertaken by the Secretary.

### C.  The POMS Manual Provision Does Not Apply to Erroneous Refunds of Prescription-Drug Premiums under Medicare Parts C and D.

Plaintiffs' contention that the recipients of erroneous refunds of Part D premiums are

entitled to recovery-waiver protections by the instructions in § HI 01001.330.C of the POMS

Manual also merits little response. That portion of the manual simply does not apply to Parts C

and D. The only relevance of the manual is that it reiterates the proposition that an erroneous

refund of any Medicare premium "is not a benefit overpayment," POMS Manual § HI

01001.330.C, within the meaning of 42 U.S.C. § 404.[20]

### D.  Plaintiffs' Due Process Claim Lacks Merit

Finally, to the extent that plaintiffs' due-process claim asserts that plaintiffs have been

deprived of a liberty interest in receiving a recovery-waiver procedure under 42 U.S.C. § 404(b)

and regulations promulgated thereunder, it fails to state a claim for the reasons stated above. To

---

[20] As was discussed earlier, beneficiaries who must purchase Part A coverage because they do not qualify for Social Security are required to pay their Part A premiums directly to the Secretary, and not by means of deductions taken by the Commissioner. 42 C.F.R. 406.32(e). It is not entirely clear, therefore, why Subsection A of POMS Manual § HI 01001.330, which gives instructions to Social Security Administration employees, makes any reference to Part A premium refunds that might be erroneously made, since any such erroneous refunds would presumably be made by the Centers for Medicare & Medicaid. See Action Alliance, 456 F. Supp.2d at 19-20 & n.10. The reference may simply exist for informational purposes, to assist SSA employees in responding to inquiries from the public. It is not necessary to discuss that subsection further, however, since the only relevant point is that Subsection C of POMS Manual § HI 01001.330 clearly does not apply in any way to erroneous refunds of Part D premiums.

the extent that plaintiffs claim to have been deprived of a property interest, it is patently without merit. A mere request for repayment is not a deprivation of property, and, if the Secretary were to take more formal steps to recover the monies, such as by a lawsuit, the affected beneficiaries would be accorded whatever rights to procedural due process applied in that context. Plaintiffs' due-process theory is merely make-weight.

### E. The Commissioner's Instructions to Extend Waiver Protections to Erroneous Refunds of Part B Premiums Does Not Compel Him to Extend Protections to Part D Refunds.

The foregoing analysis demonstrates why plaintiffs' amended and/or supplemental complaint could not survive a motion to dismiss for failure to state a claim. This section of defendant's memorandum addresses a convoluted argument made by plaintiffs before the Court of Appeals that attempted to show that the portion of the POMS Manual that extends recovery-waiver protections to erroneous refunds of Part B premiums compels this Court to rewrite 42 U.S.C. § 404 to mandate identical protections in the case of erroneous refunds of Part C-D premiums. To accept their argument, which appears in the Brief for the Appellees at 16-29, this Court would have to agree with the following propositions:

The POMS Manual provision which permits recovery waivers for Part B premiums must be authorized by a statute. The only statutes that can possibly be read as authorizing the manual provision are 42 U.S.C. § 404 and § 1395gg. With § 1395gg off the table, that leaves only § 404. To save the POMS Manual provision from invalidity, § 404 must first be construed to _authorize_ recovery-waiver rights in the case of erroneous refunds of Part B premiums, and the statute must then be reinterpreted to _mandate_ recovery-waiver rights in the case of erroneous refunds of Part D premiums. On its face, the entire argument asks this Court to look beyond the plain language of 42 U.S.C. § 404 in precisely the manner that the Court of Appeals declined to when construing

the meaning of 42 U.S.C. § 1395gg.  Action Alliance, 483 F.3d at 860-61.  But even when it is taken on its own terms, the analysis stumbles at every step of the way.

To begin with, the central proposition on which plaintiffs' theory rests – that it is permissible to broaden the scope of a statute in order to make it conform to an informal manual instruction – has the hierarchy of authority exactly backwards.  An agency's instruction manuals must be re-written to conform to statutes, not the other way around.  If there is no statutory authority for the POMS provision to extend recovery-waiver protections in the case of erroneous refunds of Part B premiums, then the POMS provision would have to fall.  So long as it is clear that the POMS Manual does not apply to erroneous refunds of Part D premiums, there is no need to consider whether it lawfully applies to erroneous refunds of any kind of premiums.

Even if the question were relevant, however, there also is no need to rewrite 42 U.S.C. § 404 to defend the validity of the POMS provision.  As was discussed earlier, it "is beyond dispute," Bechtel v. PBGC, 781 F.2d at 907, that "'[n]o statute is necessary to authorize'" the federal government to take "appropriate action" to "recover funds which its agents have wrongfully, erroneously, or illegally paid," United States v. Wurts, 303 U.S. at 415 (citation omitted), and how the government chooses to exercise that "inherent" power, United States v. Mo. Self Serv. Gas Co., 671 F. Supp. 1232, 1242 (W.D. Mo. 1987), is within its enforcement discretion.  In any event, 42 U.S.C. § 1395s(a)(1) expressly confers on the Commissioner the power to establish procedures for making the deduction of Part B premiums from Social Security checks, an authority that can reasonably be construed to carry with it the discretion to establish procedures for determining when and how to correct errors.  The Commissioner is authorized to establish such policies, pursuant to his authority to superintend the Social Security Administration.  42 U.S.C. §§ 902(a)(4)-(5).  In addition, 31 U.S.C. § 3711(a)(2) expressly

authorizes federal agencies to compromise monetary claims. The confluence of these sources of law provide ample authority for the Commissioner, in his discretion, to instruct his employees to extend recovery-waiver protections in the case of erroneous refunds of Part B premiums, even though such a refund "is not a benefit overpayment," POMS Manual § HI 01001.330.C, subject to the provisions of 42 U.S.C. § 404 and regulations promulgated thereunder.

Furthermore, the Commissioner of Social Security would not have the authority to extend the POMS Manual to deal with erroneous refunds of Part C and Part D premiums even if he wanted to. The Commissioner's rulemaking authority extends only to Part B premiums. 42 U.S.C. § 1395s(a)(1). Although he makes premium deductions under Part C and Part D, the deductions can only be done "[i]n accordance with regulations" promulgated by the Secretary of Health and Human Services, 42 U.S.C. §§ 1395w-24(d)(2), 1395w-113(c)(1), pursuant to the Secretary's separate rulemaking authority under the Medicare statutes. 42 U.S.C. § 1395hh.

Finally, even if this Court were to conclude that the Commissioner was authorized by 42 U.S.C. § 404 to give recovery-waiver protections in the case of erroneous refunds of Part B premiums, there is no reason why any governmental actor would be compelled to treat erroneous refunds of Part D premiums the same way. There are several sound policy reasons for treating the two contexts differently.

Before the Court of Appeals, plaintiffs' only basis for arguing that "no relevant distinction exists between Part B premiums, and Part D premiums," Brief for the Appellees at 12, was their mistaken belief that, "[a]s with premiums paid for coverage under Parts A, B, C," Part D enrollees "have the option of having their premiums withheld from their Social Security checks." Id. at at 3 (emphasis added). However, only Part C and Part D enrollees have an option as to whether to have their premiums deducted from their Social Security checks. With minor

exceptions not relevant here,[21] the only way Part B premiums are collected is through Social-Security deductions.[22]  As was explained earlier, for any government agency to extend such protections to Part D enrollees who choose the Social-Security deduction option would be to extend protections to only a minority who choose that particular option over more direct means, and this would create illogical distinctions amongst enrollees.

In addition, the premiums charged to Part B enrollees have no exemption for the lowest income beneficiaries.  Prescription-drug premiums under Part D, by contrast, are _not_ charged to the poorest enrollees (those with limited resources whose incomes are below 135 percent of the poverty level).  42 U.S.C. § 1395ww-114(a)(1)(A).  The population that might receive an erroneous refund of Part B premiums, therefore, includes a sub-population of extremely needy persons that is excluded from the population that might receive an erroneous refund of Part D premiums.  The government could reasonably conclude that the public interest favors the expense of conducting waiver-request reviews in the first instance, but not in the second.  There is a perfectly rational basis, therefore, for treating Part B premiums differently from Part D premiums for purposes of recovery-waiver protections.[23]

---

[21] See 42 U.S.C. § 1395s(c).

[22] As was previously explained, those few beneficiaries required to pay a premium to get Part A coverage are not even eligible for Social Security benefits and have only one premium-payment option:  to pay them directly.

[23] The twin prospects of irrational distinctions amongst identically-situated Part D enrollees and unnecessary similarity of treatment between differently-situated Part B and Part D beneficiary populations distinguish this case from Shannon v. Civil Serv. Comm'n, 444 F. Supp. 354 (N.D. Cal. 1977), aff'd in part, rev'd in part, 621 F.2d 1030 (9th Cir. 1980), a decision on which this Court has previously looked for analogous reasoning.  See Action Alliance, 456 F. Supp. 2d at 21.  Even on its own terms, however, Shannon was incorrectly decided and has never since been relied upon by any other court for the proposition urged by plaintiffs here.  In that case, the Civil Service Commission failed to deduct the proper amount of insurance premiums

## II.  PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE IT CHANGES THE NATURE OF THE CASE.

Even if plaintiffs' proposed pleading could survive a motion to dismiss, the motion to amend should be denied on the alternative ground that it would it would "introduce a 'separate, distinct and new cause of action,'" <u>Planned Parenthood of S. Ariz. v. Neely</u>, 130 F.3d at 402 (citation omitted) in a manner that would "alter the scope and nature of the case and bears no more than a tangential relationship to the original action.'" <u>Coleman v. Unknown Central Intelligence Agents</u>, 2006 WL 2506631 at *3 (quoting <u>Miss. Ass'n of Coops.</u>, 139 F.R.D. at 544). The cause of action alleged in the amended/supplemental complaint is based on an entirely different statute and adds an entirely new defendant.  And it does so after the original cause of

---

from a federal employee's retirement benefits and sought recovery without giving notice of any right to request a waiver.  <u>Id</u>. at 356.  The relevant statute provided that "recovery of payments <u>under this subchapter</u> may not be made from an individual when, in the judgment of the Civil Service Commission, the individual is without fault and recovery would be against equity and good conscience."  5 U.S.C. § 8346(b) (emphasis added).  The relevant subchapter was 5 U.S.C. §§ 8331-8348, and the statues that authorized deductions for insurance premiums, 5 U.S.C. §§ 8906, 8701 and 8714a(c)(2), fell outside that subchapter.  Without really addressing the significance of this statutory structure, the pre-<u>Chevron</u> analysis went on to acknowledge "some lack of clarity in Congressional purposes," <u>Shannon</u>, 444 F. Supp. at 358, but found that the Civil Service Commission had not met what the court perceived to be <u>the government's</u> burden of showing that Congress had a "specific purpose" to "limit" the statute to exclude insurance-premium issues.  <u>Id</u>. at 359.  Since <u>Shannon</u> was decided, <u>Chevron</u> and its many progeny have made clear that the burden properly rests with <u>the plaintiff</u> to show that the statutory text "<u>unambiguously forbids</u>" the government's reading or that the government's reading otherwise "exceeds the bounds of the <u>permissible</u>."  <u>Walton</u>, 535 U.S. at 218 (emphasis added).  Since mandamus relief was not sought, the court did not have occasion to consider whether the statutory language imposed a mandatory duty "so plainly prescribed as to be free from doubt and equivalent to a positive command.  <u>Consol. Edison</u>, 286 F.3d at 605 (citation omitted).  Under the standards of review that this Court must follow today, therefore, the <u>Shannon</u> analysis leads to exactly the opposite outcome.

action has essentially been decided against plaintiffs as a matter of law. Planned Parenthood, 130

F.3d at 402.[24]

## **CONCLUSION**

For the reasons stated, plaintiffs' motion to file an amended and/or supplemental

complaint should be denied.

|  | Respectfully submitted, |
|---|---|
| OF COUNSEL: | |
| DANIEL MERON | PETER D. KEISLER |
| General Counsel | Assistant Attorney General |
| | |
| MARK D. POLSTON | JEFFREY A. TAYLOR |
| Acting Associate General Counsel | United States Attorney |
| | |
| MARCUS H. CHRIST | /s/ Peter Robbins |
| Acting Deputy Associate | RICHARD G. LEPLEY |
| General Counsel for Litigation | PETER ROBBINS |
| | United States Department of Justice |
| LAWRENCE J. HARDER | 20 Massachusetts Avenue, N.W., Room 7142 |
| Attorney | Washington, D.C.  20530 |
| | Tel:  (202) 514-3953 |
| United States Department of | |
| Health and Human Services | Attorneys for Defendant |

---

[24] Plaintiffs' motion also should be denied for failure to comply with the prior consultation requirements of Local Rule 7(m). See Ellipso, Inc. v. Mann, 460 F. Supp. 2d at 102.  Although plaintiffs conferred with opposing counsel before filing their first motion for leave to amend, they did not do so with regard to this second motion.  As this Court will recall, defendant opposed the first motion solely on the ground that the stay should not be lifted prematurely, not on the merits.  Plaintiffs could not therefore simply presume opposition.  See Alexander v. FBI, 186 F.R.D. 197, 199 (D.D.C. 1999).  That defendant has, in fact, opposed the present motion is also irrelevant.  Id.