UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
ACTION ALLIANCE OF SENIOR CITIZENS,            )
GRAY PANTHERS, LUCY CAROLYN LOVEALL,           )
                                               )
        Plaintiffs,                            )
                                               )
        v.                                     )    C.A. No. 06-1607 (HHK)
                                               )
MICHAEL LEAVITT, Secretary of Department       )
of Health and Human Services,                  )
                                               )
        Defendant.                             )
_____)

**PLAINTIFFS' REPLY MEMORNADUM IN SUPPORT OF THEIR MOTION
FOR LEAVE TO FILE SUPPLEMENTAL AND SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

I.   THE SECRETARY'S ARGUMENT IS INFUSED WITH
MISCHARACTERIZATIONS AND MISSTATEMENTS OF FACT AND LAW. ........... 2

II.   THE RIGHTS TO SEEK WAIVER AND TO NOTICE OF THAT
RIGHT ARE MANDATED BY 42 U.S.C. § 404(b) AND ITS
IMPLEMENTING REGULATIONS................................................................ 11

     A.   This Court's original decision that the Secretary's policy is unreasonable
and not deserving of deference is correct and contradicts the Secretary's
claim of futility.......................................................................................... 11

     B.   On its face, the statute authorizes the right to waiver in this situation....................... 18

III.   THE NEW COMPLAINT DOES NOT CHANGE THE NATURE OF THE CASE......... 24

CONCLUSION..................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Action Alliance of Senior Citizens v. Leavitt*,
456 F.Supp.2d 11 (D.D.C. 2006), vacated,
483 F.3d 852 (D.C.Cir. 2007) ......................................................................................... *passim*

*Batterton v. Francis*,
432 U.S. 416 (1977) .............................................................................................................. 6, 7

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ........................................................................................................ 7, 23, 24

*Chevron U.S.A. Inc. v. Natural Res. Def. Council*,
467 U.S. 837 (1984) .................................................................................................................. 11

*Christensen v. Harris County*,
529 U.S. 576 (2000) .................................................................................................................. 18

*Elliott v. Weinberger*,
371 F.Supp. 960 (D.Haw. 1974), aff'd in part, rev'd in part,
564 F.2d 1219 (9th Cir. 1977), aff'd in part, rev'd in part *sub nom.*
*Califano v. Yamasaki*, 442 U.S. 682 (1979) ............................................................................ 7

*Elliott v. Weinberger*,
564 F.2d 1219 (9th Cir. 1977), aff'd in part, rev'd in part on other grounds *sub nom.*
*Califano v. Yamasaki*, 442 U.S. 682 (1979) ......................................................................... 24

*Feld v. Berger*,
424 F.Supp. 1356 (S.D.N.Y. 1976) ........................................................................................ 6

*Friedman v. Berger*,
547 F.2d 724 (2d Cir. 1976) ..................................................................................................... 6

*Groseclose v. Bowen*,
809 F.2d 502 (8th Cir. 1987) ................................................................................................... 23

*Herweg v. Ray*,
455 U.S. 265 (1982) ................................................................................................................... 6

*Lee v. Winter*,
439 F.Supp.2d 82 (D.D.C. 2006) ............................................................................................. 2

*Mattern v. Mathews*,
  582 F.2d 248 (3d Cir. 1978)..................................................................... 8

*Miss. Ass'n of Cooperatives v. FHA*,
  139 F.R.D. 542 (D.D.C. 1991)................................................................. 24

*Office of Personnel Management v. Richmond*,
  496 U.S. 414 (1991)............................................................................... 16

*Pope v. Railroad Retirement Board*,
  672 F.2d 972 (D.C.Cir. 1982).................................................................. 8

*Public Citizen, Inc. v. U.S. Dept. of Health and Human Services*,
  332 F.3d 654 (D.C.Cir. 2003)................................................................. 18

*Quinlivan v. Sullivan*,
  916 F.2d 524 (9th Cir. 1990) .................................................................. 23

*Schweiker v. Gray Panthers*,
  453 U.S. 34 (1981)................................................................................... 6

*Shannon v. U.S. Civil Service Comm'n*,
  444 F.Supp. 354 (N.D.Cal. 1977), aff'd in part, rev'd in part,
  621 F.2d 1030 (9th Cir. 1980) ...................................................... 8, 17, 18

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944)............................................................................... 11

*Sullivan v. Everhart*,
  494 U.S. 83 (1990)................................................................................... 7

*Zinman v. Shalala*,
  67 F.3d 841 (9th Cir. 1995) .................................................................... 23

## Statutes

5 U.S.C.
  § 8346(b)................................................................................................. 8

42 U.S.C.
  § 404..................................................................................................... 21
  § 404(a) ................................................................................................ 21
  § 404(b)............................................................................................ *passim*
  § 1395w-24(d)(2) ................................................................................... 2
  § 1395w-113(c)(1) ................................................................................. 2
  § 1395w-114(a)(3)(B)(v) ...................................................................... 10

§ 1395gg(a) ........................................................................................................ 3
§ 1395gg(b) ....................................................................................................... 3
§ 1395gg(c) ............................................................................................. 3, 4, 5, 22
§ 1396a(a)(10)(E)(iv) ..................................................................................... 10

45 U.S.C.
    § 231i ............................................................................................................. 8

## Regulations

20 C.F.R.
    § 404.501(a) ............................................................................................ 20, 21
    § 404.509 ..................................................................................................... 23

42 C.F.R.
    §§ 423.1 – 423.910 ........................................................................................ 9
    § 423.773(c) ............................................................................................... 10

## Rules

Federal Rules of Civil Procedure,
    Rule 12(b)(6) .............................................................................................. 11

## Miscellaneous

Kaiser Family Foundation, "Dual Eligibles: Medicaid's Role for Low-Income Medicare
    Beneficiaries" (Feb. 2006) ........................................................................ 10

Program Operations Manual System,
    § HI 01001.330 ........................................................................................... 12
    § HI 01001.330A .......................................................................................... 4
    § HI 01001.330B .......................................................................................... 4
    § HI 01001.330C ................................................................................... 4, 8, 23
    § HI 01001.330D .......................................................................................... 4

**INTRODUCTION**

The defendant Secretary opposes plaintiffs' request to file a Supplemental and Second Amended Complaint (hereinafter, the "New Complaint").[1]  He raises two grounds: (1) that filing a New Complaint is futile because it would be dismissed for failure to state a claim, and, (2) very briefly, that the New Complaint would radically alter the scope of the case.  The first contention is meritless, as this Court's granting of a preliminary injunction has already demonstrated, and the second borders on the frivolous.

At the outset plaintiffs need to repeat – because the Secretary ignores this point – that this case concerns the right to notice and the right to request that recovery be waived.  It is not a case about whether Ms. Loveall or any other affected beneficiary is entitled to waiver in her or his particular case.  It is irrelevant, therefore, whether the Secretary and/or the Commissioner of the Social Security Administration (SSA) would in fact decide that recovery should be waived.  The only issue before the Court is whether the Secretary is correct that no right to waiver exists for the affected beneficiaries and that therefore no obligation exists to notify them of that right.

The defendant's Opposition is characterized by provocative and pejorative language, by repeated mistakes in describing what has transpired in this case, and by reliance on alleged policy concerns that undercuts his argument that this is a straightforward question of statutory construction.  Hidden in this camouflage of misstatements and obfuscation is the one fact that controls this case: SSA paid out more "than the correct amount of payment."  Accordingly, there can be no "recovery by the United States" unless the right to waiver is offered.  42 U.S.C. § 404(b).

---

[1]  Defendant mistakenly refers to plaintiffs' motion as "for leave to file an amended complaint … or, in the alternative, for leave to file a supplemental complaint."  Opposition at 22. As was clear from plaintiffs' filings, however, the proposed New Complaint is one entity, not two alternative versions.

The Secretary refers to the payments at issue as "premium refunds." The reality, however, is that the premiums had already been withheld and paid to the prescription drug plans, pursuant to the statutory scheme. 42 U.S.C. § 1395w-113(c)(1), incorporating *id*., § 1395w-24(d)(2). They were not refunded from the plans, directly or indirectly, to the Part D enrollees. See Letter of SSA Official Beatrice Disman to Brad Plebani (Aug. 13, 2007) (Exhibit B to Opposition), at 2. Rather, after withholding and payment to the plans had been completed, some Part D enrollees received payments from SSA to which they were not entitled, which was the event that triggered the right to seek waiver before recovery.

Furthermore, the Secretary largely ignores the fact that, although he is arguing that filing the New Complaint would be futile because it would be dismissed for failure to state a claim, this Court has already held that, based on § 404(b), plaintiffs "have demonstrated a substantial likelihood of success on the merits of their claim." *Action Alliance of Senior Citizens v. Leavitt*, 456 F.Supp.2d 11, 23 (D.D.C. 2006), vacated on other grounds, 483 F.3d 852 (D.C.Cir. 2007). Given that "[a] claim will not survive a motion to dismiss only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Lee v. Winter*, 439 F.Supp.2d 82, 84-85 (D.D.C. 2006) (internal quotation marks and citation omitted), and that this Court has already effectively ruled that plaintiffs' claim is valid, defendant's contention that plaintiffs' arguments cannot prevail and that therefore amending the complaint is futile rests on very weak ground.

I.    **THE SECRETARY'S ARGUMENT IS INFUSED WITH MISCHARACTERIZATIONS AND MISSTATEMENTS OF FACT AND LAW.**

Plaintiffs' opening brief sets out the history of the issue and case in some detail (at 3-7), and that will not be repeated. The Secretary's counter-description, though, requires a response.

2

His "long introduction" (Opp. at 29) is not just lengthy, but repeatedly misstates key aspects of the case.  Before refuting his legal analysis, plaintiffs must set the record straight, as the Secretary's errors infect his Opposition in every respect.

1.  The Secretary begins by asserting that "plaintiffs initially persuaded this Court that [the Medicare waiver statute, 42 U.S.C. § 1395gg(c)] could be broadened to mandate the same recovery protections in situations where prescription-drug premiums were not properly deducted from Social Security checks ...."  Opp. at 1.  There are two errors in this statement.

First, this Court was not so persuaded.  Plaintiffs made the argument in good faith, to this Court and the Court of Appeals, that § 1395gg(c) provides the authority for waiver in this context, but both courts rejected it.  Agreeing with the Secretary's reading, this Court stated that "[t]he entire framework of § 1395gg(a-c) seems to concern only payments to providers for *items and services.*"  456 F.Supp.2d at 18.  The Court of Appeals agreed.  483 F.3d at 860.

The Secretary's apparent purpose in misstating this Court's ruling is to discredit the Court's overall analytical approach to the case and to suggest that plaintiffs somehow manipulated the Court:  "To carry the analysis any further would merely replicate *the error into which this Court was led* at the preliminary-injunction stage ...."  Opp. at 31 (emphasis added).  But the fact is that this Court rejected the § 1395gg(c) argument and premised the injunction on § 404(b).  See *infra*, at 5.

Second, the Secretary is claiming that, in this instance, "prescription-drug premiums were not properly deducted from Social Security checks."  That is a blatant misstatement of the facts and contradicts previous documents filed or relied on by the defendant.  In fact, the premium deductions were correctly made and the premiums paid over to the drug plans, thus satisfying the beneficiaries' obligation to pay the premiums.  See Declaration of Leslie Norwalk, ¶ 3 (filed

Sept. 29, 2006); Program Operations Manual System (POMS), § HI 01001.330A ("premiums are paid when they are deducted from [the beneficiary's] benefits")[2] ; Disman Letter, at 2 ("before the premiums were refunded in error, CMS had made premium payments to private prescription drug plans on behalf of the Part D participants"). This Court previously recognized that the Secretary had acknowledged "that the insurers have already received their premiums …." 456 F.Supp.2d at 23.[3]

This situation did *not* involve a failure to deduct the premium. Instead, after the premium had been deducted and passed on to the plan, SSA simply sent out additional Social Security payments. The only relevance of the previously deducted and paid-over premium payments was that they determined the amount of the erroneous payments made by SSA. These were not erroneous premium refunds, as the Secretary always refers to them (and as the plaintiffs and the courts have occasionally -- and mistakenly -- referred to them); they were simply mistaken payments sent by SSA to 230,000 Title II beneficiaries.

2. A recurrent theme of the Opposition is that plaintiffs' contention that the right to seek waiver derives from 42 U.S.C. § 404(b) is a "new claim." Opp. at 2; see also *id*. at 8, 20, 21, 29. The apparent rationale for this contention is to suggest that plaintiffs are desperately searching for a new theory to replace the one that was lost under § 1395gg(c): "Undaunted by this setback, plaintiffs are now back in this Court ... so that they can pursue a variation on the same

---

[2]  The relevant portion of the POMS is available on-line at https://s044a90.ssa.gov/apps10/poms.nsf/chapterlist!openview&restricttocategory=06.          . For the court's convenience, hard copies of § HI 01001.330A-D are attached.

[3]  It is for this reason that the Secretary's analogy to a mail carrier mistakenly returning a premium check breaks down. See Opp. at 3, 34. In this case, to correct the analogy, the carrier properly delivered the check to the insurer, thereby satisfying the insured's obligation to the insurer.

unsuccessful theme." *Id*. at 2.  And, this "new theory" "is, if anything, even more tenuous than the theory premised on 42 U.S.C. § 1395gg(c)."  *Id.* at 29.

In fact, however, plaintiffs have always relied on § 404(b), and this Court did as well. While the exact contours of their argument have been refined, plaintiffs have consistently recognized that § 404(b) provided the authority for the POMS provisions applicable to Parts A and B.  Accordingly, this Court noted that the "POMS bases its waiver provision on the general waiver provision of the Social Security Act ....  *See* 42 U.S.C.A. 404(b)."  456 F.Supp. 2d at 18 (footnote omitted); see also, *e.g., id.* at 20 ("Congress enacted the waiver provision of the [Social Security Act], on which the POMS waiver provision is based").  This Court therefore concluded that "Congress's legislative design, as indicated by the [Social Security Act] waiver provision, was to provide Medicare beneficiaries with relief from the hardships of recovery ...."  *Id*. at 21.

Moreover, the Court of Appeals, far from not "address[ing] ... the propriety of [the § 404(b)] argument being raised for the first time on appeal," Opp. at 20, recognized that both contentions were legitimately before it.  See 483 F.3d at 854 (summarizing the "two statutory bases for relief" invoked by the plaintiffs and the Court's resolution of them); *id*. at 855 (noting how this Court had dealt with the two statutory provisions).  Indeed, the very fact that the Court of Appeals determined at some length that this Court lacked jurisdiction over the § 404(b) claim indicates that that Court understood that the claim had been properly raised from the beginning. See *id*. at 856-858.

3.  The Secretary seeks to shore up his position by contending that Title II of the Social Security Act, which provides the authority for the payment of "Social Security benefits," is so complicated that the courts must give heightened deference to the agency's interpretation of

every aspect of that Title. Opp. at 5-6, 27-28. The decisions that he cites, however, do not support his premise.

Schweiker v. Gray Panthers, 453 U.S. 34 (1981) and the case on which it relies, Friedman v. Berger, 547 F.2d 724 (2d Cir. 1976), are Medicaid cases. Although Medicaid also occupies a title within the Social Security Act (Title XIX), it is a vastly different and more complex program than Title II. Medicaid is a welfare program with nearly inscrutable eligibility conditions, involving a complicated interplay between the federal and state governments and the providers of services to beneficiaries, whereas Title II is an insurance payment program from the federal government to beneficiaries. Indeed, recognizing the special status of Medicaid within the Social Security Act, the Supreme Court quoted with approval the Friedman district judge's description of the Medicaid statute as "'an aggravated assault on the English language, resistant to attempts to understand it.'" Gray Panthers, 453 U.S. at 43 n.14 (citation omitted); see also, e.g., Herweg v. Ray, 455 U.S. 265, 282 (1982) (Burger, C.J., dissenting) (complaining that the majority got "lost in the Medicaid maze"); Feld v. Berger, 424 F.Supp. 1356, 1357 (S.D.N.Y. 1976) (in a Medicaid case, the mix of governmental agencies and complex regulations "created a Serbonian bog from which the agencies seemingly are unable to extricate themselves"). While the Secretary's cited decisions do refer generally to the "Social Security Act," the cases arose exclusively in the Medicaid context, which distinguishes them from the instant case.

Batterton v. Francis, 432 U.S. 416 (1977) is also not a Title II case. Rather, it involved the old Title IV of the Social Security Act, the Aid to Families with Dependent Children (AFDC) program, which, like Medicaid, raised the complex interplay between the state and federal governments in the distribution of welfare benefits. Id. at 418-420. Moreover, that case involved express congressional delegation to the Secretary to define a specific term, thus

6

infusing that definition with "legislative effect." *Id.* at 424-425 (noting, *inter alia*, that, in a prior case involving Title II, Congress had *not* delegated such authority for defining a particular term). Nothing in the present case places such definitive weight on the Secretary's decision, reached without notice-and-comment rulemaking, to exclude the affected beneficiaries from the protections of § 404(b).

Finally, *Sullivan v. Everhart*, 494 U.S. 83 (1990) does implicate Title II, but in the context of its relationship to Title XVI, the Supplemental Security Income (SSI) program. Nothing in that decision suggests some extraordinary level of deference to be accorded because a Social Security Act program is involved. Rather, the Court simply applied the standard *Chevron* test. *Id.* at 89.

This case does not involve a complex statutory scheme, but, rather, one straightforward sentence of one statutory provision. The Supreme Court had no difficulty in analyzing § 404(b) and in concluding that the Secretary had failed to apply it correctly. In *Califano v. Yamasaki*, 442 U.S. 682, 695 (1979), the Court held, in a unanimous (8-0) decision, that, "[o]n its face, [§ 404] requires that the Secretary make a pre-recoupment waiver decision, and that the decision … be accurate." Furthermore, the mandatory nature of the provision "impl[ies] that the mandated act, … waiver of recoupment … is to precede other action." *Id.* at 695. With that premise established, the Court then determined that the subjective nature of the waiver inquiry requires the prerecoupment determination to include an oral hearing, not just written submissions. *Id.* at 696-697.[4]

---

[4] Furthermore, before and after *Yamasaki*, numerous other courts analyzed the same or very similar waiver provisions, reaching consistent conclusions that beneficiaries are entitled to notice, to the right to waiver before recovery of the erroneous payment, and to an oral hearing. See *Elliott v. Weinberger*, 371 F.Supp. 960 (D.Haw. 1974), aff'd in part, rev'd in part, 564 F.2d 1219 (9th Cir. 1977), aff'd in part, rev'd in part *sub nom. Califano v. Yamasaki*, 442 U.S. 682

In short, the Court did not accord any special deference to the Secretary's interpretation of § 404(b), and none is appropriate here. The Secretary's attempt to import the convoluted Medicaid statute into this discrete, fully explicated provision of Title II should be rejected.

4. The Secretary also makes misstatements about the structure and mechanism of Medicare. His apparent purpose is to distinguish Part D from Parts A and B, for which SSA has expressly stated that the Title II waiver provisions are applicable. See POMS, § HI 01001.330C.

The Secretary contends that Parts A and B are qualitatively different from Part D. To this end, he makes the astounding statement that "the role of the federal government [in Part D] is largely limited to providing subsidies to private drug plans to enhance their economic viability." Opp. at 10.

In fact, the Secretary plays an extensive role in the regulation and oversight of the insurance plans with which CMS enters into contracts to provide benefits under Part D. The Secretary promulgated voluminous regulations for Part D, totaling 104 pages in the Federal Register (42 C.F.R. §§ 423.1 – 423.910).[5] The Secretary also issues and revises on a regular basis a policy manual for Part D prescription drug plans.[6]

---

(1979) (discussing § 404(b)); *Mattern v. Mathews*, 582 F.2d 248 (3d Cir. 1978) (same); *Pope v. Railroad Retirement Board*, 672 F.2d 972 (D.C.Cir. 1982) (discussing the Railroad Retirement waiver statute, 45 U.S.C. § 231i); *Shannon v. U.S. Civil Service Comm'n*, 444 F.Supp. 354 (N.D.Cal. 1977), aff'd in part, rev'd in part, 621 F.2d 1030 (9th Cir. 1980) (discussing the Civil Service waiver statute, 5 U.S.C. § 8346(b)).

[5] In Subparts B through P, the regulations address the array of issues that the agency must oversee and enforce to operate this federal public benefit program: Eligibility and Enrollment; Benefits and Beneficiary Protections; Cost Control and Quality Improvement Requirements; Submission of Bids and Monthly Beneficiary Premiums; Plan Approval; Payments to Part D Plan Sponsors for Qualified Prescription Drug Coverage; Organization Compliance with State Law and Preemption by Federal Law; Coordination under Part D Plans with Other Prescription Drug Coverage; Application Procedures and Contracts with PDP Sponsors; Effect of Change of Ownership or Leasing of Facilities during Term of Contract;

In addition to the regulations and policy manuals, CMS issues extensive policy guidance to health plans, particularly concerning Part D.[7] CMS has multiple pages on its web site, www.cms.hhs.gov, devoted solely to Prescription Drug Coverage Contracting. One of those pages, Health Plan Management System (HPMS) Guidance History, indicates that, as of September 17, 2007, CMS had issued 213 guidance materials devoted to various aspects of Part D.[8] The majority of the guidance materials listed on this page deal with issues other than payment to prescription drug plans.

In a similar effort to distinguish between the Parts of Medicare and therefore to rationalize differential treatment when erroneous payments are made based on withheld premium amounts, the Secretary contends that "Part B premiums have no exemption for low-income persons, while Part D premiums are charged only to those whose incomes rise substantially above the poverty line." Opp. at 19; see also *id.* at 41. This distinction, he explains, means that many low-income Part B participants would suffer if waiver of recovery were not available, thus reinforcing the alleged logic of authorizing waiver for Part B enrollees, but not for Part D enrollees. *Id.* at 41.

---

Grievances, Coverage Determinations, and Appeals; Medicare Contract Determinations and Appeals; Intermediate Sanctions; and Premium and Cost-Sharing Subsidies for Low-Income Individuals.

[6] CMS, *Prescription Drug Benefit Manual*, http://www.cms.hhs.gov/PrescriptionDrugCovContra/12_PartDManuals.asp#TopOfPage.

[7] http://www.cms.hhs.gov/PrescriptionDrugCovContra/01_Overview.asp#TopOfPage.

[8] http://www.cms.hhs.gov/PrescriptionDrugCovContra/HPMSGH/list.asp#TopOfPage.

9

The premise, however, is incorrect.  A significant portion of Part B enrollees, numbering about 7.5 million,[9] are covered by Medicaid or the Medicare Savings Program (MSP), which results in all of their Medicare premiums, and, in some cases, deductibles, being paid for by the Medicaid program.  Because MSPs pay Part B premiums for people with incomes up to 135% of the federal poverty level, which is the same income ceiling that is used for the Part D full premium subsidy, most of the individuals receiving the Part D subsidy and the Part B subsidy are the same people.  See 42 U.S.C. § 1396a(a)(10)(E)(iv).  In fact, all people receiving the Part B subsidy automatically receive the Part D subsidy.  *Id.*, § 1395w-114(a)(3)(B)(v); 42 C.F.R. § 423.773(c).  In short, it is not true that Part B enrollees as a group are not subsidized and that therefore they are more susceptible to the harm that is occasioned when the government seeks to recover amounts erroneously paid.

5.  In another misrepresentation, the Secretary's tracking of the history of this issue leaves out an important event.  See Opp. at 18.  Shortly before SSA sent out the erroneous payments, it also sent a letter to the beneficiaries confirming that the amount it would soon be sending out belonged to them.  See, *e.g.*, Exhibit I to the New Complaint.  Consequently, when the check arrived, the beneficiaries had every reason to believe that it had been properly sent to them and that they had the right to do with it as they wished.  The Secretary ignores that letter, though, focusing instead on the fact that he acted quickly to notify beneficiaries of their alleged obligation to return the money immediately.  See Opp. at 18.  But by sending the money and a

---

9  Kaiser Family Foundation, "Dual Eligibles: Medicaid's Role for Low-Income Medicare Beneficiaries" (Feb. 2006), http://www.kff.org/medicaid/upload/Dual-Eligibles-Medicaid-s-Role-for-Low-Income-Medicare-Beneficiaries-Feb-2006.pdf.

letter establishing their right to it, the government had already induced the beneficiaries to rely

on its actions.[10]

## II.     THE RIGHTS TO SEEK WAIVER AND TO NOTICE OF THAT RIGHT ARE MANDATED BY 42 U.S.C. § 404(b) AND ITS IMPLEMENTING REGULATIONS.

The Secretary's burden in raising a Rule 12(b)(6) objection as the basis for not allowing

the New Complaint to be filed is to demonstrate that plaintiffs have no claim.  This is a daunting

proposition in the best of circumstances, but when the court has already held that plaintiffs are

likely to succeed on the merits, the hurdle becomes that much more imposing.  In essence, the

Secretary is forced to argue that this Court was wrong.

Furthermore, an alternative analytical approach to the applicability of § 404(b) in this

case provides at least an equally strong ground for plaintiffs' success on the merits.

Consequently, plaintiffs will discuss both of those approaches to the case.

### A.     <u>This Court's original decision that the Secretary's policy is unreasonable and not deserving of deference is correct and contradicts the Secretary's claim of futility.</u>

This Court concluded that, in light of the "the legislature's revealed design," the Secretary's

decision not to extend the right to waiver to Part D enrollees was unreasonable and therefore not

entitled to deference.  456 F.Supp.2d at 19.  The review was undertaken pursuant to the standards

discussed in "*Chevron* Step 2" (see *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467

U.S. 837, 843 (1984)) and *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

---

[10]  Even so, Ms. Loveall contacted both SSA and a Medicare office to ensure her right to it. She received that assurance, and "[n]othing was said about having to repay the money, so I spent it." Declaration of Lucy C. Loveall, ¶ 6 (filed Sept. 29, 2006).  The Secretary ignores this detrimental reliance, however, and the significant monthly bills for which she is responsible (see *id.*, ¶¶ 7-8), to conclude that Ms. Loveall demonstrates that policy considerations support Part D enrollees *not* having the right to seek waiver.  Opp. at 36 n. 19.

The Court's analysis proceeded from the fact that the relevant POMS provisions (§ HI 01001.330), which is anchored in § 404(b), explicitly authorized waiver for erroneous payments derived from premium problems in Parts A and B.  "[A]s evidenced by the statutory scheme of the [Social Security Act] and Medicare program," the Secretary's "justification for treating Part D beneficiaries differently is untenable …."  456 F.Supp.2d at 20.  The Court recognized that, to a beneficiary facing repayment, the cause of the erroneous payment was irrelevant.  *Id*. at 21.  And, it is no argument that applying the waiver standards could result in a loss of money to the government: "Every waiver provision results in the government bearing a loss instead of the beneficiary."  *Id.*

This Court relied extensively on the fact that "[t]he waiver regulations that the Secretary has determined should be applied to Part A and Part B premiums are consistent with Congress's intent to consider equity and hardship, whereas the Secretary's proffered distinction of Part D flatly contradicts such legislative intent."  *Id*. at 22.  There was nothing to indicate that Congress intended a different result for erroneous payments deriving from premium problems in the Part D context.  *Id.* at 22-23.

The Court also found persuasive that the Secretary offered inconsistent explanations.  He contended at one point that, with the premiums passed on to the insurers, it was the government seeking repayment, and, at another point, he argued that the money at issue belonged to the insurers.  This contradiction "does not meet the Secretary's burden of providing a reasoned analysis to support this interpretation of the relevant statute and regulations."  *Id.* at 23 (internal quotation marks and citation omitted).

The Secretary's effort to refute this analysis does not clearly state which aspects he disagrees with. Although he refers to the statute and the regulations, he does not explain how they support his position. See Opp. at 30-31.

The Secretary's attempt to derive support from the legislative history is primarily a contention that, since no legislative history refers to premium refunds, plaintiffs can garner no help from those sources. See Opp. at 32-34. As this Court has held, however, congressional intent nowhere suggests that mistakes occurring in the context of Part D premium withholding should be treated differently from those in Parts A and B. There was no need for the statute or legislative history to state the applicability of the right to waiver to Part D when that right existed for Parts A and B at the time that Part D was created. See 456 F.Supp.2d at 22-23.

The Secretary seeks to bolster his position by offering policy rationales. First, he claims that it is illogical to discriminate among Part D beneficiaries based on the method of premium payment they selected. Opp. at 34. But this argument falters on the mail carrier analogy, for the reality is that the premium withholding mechanism worked correctly, so that the insurer was in fact paid. See *supra* at 4 n. 3.

Furthermore, the alleged "preferential treatment" (Opp. at 34) accorded the plaintiffs in this case does not exist, for comparing them to other payors of Part D premiums is misplaced. In fact, the plaintiffs are discriminated against when compared to the correct group, which consists of other recipients of erroneous Title II payments. Plaintiffs here are asking only for the same treatment that all other Title II beneficiaries receive when their Social Security check is more than it should be.

The suggestion that authorizing the right to waiver in this situation would "create a disincentive to be self-reliant" (Opp. at 35) is frivolous and insensitive. These beneficiaries have

simply selected an option for paying their premiums that Congress has offered, that simplifies and expedites the payment process for the plans as well, and that benefits the Medicare program as a whole by ensuring that premiums are timely and fully paid. (And, in fact, the withholding mechanism worked here just as intended.)

There is no indication that any Part D enrollee has chosen or would choose the withholding option because of the possibility that SSA would later make an erroneous payment for which they could request waiver of recovery. Moreover, the choice of the withholding option strongly demonstrates the beneficiaries' responsibility, for, by doing so, they ensure that premiums are paid before monthly income can be exhausted on necessities such as food, rent, and utilities. The Secretary's suggestion that, by selecting the withholding option beneficiaries demonstrate a deficiency in self-reliance, indicates his lack of sensitivity to the financial insecurity of many elderly and disabled beneficiaries, and their need for assistance in bill paying. Congress recognized this need when it authorized the withholding option, and the Secretary's criticism of those who have accepted this offer strays far from reality.

The Secretary also opines that erroneous payments of Title II benefits are more deserving of waiver protection than "erroneous refunds of premiums of Medicare Part D," due to a perceived difference in their financial situations. Opp. at 35. Putting aside that these *were* erroneous Title II payments, not premium refunds, the Secretary's logic is faulty. Medicare Part D beneficiaries not eligible for the Low Income Subsidy (LIS) are essentially in the same position as Title II beneficiaries. They are elderly or disabled, and, although they are not entitled to the welfare protections of the LIS, they are generally living on fixed incomes and are, as a group, in a precarious financial position, as over half of all Medicare beneficiaries have annual incomes of less than $18,000. See 456 F.Supp.2d at 24 & n. 15. As this Court noted: "[I]t was

because of the special coincidence of medical needs and financial problems among elderly people that the Medicare program was established in the first place." *Id.* at 20 n. 11 (internal quotation marks and citation omitted).  Contrary to the Secretary' implication, Title II beneficiaries are not recipients of welfare, unless their incomes are so low that they are also entitled to SSI (in which event they would be eligible for the LIS in Part D).  It would be irrational to distinguish on income grounds between Title II beneficiaries and Part D enrollees not eligible for the LIS; indeed, they are largely the same people.

The Secretary also points to alleged differences between Parts A and B on the one hand, and Part D on the other, to support the differential treatment on the issue of waiver.  Opp. at 40-41.  First, he notes that only Part D beneficiaries have the *option* of withholding.  But it is not that withholding is mandated in Parts A and B from which the Secretary divines significance; rather, it is that those Part D enrollees who choose the option would allegedly receive preferential treatment if waiver were applicable compared to those Part D enrollees who do not opt for withholding.  As plaintiffs have explained, however (*supra* at 14), the withholding option for Part D premiums benefits the plans and Medicare as a whole by guaranteeing the payment of premiums, in addition to providing a simplified payment process for beneficiaries.  The fact that those beneficiaries who choose withholding may become entitled to seek recovery of an erroneous payment if the waiver standard is applicable to them does not distinguish them from other beneficiaries, for all are entitled to the rights authorized by § 404(b) when a mistake is made resulting in an incorrect higher  payment.  The alleged "illogical distinctions" among Part D enrollees if the right to waiver were applicable is an illusion.

The Secretary also argues that it is logical to apply the right to waiver in the Part B context but not in Part D because the latter, but not the former, has an exemption for low income

people. Consequently, he contends, when a mistaken payment is made in the Part D context, there is less need for correction than in the Part B context, where the "enrollees have no exemption for the lowest income beneficiaries." Opp. at 41. As plaintiffs have explained, however, that is factually inaccurate, as low income Part B beneficiaries do have their premiums and deductions subsidized. See *supra* at 9-10. The Secretary's determination to discern a distinction between Parts B and D in order to construct a rationale for their differential treatment in the waiver context flounders on an incorrect premise.[11]

The Secretary also rejects plaintiffs' argument that the Secretary could not apply the waiver standards to payments erroneously made in Parts A and B unless there was statutory authority to do so. Opp. at 38-41. Terming this "a convoluted argument made by plaintiffs before the Court of Appeals," *id*. at 38, the Secretary nevertheless fails even to mention the decision on which plaintiffs relied for that contention, *Office of Personnel Management v. Richmond*, 496 U.S. 414 (1991), and does not contradict plaintiffs' argument.[12]

*Richmond* held that, under the Appropriations Clause, a federal agency cannot pay out benefits without statutory authority, even to compensate an individual who has relied to his detriment on information provided by the agency. Waiving recovery of an overpayment without statutory authority would effect exactly that result, for the same reason: payment out of the Treasury to make up for an agency mistake. The "payment" in this case is the decision not to

---

[11] The Secretary has abandoned a different theory, argued originally to this Court and then to the Court of Appeals, to explain the rationale for authorizing waiver only in the Part B context. That theory, that Part B premiums are owed to the government while Part D premiums are owed to the insurer, was soundly rejected by this Court. See 456 F.Supp.2d at 21. The Secretary's latest theory for distinguishing between the Parts for purposes of the applicability of waiver is equally unconvincing.

[12] Plaintiffs cited *Richmond* for the same proposition in this Court as well. See Docket # 8 (filed Sept. 25, 2006) at 18.

recover the amount erroneously paid (*i.e.*, allowing the mistaken payment to remain in the possession of the beneficiary), but it has the same impact as paying out money in the first place without authority.  The Secretary has no answer to this point, nor did he in the Court of Appeals.  The short of it is that there must be authority to waive an overpayment, and since apparently there exists authority for waiver in Parts A and B, the same authority applies in the Part D context.  Consequently, § 404(b) must apply to situations arising in Part D as well.

Furthermore, recognizing the importance to which this Court and the D.C. Circuit in prior litigation (see 456 F.Supp.2d at 21, 24) assigned the decision and analysis in the similar case of *Shannon v. U.S. Civil Service Comm'n*, 444 F.Supp. 354 (N.D.Cal. 1977), aff'd in part, rev'd in part, 621 F.2d 1030 (9th Cir. 1980), the Secretary attempts to undercut the impact of that decision in a footnote.  Opp. at 41 n. 21.  The Secretary claims that that decision was wrongly decided and that, somehow, "the *Shannon* analysis leads to exactly the opposite outcome."  *Id.*

*Shannon* arose in the context of an overpayment caused by the failure to deduct insurance premiums from monthly benefits.  The Commission argued that the relevant waiver statute was not applicable because the mistake was not caused by a miscalculation of the amount of the annuity.  444 F.Supp. at 358.  The district court rejected that distinction as irrelevant, in language that this Court quoted:

> [T]he obvious purpose of [the Civil Service waiver statute] is to avoid the hardship that can result from recovering overpayments from a blameless annuitant.  The cause of the overpayment is immaterial to the impact on the annuitant.  By the language of the statute, Congress did not differentiate the various funds within the Commission when it authorized waiver of recovery from an innocent retired employee.

*Id.*, quoted in 456 F.Supp.2d at 21.  That common sense analysis remains applicable to this case: it is irrelevant that the premium withholding procedure led to the erroneous payment of Title II benefits.  The harm to the beneficiary is the same regardless of what triggered the error.[13]

This Court correctly determined that no reasonable basis existed for denying the right to waiver to Part D beneficiaries when § 404(b) had been interpreted in the POMS to provide that right to Part B beneficiaries, and that therefore no deference was due.[14]  The Secretary labors at length to offer some rationale, but either his premises are faulty or his conclusions do not follow. No logical reason presents itself why reliance on § 404(b) for the POMS provision applicable to Parts A and B does not lead to the identical result in the Part D context.  The Court's original determination should stand, and that defeats the suggestion that filing the New Complaint would be futile.

### B.  On its face, the statute authorizes the right to waiver in this situation.

This Court's analysis proceeded from the assumption that the relevant statute, 42 U.S.C. § 404(b), was ambiguous.  456 F.Supp.2d at 19.  In fact, however, the statute is not ambiguous and dictates application of the waiver standards in this context without the need to reach the previous analysis.

Section 404(b) states, in applicable part: "In any case in which more than the correct amount of payment has been made, there shall be no adjustment of payments to, or recovery by

---

[13]  The Secretary attempts to find significance in the fact that *Shannon* was pre-*Chevron*, but the *Shannon* court essentially applied a *Chevron* standard: "The agency interpretation of a statute is generally entitled to great deference and should be sustained unless it is plainly erroneous or inconsistent with the statute."  444 F.Supp. at 357.

[14]  No deference is due for an additional reason: the policy of not applying the waiver rules in this situation is not the product of notice-and-comment rulemaking or, in fact, of any written analysis at all.  See, *e.g., Christensen v. Harris County*, 529 U.S. 576, 587 (2000); *Public Citizen, Inc. v. U.S. Dept. of Health and Human Services*, 332 F.3d 654, 660 (D.C.Cir. 2003).

the United States from, any person" who meets the two prongs of the waiver standard.  The instant situation falls squarely within the terms of the statute.

First, even assuming that the statute only applies when the payments at issue are made by SSA, there is no dispute that that entity did in fact make the payments.  See, *e.g.*, Norwalk Dec., ¶ 4.  Second, even assuming that the payments at issue must be Title II funds,[15] that is precisely what was paid here, despite the Secretary's repeated references to erroneous premium refunds.[16] There is no other possible source for the payments, since the premiums themselves had been passed on to the plans and there was no attempt to recover them.  Third, and most important, "more than the correct amount of payment" was made.  Consequently, recovery "by the United States" (whether it be CMS, SSA, or the two working in conjunction) is prohibited without the right to waiver being offered and considered if requested.  The Title II waiver statute explicitly covers this situation.

It is irrelevant that the amounts erroneously sent to the beneficiaries were paid under the mistaken belief that these beneficiaries had opted not to have their Part D premiums withheld from their Social Security checks.  Although SSA believed that the amount of the Social Security benefit that it had withheld and passed on to the prescription drug plan should be returned to the beneficiary, that money was not retrieved from the plan.  See *supra* at 2.  Consequently, SSA simply made a mistaken payment, and the rationale for, or background of, that mistake is not

---

[15]  The waiver statute does not refer to Title II payments, but merely to the fact that "more than the correct amount of payment has been made."  The Secretary paraphrases this phrase to read that "'more than the correct amount of payment' of Title II benefits 'has been made.'"  Opp. at 6.

[16]  In the Court of Appeals, for instance, plaintiffs stated that "SSA instructed the Treasury Department to pay these amounts ...."  Brief for the Appellees at 5.  The government did not dispute that statement in its Reply Brief or at oral argument.

relevant.  The payment by SSA therefore directly implicates the waiver statute because it is a "case in which more than the correct amount of payment has been made ...."

The implementing regulation, 20 C.F.R. § 404.501(a), adds to this authority.  The regulation interprets the statute to apply to "overpayments" (a word that does not appear in the statute itself).  It defines overpayment in a number of ways, including as "a payment where no amount is payable under title II of the Act."  In other words, if SSA simply sends someone – a beneficiary or anyone else – a payment for which there is no statutory authority, that is an overpayment.  And, that is precisely what happened here.  Although statutory authority existed for the regular monthly benefits that the beneficiaries received, no authority existed for sending them the amount of past premiums withheld.  That was a mistake, but that mistake, like many others that could be made, resulted in an erroneous payment that could only be recovered pursuant to the waiver rules.

Part of the confusion generated by the government in this case stems from the fact that CMS took charge of the recovery and made the decision that waiver would not be applicable.  That fact is irrelevant, however: SSA and CMS have established, as the POMS confirms, that an erroneous payment of this type, regardless of labeling it an "erroneous premium refund," is subject to the Social Security waiver provision.  And that provision not only prohibits SSA from recovering without offering the right to seek waiver, but it precludes "recovery *by the United States* from any person" who satisfies the waiver standards.  42 U.S.C. § 404(b) (emphasis added).  In short, once SSA has made an incorrect payment, *no* government agency has the authority to recover that payment without extending the right to waiver.

The Secretary's "short legal analysis" (Opp. at 29) in support of his position purports to find support in the statutory language.  He underscores the words "payment" and "under this

subchapter" in the recovery provision, 42 U.S.C. § 404(a), and the words "this subchapter" in the

waiver provision, *id.*, § 404(b).  He states that these can only be references to payments under

Title II.  His point is not clear, however, but plaintiffs note that the payments at issue in this case

*were* from Title II.  In any event, as the POMS provision applicable to Parts A and B has made

clear, § 404(b) does apply to erroneous payments based on amounts previously withheld to pay

for premiums.

The Secretary's main point, however, is somehow to tie the language of the waiver

statute to his contention that the payments at issue were premium refunds and therefore are not

within the ambit of § 404.  Opp. at 30-32.  The statute, though, does *not* include a "list of

transactions that fall within the scope of 42 U.S.C. § 404 …."  Opp. at 30.  Such a discrete and

limited directory of situations triggering waiver simply does not exist.  Instead, the statute refers

generally to all situations "in which more than the correct amount of payment" has been made.

And, as plaintiffs have explained, that is precisely what occurred here – and it is irrelevant what

kind of error caused that erroneous payment.

Moreover, the regulation, which fleshes out the statutory language, expressly refers to

payments "where no amount is payable under title II."  20 C.F.R. § 404.501(a).  Although the

Secretary quotes this language (see Opp. at 8, 36-37), he fails to recognize its applicability to this

situation, instead focusing his attention on the inevitably hopeless search for the phrase

"erroneous refund" on his "list" of waiver-triggering events.  Opp. at 37.[17]

The Secretary's apparent ultimate position is that the erroneous payments here were not

made "under this subchapter" because they were premium refunds, not Title II payments.

---

[17]  Alternatively, this was "a payment in excess of the amount due under title II of the Act
...."  20 C.F.R. § 404.501(a).  In either event, the payment was made by SSA from Title II funds.
Consequently, it was an "overpayment" under the regulatory definition, and "more than the
correct amount of payment" under the statutory definition.

Plaintiffs have explained that that is factually incorrect: the amount of the premiums were withheld correctly from earlier Title II payments and paid to the plans as the premium payments. Later, SSA mistakenly paid to the beneficiaries the *amount* of those premiums, but it did not take the premium payments back from the plans and refund them to the beneficiaries: it simply paid them extra Title II benefits.

The Secretary relies on the fact that plaintiffs themselves and the Court of Appeals referred on occasion to the erroneous payments as "erroneous refunds of Medicare premiums." Opp. at 31 & n. 18. (He could also have noted that this Court did the same. See 456 F.Supp.2d at 13, 17.) These references, though, are a short-hand for what happened, not a legal conclusion or a statement of fact. Regardless of what terminology has been employed, it is simply not true that the premiums were refunded, as the Secretary has acknowledged. The premiums stayed with the plans and -- in an entirely separate transaction -- erroneous payments were made out of Title II funds to the beneficiaries in the amount of those premiums.

The reference by the Court of Appeals is especially off the mark for the Secretary's intended use. It came in the context of plaintiffs' argument that the Medicare waiver statute, 42 U.S.C. § 1395gg(c), was applicable, and the Court of Appeals was simply stating that overpayments to a provider of "items and services" were not related to the payments at issue in this case, which it referred to as "erroneous refunds of Medicare premiums." 483 F.3d at 860-861. In essence, the Secretary is contending that the appellate court's use of that latter term is conclusive for this case, but that is not correct. The Court of Appeals was not deciding the legal status of the amounts that SSA paid out; it was simply referring, as the parties and this Court had previously done, to the amounts at issue by a simple term that reflected the origin of the mistake.

As much as the Secretary would prefer, the payments mistakenly made by SSA in this case were not "erroneous premium refunds": they were Title II payments whose only connection to the previously paid Part D premiums was that their amounts reflected the amounts of the premiums. No refund of premiums was made in this case.

It bears repeating that the purpose of waiver is to protect vulnerable and blameless people from mistakes by the federal government. Waiver "act[s] as a safety valve to provide relief from an otherwise harsh or inequitable result," *Zinman v. Shalala*, 67 F.3d 841, 843 n. 1 (9th Cir. 1995). The "equity and good conscience" test, which is part of the waiver analysis, see, *e.g.*, *Yamasaki*, 442 U.S. at 686; POMS, § HI 01001.330C, represents "a broad concept of fairness." *Quinlivan v. Sullivan*, 916 F.2d 524, 527 (9th Cir. 1990); see also, *e.g.*, *Groseclose v. Bowen*, 809 F.2d 502, 505-506 (8th Cir. 1987) ("equity and good conscience" goes beyond the detrimental reliance concept set out in the regulation, 20 C.F.R. § 404.509).

The Secretary's continued refusal to acknowledge the applicability of waiver in this context mirrors his original aggressive response to the erroneous payments and betrays a genuine misunderstanding of the concept of waiver. In his web postings and letters to the beneficiaries, he incorrectly suggested that they had no rights beyond those benevolently bestowed upon them by the Secretary. In fact, however, waiver of recovery is a recognition that, when the standards are met, the beneficiary need not repay because ownership in the erroneous payment has been transferred to the beneficiary:

> Waiver is not a matter of "governmental beneficence," as the Secretary puts it. Under § 404(b) waiver is not discretionary, but mandatory, under the conditions specified. Thus, the statute creates a property interest in retention of overpayments if the conditions of waiver are met, even if there was no right to receive the overpayments in the first place.

*Elliott v. Weinberger*, 564 F.2d 1219, 1230 (9th Cir. 1977), aff'd in part, rev'd in part on other grounds *sub nom. Califano v. Yamasaki*, 442 U.S. 682 (1979).

This motivating logic behind waiver is no less applicable when the cause of the erroneous payment is mired in the mistake-prone world of premium withholding.  And nothing in the statute remotely suggests such an exception.[18]

### III.    THE NEW COMPLAINT DOES NOT CHANGE THE NATURE OF THE CASE.

The Secretary contends in the alternative that the New Complaint would introduce a new statutory claim and a new defendant, thereby changing the nature of the case.  Opp. at 42-43. There is no merit to this contention, as the proposed changes will not "radically alter the scope and nature of the case ...."  *Miss. Ass'n of Cooperatives v. FHA*, 139 F.R.D. 542, 544 (D.D.C. 1991) (quoted in Opposition at 24).  This is the same case as before.

As noted *supra* at 5, and as both this Court and the Court of Appeals have recognized, the § 404(b) claim has been in the case all along.

As for adding the Commissioner, plaintiffs are taking that action in the exercise of caution, and his inclusion will not alter the case in any way.[19]  The beneficiaries did not originally sue SSA for a very good reason: SSA was not the agency refusing to authorize the

---

[18]    The beneficiaries' due process claims are for notice of the right to waiver and for an oral hearing prior to recovery.  See New Complaint, ¶¶ 51, 53.  The right to waiver is "a property interest [that] commands due process protection."  *Elliott*, 564 F.2d at 1230.  Accordingly, due process was held to require both notice and the right to a pre-recoupment hearing.  *Id.* at 1232-1236.  Although this case could and should be resolved on statutory grounds, the alternative due process arguments are strong in their own regard and are not "make-weight."  Opp. at 38.

[19]    The Secretary incorrectly states that the Court of Appeals determined that SSA was the agency to which the plaintiffs should have directed their demand that beneficiaries receive notice and the right to waiver.  Opp. at 22 n. 11.  While the Court of Appeals questioned which agency might be appropriate, it specifically declined to rule on that point.  483 F.3d at 857.

right to seek waiver and notice of that right.  CMS took full responsibility for that decision, and

had sent out the letters to the affected beneficiaries demanding repayment.  See, *e.g.*, Exhibit J to

the New Complaint.  Given that repayment had to be made to CMS, it would have been illogical

to request the right to seek waiver from a different agency.

SSA has historically implemented the waiver standard and determined whether recovery

should be waived when beneficiaries have the right to seek it, including for Part B beneficiaries

when erroneous payments are made in that context.  Accordingly, to ensure that all possibly

relevant entities are before the Court, plaintiffs are seeking to add the Commissioner as a

defendant.  Since he is represented by the same counsel (the Justice Department) and the legal

theories are the same as for the Secretary, the Commissioner's participation will not affect the

nature or scope of the case.

**CONCLUSION**

Filing the New Complaint will not be futile, as a motion to dismiss is doomed to fail.

Accordingly, and for the reasons stated, the Court should grant leave for the filing of plaintiffs'

Supplemental and Second Amended Complaint.


Respectfully submitted,


/s/ Vicki Gottlich

VICKI GOTTLICH
D.C. Bar No. 937185
PATRICIA B. NEMORE
D.C. Bar No. 204446
Center for Medicare Advocacy, Inc.
1025 Connecticut Ave., N.W., Suite 709
Washington, D.C. 20036
(202) 293-5760


25

GILL DEFORD
D.C. Bar No. 459280
WEY-WEY KWOK
D.C. Bar No. 461647
JUDITH STEIN
BRAD PLEBANI
Center for Medicare Advocacy, Inc.
P.O. Box 350
Willimantic, CT 06226
(860) 456-7790

SALLY HART
Center for Medicare Advocacy, Inc.
2033 East Speedway Blvd., Suite 200
Tucson, AZ 85719
(520) 322-0126

Attorneys for Plaintiffs

DATED:  October 9, 2007

## <u>CERTIFICATE OF SERVICE</u>

I, Michael Rubin, under the direction of counsel for the plaintiffs, Vicki Gottlich, certify that, on October 9, 2007, Plaintiffs' Reply Memorandum in Support of their Motion for Leave to File Supplemental and Second Amended Complaint was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ Michael Rubin

Michael Rubin