IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ACTION ALLIANCE OF SENIOR CITIZENS, et al,, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 06-1607-HHK |
| MICHAEL LEAVITT, et al. | ) ) | |
| Defendants. | ) | |

### DEFENDANTS' MOTION TO DISMISS
### PLAINTIFFS' SUPPLEMENTAL AND SECOND AMENDED COMPLAINT

Pursuant to Fed. R. Civ. P. 12(b)(6), defendants in the above-captioned action respectfully move this Court for an order dismissing plaintiffs' supplemental and second amended complaint for failure to state a claim upon which relief can be granted.  Pursuant to Fed. R. Civ. P. 12(b)(1), defendants also move to dismiss the claims of plaintiffs Action Alliance of Senior Citizens and Gray Panthers for lack of subject-matter jurisdiction.  For the reasons in support of this motion, defendants respectfully refer the Court to the attached memorandum.

Respectfully submitted,

OF COUNSEL:
DANIEL MERON
General Counsel

MARK D. POLSTON
Associate General Counsel

CAROL J. BENNETT
Acting Deputy Associate
General Counsel for Litigation

MARCUS H. CHRIST
LAWRENCE J. HARDER
Attorneys
United States Department of
Health and Human Services

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

/s/ Peter Robbins
RICHARD G. LEPLEY
PETER ROBBINS
United States Department of Justice
20 Massachusetts Avenue, N.W., Room 7142
Washington, D.C.  20530
Tel:  (202) 514-3953

Attorneys for Defendants

DAVID BLACK
General Counsel

THOMAS CRAWLEY
Deputy General Counsel

GWEN JONES KELLEY
Acting Associate General Counsel
Office of Program Law

EILEEN FARMER
HEDY GORDON
Attorneys
Office of the General Counsel
Social Security Administration

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ACTION ALLIANCE OF SENIOR CITIZENS, et al,, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 06-1607-HHK |
| MICHAEL LEAVITT, et al. | ) ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFFS' SUPPLEMENTAL AND SECOND AMENDED COMPLAINT**

OF COUNSEL:

DANIEL MERON
General Counsel

MARK D. POLSTON
Associate General Counsel

CAROL J. BENNETT
Acting Deputy Associate
General Counsel for Litigation

MARCUS H. CHRIST
LAWRENCE J. HARDER
Attorneys
United States Department of
Health and Human Services

DAVID BLACK
General Counsel

THOMAS CRAWLEY
Deputy General Counsel

GWEN JONES KELLEY
Acting Associate General Counsel
Office of Program Law

EILEEN FARMER
HEDY GORDON
Attorneys
Office of the General Counsel
Social Security Administration

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

RICHARD G. LEPLEY
PETER ROBBINS
United States Department of Justice
20 Massachusetts Avenue, N.W.
Room 7142
Washington, D.C. 20530
Tel: (202) 514-3953

Attorneys for Defendants

## TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  Overview of the Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.  Social Security. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          1.  The authority of the Commissioner of Social Security. . . . . . . . . . . . . . . . . . . 5

          2.  Benefits under Title II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          3.  How overpayments of Title II benefits are recovered. . . . . . . . . . . . . . . . . . . 6

          4.  When a notice of a right to request a waiver of recovery is needed.. . . . . . . . . . . 7

    C.  Medicare . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          1.  The authority of the Secretary of Health and Human Services. . . . . . . . . . . . . . 9

          2.  Medicare Parts A-B and Parts C-D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          3.  Recovery of overpayments under Medicare . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    D.  Medicare Premiums and Payment Methods.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    E.  The Government's Authority to Recover Erroneous Refunds of Medicare Premiums. . . 15

    F.  Recovery Waivers for Erroneous Refunds of Premiums under Part B
       and Parts C-D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    I.  THE ORGANIZATIONAL PLAINTIFFS HAVE NOT MET THE
       JURISDICTIONAL PREREQUISITES ESTABLISHED BY THE
       COURT OF APPEALS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    II.  PLAINTIFFS FAIL TO STATE A CLAIM BECAUSE 42 U.S.C. § 404(b)
       DOES NOT APPLY TO ERRONEOUS REFUNDS OF MEDICARE
       PART D PREMIUMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

A. The Commissioner's Construction of His Statutory Authority Is
   Entitled to Deference. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

B. The Recovery-Waiver Provision in 42 U.S.C. § 404(b) Does Not
   Apply to Erroneous Refunds of Medicare Premiums Because
   Medicare Premiums Are Not Title II Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . 27

   1. The Commissioner's view is consistent with the plain statutory
      language. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

   2. The legislative history does not support plaintiffs' construction. . . . . . . . 31

   3. Plaintiffs' reading makes absurd distinctions among
      prescription-drug enrollees and perversely discourages
      self-reliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

B. Notice of Waiver-Request Rights Is Not Required under 20 C.F.R.
   § 404.502a Because Erroneous Refunds of Medicare Premiums are
   not Overpayments Subject to Waiver Protection under Title II Regulations. . . . . 35

C. The POMS Manual Provision Does Not Apply to Erroneous Refunds of
   Prescription-Drug Premiums under Medicare Parts C and D. . . . . . . . . . . . . . . . 36

D. Plaintiffs' Due Process Claim Lacks Merit. . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

E. Plaintiffs' Statutory-Construction Arguments Are Unpersuasive. . . . . . . . . . . . 37

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## INTRODUCTION

This action seeks to impose extra-statutory fetters on the ability of the federal government to recover millions of dollars in insurance premiums that were erroneously returned to some Medicare beneficiaries newly enrolled in prescription-drug plans in 2006.  Plaintiffs claim that one particular minority of enrollees – those who opt to pay their prescription-drug premiums to a private insurer through deductions from their monthly Social Security checks – enjoy special protections against the recovery of erroneous refunds that are not enjoyed by other enrollees who pay their premiums by more direct means.  Plaintiffs have been unable, however, to identify any statute or regulation that supports, let alone mandates, such a curious policy preference.

In their original and first amended complaints, plaintiffs claimed that the special anti-recovery rights they seek were mandated somewhere in the penumbra of 42 U.S.C. § 1395gg.  As this Court will recall, that statute authorizes the Secretary of Health and Human Services to require beneficiaries to return certain overpayments made to health-care providers for medical "items and services" under the Medicare program.  42 U.S.C. § 1395gg(a).  But, in circumstances where the beneficiary is not at fault, the statute prohibits recovery where it "would defeat the purposes" of the Social Security Act or "would be against equity and good conscience."  42 U.S.C. § 1395gg(c).  Although plaintiffs initially persuaded this Court that this statute could be broadened to mandate the same recovery protections in situations where prescription-drug premiums deducted from Social Security checks were erroneously refunded, Action Alliance of Senior Citizens v. Leavitt, 456 F. Supp. 2d 11, 17-23 (D.D.C. 2006), rev'd, 483 F.3d 852 (D.C. Cir. 2007), their theory was subsequently rejected in near-summary fashion by the Court of Appeals for this Circuit.  Action Alliance of Senior Citizens v. Leavitt, 483 F.3d 852, 859-61

(D.C. Cir. 2007). "[B]y its plain terms," the Court held, the language of 42 U.S.C. § 1395gg simply "has nothing to do with erroneous refunds of Medicare premiums." Id.

Undaunted by this setback, plaintiffs are now back before this Court, having been granted leave to amend their complaint. The theory they seek to assert in their second amended complaint, however, is merely a variation on the first unsuccessful theme. In its current incarnation, plaintiffs argue that the anti-recovery rights which they had originally thought were placed in 42 U.S.C. § 1395gg actually can be found within the penumbra of 42 U.S.C. § 404, which requires the Commissioner of Social Security to effect recovery where "more . . . than the correct amount" of old-age, survivor or disability benefits has been paid to a beneficiary under Title II of the Social Security Act, 42 U.S.C. § 404(a)(1), but likewise forbids recovery from a beneficiary who is without fault with respect to the overpayment where recovery "would defeat the purpose" of Title II or "would be against equity and good conscience." 42 U.S.C. § 404(b). But the new claim is as untenable as its predecessor. Both theories share a common flaw in that they confuse the payment by a beneficiary of an insurance premium – which the beneficiary of the policy is trying to have transferred to a private insurer in satisfaction of his contractual obligation to the insurer – with the overpayment to a beneficiary of a statutory entitlement – which the beneficiary might receive from the government in putative satisfaction of the government's legal obligation to him. Plaintiffs' second amended complaint should therefore be dismissed.[1]

---

[1] Defendants previously attempted to join the issue on the merits when they argued, among other things, that plaintiffs' motion to file a second amended complaint should be denied on the ground of futility, because the new claims could not survive a motion to dismiss for failure to state a claim. Defendant's Opposition to Plaintiffs' Motion for Leave to File Supplemental and Second Amended Complaint at 29-42 (Doc. 42). Although this Court granted the motion to amend, the summary order did not discuss the merits of plaintiffs' new claims. Order dated

# BACKGROUND

### A.  Overview of the Issue

The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("Medicare Prescription Drug Act"), Pub. L. No. 108-173, 117 Stat. 2066 (2003), created a new prescription-drug benefit that went into effect last year.  Under the program, beneficiaries do not obtain insurance coverage from the federal government as they do in traditional Medicare.  Rather, they purchase drug coverage from an array of private plans that are subsidized by the government and compete with each other for the beneficiary's business.  Most prescription-drug enrollees are required to pay a premium in return for this private insurance.  The premium money, in turn, belongs to the insurer, not to the federal government.

The beneficiary has three options for making his premium payment to the private insurer.  First, he can pay the money directly, such as by mail.  Second, he can have the payment made for him by means of an electronic funds-transfer from a bank or credit-card company.  Finally, he can have the money deducted for him from his monthly Social Security check and transferred by the government to the private insurer.  The insurer is expressly prohibited from offering any financial incentives to influence the enrollee's choice of payment method.  The issue in this case

---

November 13, 2007 at 1 (Doc. 46).  Defendants do not interpret the order as being intended as a ruling on the merits of what plaintiffs themselves describe as a "significant issue" of statutory construction, Motion for Leave to File Supplemental and Second Amended Complaint ("Pl. Amend Mem.") at 1 (Doc 37), that involves millions of dollars in public funds.  We therefore respectfully seek such a ruling on the merits here.  Even if defendants do not prevail on the motion, it would be more efficient to resolve the issues of statutory construction now and reserve until later the nature of the relief, if any, that could be granted to the named plaintiff and any members of the plaintiff organizations who might be deemed to be entitled to some form of relief.

-3-

concerns what happens if a premium payment is returned to the beneficiary because of a mistake made by one of the actors in the payment process.

The common-sense answer, of course, is that the beneficiary still owes the premium money to the insurer. If the mailman mistakenly returns the envelope bearing the premium check, for instance, the beneficiary obviously still owes the money to the insurer, and the insurer has a right to demand it. Similarly, if the insurer itself mistakenly refunds the premium, it can recover the money to correct the error. Recovery is also available where the entity that erred in favor of the beneficiary was the bank or the credit-card company. In the absence of a contract clause that anticipates the problem and expressly requires the creditor to waive recovery of the funds in hardship circumstances, it would be up to the discretionary judgment of the creditor whether to forgive the debt or to make arrangements for repayment on an installment plan.

The question in this case is whether an enrollee in a prescription-drug plan has any special rights to keep erroneous refunds of premium payments where the entity that made the mistake is the federal government, not acting in the capacity of a payer of a statutory entitlement, but merely acting as a helpful conduit of the premium money from the hands of the beneficiary to the hands of the private insurer. Once again, the common-sense answer is no. Where a mistaken refund has been made in this setting and the government has transferred the appropriate sum into the rightful hands of the private insurer, the government logically should have just as much right to recover the erroneous refund as the bank, or the credit-card company, or the insurer (if the insurer had been left unpaid). Plaintiffs' contention that prescription-drug enrollees who rely on the government to help transfer payment money should be entitled to greater anti-recovery protections than are enjoyed by other enrollees is simply illogical. The remainder of this

memorandum merely shows why the Social Security and Medicare statutes can reasonably be read as eschewing that illogical result.

**B.  Social Security**

Title II of the Social Security Act, 42 U.S.C. §§ 401-434, establishes an insurance program for the elderly and disabled, commonly known simply as Social Security.  The features of the program relevant here are set forth below.

### 1.  The authority of the Commissioner of Social Security

Since 1995, the administration of the Title II benefit program has been entrusted exclusively to the Social Security Administration ("SSA").[2]  The Commissioner of Social Security has broad responsibility for the "exercise of all powers and the discharge of all duties" of the Social Security Administration, 42 U.S.C. § 902(a)(4), including the power to "prescribe such rules and regulations as the Commissioner determines necessary or appropriate to carry out functions of the Administration."  42 U.S.C. § 902(a)(5); <u>see also</u> 42 U.S.C. § 405(b).  Regulations governing Title II benefits are published at 20 C.F.R. Part 404.  Informal instructions on how to administer the Title II program are published in a Program Operations Manual System ("POMS Manual").[3]

### 2.  Benefits under Title II

The Social Security program established by Title II has two primary parts.  The first part consists of old-age and survivor benefits.  42 U.S.C. § 402.  The second consists of disability

---

[2] SSA became independent of the Department of Health and Human Services in §110 of the Social Security Independence and Program Improvements Act of 1994, Pub. L. No. 103-296, 108 Stat. 1464, 1490 (1994).

[3] https://s044a90.ssa.gov/apps10/poms.nsf/partlist!OpenView (with hyperlinks to specific manuals).

benefits. 42 U.S.C. § 423. The "total monthly benefits to which beneficiaries may be entitled" under these programs, 42 U.S.C. § 403(a)(1), are determined according to an extraordinarily complicated set of calculations, definitions, reductions, penalties and credits. See 42 U.S.C. §§ 402- 403, 409-425, 428-31. The "Byzantine construction" of these statutes "is among the most intricate ever drafted by Congress" and has been famously characterized as being "'almost unintelligible to the uninitiated.'" Schweiker v. Gray Panthers, 453 U.S. 34, 43 (1981) (quoting Friedman v. Berger, 547 F.2d 724, 727 n.7 (2d Cir. 1976) (per Friendly, J.)). In light of the fact that "[m]illions of Americans receive benefits under these programs," it is not surprising that "inevitably, some beneficiaries occasionally receive more than their entitlement." Sullivan v. Everhart, 494 U.S. 83, 85 (1990). Section 204 of the Social Security Act, 42 U. S. C. § 404, addresses what the Commissioner is required to do when he determines that an overpayment of Title II benefits has been made to a Social Security beneficiary.

### 3. How overpayments of Title II benefits are recovered

The statute provides, in relevant part, that, "[w]henever the Commissioner of Social Security finds that more . . . than the correct amount of payment has been made to any person under this subchapter [that is, Title II of the Social Security Act], proper adjustment or recovery shall be made, under regulations prescribed by the Commissioner." 42 U.S.C. § 404(a)(1). To bring about the recovery of overpayments of Title II benefits, the Commissioner may "decrease any payment under this subchapter" [that is Title II], or he may demand a "refund" directly from the beneficiary, or he may take various other offset measures. 42 U.S.C. § 404(a)(1)(A). However, "[i]n any case in which more than the correct amount of payment" of Title II benefits "has been made, there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of

this subchapter [that is Title II] or would be against equity and good conscience." 42 U.S.C.
§ 404(b).

Pursuant to his rulemaking authority, the Commissioner has established an administrative
procedure by which the recipient of an overpayment of Title II benefits can seek a waiver of
recovery. The process includes an opportunity for the beneficiary to present an application for
the waiver, 20 C.F.R. § 404.506(b); furnish information in support of the request, 20 C.F.R.
§ 404.506(c); make his argument to an SSA official, 20 C.F.R. §§ 404.506(c)-(f); receive a
decision from that official, 20 C.F.R. § 404.506(g); and, if the beneficiary wishes, challenge that
decision through further administrative appeals. 20 C.F.R. § 404.506(h). See 20 C.F.R.
§§ 404.907-404.913, §§ 404.919-404.922 (reconsideration), §§ 404.929-404.961 (administrative
law judge hearing), §§ 404.966-404.981 (Appeals Council review). Informal instructions for
making the waiver determinations are set forth in §§ GN 02250.001-GN 02250.425 of the POMS
Manual. To ensure that beneficiaries are able to avail themselves of this process, the regulations
provide that, where a beneficiary has a right to request a waiver, the beneficiary must receive a
notice, 20 C.F.R. § 404.502a, which, among other things, includes an "explanation of the right to
request a waiver of adjustment or recovery," 20 C.F.R. § 404.502a(e), instructions about the
availability of waiver-request forms, 20 C.F.R. § 404.502a(g), and a statement that the
beneficiary should notify SSA "promptly" if a waiver is desired. 20 C.F.R. § 404.502a(j).

### 4.  When a notice of a right to request a waiver of recovery is needed

The purpose of the recovery protections in 42 U.S.C. § 404(b) was to make "more
equitable the recovery by the Federal Government of incorrect payments to individuals," H.R.
Rep. No. 76-728 at 19 (1939) (emphasis added), which, at the time those words were written,
meant the incorrect payments of old-age and survivor benefits established in Title II. Id. at 8-9.

Accordingly, the regulations promulgated by the Commissioner make clear that a notice of a right to request a waiver of recovery exists only where (a) "an initial determination is made that more than the correct amount of payment" of Title II benefits "has been made," and (b) the Commissioner seeks "adjustment or recovery of the overpayment."  20 C.F.R. § 404.502a.  For purposes of these provisions, "the term <u>overpayment</u>" is defined to include

> a payment in excess of the amount due under title II of the Act, a payment resulting from the failure to impose deductions or to suspend or reduce benefits under [42 U.S.C. §§ 403, 422(b), 424, and 428(c)-(e)], a payment pursuant to [42 U.S.C. § 405(n)] in an amount in excess of the amount to which the individual is entitled under [42 U.S.C. § 402 or § 423], a payment resulting from the failure to terminate benefits, and a payment where no amount is payable under title II of the Act.

20 C.F.R. § 404.501(a) (emphasis in original).  Under this regulatory scheme, the Commissioner is not required to afford waiver protections with respect to any erroneous transfers of money that do not fit within the definition of an overpayment of Title II benefits.  And, obviously, he is not required to give notice of the right to request a waiver in circumstances where no right to request a waiver of recovery exists.[4]

The gravamen of the new theory in plaintiffs' second amended complaint is that the waiver protections in 42 U.S.C. § 404(b) should be stretched to also include circumstances where the Secretary of Health and Human Services has undertaken to recover erroneous refunds of

---

[4] The regulation also lists nine other kinds of payments for which an adjustment may be made.  20 C.F.R. §§ 404.501(a)(1)-(9).  The only one that involves Medicare is 20 C.F.R. § 404.501(a)(7), and it merely involves execution of the deduction that the Secretary of Health and Human Services is authorized to utilize under 42 U.S.C. § 1395gg to recover Medicare overpayments.  Those adjustments are subject to separate Medicare recovery-waiver regulations, 42 C.F.R. §§ 405.351-405.358, and requests for waivers therefore are referred to the Secretary.  POMS Manual § GN 02250.290.

Medicare prescription-drug premiums.  The discussion therefore now turns to the Medicare program.

### C.  Medicare

Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh, establishes a program of health insurance for the elderly and disabled, commonly known as Medicare.  The relevant portions of Medicare are set forth below.

#### 1.  The authority of the Secretary of Health and Human Services

The Medicare program is administered by the Secretary of Health and Human Services, who is empowered to "prescribe such regulations as may be necessary to carry out the administration" of the program entrusted to his care.  42 U.S.C. § 1395hh(a)(1).  These powers have been delegated to the Centers for Medicare & Medicaid Services ("CMS"), which administers the program on behalf of the Secretary.  Regulations governing the administration of the Title XVIII program are set forth in 42 C.F.R. Parts 400-426.

#### 2.  Medicare Parts A-B and Parts C-D

Although Medicare is commonly described as consisting of four parts, it is more useful to think of it here as being divided into two regimes.  The first regime is the traditional fee-for-service program originally established by Congress in the Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286 (1965).  It consists of two parts.  Part A is a mandatory program that covers hospital inpatient services and related aftercare.  42 U.S.C. §§ 1395c-1395i-5.  Part B is a supplemental program that covers other medical expenses, such as physician visits and outpatient services.  42 U.S.C. §§ 1395j-1395w-4.  The money used to fund Part A and Part B is paid out from separate federal accounts.  42 U.S.C. §§ 1395i, 1395t.  Insurance benefits are paid from these accounts to the beneficiary or, more commonly, to a health-care provider that takes an

assignment of the beneficiary's claim.  Under Medicare Parts A and B, the insurer is the federal

government, and the beneficiary's insurance relationship is exclusively with the government.

The second Medicare regime consists of two recently-created programs designed to

involve the private sector more directly in the provision of insurance coverage to the elderly and

disabled.  Medicare Part C, which was added by Congress in the Balanced Budget Act of 1997,

Pub. L. No. 105-33, 111 Stat. 276 (1997), allows beneficiaries to purchase Part A-B coverage

from a private managed-care organization.  42 U.S.C. §§ 1395w-21-1395w-28.  These private

plans were originally called Medicare+Choice plans and are now called Medicare Advantage

plans ("MA").  Under Part C, the managed-care organization is the insurer, and the beneficiary's

insurance relationship is with that private organization.  Apart from setting standards for the

approval of managed-care organizations, see 42 U.S.C. §§ 1395w-25-1395w-27, the role of the

federal government is largely limited to making payments to managed-care organizations to

reimburse them for providing Medicare-covered services.  42 U.S.C. § 1395w-23.

As was discussed above, Part D is the newest addition to the Medicare program.  It

permits beneficiaries to purchase prescription-drug coverage from private sponsors of insurance

plans, 42 U.S.C. §§ 1395w-101-152, in a manner similar to the way they may purchase Part A

and Part B coverage from private managed-care organizations under Part C.  Indeed, managed-

care organizations are required to give enrollees the option of adding Part D drug coverage to

their Part C coverage.  42 U.S.C. § 1395w-131(a).  Under Part D, the insurer is a private entity,

and the beneficiary's insurance relationship is with that private sponsor.  Apart from setting

standards for the approval of drug-plan sponsors, see 42 U.S.C. § 1395w-112, the role of the

federal government is largely limited to providing subsidies to private drug plans to enhance their

economic viability.  42 U.S.C. § 1395w-115.  These subsidies are paid from a separate Medicare

account.  42 U.S.C. § 1395w-116.

### 3.  Recovery of overpayments under Medicare

Like the Social Security statutes in Title II, the Medicare statutes in Title XVIII have been

characterized as both "massive," Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1,

13 (2000), and "extremely 'complex.'"  Palisades Gen. Hosp. Inc. v. Leavitt, 426 F.3d 400, 401

(D.C. Cir. 2005) (quoting Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 404 (1993)).  As in

the case of Title II, Congress recognized when it enacted the Medicare program that there was a

possibility that overpayments of Title XVIII benefits might be erroneously made.  Section 1870

of the Social Security Act, 42 U.S.C. § 1395gg, addresses the situations in which the Secretary is

required to seek recovery of Medicare-benefit overpayments from an individual beneficiary.

In pertinent part, the statute provides that "[a]ny payment under this subchapter [that is,

Title XVIII of the Social Security Act] to any provider of services or other person with respect to

any items or services furnished any individual shall be regarded as a payment to such individual,"

42 U.S.C. § 1395gg(a), and adjustments to such payments shall be made where (a) "more than

the correct amount is paid under this subchapter [that is, Title XVIII of the Social Security Act]

to a provider of services or other person for items or services furnished an individual," 42 U.S.C.

§ 1395gg(b)(1), and (b) the Secretary determines that "the excess over the correct amount cannot

be recouped from such provider" (or other person) within a specified time frame, id., and (c) the

provider of services (or other person) "was without fault" for the overpayment.  Id.  In that

setting, recovery can be made from the individual beneficiary "under regulations prescribed" by

the Secretary.  42 U.S.C. § 1395gg(b).[5]  However, the statute goes on to stipulate that "[t]here shall be no adjustment" nor "shall there be recovery" where, among other things, the beneficiary was "without fault" for the overpayment and recovery would "defeat the purposes of subchapter II or subchapter XVIII," or "would be against equity and good conscience."  42 U.S.C. § 1395gg(c).

As was discussed earlier, the Court of Appeals for this Circuit has now determined, as a matter of law, that 42 U.S.C. § 1395gg – the statute in which Congress identified the circumstances where the Secretary is required to recover Medicare overpayments from individual beneficiaries – has "nothing to do" with the recovery of erroneous refunds of Medicare Part D premiums.  Action Alliance, 483 F.3d at 860-61.  In an effort to revive their case, plaintiffs have amended their complaint to allege that the provision in the Social Security Act dealing with the recovery of Title II overpayments, 42 U.S.C. § 404, has something to do with erroneous refunds of Part D premiums, at least where the beneficiary has chosen a deduction from his Social Security check as the means of transferring his premium payment to his private insurer.  To see why this theory is wrong, it is first necessary to examine two more aspects of the statutory scheme:  how premiums are collected under Medicare Part B and Parts C-D, and the authority of the federal government to recover erroneous refunds in both settings.

**D.  Medicare Premiums and Payment Methods**

Beneficiaries who choose to purchase supplemental insurance coverage from the federal government under Medicare Part B are charged a premium.  42 U.S.C. § 1395r.  Because the federal government is the insurer, the premium is owed to the government.  Generally, the

---

[5] One example of where this statute might apply would be if a beneficiary had presented a phony Medicare card to a solo-practice chiropractor, who had since gone out of business.

amount of the premium is automatically deducted from the beneficiary's monthly Social Security check, "in such manner and at such times as the Commissioner of Social Security shall by regulation prescribe" after "consultation with the Secretary" of Health and Human Services. 42 U.S.C. § 1395s(a)(1). The Part B premium money withheld by the Commissioner is then transferred into the appropriate Medicare account. 42 U.S.C. § 1395s(a)(2).[6]

Most beneficiaries who choose to purchase the prescription-drug coverage available from private insurers under Medicare Part D are also charged a premium, 42 U.S.C. § 1395w-113, the amount of which varies depending on the extensiveness of the drug coverage. With rare exceptions, beneficiaries with limited assets and with incomes below 135 percent of the federal poverty level are entitled to have their entire premiums paid to the private plan for them by the federal government. 42 U.S.C. §§ 1395w-114(a)(1)(A), (3)(D). Beneficiaries with limited assets and incomes between 135 percent and 150 percent of the poverty level are entitled to receive premium subsidies from the government on a sliding scale. 42 U.S.C. §§ 1395w-114(a)(2)(A), (3)(D), (3)(E). Low-income beneficiaries also may qualify for premium subsidies furnished by state programs. 42 U.S.C. § 1395w-133. As a result of these provisions, about 10 million of the 23 million Part D enrollees are not required to pay a premium. HHS News at 2 (June 14, 2006).[7] The obligation to pay a premium to obtain Part D coverage therefore falls only on the remaining

---

[6] Beneficiaries who qualify for Medicare Part A generally are automatically enrolled in that part of the program and are not charged a premium. A relatively small number of persons (who do not meet Part A eligibility requirements) are permitted to purchase Part A coverage, 42 U.S.C. § 1395i-2a(a), in return for a premium. 42 U.S.C. § 1395i-2a(d). These premium payments must be made directly to the Secretary. 42 CFR § 406.32(e).

[7] http://www.hhs.gov/news/press/2006pres/20060614.html.

13 million enrollees who are not poor, at least not as Congress and the states have defined poverty through their elected representatives.

As was discussed above, the insurance coverage available under Medicare Parts C and D is purchased from a private entity, and the beneficiary pays premiums to that private entity, not the federal government. In the case of both programs, the beneficiary "may opt to make a direct payment of the premium to the plan," 42 C.F.R. § 422.262(f)(3)(ii) (incorporated by reference in 42 C.F.R. § 423.293(a)), by, for instance, mailing in a check every month. "In accordance with regulations" promulgated by the Secretary of Health and Human Services (not the Commissioner of Social Security), the private insurer must also make at least two additional payment options available to the beneficiary. 42 U.S.C. § 1395w-24(d)(2) (incorporated by reference in 42 U.S.C. § 1395w-113(c)(1)).[8] First, the private insurer must permit the beneficiary to make payment by means of "an electronic funds transfer mechanism (such as automatic charges of an account at a financial institution or a credit or debit card account)." 42 U.S.C. § 1395w-24(d)(2)(B) (incorporated by reference in 42 U.S.C. § 1395w-113(c)(1)). Second, the private insurer must permit "withholding from benefit payments in the manner provided" under 42 U.S.C. § 1395s. 42 U.S.C. § 1395w-24(d)(2)(A) (incorporated by reference in 42 U.S.C. § 1395w-113(c)(1)). In the latter case, all premium payments withheld must be credited to the appropriate Medicare account and then paid by the Secretary to the private insurer. 42 U.S.C. § 1395w-24(d)(2); 42 U.S.C. § 1395w-113(c)(1). The insurer may not impose a charge on the beneficiary to influence him to choose one payment option over another. 42 C.F.R. § 422.262(f)(3)(I) (incorporated by reference in 42 C.F.R. § 423.293(a)). If a premium payment is not received by the private drug

---

[8] The statutory text erroneously cross-references 42 U.S.C. § 1394w-24(d). This is clearly a typographical error.

plan from any of these enrollees (including those who pay through Social Security deductions), the private insurer has a legal right to terminate him from the plan.  42 U.S.C. § 1395w-24(d)(1) (incorporated in 42 U.S.C. § 1395w-113(c)(1)).

**E.  The Government's Authority to Recover Erroneous Refunds of Medicare Premiums**

As was discussed above, neither 42 U.S.C. § 404 nor 42 U.S.C. § 1395gg addresses erroneous refunds of Medicare premiums.  In the absence of a statute that expressly forbids recovery, however, it "is beyond dispute," Bechtel v. PBGC, 781 F.2d 906, 907 (D.C. Cir. 1985) (per curiam), that the federal government has a common-law right to take "appropriate action" to recover any funds "which its agents have wrongfully, erroneously, or illegally paid." United States v. Wurts, 303 U.S. 414, 415 (1938) (citations omitted); see also Clearfield Trust Co. v. United States, 318 U.S. 363, 368 (1943); Wis. Cent. R.R. v. United States, 164 U.S. 190, 212 (1896).  In addition, in the case of erroneous Part D refunds where the Secretary has already transferred the premium funds to the insurer (to prevent an interruption in the beneficiary's coverage), the Secretary has a common-law right to stand "'in the place of [the] one whose claim he has paid,'" United States v. California, 507 U.S. 746, 747 (1993) (quoting Unites States v. Munsey Trust Co., 332 U.S. 234, 242 (1947)), and exercise the common-law recovery rights of the insurer.  The government, then, clearly has a common-law right to recover erroneous refunds of Medicare premiums, regardless of whether there is any statute that expressly authorizes it.  See Mount Sinai Hosp. v. Weinberger, 517 F.2d 329, 336-38 (5th Cir. 1975) (applying common-law recovery rights to Medicare program); Wilson Clinic & Hosp., Inc. v. Blue Cross of S.C., 494 F.2d 50, 52 (4th Cir. 1974) (same).

It is equally well settled that, in the absence of express statutory guidelines, an agency has "complete discretion" to "decide how and when" its enforcement powers "should be exercised" in

particular circumstances. <u>Heckler v. Chaney</u>, 470 U.S. 821, 835 (1985). Thus, in the absence of a "federal statutory provision that 'either explicitly authorizes or in terms forbids recoupment for overpayments,'" <u>Johnson v. Likins</u>, 568 F.2d 79, 84 (8th Cir. 1977) (quoting <u>Swasey v. Whalen</u>, 562 F.2d 831, 833 (1st Cir. 1977)), a federal agency has the discretion to establish recovery rules as it deems appropriate. <u>See</u> <u>California v. Settle</u>, 708 F.2d 1380, 1392-84 (9th Cir. 1983); <u>cf.</u> <u>Laskowski v. Spellings</u>, 443 F.3d 930, 940 (7th Cir. 2006) (Sykes, J., dissenting) (government cannot be compelled to recoup payments made to a university), <u>vacated and remanded to reconsider standing issue</u>, 127 S. Ct. 3051 (2007). In addition, 31 U.S.C. § 3711(a)(2) expressly authorizes every federal agency to compromise monetary claims, including common-law ones.

### F. Recovery Waivers for Erroneous Refunds of Premiums under Part B and Parts C-D

The Commissioner of Social Security and the Secretary of Health and Human Services have exercised their authority differently with respect to the premium deductions for which they are authorized to establish rules, depending on whether the premium deductions are for Part B premiums or not. The regulations promulgated by the Commissioner do not expressly authorize SSA to entertain requests from beneficiaries to waive recovery of erroneous refunds of Part B premiums that might occur due to a failure to make the deduction from Social Security checks required by 42 U.S.C. § 1395s(a)(1). However, manual instructions published by the Commissioner recognize that "[s]uch an erroneous refund may occur, for example, because of incorrect information supplied by a third party," or because of "a processing error, or because "incorrect data" has been entered into billing systems. POMS Manual § HI 01001.330.A.[9] These errors may result in the beneficiary receiving "a refund which is not actually due him/her," either

---

[9] https://s044a90.ssa.gov/apps10/poms.nsf/lnx/0601001330.

in the form of "a separate check" or in the form of an amount "added to the individual's monthly [Title II] benefit." Id. When such erroneous refunds occur, the POMS Manual instructs that "the same rules and procedures pertaining to recovery of a monthly benefit overpayment (see GN 02250.150- GN 02250.425) apply even though the incorrect premium payment is not a benefit overpayment." Id. at § HI 01001.330.C.

The POMS Manual provision does not apply to erroneous refunds of Part C or Part D premiums, and the Secretary of Health and Human Services has chosen not to issue similar instructions to his employees. As result, recipients of erroneous refunds of Part C and Part D premiums (which were supposed to be transferred to the private insurer) enjoy no more right to resist recovery of the funds by the Secretary than the beneficiary would enjoy if the right to recovery were being asserted by the private insurer. This is the state of affairs that plaintiffs in this action seek to change.

## STATEMENT OF THE CASE

The facts that give rise to this legal argument are already well known to this Court and will be summarized only briefly here. As the Court will recall, the Part D prescription-drug benefit that went into effect in 2006 was "the most significant change to the Medicare program since its inception in 1965." 70 Fed. Reg. 4194, 4197 (Jan. 29, 2005). About 23 million beneficiaries receive prescription-drug coverage through a Part D plan. HHS News at 2. Of these, about 13 million are required to pay premiums. Id. The remaining 10 million enrollees pay no premium because of their low-income status. Id. Only about 20 percent of enrollees pay premiums by means of Social Security deductions. Action Alliance, 483 F.3d at 854.

Because of a government computer-processing error in August 2006, some $47 million in premium refunds were sent to about 230,000 beneficiaries enrolled in Part D plans. Id. The

erroneous refunds averaged about $215 per beneficiary.  Id.  Some refunds were sent by check

and some were sent by electronic deposit.  Upon learning of the mistake, the Secretary continued

to make the transfer payments to the private insurers (so as to prevent an interruption in the

enrollees' coverage caused by the government's mistake) and immediately wrote to the recipients

of the erroneous refunds asking them to return the money.  Id.  The letter "requested repayment

of the funds by the end of that month, but indicated that '[i]f returning the amount in full presents

you with a hardship, you may request to make monthly installment payments for as many as

seven months.'"  Id. (citation omitted).  About $38 million has now been recovered as a result of

this letter.

On September 15, 2006, plaintiffs brought suit in this Court seeking to block the recovery

effort and force the Secretary to return the funds that had been recovered to date.  The original

plaintiffs were two advocacy organizations, Action Alliance of Senior Citizens and the Gray

Panthers.  The complaint was later amended to add an individual plaintiff, Lucy C. Loveall, who

had been asked to return $161.70 in seven monthly installments.  Then as now, the gravamen of

plaintiffs' argument was that recovery efforts were unlawful unless the recipients of the erroneous

refunds were first given a chance to pursue a putative right to a waiver of recovery based on

hardship.

As was discussed above, the original and first amended complaints alleged that the

putative recovery-waiver rights were mandated in the only place they logically might appear – the

Medicare statutes themselves.  In ruling on plaintiffs' motion for a preliminary injunction, the

Court initially found that the language of 42 U.S.C. § 1395gg – the Medicare statute that

expressly mandates the recovery of overpayments and expressly mandates waiver protections in

certain instances – does not, on its face, reach to erroneous refunds of Medicare premiums.

Action Alliance, 456 F. Supp. 2d at 18-19.  However, it construed Congress' failure to mention

erroneous premium refunds as a form of ambiguous silence, rather than as an instance of

unambiguous clarity.  Id.  The Court then went on to grant a preliminary injunction, reasoning

that the denial of waiver protections to recipients of erroneous Part D refunds would not be

"reasonable in light of the legislature's revealed design."  Id. at 17 (quoting NationsBank of N.C.

v. Variable Annuity Life Ins. Co., 513 U.S. 251, 257 (1995)).  The centerpiece of the analysis

was the Court's belief that it was not fair for the Secretary to deny recovery-waiver opportunities

to the recipients of erroneous refunds of Part D premiums when the Commissioner of Social

Security, through his manual instructions, had accorded the recovery-waiver opportunities to the

recipients of erroneous refunds of Part B premiums.

     The Court of Appeals for this Circuit reversed the preliminary injunction, finding that the

scope of recovery-waiver rights under 42 U.S.C. § 1395gg(c) was not ambiguous on its face and

that the clear and precise language in the statute "has nothing to do with erroneous refunds of

Medicare premiums."  Action Alliance, 483 F.3d at 860-61.  Because the meaning of the statute

could be determined solely "by its plain terms," id. at 860, the Court of Appeals did not address

any of the policy rationales found persuasive by this Court.  This was, the Court of Appeals

stated, "the easy part of the case."  Id.

     Perhaps sensing the deficiencies in their original theory, plaintiffs devoted most of their

appellate memorandum to a new argument, raised for the first time on appeal, that the right to

request a recovery waiver could be found in the language of 42 U.S.C. § 404(b), as well as the

language in 42 U.S.C. § 1395gg(c).  The Court of Appeals declined to address either the merits

of this argument or the propriety of its being raised for the first time on appeal.  Instead, the

Court held that federal subject-matter jurisdiction to even entertain the new legal theory would

not exist until at least one beneficiary had presented a demand for a waiver to the Commissioner

of Social Security and received a "final decision" from him, Action Alliance, 483 F.3d at 857

(quoting Weinberger v. Salfi, 422 U.S. 749, 763-64 (1975)), with respect to whether recipients of

erroneous refunds of Part D premiums were entitled to recovery-waiver protections under 42

U.S.C. § 404(b).

      In an effort to meet the jurisdictional requirements set forth by the Court of Appeals,

plaintiff Loveall wrote to the Commissioner on May 4, 2007, asking whether she could obtain

consideration of a recovery-waiver request with respect to the refund-recovery effort initiated by

the Secretary of Health and Human Services in 2006.  Supplemental and Second Amended

Complaint for Declaratory, Injunctive and Mandamus Relief ("Second Am. Compl.") at ¶ 25 &

Pl. Ex. B attached thereto (Doc. 47).  A similar letter was submitted to the Commissioner by

plaintiffs Action Alliance for Senior Citizens and the Gray Panthers.  Id.

      By letter dated August 13, 2007, the Commissioner responded to both letters.  The

Commissioner denied Ms. Loveall's request for waiver consideration on the ground that the anti-

recovery protections in 42 U.S.C. § 404(b) do not apply to erroneous refunds of Part D premiums

received by Medicare beneficiaries.  Noting that the statute, in relevant part, applies only in

circumstances where "more . . . than the correct amount" has been paid under Title II of the

Social Security Act, the Commissioner concluded that "[t]he erroneous Part D premium refund

that Ms. Loveall received did not cause her to receive more than the correct amount of her

monthly title II Social Security benefits."  Letter of Beatrice M. Disman dated August 13, 2007

("Disman Letter") at 2 (Pl. Ex. H) (attached to second amended complaint).  "Rather, she

received the correct amount of monthly title II benefits due her."  Id.  What was deposited in her

bank account, the Commissioner explained, was not a sum of money to which she had

-20-

erroneously been deemed to be entitled under Social Security, but a premium payment to which she claimed no entitlement and which she wanted to have transferred (for her) to the private insurer.  As result, the Commissioner noted, the Secretary's recovery request "does not result in an obligation to repay a title II overpayment" made to Ms. Loveall.  Id. (emphasis added).  Rather, it "results in an obligation to pay her Part D premiums . . . in order to retain her prescription drug coverage."  Id. (emphasis added).  Finally, the Commissioner observed that there would be "no justification" for giving "those Part D beneficiaries who opt to pay premiums by way of title II benefit deductions greater rights than are enjoyed by Part D beneficiaries who pay premiums directly to the private insurance plans."  Id.  For these reasons, the Commissioner found that "the erroneous premium refund that Ms. Loveall received does not constitute an overpayment of title II benefits."  Id.[10]  Plaintiffs challenge the correctness of that decision here. They request injunctive and mandamus relief to force the Secretary to return all erroneous refunds that have been collected to date and to require the Commissioner to inform all recipients of erroneous refunds that they have a putative right to request a waiver under 42 U.S.C. § 404(b). Second Am. Compl. at pp. 16-17.

## ARGUMENT

## I.  THE ORGANIZATIONAL PLAINTIFFS HAVE NOT MET THE JURISDICTIONAL PREREQUISITES ESTABLISHED BY THE COURT OF APPEALS.

At the outset, this Court lacks subject-matter jurisdiction over the claims of the two organizational plaintiffs, Action Alliance for Senior Citizens and the Gray Panthers.  This Court

---

[10] Prior to the Commissioner's decision, the SSA sent out an erroneous response, Second Am. Compl. at ¶ 27, that was immediately retracted.  See Defendant's Memorandum in Opposition to Plaintiffs' Motion to Vacate Stay at 9-10 (Doc. 30).

has previously held that the groups lack standing to sue as organizations because they have suffered no legally cognizable injury to their interests as advocacy organizations, Action Alliance, 456 F. Supp. 2d at 16 n.4, and, to the extent those claims are re-alleged in plaintiffs' second amended complaint, Second Am. Compl. at ¶¶ 33-39, they should be dismissed for the same reasons.  In addition, neither organization is an "individual" within the meaning of 42 U.S.C. § 405(g), and therefore cannot meet its jurisdictional prerequisites in their own capacity as organizations.  As the Surpeme Court has explained, "[i]t is essentially the[] rights to review" of the members of the organization "that are at stake," and "the statutes that create the special review channel adequately protect those rights."  Illinois Council, 529 U.S. at 24.

In a case such as this one, an "association 'speaks only on behalf of its member[s], and thus has standing only because of the injury those members allegedly suffer.'"  Am. Chiropractic Ass'n, Inc. v. Leavitt, 431 F.3d 812, 817 (D.C. Cir. 2005) (quoting Illinois Council, 529 U.S. at 24).  Thus, an association can assert claims of its members "only if its members would have standing in their own right," Arizonans for Official English v. Arizona, 520 U.S. 43, 65-66 (1997), a concept that includes not only the elements necessary for Article III standing, but any additional requirements for subject-matter jurisdiction established by Congress, such as "exhaustion requirements."  Am. Coalition for Competitive Trade v. Clinton, 128 F.3d 761, 765 (D.C. Cir. 1997).  The association must also establish that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Gettman v. DEA, 290 F.3d 430, 435 (D.C. Cir. 2002) (citations omitted); see generally, Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977).

The two organizational plaintiffs here meet neither of these tests.  Like its predecessors, plaintiffs' second amended complaint fails to identify a single one of plaintiffs' members who has

requested a decision by the Commissioner with respect to whether the recovery-waiver

provisions in 42 U.S.C. § 404(b) are applicable, and any such showing would require the

participation of the member(s) in question.  This "essentially forecloses an association's ability to

proceed in such cases without individualized member participation."  <u>AMA v. United Healthcare

Corp.</u>, 2007 WL 1771498 at *21 (S.D.N.Y. June 18, 2007).  Subject-matter jurisdiction is

therefore limited to the individual plaintiff, Ms. Loveall, who presented the § 404(b) issue to the

Commissioner and received the Commissioner's final decision on the matter.[11]

## II.  PLAINTIFFS FAIL TO STATE A CLAIM BECAUSE 42 U.S.C. § 404(b) DOES NOT APPLY TO ERRONEOUS REFUNDS OF MEDICARE PART D PREMIUMS.

What remains of plaintiffs' second amended complaint should be dismissed in its entirety

for failure to state a claim on which relief can be granted.  To state a claim, the allegations in a

complaint must "possess enough heft to 'sho[w] that the pleader is entitled to relief'" under the

applicable law.  <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 1966 (2007) (quoting Fed. R.

Civ. P. 8(a)(2)).[12]  In this case, that would mean establishing a right to injunctive or mandamus

---

[11] Plaintiffs cannot, of course, rely on a statistical analysis to show a likelihood of presentment.  <u>See</u> <u>Action Alliance</u>, 456 F. Supp. 2d at 15-16.  To the extent that this Court previously relied on such an analysis to determine whether plaintiffs' members have suffered the injury-in-fact necessary for standing, defendants respectfully disagree with that portion of the Court's analysis, but we acknowledge that the Court has ruled and reserve further argument for a later stage of this litigation.

[12] The <u>Bell Atlantic</u> decision rejected the test previously urged by plaintiffs under which a "claim will not survive a motion to dismiss only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Plaintiffs' Reply Memorandum in Support of Their Motion for Leave to File Supplemental and Second Amended Complaint ("Pl. Amend. Reply") at 2 (Doc. 45) (quoting <u>Lee v. Winter</u>, 439 F. Supp. 2d 82, 84-85 (D.D.C. 2006) (quoting, <u>inter alia</u>, <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)).  That standard, the Supreme Court stated, "has been questioned, criticized, and explained away long enough," and is now "best forgotten as an incomplete, negative gloss on an accepted pleading standard:  once a claim has been stated adequately, it may be supported by showing any set of

relief on the basis of some instruction in 42 U.S.C. § 404(b) or regulations promulgated

thereunder that commands the Commissioner of Social Security to give recovery-waiver

protection to recipients of erroneous refunds of Medicare Part D premiums in circumstances

where the Secretary of Health and Human Services, pursuant to his separate authority, has

undertaken to recover the money.  The demanding standards under which this Court must

evaluate agency interpretations of statutes and regulations committed to their administration, as

well as the even more demanding standards under which it must review a claim for mandamus

relief, are set forth below.

### A. The Commissioner's Construction of His Statutory Authority Is Entitled to Deference.

Under the familiar principles in Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 843-44

(1984), a court reviewing an agency's construction of a statute does not "sit in review to

substitute [its] judgment for that of the agency," Organo Carballo v. Reich, 11 F.3d 186, 192-93

(D.C. Cir. 1993), but rather must defer to the agency's reading unless the statutory language

"unambiguously forbids" it or the interpretation "exceeds the bounds of the permissible" for some

other reason.  Barnhart v. Walton, 535 U.S. 212, 218 (2002).  To meet this deferential test, the

agency's reading of the statute "need not be the only reasonable one," Conn. Dep't of Income

Maint. v. Heckler, 471 U.S. 524, 532 (1985), or even "the best or most natural one by

grammatical or other standards."  Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702 (1991).

Rather, the agency's construction is entitled to deference so long as it falls "within the bounds of

reasonable interpretation," Your Home Visiting Nurse Servs., Inc. v. Shalala, 525 U.S. 449, 453

(1999), even "if the agency's reading differs from what the court believes is the best

_____

facts consistent with the allegations in the complaint."  Bell Atlantic, 127 S. Ct. at 1969.

-24-

interpretation." Nat'l Cable Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980 (2005).

The rationale for deference only increases in the case of "a complex and highly technical regulatory program," Wis. Dep't of Health & Family Servs. v. Blumer, 534 U.S. 473, 497 (2002) (citation omitted), where "resolution of ambiguity in a statutory text is often more a question of policy than of law." Pauley, 501 U.S. at 696; see also Walton, 535 U.S. at 222 (emphasizing importance of deference in light of "the related expertise of the Agency, the importance of the question to the administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question."). Nowhere do these principles of deference apply with more force than in the case of the Social Security Act, Sullivan v. Everhart, 494 U.S. at 89; Gray Panthers, 453 U.S. at 43; Batterton v. Francis, 432 U.S. 416, 425 (1977), the "Byzantine construction" of which has long been recognized as being "among the most intricate ever drafted by Congress" and "'almost unintelligible to the uninitiated.'" Gray Panthers, 453 U.S. at 43 (quoting Friedman v. Berger, 547 F.2d at 727 n.7 (per Friendly, J.).[13]

"When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." Udall v. Tallman, 380 U.S. 1, 16 (1965). The task of a court reviewing an agency's reading of its own regulations "is not to decide which among several competing interpretations best serves the regulatory purpose," Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994), but rather "the agency's interpretation must be given 'controlling

---

[13] Plaintiffs' contention that only Medicaid statutes are sufficiently Byzantine to warrant particular deference, Pl. Amend Reply at 6, is not supported by the text of any of these decisions. Indeed, the proposition that the statutory scheme in this case is not complicated is hard to square with the fact that it has taken a year-and-half, a trip to the Court of Appeals, and two amended complaints for plaintiffs to even articulate their current statutory theory.

weight unless it is plainly erroneous or inconsistent with the regulation.'" <u>Id</u>. (citation omitted). And "[t]his broad deference [to the administrative agency] is all the more warranted when, as here, the regulation concerns a 'complex and highly technical regulatory program.'" <u>Id</u>.

Finally, the standards for determining whether plaintiffs are entitled to the remedy of mandamus are the most demanding of all. "The common law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only after he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty." <u>Heckler v. Ringer</u>, 466 U.S. 602, 616 (1984). Mandamus relief applies only in the case of a "specific, unequivocal command" that orders "a precise, definite act," <u>Norton v. S. Utah Wilderness Alliance</u>, 542 U.S. 55, 63 (2004) (citations omitted), in a manner "so plainly prescribed as to be from doubt and equivalent to a positive command." <u>Consol. Edsion Co. of N.Y., Inc. v. Ashcroft</u>, 286 F.3d 600, 605 (D.C. Cir. 2002) (quoting <u>Wilbur v. United States ex rel. Kadrie</u>, 281 U.S. 206, 218 (1930)). Where "the duty is not thus plainly prescribed," but rather "depends on a statute or statutes the construction or application of which is not free from doubt, it is regarded as involving the character of judgment or discretion which cannot be controlled by mandamus." <u>Power v. Barnhart</u>, 292 F.3d 781, 786 (D.C. Cir. 2002) (quoting <u>Kadrie</u>, 281 U.S. at 219, and <u>Consol. Edison,</u> 286 F.3d at 605). Under any of these standards, plaintiffs bear a daunting burden of showing that the recovery-waiver right for which they contend is plainly set forth in a statute or regulation.[14]

---

[14] Although the Supreme Court has yet to rule on the question, <u>see</u> <u>Ringer</u>, 466 U.S. at 616, the Court of Appeals for this Circuit has held that mandamus relief may be available, in some circumstances, to compel procedural requirements of the Social Security Act, notwithstanding the limitations on judicial review in 42 U.S.C. § 405(h). <u>Ganem v. Heckler</u>, 746 F.2d 844, 848 (D.C. Cir. 1984). Defendants respectfully reserve that issue for appeal.

**B.  The Recovery-Waiver Provision in 42 U.S.C. § 404(b) Does Not Apply to Erroneous Refunds of Medicare Premiums Because Medicare Premiums Are Not Title II Benefits.**

Plaintiffs' newest theory of the case simply does not meet these deferential standards of review.  The analysis begins, "as always, with the language of the statute," <u>Duncan v. Walker</u>, 533 U.S. 167, 172 (2001), and with "the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."  <u>Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.</u>, 541 U.S. 246, 252 (2004) (quoting <u>Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.</u>, 469 U.S. 189, 194 (1985)).  "[W]here, as here, the statute's language is plain," that is "also where the inquiry should end."  <u>United States v. Ron Pair Enters, Inc.</u>, 489 U.S. 235, 241 (1989).  In that setting, the "sole function" of the court is simply to follow the statute "according to its terms."  <u>Id</u>.  As was the case with 42 U.S.C. § 1395gg, the clarity of 42 U.S.C. § 404(b) makes this an "easy" question of statutory construction.  <u>Action Alliance</u>, 483 F.3d at 860.

**1.  The Commissioner's view is consistent with the plain statutory language.**

The terms of 42 U.S.C. § 404 could not be plainer.  The statute begins by mandating, in pertinent part, that, "[w]henever the Commissioner of Social Security finds that more . . . than the correct amount of <u>payment</u> has been made to any person <u>under this subchapter</u>, proper adjustment or recovery shall be made."  42 U.S.C. § 404(a) (emphasis added).  It then goes on to provide that "there shall be no adjustment of payments to, or recovery by the United States" from a beneficiary who is without fault for the overpayment "if such adjustment or recovery would defeat the purpose of <u>this subchapter</u> or would be against equity and good conscience."  42 U.S.C. § 404(b) (emphasis added).  The subchapter to which the statute refers is 42 U.S.C. §§ 401-434, and the payments to which it refers are payments of the old-age, survivor and

disability benefits that are mandated by Title II.  42 U.S.C. §§ 402, 423.  This is how the statute has been interpreted by the Commissioner in regulations, 42 C.F.R. § 404.501(a), and that is how it was interpreted in the Commissioner's letter to plaintiff.  Disman Letter at 2.  That is the only manner in which it <u>can</u> be read.

The absence of Part D prescription-drug premiums from the list of transactions that fall within the scope of 42 U.S.C. § 404 does not make the statute silent or ambiguous.  It makes the statute absolutely clear.  "The logic that invests the omission with significance" is the familiar rule of <u>expressio unius est exclusio alterius,</u> under which "the mention of some implies the exclusion of others."  <u>United Dominion Indus., Inc. v. United States</u>, 532 U.S. 822, 836 (2001); <u>see also</u> <u>Rowland v. Cal. Men's Colony</u>, 506 U.S. 194, 200 (1993) ("It is presumble that Congress legislates with knowledge of our basic rules of statutory construction") (citation omitted).  By its plain terms, 42 U.S.C. § 404 – like 42 U.S.C. § 1395gg – simply has nothing to do with erroneous refunds of Medicare Part D premiums.  It concerns only overpayments of Title II entitlements.  Because the statute "speaks clearly 'to the precise question at issue," this Court "'must give effect to the unambiguously expressed intent of Congress'."  <u>Walton</u>, 535 U.S. at 217 (quoting <u>Chevron</u>, 467 U.S. at 842-43).  To carry the analysis any further would merely replicate the error into which this Court was led at the preliminary-injunction stage and would invite reversal in exactly the same terms.

Significantly, when they argued their case before the Court of Appeals, plaintiffs candidly admitted that their position with respect to both 42 U.S.C. § 1395gg and § 404(b) would necessarily fail unless the Court accepted their contention that, "[i]n reality, the 'premium refunds' were not that at all," but rather "were simply payments based on the amount of the

premium." Brief for the Appellees at 28 (Ex. B to Def. Stay Mem) (Doc. 30).[15] In rejecting

plaintiffs' § 1395gg theory, the Court of Appeals refused plaintiffs' invitation to word-play,

expressly characterizing the transactions at issue as being exactly what they were: "erroneous

refunds of Medicare premiums" that had "nothing to do" with the payments of Medicare benefits

for medical items or services. Action Alliance, 483 F.3d at 860-61. If the Court used the phrase

"erroneous refunds of Medicare premiums," id., as a "short-hand for what happened," Pl. Amend

Reply at 22, it is only because that is precisely what did happen.

  In their subsequent motion to amend their complaint, plaintiffs merely repeated the

characterization that the Court of Appeals rejected:

> Although the government persists in referring to this as an erroneous or mistaken
> 'premium refund' . . . that terminology is not accurate. The mistaken payments
> were based on the amounts of premiums withheld from their Social Security
> checks in the past, but they were not refunds of the premiums.

Pl. Amend Mem. at 2 n.1 (emphasis in original). It borders on the absurd for plaintiffs to now

suggest that what the Court meant to say was that "erroneous payments were made out of Title II

funds for beneficiaries in the amount of those premiums," id. at 22, when that convoluted

characterization was the centerpiece of plaintiffs' argument and the Court declined to use it. At

the very least, however, a distinction between an "erroneous refund of Medicare Part D

premiums" and a "payment of Title II funds in exactly the same amount as an erroneous refund of

Medicare Part D premiums" is not so intuitively obvious that it can be said to be compelled by

the plain language of the statutory scheme.

---

[15] Plaintiffs came to this position somewhat late in the litigation. In moving for a temporary restraining order and preliminary injunction, they themselves characterized the relevant transactions as "refunds." Plaintiffs' Motion for a Temporary Restraining Order and for a Preliminary Injunction at 2 (Doc. 3).

The other "plain language" arguments that appear in plaintiffs' most recent discussion of the statute only further weaken their position. When subsection (b) refers to recovery-waiver rights in circumstances where "more than the correct amount of payment has been made," 42 U.S.C. § 404(b), it not referring, as plaintiffs insist, to some abstract category of payments divorced from the rest of the statute. See Pl. Amend Reply at 18-19. Congress was obviously referring to those specific circumstances where "more . . . than the correct amount of payment has been made to any person under this subchapter." 42 U.S.C. § 404(a) (emphasis added). An attempt to construe the wording in subsection (b) simply by ignoring the antecedent reference to overpayments made under Title II not only conflicts with common sense, but violates the cardinal interpretive canon that "[s]tatutes must 'be read as a whole.'" United States v. Atlantic Research Corp., 127 S. Ct. 2331, 2336 (1997) (quoting King. v. St. Vincent's Hosp., 502 U.S. 215, 221 (1991)). This Court cannot determine the plain meaning of a statute by ignoring the most meaningful half.

Finally, plaintiffs' contention that the correct statutory construction somehow turns on the Secretary's voluntary decision to transfer the amount of the erroneously-refunded premium money to the private plans (so to avoid placing enrollees in jeopardy of losing their coverage), see Pl. Amend Reply at 19, is absurd. The nature of the transaction remains an erroneous refund of Part D premiums. Indeed, it would be odd to think that the Secretary could have avoided an obligation to extend recovery-waiver rights to enrollees simply by refusing to transfer premium funds to the private plans until the erroneous refund had been refunded. The meaning of 42

U.S.C. § 404(b) turns on its language, not on voluntary efforts undertaken by the Secretary to soften the impact of an error.[16]

### 2. The legislative history does not support plaintiffs' construction.

Where the language in a statute is "straightforward," there "is no reason to resort to legislative history" for further clarification of its meaning. United States v. Gonzales, 520 U.S. 1, 6 (1997). However, an examination of the histories of the Title II overpayment provision and the legislation in which Congress created the Part D prescription-drug benefit only reinforces the conclusion that 42 U.S.C. § 404 has nothing to do with erroneous refunds of prescription-drug premiums.

The legislative history of 42 U.S.C. § 404, which was added by the Social Security Act Amendments of 1939, 53 Stat. 1360, 1368 (1939), merely states that "[p]rovision is made for making more equitable the recovery by the Federal Government of incorrect payments to individuals." H.R. Rep. No. 76-728 at 19 (1939). The payments to which the passage refers are the payments of original old-age and survivor benefits described eleven pages earlier in the report. Id. at 8-9. Thus, as the Supreme Court has stated, "[t]he legislative history" of 42 U.S.C. § 404 "indicates merely that Congress intended to make recovery more equitable by authorizing waiver." Califano v. Yamasaki, 442 U.S. 682, 694 n.9 (1979). It does not suggest that the kind of recovery Congress was making more equitable was anything other than the recovery of overpayments of Title II entitlements. Indeed, it would have required the powers of prophet for a

---

[16] Plaintiffs' contention that the "mail carrier analogy" is misplaced because premium money was paid to the insurer by the Secretary, rather than being returned to the enrollee without being forwarded, Pl. Amend. Reply at 13, makes a distinction without any legally meaningful difference. In any event, the argument would not apply at all in the case of a bank that, pursuant to 42 U.S.C. § 1395w-23(d)(2)(B), erroneously failed to make a full deduction from an enrollee's account after transferring premium funds to the insurer.

legislative draftsman in 1939 to envision that, three decades later, Congress would establish a Medicare program, and that, four more decades later, Congress would create a prescription drug benefit, and that, in that new program, enrollees would purchase coverage from private insurers and be given the option of having premiums deducted from Social Security checks.

If Congress had wanted to extend recovery-waiver protections to beneficiaries who had premium money mistakenly returned to them under any set of circumstances, the logical place to find an expression of that intent would be in the legislative history of the Medicare Prescription Drug Act of 2003. That history, in turn, merely states that an enrollee who is required to pay a premium under a Part D prescription-drug plan "has the option of having the amount withheld from his or her Social Security payment or having payment made through an electronic funds transfer mechanism." H.R. Rep. No. 108-391 at 468 (2003) (Conf. Rep.), reprinted in 2004 U.S.C.C.A.N. 1808, 1846. The payment options outlined in Part D were extended in the same legislation to the payment of Part C premiums. The purpose of the Part C options was similarly to allow enrollees "to have their [managed care] premiums deducted from their Social Security benefits," or "through electronic funds transfer," id. at 547, reprinted in 2004 U.S.C.C.A.N. at 1917, at their option. There is nothing in either passage that remotely suggests that enrollees who choose the deduction method of payment were intended to have greater protections against the recovery of erroneous premium refunds than enrollees who choose the direct-payment or electronic funds-transfer methods. On the contrary, the drafters plainly envisioned that the three payment methods were co-equal ways of accomplishing the same result: the payment of premiums to a private insurer. Nor did the drafters express any desire to revise the meaning of 42 U.S.C. § 404(b) in any way, let alone to expand the recovery-waiver protections to include erroneous refunds of Part D premiums where such premiums were supposed to be deducted from

Social Security checks.  There is nothing in the legislative history that suggests that Social-Security deductions were anything other than an alternative way for enrollees to make payments to a private insurer.

### 3. Plaintiffs' reading makes absurd distinctions among prescription-drug enrollees and perversely discourages self-reliance.

The reason why Congress thought premium payment by Social-Security deduction was nothing special is not hard to see:  there is nothing special about it.  As was explained at the beginning of this memorandum, there is no legally-significant difference between enrollees who pay premiums by means of the United States mail, enrollees who pay premiums by means of electronic funds-transfers, and enrollees who pay premiums by means of deductions from Social-Security checks.  Each is simply a different method of accomplishing exactly the same thing: getting a premium payment transferred out of the hands of an insurance beneficiary and into the hands of the private insurer, so that the enrollee can enjoy the benefits of the insurance coverage without interruption.  As was discussed earlier, if the mailman returned an envelope bearing a premium check, the beneficiary would scarcely be able to claim hardship as a reason for keeping the premium money for himself.  Nor would hardship be a defense against an erroneous refund by the bank, or the credit-card company, or the insurer itself.  There is no logical reason to give preferential treatment to enrollees who choose the Social Security deduction.

In fact, there is at least one very good policy reason not to.  A beneficiary who chooses the direct-mail or electronic funds-transfer method of payment has effectively made a statement that, all other things being equal, he would rather make sure himself that the premium gets paid to the private insurer than rely on the good offices of government agencies to get the job done. To give preferential rights to enrollees who choose the Social-Security deduction method would

-33-

make things no longer equal, and, to that extent, create a disincentive to be self-reliant. And it would be particularly anomalous to do so in light of regulations that prohibit the private insurer from doing exactly the same thing: giving beneficiaries a financial incentive to choose one payment option over another. 42 C.F.R. § 422.262(f)(3)(i) (incorporated in 42 C.F.R. § 423.293(a)). Thus, the result urged by plaintiffs conflicts with 'the common mandate of statutory construction to avoid absurd results." Rowland, 506 U.S. at 200.

There are also perfectly logical reasons to give greater hardship protections in the case of erroneous overpayments of Social Security old-age, survivor and disability benefits under Title II of the Social Security Act than in cases of erroneous refunds of premiums under Medicare Part D. Old-age, survivor and disability benefits are received by everyone who meets eligibility requirements, and they are intended to provide for basic necessities of life. Prescription-drug premiums are paid only by those whose assets exceed statutory limits or whose income at least exceeds 135-percent of the poverty level. 42 U.S.C. § 1395w-114(a)(1)(A). And premiums are paid only by persons who, by choosing to enroll in a plan in the first place, have already made the judgment that they can afford to pay the premiums each month. Administrative procedures, in turn, cost the government money (money that could be used for many other purposes, including assistance programs for low-income families). In balancing the trade-offs, Congress could certainly have made a reasoned judgment that there was considerably more need to ensure that impoverished Social Security beneficiaries had a chance to explain hardship circumstances where they had spent overpayments of Title II benefits than there would be to give a similar opportunity to a non-poor enrollee in an insurance plan who had merely miscalculated the affordability of premiums that he agreed to pay when he voluntarily signed up for prescription-drug coverage. If

plaintiffs believe that judgment was incorrectly made, their arguments should be addressed to the elected branches of government.[17]

> **B.  Notice of Waiver-Request Rights Is Not Required under 20 C.F.R. § 404.502a Because Erroneous Refunds of Medicare Premiums are not Overpayments Subject to Waiver Protection under Title II Regulations.**

Plaintiffs' contention that beneficiaries who receive an erroneous refund of prescription-drug premiums have a right to a recovery-waiver hearing under regulations promulgated by the Commissioner at 20 C.F.R. 404.501, et seq., is equally without merit.  As was explained earlier, the regulatory scheme requires notice of a right to request a waiver only where "an initial determination is made that more than the correct amount of payment has been made" and the Commissioner "seek[s] adjustment or recovery of the overpayment."  20 C.F.R. § 404.502a.  The term "overpayment includes a payment in excess of the amount due under title II" of the Social Security Act, "a payment resulting from the failure to impose deductions or to suspend or reduce benefits" under various Title II provisions, a payment made pursuant to 42 U.S.C. § 405(n) in excess of the amount to which the individual is entitled under 42 U.S.C. §§ 402 or 423, "a payment resulting from the failure to terminate benefits," and "a payment where no amount is

---

[17]  The factual circumstances alleged by the individual plaintiff nicely illustrate the point. Plaintiffs' amended complaint alleges that Lucy C. Loveall received an erroneous refund of $161.70, which she was asked to return in monthly installments over a seven-month period. Second Am. Compl. at ¶ 43 and attached Pl. Ex. J.  She further alleges that she is a member of a two-person household with an income of $2,214.12 a month, Second Am. Compl. at ¶ 41, which is almost twice the federal poverty level.  72 Fed. Reg. 3147, 3147 (Jan. 24, 2007).  Even if the matter were within his purview to begin with, the Commissioner could certainly make a reasoned judgment that it is not a reasonable expenditure of public resources to hold a multi-step hearing process, 20 C.F.R. §§ 404.501, et seq., solely to determine whether the unlikely circumstance exists that a non-poor person genuinely cannot afford to repay such a small sum of money at the rate of what amounts to less than $1 a day.  This is not to say that it is inconceivable that a Part D enrollee could have a legitimate hardship case, only that such cases can reasonably be expected to be sufficiently rare as to make the administrative cost of conducting hearings with regard to such small amounts of money cost-inefficient.

payable under title II of the Act." 20 C.F.R. § 404.501 (emphasis in original). An erroneous refund of a Part D prescription-drug premium is not on that list. The regulations cannot be stretched even to authorize waiver-recovery protection in that circumstance, let alone construed to unambiguously mandate it. Indeed, the recovery effort in this case was not even undertaken by the Commissioner. It was undertaken by the Secretary.[18]

### C. The POMS Manual Provision Does Not Apply to Erroneous Refunds of Prescription-Drug Premiums under Medicare Parts C and D.

Plaintiffs' contention that the recipients of erroneous refunds of Part D premiums are entitled to recovery-waiver protections by the instructions in § HI 01001.330.C of the POMS Manual also merits little response. That portion of the manual simply does not apply to Parts C and D. The only relevance of the manual is that it reiterates the proposition that an erroneous refund of any Medicare premium "is not a benefit overpayment," POMS Manual § HI 01001.330.C, within the meaning of 42 U.S.C. § 404.[19]

-----

[18] Plaintiffs' attempt to characterize the erroneous refunds of Part D premiums in this case as a "payment where no amount is payable under title II of the Act," Pl. Amend Reply at 20, merits little response. The Commissioner has never made any determination that plaintiff Loveall, or any member of the plaintiff associations, is not entitled to receive Title II payments, nor did the Secretary endeavor to collect any payment of Title II benefits where the recipient was ineligible to receive any payment at all under Title II. Plaintiffs' regulatory argument merely repeats the mistaken characterization on which their statutory argument is premised. Any ambiguity that might be deemed to exist in the regulation, however, must be resolved in favor of deference to the Commissioner's view. See Power, 292 F.3d at 786.

[19] As was discussed earlier, beneficiaries who must purchase Part A coverage because they do not qualify for Social Security are required to pay their Part A premiums directly to the Secretary, and not by means of deductions taken by the Commissioner. 42 C.F.R. 406.32(e). It is not entirely clear, therefore, why Subsection A of POMS Manual § HI 01001.330, which gives instructions to Social Security Administration employees, makes any reference to Part A premium refunds that might be erroneously made, since any such erroneous refunds would presumably be made by the Centers for Medicare & Medicaid Services. See Action Alliance, 456 F. Supp.2d at 19-20 & n.10. The reference may simply exist for informational purposes, to assist SSA employees in responding to inquiries from the public. The only relevant point is that

### D.  Plaintiffs' Due Process Claim Lacks Merit

Finally, to the extent that plaintiffs' due-process claim asserts that plaintiffs have been deprived of a liberty interest in receiving a recovery-waiver procedure under 42 U.S.C. § 404(b) and regulations promulgated thereunder, it fails to state a claim for the reasons stated above.  To the extent that plaintiffs claim to have been deprived of a property interest, it is patently without merit.  A mere request for repayment is not a deprivation of property, and, if the Secretary were to take more formal steps to recover the monies, such as by a lawsuit, the affected beneficiaries would be accorded whatever rights to procedural due process applied in that context.  Plaintiffs' due-process theory is merely make-weight.

### E.  Plaintiffs' Statutory-Construction Arguments Are Unpersuasive.

The foregoing analysis demonstrates why plaintiffs' second amended complaint should be dismissed.  This section of defendant's memorandum addresses various other statutory-construction arguments that appear in plaintiffs' reply in support of their motion to amend their complaint.  Plaintiffs' threshold contention that this Court already held that 42 U.S.C. § 404(b) mandates recovery-waiver rights when it ruled on plaintiffs' motion for a preliminary injunction, Pl. Amend. Reply at 18, is simply wrong.  The decision reversed by the Court Appeals addressed the meaning of 42 U.S.C. § 1395gg, Action Alliance, 456 F. Supp. 2d at 19-23, not § 404(b).

Even if the decision were deemed to contain an implied ruling on the meaning of § 404(b), however, the subsequent decision by the Commissioner (in response to plaintiff Loveall's request for an administrative ruling) would still be entitled to deference.  As the Supreme Court has explained, deference to agency statutory constructions rests on the

_____

Subsection C of POMS Manual § HI 01001.330 clearly does not apply in any way to erroneous refunds of Part D premiums.

presumption (mandated by the constitutional separation of powers) that Congress, to the extent

that it may be deemed to have "left ambiguity in a statute meant for implementation by an

agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and

desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity

allows." Nat'l Cable, 545 U.S. at 982 (quoting Smiley v. Citibank (South Dakota), N.A., 517

U.S. 735, 740-41 (1996)). It follows that a "prior judicial construction of a statute trumps an

agency construction otherwise entitled to Chevron deference only if the prior court decision holds

that its construction follows from the unambiguous terms of the statute and thus leaves no room

for agency discretion." Id. Thus, "[o]nly a judicial precedent holding that the statute

unambiguously forecloses the agency's interpretation, and therefore contains no gap for the

agency to fill, displaces a conflicting agency construction." Id. at 982-83. Indeed, plaintiffs

themselves appear to concede that a conclusion that the meaning of § 404(b) is "ambiguous," Pl.

Amend. Reply at 18, is fatal to their statutory-construction argument.

Moreover, the only discussion of § 404(b) that appears in this Court's preliminary-

injunction opinion merely incorrectly assumes that the Commissioner "bases" the POMS Manual

provision relating to recovery of erroneous Part B premium refunds "on the general waiver

provision of the Social Security Act" in 42 U.S.C. § 404(b). Action Alliance, 456 F. Supp. 2d at

18. As was discussed above, however, the POMS provision states exactly the opposite: that an

erroneous refund of a Part B premium "is not a benefit overpayment" within the meaning of 42

U.S.C. § 404, POMS Manual § HI 01001.330.C, and therefore that authority to extend waiver

rights in that setting cannot possibly be based on § 404(b). The POMS provision cannot possibly

be "anchored" in § 404(b), Pl. Amend Reply at 12; the text of the manual tosses that anchor

overboard.

Even if the question were relevant, however, there also is no need to rewrite 42 U.S.C. § 404 to defend the validity of the POMS provision. As was discussed earlier, it "is beyond dispute," Bechtel v. PBGC, 781 F.2d at 907, that "'[n]o statute is necessary to authorize'" the federal government to take "appropriate action" to "recover funds which its agents have wrongfully, erroneously, or illegally paid," United States v. Wurts, 303 U.S. at 415 (citation omitted), and how the government chooses to exercise that "inherent" power, United States v. Mo. Self Serv. Gas Co., 671 F. Supp. 1232, 1242 (W.D. Mo. 1987), is within its enforcement discretion. In any event, 42 U.S.C. § 1395s(a)(1) expressly confers on the Commissioner the power to establish procedures for making the deduction of Part B premiums from Social Security checks, an authority that can reasonably be construed to carry with it the discretion to establish procedures for determining when and how to correct errors. The Commissioner is authorized to establish such policies, pursuant to his authority to superintend the Social Security Administration. 42 U.S.C. §§ 902(a)(4)-(5). In addition, 31 U.S.C. § 3711(a)(2) expressly authorizes federal agencies to compromise monetary claims. The confluence of these sources of law provide ample authority for the Commissioner, in his discretion, to instruct his employees to extend recovery-waiver protections in the case of erroneous refunds of Part B premiums, even though such a refund "is not a benefit overpayment," POMS Manual § HI 01001.330.C, subject to the provisions of 42 U.S.C. § 404 and regulations promulgated thereunder. It was not necessary to rely on 42 U.S.C. § 404(b).[20]

─────────────

[20] Plaintiffs' reliance on OPM v. Richmond, 496 U.S. 414 (1990), in this connection, Pl. Amend. Reply at 16-17, is completely misplaced. That decision merely held that promissory estoppel could not compel the federal government to pay money on the basis of erroneous promises of a government agent. Id. at 419-34. It has nothing to do with the circumstances, if there are any, when the government is compelled by law to recover erroneous payments made to private parties. And it certainly has nothing to do with whether 42 U.S.C. § 404(b) applies to the

In any event, the central proposition on which plaintiffs' argument rests – that it is permissible to broaden the scope of a statute in order to make it conform to an informal manual instruction – has the hierarchy of authority exactly backwards. An agency's instruction manuals must be re-written to conform to statutes, not the other way around. If there is no statutory authority for the POMS provision to extend recovery-waiver protections in the case of erroneous refunds of Part B premiums, then the POMS provision would have to fall. So long as it is clear that the POMS Manual does not apply to erroneous refunds of Part D premiums, there is no need to consider whether it lawfully applies to erroneous refunds of any other kinds of premiums.

Furthermore, the Commissioner of Social Security would not have the authority to extend the POMS Manual to deal with erroneous refunds of Part C and Part D premiums even if he wanted to. The Commissioner's rulemaking authority extends only to Part B premiums. 42 U.S.C. § 1395s(a)(1). Although he makes premium deductions under Part C and Part D, the deductions can only be done "[i]n accordance with regulations" promulgated by the Secretary of Health and Human Services, 42 U.S.C. §§ 1395w-24(d)(2), 1395w-113(c)(1), pursuant to the Secretary's separate rulemaking authority under the Medicare statutes. 42 U.S.C. § 1395hh.

Finally, even if this Court were to conclude that the Commissioner was <u>authorized</u> by 42 U.S.C. § 404 to give recovery-waiver protections in the case of erroneous refunds of Part B premiums, there is no reason why any governmental actor would be <u>compelled</u> to treat erroneous refunds of Part D premiums the same way. Part C and Part D enrollees have the <u>option</u> as to whether to have their premiums deducted from their Social Security checks. With minor

---

recovery of erroneous refunds of Part D premiums.

exceptions not relevant here,[21] the only way Part B premiums are collected is through Social-Security deductions.[22]  As was explained earlier, for any government agency to extend such protections to Part D enrollees who choose the Social-Security deduction option would be to extend protections to only a minority who choose that particular option over more direct means, and this would create illogical distinctions amongst enrollees.[23]

_____

[21] See 42 U.S.C. § 1395s(c).

[22] As was previously explained, those few beneficiaries required to pay a premium to get Part A coverage are not even eligible for Social Security benefits and have only one premium-payment option:  to pay them directly.

[23] The prospect of irrational distinctions amongst identically-situated Part D enrollees distinguishes this case from Shannon v. Civil Service Commission, 444 F. Supp. 354 (N.D. Cal. 1977), aff'd in part, rev'd in part, 621 F.2d 1030 (9th Cir. 1980), a decision on which this Court has previously looked for analogous reasoning.  See Action Alliance, 456 F. Supp. 2d at 21. Even on its own terms, however, Shannon was incorrectly decided and has never since been relied upon by any other court for the proposition urged by plaintiffs here.  In that case, the Civil Service Commission failed to deduct the proper amount of insurance premiums from a federal employee's retirement benefits and sought recovery without giving notice of any right to request a waiver.  Id. at 356.  The relevant statute provided that "recovery of payments under this subchapter may not be made from an individual when, in the judgment of the Civil Service Commission, the individual is without fault and recovery would be against equity and good conscience."  5 U.S.C. § 8346(b) (emphasis added).  The relevant subchapter was 5 U.S.C. §§ 8331-8348, and the statues that authorized deductions for insurance premiums, 5 U.S.C. §§ 8906, 8701 and 8714a(c)(2), fell outside that subchapter.  Without really addressing the significance of this statutory structure, the pre-Chevron analysis went on to acknowledge "some lack of clarity in Congressional purposes," Shannon, 444 F. Supp. at 358, but found that the Civil Service Commission had not met what the court perceived to be the government's burden of showing that Congress had a "specific purpose" to "limit" the statute to exclude insurance-premium issues.  Id. at 359.  Since Shannon was decided, Chevron and its many progeny have made clear that the burden properly rests with the plaintiff to show that the statutory text "unambiguously forbids" the government's reading or that the government's reading otherwise "exceeds the bounds of the permissible."  Walton, 535 U.S. at 218 (emphasis added).  Since mandamus relief was not sought, the court did not have occasion to consider whether the statutory language imposed a mandatory duty "so plainly prescribed as to be free from doubt and equivalent to a positive command.  Consol. Edison, 286 F.3d at 605 (citation omitted).  Under the standards of review that this Court must follow today, therefore, the Shannon analysis leads to exactly the opposite outcome.

## CONCLUSION

For the reasons stated, plaintiffs' motion to file an amended and/or supplemental complaint should be denied.

Respectfully submitted,

OF COUNSEL:
DANIEL MERON
General Counsel

MARK D. POLSTON
Associate General Counsel

CAROL J. BENNETT
Acting Deputy Associate
General Counsel for Litigation

MARCUS H. CHRIST
LAWRENCE J. HARDER
Attorneys
United States Department of
Health and Human Services

DAVID BLACK
General Counsel

THOMAS CRAWLEY
Deputy General Counsel

GWEN JONES KELLEY
Acting Associate General Counsel
Office of Program Law

EILEEN FARMER
HEDY GORDON
Attorneys
Office of the General Counsel
Social Security Administration

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

/s/ Peter Robbins
RICHARD G. LEPLEY
PETER ROBBINS
United States Department of Justice
20 Massachusetts Avenue, N.W., Room 7142
Washington, D.C. 20530
Tel: (202) 514-3953

Attorneys for Defendants

-42-