UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

ACTION ALLIANCE OF SENIOR CITIZENS,    )
GRAY PANTHERS, LUCY CAROLYN LOVEALL,    )
       )
      Plaintiffs,    )
       )
      v.    )    C.A. No. 06-1607 (HHK)
       )
MICHAEL LEAVITT, Secretary of Department    )
of Health and Human Services;  MICHAEL J. ASTRUE,    )
Commissioner of the Social Security Administration,    )
       )
      Defendants.    )
_____    )

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

I.    SHORT HISTORY OF THE CASE ........................................................................ 3

II.   LEGAL AND FACTUAL BACKGROUND OF THE CASE .................................. 5

III.  DEFENDANTS CONTINUE TO MISCHARACTERIZE THE EVENTS
      AT ISSUE AND TO MISSTATE POINTS OF FACT AND LAW ....................... 10

IV.   PURSUANT TO THE TITLE II WAIVER PROVISION, THE GOVERNMENT
      MUST PROVIDE PART D ENROLLEES WHO RECEIVE ERRONEOUS
      PAYMENTS WITH THE RIGHT TO REQUEST WAIVER AND ITS
      ATTENDANT RIGHTS ......................................................................................... 17

      A. The Title II waiver statute unambiguously authorizes the right to waiver
         in this situation. ................................................................................................. 18

      B. This Court's original decision that the Secretary's policy is unreasonable
         and not deserving of deference is correct. ........................................................ 25

V.    THE DUE PROCESS CLAUSE ALSO ENTITLES PLAINTIFFS TO THE
      RIGHTS TO NOTICE AND TO A PRIOR ORAL HEARING ............................. 30

VI.   DEFENDANTS' RENEWED ATTEMPT TO CONTEST THE STANDING
      OF THE ORGANIZATIONAL PLAINTIFFS SHOULD BE REJECTED
      AGAIN ................................................................................................................... 31

VII.  DEFENDANTS SHOULD BE ORDERED TO SEND NOTICE TO ALL
      PART D ENROLLEES WHO RECEIVED THE ERRONEOUS PAYMENTS
      ADVISING THEM OF THEIR RIGHT TO SEEK WAIVER AND ITS
      ATTENDANT RIGHTS. ........................................................................................ 37

CONCLUSION ........................................................................................................... 38

# TABLE OF AUTHORITIES

## Cases

\* *Action Alliance of Senior Citizens v. Leavitt*,
456 F.Supp.2d 11 (D.D.C. 2006), vacated,
483 F.3d 852 (D.C.Cir. 2007) ............................................................................. passim

*Action Alliance of Senior Citizens v. Leavitt*,
483 F.3d 852 (D.C.Cir. 2007) ............................................................................. passim

*Air Transport Ass'n of America v. Reno*,
80 F.3d 477 (D.C. Cir. 1996) ................................................................................. 35

*AMA v. United Healthcare Corp.*,
2007 WL 1771498 (S.D.N.Y. June 18, 2007) ........................................................ 36

*Americans for Official English v. Arizona*,
520 U.S. 43 (1997) ................................................................................................. 33

*Am. Coalition for Competitive Trade v. Clinton*,
128 F.3d 761 (D.C. Cir. 1997) ............................................................................... 33

*Batterton v. Francis*
432 U.S. 416 (1977) ............................................................................................... 13

\* *Califano v. Yamasaki*,
442 U.S. 682 (1979) ............................................................................... 14, 17, 24, 31

*Chevron U.S.A. Inc. v. Natural Res. Def. Council*,
467 U.S. 837 (1984) ............................................................................................... 18

*Christensen v. Harris County*,
529 U.S. 576 (2000) ............................................................................................... 30

*Elliott v. Weinberger*,
371 F.Supp. 960 (D.Haw. 1974), aff'd in part, rev'd in part, 564 F.2d 1219
(9th Cir. 1977), aff'd in part, rev'd in part *sub nom. Califano v. Yamasaki*,
442 U.S. 682 (1979) ............................................................................................... 17

*Elliott v. Weinberger*,
564 F.2d 1219, 1230 (9th Cir. 1977), aff'd in part, rev'd in part *sub nom.*
*Califano v. Yamasaki*, 442 U.S. 682 (1979) ..................................................... 17, 25, 31

*Feld v. Berger*,
    424 F.Supp. 1356 (S.D.N.Y. 1976)................................................................ 13

*Friedman v. Berger*,
    547 F.2d 724 (2d Cir. 1976)..................................................................... 12

*Groseclose v. Bowen*,
    809 F.2d 502 (8th Cir. 1987) ................................................................... 24

*Herweg v. Ray*,
    455 U.S. 265 (1982)............................................................................ 13

*Hunt v. Wash. State Apple Adver. Comm'n*,
    432 U.S. 333 (1977)............................................................................ 32

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*,
    477 U.S. 274 (1986)............................................................................ 34

*Long Term Care Pharmacy Alliance v. UnitedHealth Group, Inc.*,
    498 F.Supp.2d 187 (D.D.C. 2007)............................................................... 35

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)............................................................................ 31

*Mattern v. Mathews*,
    582 F.2d 248 (3d Cir. 1978)..................................................................... 17

*Office of Personnel Management v. Richmond*,
    496 U.S. 414 (1991)....................................................................... 29, 30

\* *Pope v. Railroad Retirement Board*,
    672 F.2d 972 (D.C.Cir. 1982) ..................................................... 18, 23, 25, 37, 38

*Pub. Citizen v. F.T.C.*,
    869 F.2d 1541 (D.C.Cir. 1989) ................................................................. 35

*Public Citizen, Inc. v. U.S. Dept. of Health and Human Services*,
    332 F.3d 654 (D.C.Cir. 2003) .................................................................. 30

*Quinlivan v. Sullivan*,
    916 F.2d 524 (9th Cir. 1990) ................................................................... 24

*Schweiker v. Gray Panthers*,
    453 U.S. 34 (1981)......................................................................... 12, 13

*Shalala v. Illinois Council on Long Term Care, Inc.,*
   529 U.S. 1, 24 (2000) ................................................................. 36

*Shannon v. U.S. Civil Service Comm'n,*
   444 F.Supp. 354 (N.D.Cal. 1977), aff'd in part, rev'd in part,
   621 F.2d 1030 (9th Cir. 1980) ........................................... 18, 23, 24

*Sierra Club v. EPA,*
   292 F.3d 894 (D.C. Cir. 2002) ................................................... 32

*Skidmore v. Swift & Co.,*
   323 U.S. 134 (1944) ................................................................. 18

*Sullivan v. Everhart,*
   494 U.S. 83 (1990) ................................................................. 14

*Telecommunications Research & Action Center v. Allnet Communication Services, Inc.,*
   806 F.2d 1093, (D.C. Cir. 1986) ................................................ 35

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,*
   517 U.S. 544 (1996) ................................................................. 35

*United States v. Mead Corp.,*
   533 U.S. 218 (2001) ................................................................. 30

*Warth v. Seldin,*
   422 U.S. 490, 511 (1975) .......................................................... 33

*Zinman v. Shalala,*
   67 F.3d 841 (9th Cir. 1995) ....................................................... 24

* Denotes decisions on which counsel chiefly rely.

**Statutes**

5 U.S.C.
   § 8346(b) ............................................................................. 18

42 U.S.C.
   § 404 ................................................................................. 14
   § 404(b) .......................................................................... passim
   § 405(g) ........................................................................... 4, 36
   § 405(h) ............................................................................. 36

42 U.S.C.
§ 1395w-24(d)(2) ............................................................................................... 3, 6
§ 1395w-24(d)(2)(A) .............................................................................................. 5
§ 1395w-113(c)(1) ............................................................................................. 3, 6
§ 1395w-116(b)(3) ............................................................................................. 5, 6
§ 1395gg(c) .................................................................................. 4, 10, 11, 18, 22

45 U.S.C.
§ 231i ................................................................................................................ 17

## Regulations

20 C.F.R.
§ 404.501(a) ..................................................................................................... 20, 21
§ 404.502a ....................................................................................................... 17, 30
§ 404.506 ............................................................................................................. 17
§ 404.506(c)-(g) ................................................................................................... 30
§ 404.509 ............................................................................................................. 24

42 C.F.R.
§ 423.1-423.910 .................................................................................................. 15

## Rules

Federal Rules of Civil Procedure,
3 ........................................................................................................................... 5
4(i)(1) ................................................................................................................... 5
56(a) ..................................................................................................................... 5

## Miscellaneous

Program Operations Manual System
§ HI 01001.330 ................................................................................................... 26
§ HI 01001.330A ................................................................................................... 6
§ HI 01001.330C ...................................................................................... 20, 24, 29

## INTRODUCTION

With the filing of plaintiffs' Supplemental and Second Amended Complaint (hereinafter, the "New Complaint") on November 13, 2007, this case is back before this Court.  Since the jurisdictional defect detected by the Court of Appeals has been resolved and is not at issue, this Court may rule on plaintiffs' claims and order permanent relief.

The defendants' Motion to Dismiss Plaintiffs' Supplemental and Second Amended Complaint (hereinafter, "Motion to Dismiss") puts the case in a peculiar posture.  This Court has now agreed twice with plaintiffs' contentions on the merits: once in holding that plaintiffs were likely to succeed when it issued a preliminary injunction, and again when it rejected the Secretary's argument that the New Complaint should not be filed because it would be dismissed for failure to state a claim.  Despite that latter ruling, defendants have now moved to dismiss for the same reasons that the Court has already rejected.  Defendants claim that they are doing so to obtain "a ruling on the merits," Motion to Dismiss at 2 n.1, but this Court has already made such a ruling.

In any event, plaintiffs were planning to move for summary judgment, had largely completed their pleadings, and were planning to file the motion on December 10, 2007.[1] With the filing of defendants' Motion to Dismiss, however, plaintiffs decided, in the interest of reduced paper, to file their Opposition to the Motion to Dismiss and their Memorandum in Support of Summary Judgment as this one document.

This case raises a significant issue about the defendants' handling of the new Medicare Part D program.  The particular context in which it arises is itself important, as the challenged action has adversely affected about 230,000 Part D enrollees, most of

---

[1] See *infra* at 5 n.2.

whom have fixed and limited incomes, because of a mistake attributed solely to the government.  The immediate issue therefore is the Secretary's demand for repayment of Title II monies without first notifying beneficiaries of, and affording them, the right to request a hardship waiver.  In the long term, the government's determination not to accord these beneficiaries the right to seek waiver of recovery is also significant for the future of the Part D program, for it indicates that the right to seek a hardship waiver will not be accorded to beneficiaries in other instances of incorrect payments.

At the outset plaintiffs need to repeat – because the defendants continue to ignore this point – that this case concerns the right to notice and the right to request that recovery be waived.  It is *not* a case about whether Ms. Loveall or any other affected beneficiary is entitled to waiver in her or his particular case.  It is irrelevant, therefore, whether the Secretary and/or the Commissioner of the Social Security Administration (SSA) would in fact decide that recovery should be waived.  The only issue before the Court is whether the defendants are correct that no right to waiver exists for the affected beneficiaries and that therefore no obligation exists to notify them of that right.

The defendants' Motion to Dismiss is largely a verbatim repetition of the Defendant's Opposition to Plaintiffs' Motion for Leave to File Supplemental and Second Amended Complaint (docket # 42) (hereinafter, "Opposition").  Consequently, as in the Opposition, the Motion to Dismiss is characterized by repeated mistakes in describing what has transpired in this case and what this case is about.  Hidden in this camouflage of misstatements and obfuscation is the one fact that controls this case: SSA paid out more "than the correct amount of payment."  Accordingly, there can be no "recovery by the United States" unless the right to waiver is offered.  42 U.S.C. § 404(b).

Most significantly, defendants' studied mischaracterization of the case forces them to continue to refer repeatedly to the payments at issue as "premium refunds." The reality, however, is that the premiums had already been withheld and paid to the prescription drug plans, pursuant to the statutory scheme. 42 U.S.C. § 1395w-113(c)(1), incorporating *id.*, § 1395w-24(d)(2). They were not refunded from the plans, directly or indirectly, to the Part D enrollees. Rather, after withholding and payment to the plans had been completed, some Part D enrollees received payments from SSA to which they were not entitled, and *that* was the event that triggered the right to seek waiver. Defendants refuse to recognize the reality of those events.

With the filing and service of the New Complaint, and a sufficient record to establish the relevant undisputed material facts, plaintiffs now seek summary judgment on their claims. A Statement of Material Facts and a Proposed Order accompany this Motion and Memorandum. As it has twice before, this Court should hold in plaintiffs' favor on the merits, denying the motion to dismiss and issuing declaratory and injunctive relief that establishes plaintiffs' right to waiver of recovery of the erroneous payments at issue, their right to a prior oral hearing, and notice of those rights.

## I.    SHORT HISTORY OF THE CASE

In response to the Secretary's demands for repayment of erroneous Social Security Title II payments made to 230,000 Medicare beneficiaries enrolled in the Part D prescription drug program, the two plaintiff organizations filed the original complaint on September 15, 2006. Seeking to force the government to provide the beneficiaries with the right to request waiver of recovery, they filed a motion for a TRO and preliminary injunction with the complaint. The defendant Secretary moved to dismiss on the ground

that the plaintiffs lacked standing.  On September 27, 2006 plaintiffs filed their First Amended Complaint, which added a new plaintiff, Lucy Carolyn Loveall, a beneficiary from whom the Secretary had demanded recovery.

Also on September 27, after a hearing, the Court denied the government's motion to dismiss and granted the plaintiffs' motion for a preliminary injunction.  The order required the Secretary to return any money that had been paid back by beneficiaries, and, if further collection efforts were instituted, to provide notice and the right to seek waiver. In its opinion issued several days later, the Court explained the legal basis for its rulings. *Action Alliance of Senior Citizens v. Leavitt*, 456 F.Supp.2d 11 (D.D.C. 2006).

The Secretary appealed and obtained a stay pending appeal from the Court of Appeals.  This Court stayed further proceedings in the district court until 30 days after the final decision of the Court of Appeals.

After briefing and oral argument, the Court of Appeals *sua sponte* directed the parties to brief the issue of this Court's jurisdiction.  On April 17, 2007, that Court vacated the preliminary injunction.  It held that that the district court lacked jurisdiction to consider the applicability of the Social Security waiver statute, 42 U.S.C. § 404(b), because plaintiffs had not met the "presentment" requirement of 42 U.S.C. § 405(g), which provided the only avenue for review of the claim under § 404(b).  *Action Alliance of Senior Citizens v. Leavitt*, 483 F.3d 852, 856-858 (D.C.Cir. 2007).  It also held that, while there was jurisdiction over the claim under the Medicare waiver statute, 42 U.S.C. § 1395gg(c), that provision was not applicable in this situation and therefore did not provide a basis for waiver.  *Id*. at 858-861.

After the appellate court's decision, plaintiffs followed the steps outlined by that court to satisfy its view of presentment. After the mandate of the Court of Appeals issued, the stay terminated and plaintiffs moved for leave to file the New Complaint, in which the Commissioner of SSA was also named as a defendant. The Secretary opposed that motion on the ground that its filing was futile because plaintiffs could not state a claim. This Court granted plaintiffs' motion for leave to file on November 13, 2007, and the Clerk filed the New Complaint that day.

Defendants moved to dismiss on December 3, 2007. Plaintiffs are now timely moving for summary judgment.[2]

## II.    LEGAL AND FACTUAL BACKGROUND OF THE CASE

The Medicare program is now divided into four substantive parts (labeled A through D), which provide for insurance coverage, respectively, of inpatient hospital and related care, of outpatient services, of a managed care program, and of a prescription drug program. See, *e.g., Action Alliance*, 456 F.Supp.2d at 13. As with premiums paid for coverage under Parts B and C, Congress determined that Part D beneficiaries should have the option of having their premiums withheld from their Social Security checks. 42 U.S.C. §§ 1395w-116(b)(3), 1395w-24(d)(2)(A). When a beneficiary selects that option,

---

[2]   A plaintiff may move for summary judgment after 20 days from the "commencement of the action." F.R.Civ.P. 56(a). The action "is commenced by filing a complaint with the court," F.R.Civ.P. 3, an event that took place in this case in September 2006. Even if the action is not considered to have commenced until filing and service of the New Complaint, however, the filing of the New Complaint on November 13 effected service on the original defendant, the Secretary, through the court's e-filing system, and plaintiffs served the new defendant, the Commissioner, by certified mail pursuant to F.R.Civ.P. 4(i)(1) on November 14, with the return receipts showing that the Commissioner, the United States Attorney, and the Attorney General all had received it by November 19, 2007. Consequently, moving for summary judgment after December 9, 2007 satisfies even the strictest reading of Rule 56(a).

SSA credits the withheld amount to the Medicare Prescription Drug Account, from which it is paid to the prescription drug plan in which the beneficiary is enrolled.  *Id.*, § 1395w-113(c)(1), incorporating *id.*, § 1395w-24(d)(2); *id.*, § 1395w-116(b)(3).

SSA's withholding of the premium payment satisfies the beneficiary's obligation to pay the premium: "In the case of a beneficiary, premiums are paid when they are deducted from his/her benefits."  Program Operations Manual System (POMS), § HI 01001.330A;[3] see also Declaration of Leslie Norwalk (docket # 16, filed Sept. 29, 2006), ¶ 3.  Accordingly, the beneficiary's obligation to the prescription drug plan is met at the time of withholding.  Correspondingly, as the Secretary has acknowledged and this Court has recognized, the transfer of the withheld portion of the Social Security benefit to the drug plan establishes that it has been paid.  See 456 F.Supp.2d at 23 (citing Mem. in Support of Def. Motion to Dismiss (docket # 6), at 6).  There is no dispute that that transfer was correctly effected in this situation, for the defendant SSA noted that, before the erroneous payments were made, "CMS had made premium payments to private prescription drug plans on behalf of the Part D participants."  Letter of SSA Official Beatrice Disman (Aug. 13, 2007) (Ex. H to New Complaint), at 2.  Indeed, this Court previously recognized that the Secretary had acknowledged "that the insurers have already received their premiums …."  456 F.Supp.2d at 23.

Thus, contrary to the defendants' contentions throughout, this case does not present a failure to deduct the premiums or to pay them over to the drug plans.  Rather, the event that triggered defendants' determination to ignore the beneficiaries' right to

---

[3]  The relevant portion of the POMS is available on-line at https://s044a90.ssa.gov/apps10/poms.nsf/chapterlist!openview&restricttocategory=06.  A hard copy is attached to plaintiffs' Reply Memorandum in support of their motion for leave to file the New Complaint (docket # 45).

waiver occurred after, and was unrelated to, the withholding of premiums and therefore after the beneficiaries' obligation to pay the premium had been satisfied.

In August 2006, SSA, believing incorrectly that 230,000 Part D enrollees no longer wished to have their premiums withheld, paid to them the amount of one or more monthly premiums previously withheld, either by direct deposit or by check.  This mistake was entirely a governmental error, and no suggestion has been made that any of the beneficiaries were at fault.  See, *e.g*., Norwalk Dec., ¶ 4.

Contrary to how defendants have persistently characterized these payments by SSA, they were not refunds of the actual premiums withheld to pay the insurance companies.  Those premiums had already been passed on to the insurers, and no attempt was made to recover them from the plans.  Disman Letter, at 2.  Rather, the payments simply reflected the *amounts* of the premiums.  SSA instructed the Treasury Department to pay these amounts, in the mistaken belief that these portions of the beneficiaries' Social Security payments should not have been withheld.

This mistake was compounded by SSA's sending of a letter to the affected beneficiaries explaining that "[t]his is the money that you are due."  See Letter to Lucy Loveall (Ex. I to the New Complaint).  When the Secretary later discovered the error, he also sent a letter to the beneficiaries, which contradicted the letter previously sent by SSA and explained that there had been a mistake.[4]

The Secretary, through the Department of Health & Human Services' Centers for Medicare & Medicaid Services (CMS), then took steps to recover the estimated $50

---

[4]  That first letter from the Secretary is referred to in the first sentence of the Secretary's later demand letter to the beneficiaries.  See Exs. A and J to the New Complaint.

million that had been erroneously paid out.  He posted on his website, and sent to his Part D "partners", a "Tip Sheet" entitled "Information Partners Can Use to Help Beneficiaries with: PREMIUM WITHHOLD REFUND ISSUE."  It explained that beneficiaries had to repay the amounts erroneously paid to them and that they would be receiving a letter in early September "letting them know the process for returning the overpayment."  The Secretary also posted and distributed a release that newsletters and other publications could publish in which similar information appeared.[5]

In late August and early September 2006, CMS sent the demand letter to the affected beneficiaries.  Exs. A and J to the New Complaint.  In this letter, the Secretary acknowledged that a Medicare "processing error" had caused the erroneous payment, stated the amount of that payment, and explained how it should be repaid.  Beneficiaries were told that they "should return this payment by September 30, 2006," and, in an ominous omission, the letter did not state the consequences for failing to meet that deadline.

The letter also stated that the erroneous payment should be returned "so that it can be used to pay your premiums as you intended."  This statement was inaccurate in implying that the premium would not otherwise be paid (when in fact it had already been paid), and it operated as a threat that, by failing to repay, beneficiaries would lose their Part D coverage**.**

Further, because the letter acknowledged that repayment might cause a "hardship," beneficiaries were told that they could request to make monthly installment payments.  The Secretary did not, however, offer or explain the right to seek waiver of

---

[5]  Copies of the Tip Sheet and the release were attached as Exs. A and B to Pls. Motion for a Temporary Restraining Order and for a Preliminary Injunction (docket # 3).

recovery, despite his explicit recognition that hardship could be occasioned by the recovery.

Before CMS demanded its return, plaintiff Lucy Carolyn Loveall, then 65 years old, had spent the erroneous payment that she had received. She had relied on the letter from SSA stating that the money was hers and on follow-up contacts that were made on her behalf both to SSA and the Medicare agency confirming that point: "Nothing was said about having to repay the money." Declaration of Lucy C. Loveall, ¶ 6 (docket # 14, filed Sept. 29, 2006). When CMS told her to return the money, she could not afford to repay it because of monthly expenses that greatly exceeded her income, a situation that largely resulted from having to repay a loan that had been needed to pay for replacement of her teeth with dentures because she lacked dental insurance. *Id.*, ¶¶ 7-8.

The other two plaintiffs, the organizations Action Alliance for Senior Citizens and the Gray Panthers, had members enrolled in Part D. Members of the organizations received the erroneous payments and therefore were not informed of their right to waiver. Declarations of Pedro Rodriguez and Susan Murany (docket # 8); see 456 F.Supp.2d at 15-16.

On behalf of all three plaintiffs, their counsel requested in writing to the defendants that the affected beneficiaries be given the right to seek waiver and its attendant rights pursuant to 42 U.S.C. § 404(b). Ex. B to the New Complaint. In response, CMS ultimately contended that it was not responsible for carrying out the terms of that provision, as it involved Social Security benefits. Ex. F to the New Complaint. SSA ultimately responded that, although it did have responsibilities under § 404(b), that provision was not applicable in this situation because there had been no overpayment of

Title II benefits.  Ex. H to the New Complaint.  In short, the defendants contend that no right to waiver applies in this context.

### III.    DEFENDANTS CONTINUE TO MISCHARACTERIZE THE EVENTS AT ISSUE AND TO MISSTATE POINTS OF FACT AND LAW.

The first half of defendants' Motion to Dismiss is a virtual verbatim recitation of the first part of the Secretary's Opposition.  As a consequence, defendants continue to misstate key aspects of the case.  Plaintiffs must therefore once again set the record straight, as these errors infect the Motion to Dismiss just as they did the Opposition.

1. Defendants assert that "plaintiffs initially persuaded this Court that [the Medicare waiver statute, 42 U.S.C. § 1395gg(c)] could be broadened to mandate the same recovery protections in situations where prescription-drug premiums deducted from Social Security checks were erroneously refunded …."  Motion to Dismiss, at 1.  Although defendants at least are no longer pretending that "prescription-drug premiums were not properly deducted," Opposition at 1, the statement is still in error.

As plaintiffs have explained, this Court was not so persuaded.  Plaintiffs made the argument in good faith, to this Court and the Court of Appeals, that § 1395gg(c) provides the authority for waiver in this context, but both courts rejected it.  Agreeing with the Secretary's reading, this Court stated that "[t]he entire framework of § 1395gg(a-c) seems to concern only payments to providers for *items and services*."  456 F.Supp.2d at 18.  The Court of Appeals agreed.  483 F.3d at 860.

Defendants' apparent purpose in misstating this Court's ruling is to discredit the Court's overall analytical approach to the case and to suggest that plaintiffs somehow manipulated the Court: "To carry the analysis any further would merely replicate *the*

*error into which this Court was led* at the preliminary-injunction stage ….'"  Motion to

Dismiss at 31 (emphasis added).  But the fact is that this Court rejected the § 1395gg(c)

argument and premised the injunction on § 404(b).  Since plaintiffs pointed out this error

in their Reply on the Motion for Leave to Amend (docket # 45) (hereinafter, "Reply"), it

is inexplicable that defendants continue to misstate the nature of this Court's ruling.

      2.  A recurrent theme of the Motion to Dismiss, as of the Opposition, is that

plaintiffs' contention that the right to seek waiver derives from 42 U.S.C. § 404(b) is a

"new claim."   Motion to Dismiss at 2; see also *id*. at 8, 19, 27.  The apparent rationale

for this contention is to suggest that plaintiffs are desperately searching for a new theory

to replace the one that was lost under § 1395gg(c): "Undaunted by this setback, plaintiffs

are now back before this Court ….  [Their new] theory … is merely a variation on the

first unsuccessful theme."  *Id*. at 2.

      In fact, however, plaintiffs have always relied on § 404(b), and this Court did as

well.  While the exact contours of their argument have been refined, plaintiffs have

consistently recognized that § 404(b) provided the authority for the POMS provisions

applicable to Parts A and B.  Accordingly, this Court noted that the "POMS bases its

waiver provision on the general waiver provision of the Social Security Act ....  *See* 42

U.S.C.A. 404(b)."  456 F.Supp. 2d at 18 (footnote omitted); see also, *e.g., id.* at 20

("Congress enacted the waiver provision of the [Social Security Act], on which the

POMS waiver provision is based").  This Court therefore concluded that "Congress's

legislative design, as indicated by the [Social Security Act] waiver provision, was to

provide Medicare beneficiaries with relief from the hardships of recovery ...."  *Id*. at 21.

Moreover, the Court of Appeals, far from not "address[ing] ... the propriety of [the § 404(b)] argument being raised for the first time on appeal," Motion to Dismiss at 19, recognized that both contentions were legitimately before it. See 483 F.3d at 854 (summarizing the "two statutory bases for relief" invoked by the plaintiffs and the Court's resolution of them); *id*. at 855 (noting how this Court had dealt with the two statutory provisions). Indeed, the very fact that the Court of Appeals determined at some length that this Court lacked jurisdiction over the § 404(b) claim indicates that that Court understood that the claim had been properly raised from the beginning. See *id*. at 856-858.

3. Defendants seek to shore up their position by contending that Title II of the Social Security Act, which provides the authority for the payment of "Social Security benefits," is so complicated that the courts must give heightened deference to the agency's interpretation of every aspect of that Title. Motion to Dismiss at 5-6, 25. The cited decisions, however, do not support their premise.

*Schweiker v. Gray Panthers*, 453 U.S. 34 (1981) and the case on which it relies, *Friedman v. Berger*, 547 F.2d 724 (2d Cir. 1976), are Medicaid cases. Although Medicaid also occupies a title within the Social Security Act (Title XIX), it is a vastly different and more complex program than Title II. Medicaid is a welfare program with nearly inscrutable eligibility conditions, involving a complicated interplay between the federal and state governments and the providers of services to beneficiaries, whereas Title II is a pension program authorizing payments from the federal government to

beneficiaries.[6]  While defendants' cited decisions do refer generally to the "Social Security Act," the cases arose exclusively in the Medicaid context, which distinguishes them from the instant case.  Defendants' inability to explain how or why this distinction is not valid, while simply stating that it is not (Motion to Dismiss at 25 n. 13), underscores the lack of support for their contention.

Batterton v. Francis, 432 U.S. 416 (1977) is also not a Title II case.  Rather, it involved the old Title IV of the Social Security Act, the Aid to Families with Dependent Children program, which, like Medicaid, raised the complex interplay between the state and federal governments in the distribution of welfare benefits.  Id. at 418-420.  Moreover, that case, like Gray Panthers, involved express congressional delegation to the Secretary to define a specific term, thus infusing that definition with "legislative effect."  Id. at 424-425 (noting, inter alia, that, in a prior case involving Title II, Congress had not delegated such authority for defining a particular term); see also Gray Panthers, 453 U.S. at 44 (citing Batterton for the congressional decision to accord "legislative effect" to the provision at issue).  Nothing in the present case places such definitive weight on the defendants' decision, reached without notice-and-comment rulemaking, to exclude the affected beneficiaries from the protections of § 404(b).

---

[6]  Recognizing the special status of Medicaid within the Social Security Act, the Supreme Court quoted with approval the Friedman district judge's description of the Medicaid statute as "'an aggravated assault on the English language, resistant to attempts to understand it.'"  Gray Panthers, 453 U.S. at 43 n.14 (citation omitted); see also, e.g., Herweg v. Ray, 455 U.S. 265, 282 (1982) (Burger, C.J., dissenting) (complaining that the majority got "lost in the Medicaid maze"); Feld v. Berger, 424 F.Supp. 1356, 1357 (S.D.N.Y. 1976) (in a Medicaid case, the mix of governmental agencies and complex regulations "created a Serbonian bog from which the agencies seemingly are unable to extricate themselves").

Finally, *Sullivan v. Everhart*, 494 U.S. 83 (1990) does implicate Title II, but in the context of its relationship to Title XVI, the Supplemental Security Income (SSI) program. Nothing in that decision suggests some extraordinary level of deference to be accorded because a Social Security Act program is involved. Rather, the Court simply applied the standard *Chevron* test. *Id*. at 89.

This case does not involve a complex statutory scheme, or explicitly delegate legislative powers to the agencies to define terms. Rather, it presents for consideration one straightforward sentence of one statutory provision. The Supreme Court had no difficulty in analyzing § 404(b) and in concluding that the Secretary had failed to apply it correctly. In *Califano v. Yamasaki*, 442 U.S. 682, 695 (1979), the Court held, in a unanimous (8-0) decision, that, "[o]n its face, [§ 404] requires that the Secretary make a pre-recoupment waiver decision, and that the decision … be accurate." Furthermore, the mandatory nature of the provision "impl[ies] that the mandated act, … waiver of recoupment … is to precede other action." *Id*. at 695. With that premise established, the Court then determined that the subjective nature of the waiver inquiry requires the prerecoupment determination to include an oral hearing, not just written submissions. *Id.* at 696-697.

 In short, the Court did not accord any special deference to the Secretary's interpretation of § 404(b), and none is appropriate here. Defendants' attempt to import the convoluted  Medicaid statute into this discrete, fully explicated provision of Title II should be rejected.

4. Defendants have apparently dropped one of the cornerstones of their argument. In their Opposition, at 19, 41, they maintained that it was logical to distinguish between

Parts B and D with respect to the right to waiver because Part B had no premium

exemptions for low-income people so that, according to their argument, a more

pronounced need for the right to waiver existed in the Part B context. Plaintiffs explained

why the factual premise of this contention was simply wrong. Reply at 9-10. Defendants

have decided not to repeat this argument. Compare Motion to Dismiss at 19 and 41 with

Opposition at 19 and 41 (former omitting the discussions on this point that appeared in

the latter).

Nevertheless, in defendants' effort to distinguish Part D as qualitatively different

from Parts A and B, they continue to make misstatements about the structure and

mechanism of Medicare. To this end, they repeat the astounding statement from the

Opposition that "the role of the federal government [in Part D] is largely limited to

providing subsidies to private drug plans to enhance their economic viability." Motion to

Dismiss at 10-11; Opposition at 10.

In fact, however, the defendant Secretary plays an extensive role in the regulation

and oversight of the insurance plans with which CMS enters into contracts to provide

benefits under Part D. The Secretary promulgated voluminous regulations for Part D,

totaling 104 pages in the Federal Register (42 C.F.R. §§ 423.1 – 423.910).[7] The

---

[7] In Subparts B through P, the regulations address the array of issues that the agency must oversee and enforce to operate this federal public benefit program: Eligibility and Enrollment; Benefits and Beneficiary Protections; Cost Control and Quality Improvement Requirements; Submission of Bids and Monthly Beneficiary Premiums; Plan Approval; Payments to Part D Plan Sponsors for Qualified Prescription Drug Coverage; Organization Compliance with State Law and Preemption by Federal Law; Coordination under Part D Plans with Other Prescription Drug Coverage; Application Procedures and Contracts with PDP Sponsors; Effect of Change of Ownership or Leasing of Facilities during Term of Contract; Grievances, Coverage Determinations, and Appeals; Medicare Contract Determinations and Appeals;

Secretary also issues and revises on a regular basis a policy manual for Part D

prescription drug plans.[8]

In addition to the regulations and policy manuals, CMS issues extensive policy

guidance to health plans, particularly concerning Part D.[9]  CMS has multiple pages on its

web site, www.cms.hhs.gov, devoted solely to Prescription Drug Coverage Contracting.

One of those pages, Health Plan Management System (HPMS) Guidance History,

indicates that, as of December 4, 2007, CMS had issued 218 guidance materials devoted

to various aspects of Part D.[10]  The majority of the guidance materials listed on this page

deal with issues other than payment to prescription drug plans.

Defendants are unable to offer any rationale why Part B beneficiaries with

erroneous payments based on premium refunds should have the right to waiver while Part

D beneficiaries in exactly the same context are not accorded such a right.

5.  In another misrepresentation, the Secretary's tracking of the history of this

issue again leaves out an important event.  Shortly before SSA sent out the erroneous

payments, it also sent a letter to the beneficiaries confirming that the amount it would

soon be sending out belonged to them.  See, *e.g*., Exhibit I to the New Complaint.

Consequently, when the check arrived, the beneficiaries had every reason to believe that

_____

Intermediate Sanctions; and Premium and Cost-Sharing Subsidies for Low-Income
Individuals.

[8] CMS, *Prescription Drug Benefit Manual*,
http://www.cms.hhs.gov/PrescriptionDrugCovContra/12_PartDManuals.asp#TopOfPage.

[9]
http://www.cms.hhs.gov/PrescriptionDrugCovContra/01_Overview.asp#TopOfPage.

[10]
http://www.cms.hhs.gov/PrescriptionDrugCovContra/HPMSGH/list.asp#TopOfPage.

it had been properly sent to them and that they had the right to do with it as they wished.

Defendants continue to ignore that letter, though, focusing instead on the fact that the

Secretary notified beneficiaries of their alleged obligation to return the money

immediately. See Motion to Dismiss at 18. But by sending the money and a letter

establishing their right to it, the government had already induced the beneficiaries to rely

on its actions.[11]

### IV. PURSUANT TO THE TITLE II WAIVER PROVISION, THE GOVERNMENT MUST PROVIDE PART D ENROLLEES WHO RECEIVE ERRONEOUS PAYMENTS WITH THE RIGHT TO REQUEST WAIVER AND ITS ATTENDANT RIGHTS.

Plaintiffs seek the rights to seek waiver of recovery, to an oral hearing on that

right before recovery is begun, and to notice of their right to seek waiver. If plaintiffs are

entitled to seek waiver under 42 U.S.C. § 404(b), the regulations make clear that they are

also entitled to notice of their rights and to an oral hearing before any recovery is

effected. See 20 C.F.R. §§ 404.502a, 404.506; see also *Yamasaki*, 442 U.S. at 696-697

(explaining that right to a prior oral hearing is necessary on a request for waiver because

of the subjective issues involved in a waiver determination).[12] Consequently, the

---

[11] Even so, Ms. Loveall contacted both SSA and a Medicare office to ensure her right to it, and she received that assurance. Loveall Dec., ¶ 6. The Secretary ignores this detrimental reliance, however, and the significant monthly bills for which she is responsible (see *id.*, ¶¶ 7-8), to conclude yet again that Ms. Loveall's situation demonstrates that policy considerations support Part D enrollees *not* having the right to seek waiver. Motion to Dismiss at 35 n. 17.

[12] Furthermore, before and after *Yamasaki*, numerous other courts analyzed the same or very similar waiver provisions, reaching consistent conclusions that beneficiaries are entitled to notice, to the right to waiver before recovery of the erroneous payment, and to a prior oral hearing. See *Elliott v. Weinberger*, 371 F.Supp. 960 (D.Haw. 1974), aff'd in part, rev'd in part, 564 F.2d 1219 (9th Cir. 1977), aff'd in part, rev'd in part *sub nom. Califano v. Yamasaki*, 442 U.S. 682 (1979) (discussing § 404(b)); *Mattern v. Mathews*, 582 F.2d 248 (3d Cir. 1978) (same); *Pope v. Railroad Retirement Board*, 672 F.2d 972 (D.C.Cir. 1982) (discussing the Railroad Retirement waiver statute, 45 U.S.C. § 231i);

determinative issue on the merits is whether the right to request waiver is authorized and required by 42 U.S.C. § 404(b).[13]

### A.  The Title II waiver statute unambiguously authorizes the right to waiver in this situation.

In evaluating the likelihood of success for the preliminary injunction motion, this Court reviewed the statutory scheme pursuant to the standards discussed in "*Chevron* Step 2"[14] because of its belief that the statute was ambiguous.  See 456 F.Supp.2d at 17-19.  While plaintiffs agree with the Court's analysis under that approach, and offer it as an alternative basis for ruling in their favor on the merits, see *infra* at 25, the statute is *not* ambiguous and the Court should rule in plaintiffs' favor pursuant to *Chevron* Step 1 and the explicit dictate of the Title II waiver provision, 42 U.S.C. § 404(b).

Section 404(b) states, in applicable part: "In any case in which more than the correct amount of payment has been made, there shall be no adjustment of payments to, or recovery by the United States from, any person" who meets the two prongs of the waiver standard.  The instant situation falls squarely within the terms of the statute.

First, even assuming that the statute only applies when the payments at issue are made by SSA, there is no dispute that that entity did in fact make the payments.  See, *e.g.*,

---

*Shannon v. U.S. Civil Service Comm'n*, 444 F.Supp. 354 (N.D.Cal. 1977), aff'd in part, rev'd in part, 621 F.2d 1030 (9th Cir. 1980) (discussing the Civil Service waiver statute, 5 U.S.C. § 8346(b)).

[13]  Both this Court and the Court of Appeals determined that the Medicare waiver provision, 42 U.S.C. § 1395gg(c), was not applicable here because it only applied to erroneous payments for "items and services."  456 F.Supp.2d at 18; 483 F.3d at 860-861.  Consequently, the New Complaint does not raise this argument, and it is not here at issue.

[14]  See *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

Norwalk Dec., ¶ 4.  Second, even assuming that the payments at issue must be Title II funds,[15] that is precisely what was paid here.[16]  There is no other possible source for the payments, since the premiums themselves had been passed on to the plans and there was no attempt to recover them.  Third, and most important, "more than the correct amount of payment" was made.  Consequently, recovery "by the United States" (whether it be CMS, SSA, or the two working in conjunction) is prohibited without the right to waiver being offered, considered, and ruled upon if requested.  The Title II waiver statute explicitly covers this situation.

It is irrelevant that the amounts erroneously sent to the beneficiaries were paid under the mistaken belief that these beneficiaries had opted not to have their Part D premiums withheld from their Social Security checks.  Although SSA believed that the amount of the Social Security benefit that it had withheld and passed on to the prescription drug plan should be returned to the beneficiary, that money was not retrieved from the plan.  See *supra* at 6-7.  The erroneous payment was not, therefore, a refund of the premium.  SSA simply made a mistaken payment, and the rationale for, or background of, that mistake is not relevant.  The payment by SSA therefore directly implicates the waiver statute because it is a "case in which more than the correct amount of payment has been made ...."

In an apparent response to this argument, defendants continue to misrepresent the actual events.  They refer to "the Secretary's voluntary decision to transfer the amount of

_____

[15]  The waiver statute does not refer to Title II payments, but merely to the fact that "more than the correct amount of payment has been made."

[16]  In the Court of Appeals, for instance, plaintiffs stated that "SSA instructed the Treasury Department to pay these amounts ...."  Brief for the Appellees at 5.  The government did not dispute that statement in its Reply Brief or at oral argument.

the erroneously-refunded premium money to the private plans ….."  Motion to Dismiss at 30.  But, as plaintiffs have explained, see *supra* at 6, the premium payments, by statute and policy, were automatically transferred to the drug plans as soon as the premiums were withheld.  It was only later, after the plans had been paid, that SSA made the erroneous payments.  Once again, this was not "an erroneous refund of Part D premiums," Motion to Dismiss at 30, but an erroneous payment of Title II benefits after premiums had been correctly withheld and paid to the plans.

Part of the confusion generated by the government in this case stems from the fact that CMS took charge of the recovery and made the decision that waiver would not be applicable.  That fact is irrelevant, however: SSA and CMS have established that an erroneous payment of this type, regardless of labeling it an "erroneous premium refund," is subject to the Social Security waiver provision.  POMS, § HI 01001.330C.  And that provision not only prohibits SSA from recovering without offering the right to seek waiver, but it precludes "recovery *by the United States* from any person" who satisfies the waiver standards.  42 U.S.C. § 404(b) (emphasis added).  In short, once SSA has made an incorrect payment, *no* government agency has the authority to recover that payment without extending the right to waiver.

The implementing regulation, 20 C.F.R. § 404.501(a), adds to this authority.  The regulation interprets the statute to apply to "overpayments" (a word that does not appear in the statute itself).  It defines overpayment in a number of ways, including as "a payment where no amount is payable under title II of the Act."  In other words, if SSA sends someone – a beneficiary or anyone else – a payment for which there is no statutory authority, that is an overpayment.  And, that is precisely what happened here.  Although

statutory authority existed for the regular monthly benefits that the beneficiaries received, no authority existed for sending them the amount of past premiums withheld. That was a mistake, but that mistake, like many others that could be made, resulted in an erroneous payment that could only be recovered pursuant to the waiver rules.[17]

The Secretary's main defense throughout this litigation has been the misguided contention that the payments at issue were not Title II payments, but were instead refunds of premiums already paid and therefore not within the ambit of § 404. He maintains that argument even now, when it has been clearly refuted. See, *e.g.,* Motion to Dismiss at 3-5, 27-29. These were not premium refunds; the erroneous payments were not refunded from the plans, directly or indirectly, to the Part D enrollees. Rather, after withholding and payment to the plans had been properly completed, some Part D enrollees received payments from SSA to which they were not entitled.

Once that point is recognized, the waiver statute must be invoked, as it does not limit the circumstances in which the erroneous payment of Title II benefits triggers the right to seek waiver. The statute refers generally to all situations "in which more than the correct amount of payment" has been made. That is precisely what occurred here – and it is irrelevant what kind of error caused that erroneous payment.

The Secretary's position, that the erroneous payments here were premium refunds, is not factually incorrect: the premium amounts were withheld correctly from

---

[17]    Another portion of the regulation defines an overpayment as "a payment in excess of the amount due under title II of the Act ...."  20 C.F.R. § 404.501(a).  One way or the other, therefore, the event here at issue fits within the overpayment regulation, as the critical factor is that a mistaken payment was made by SSA from Title II funds. Consequently, it was an "overpayment" under the regulatory definition, and "more than the correct amount of payment" under the statutory definition.

earlier Title II payments and paid to the plans as the premiums.  Later, SSA mistakenly

paid to the beneficiaries the *amount* of those premiums, but it did not take the premium

payments back from the plans and refund them to the beneficiaries: it simply paid them

extra Title II benefits.

The Secretary's main authority for his contrary assertion has been and remains

that plaintiffs and the Court of Appeals referred on occasion to the mistaken Title II

payments as "erroneous refunds of Medicare premiums."  See Motion to Dismiss at 28-

29 & n. 15; Opposition at 31 & n. 18.  (This Court did the same.  See 456 F.Supp.2d at

13, 17.)  These references, though, are a short-hand for what happened, not a legal

conclusion or a statement of fact.  Regardless of what terminology has been employed, it

is not true that the premiums were refunded, as the Secretary has acknowledged.  The

premiums stayed with the plans and -- *in an entirely separate transaction* -- erroneous

payments were made out of Title II funds to the beneficiaries in the amount of those

premiums.

The reference by the Court of Appeals is especially off the mark for the

Secretary's intended use.  It came in the context of plaintiffs' argument that the Medicare

waiver statute, 42 U.S.C. § 1395gg(c), was applicable, and the Court of Appeals was

merely stating that overpayments to a provider of "items and services" were not related to

the payments at issue in this case, which it referred to as "erroneous refunds of Medicare

premiums."  483 F.3d at 860-861.  In essence, the Secretary is contending that the

appellate court's use of that latter term is conclusive for this case, but that is not correct.

The Court of Appeals was not deciding the legal status of the amounts that SSA paid out;

it was simply referring, as the parties and this Court had previously done, to the amounts at issue by a term that reflected the origin of the mistake.

Additional support for plaintiffs' position is found in another right-to-waiver case in which the government relied on a similar contention that there had been no overpayment. In *Shannon v. U.S. Civil Service Comm'n*, 444 F.Supp. 354 (N.D.Cal. 1977), aff'd in part, rev'd in part, 621 F.2d 1030 (9th Cir. 1980), which both this Court and the D.C. Circuit have recognized as on point,[18] the overpayment was caused by the failure to deduct insurance premiums from monthly benefits. The Commission argued that the relevant waiver statute was not applicable because the mistake was not caused by a miscalculation of the annuity amount. 444 F.Supp. at 358. The district court rejected that distinction as irrelevant, in language that this Court quoted:

> [T]he obvious purpose of [the Civil Service waiver statute] is to avoid the hardship that can result from recovering overpayments from a blameless annuitant. The cause of the overpayment is immaterial to the impact on the annuitant. By the language of the statute, Congress did not differentiate the various funds within the Commission when it authorized waiver of recovery from an innocent retired employee.

*Id.*, quoted in 456 F.Supp.2d at 21.

That common sense analysis remains applicable to this case: it is irrelevant that the premium withholding procedure provided the background to the erroneous payment of Title II benefits. The mistake in both instances is a payment of benefits to which the beneficiary is not entitled, and the potential harm is the same regardless of what triggered

---

[18] See 456 F.Supp.2d at 21, 24 (discussing *Shannon* and *Pope v. U.S. R.R. Retirement Board*, 672 F.2d 972 (D.C.Cir. 1982)).

the error.  The defendants' convoluted attempt to explain *Shannon* as somehow

supporting their position is unfounded.  See Motion to Dismiss at 41 n. 23.[19]

It bears repeating that the purpose of waiver is to protect vulnerable and blameless

people from mistakes by the federal government.  In this situation, those at risk are the

elderly and disabled, who are generally living on fixed incomes and are, as a group, in a

precarious financial position: over half of all Medicare beneficiaries have annual incomes

of less than $18,000.  See 456 F.Supp.2d at 24 & n. 15.  As this Court noted: "[I]t was

because of the special coincidence of medical needs and financial problems among

elderly people that the Medicare program was established in the first place."  *Id.* at 20 n.

11 (internal quotation marks and citation omitted).

The right to waiver is therefore critical to their financial security, for it "act[s] as a

safety valve to provide relief from an otherwise harsh or inequitable result," *Zinman v.

Shalala*, 67 F.3d 841, 843 n. 1 (9th Cir. 1995).  Consequently, the "equity and good

conscience" test, which is part of the waiver analysis, see, *e.g.*, *Yamasaki*, 442 U.S. at

686; POMS, § HI 01001.330C, represents "a broad concept of fairness."  *Quinlivan v.

Sullivan*, 916 F.2d 524, 527 (9th Cir. 1990); see also, *e.g.*, *Groseclose v. Bowen*, 809 F.2d

502, 505-506 (8th Cir. 1987) ("equity and good conscience" goes beyond the detrimental

reliance concept set out in the regulation, 20 C.F.R. § 404.509).  As the D.C. Circuit has

recognized:

> [T]he loss occasioned by recoupment should not be minimized.  The
> deprivation of a significant portion of fixed income can be a substantial

---

[19]  Defendants attempt to find significance in the fact that *Shannon* was pre-*Chevron*.
The *Shannon* court, however, applied a *Chevron* standard: "The agency interpretation of
a statute is generally entitled to great deference and should be sustained unless it is
plainly erroneous or inconsistent with the statute."  444 F.Supp. at 357.

> loss indeed.  Retired individuals living on fixed income frequently can ill
> afford even a moderate temporary decrease in their disposable income.

*Pope v. U.S. R.R. Retirement Board*, 672 F.2d 972, 975 (D.C.Cir. 1982) (citation and

quotation marks omitted).

The Secretary's continued refusal to acknowledge the applicability of waiver in

this context mirrors his original aggressive response to the erroneous payments and

betrays a genuine misunderstanding of the concept of waiver.  In his web postings and

letters to the beneficiaries, he incorrectly suggested that they had no rights beyond those

benevolently bestowed upon them by the Secretary.  In fact, however, waiver of recovery

is a recognition that, when the standards are met, the beneficiary need not repay because

ownership in the erroneous payment has been transferred to the beneficiary:

> Waiver is not a matter of "governmental beneficence," as the Secretary
> puts it.  Under § 404(b) waiver is not discretionary, but mandatory, under
> the conditions specified.  Thus, the statute creates a property interest in
> retention of overpayments if the conditions of waiver are met, even if
> there was no right to receive the overpayments in the first place.

*Elliott v. Weinberger*, 564 F.2d 1219, 1230 (9th Cir. 1977), aff'd in part, rev'd in part on

other grounds *sub nom*. *Califano v. Yamasaki*, 442 U.S. 682 (1979).

This motivating logic behind waiver is no less applicable when the genesis of the

erroneous payment lies in the mistake-prone world of premium withholding.  And

nothing in the statute remotely suggests such an exception.

### B.  <u>This Court's original decision that the Secretary's policy is unreasonable and not deserving of deference is correct.</u>

If the Court believes that the waiver statute is ambiguous, however, it should

evaluate the Secretary's position under the same *Chevron* Step 2 analysis that it used in

granting the preliminary injunction and reach the same conclusion.  In that decision this

Court concluded that, in light of "the legislature's revealed design," it should not defer to the Secretary's conclusion that waiver was not available. 456 F.Supp. at 20.

The Court's analysis proceeded from the fact that the relevant POMS provisions (§ HI 01001.330), which is anchored in § 404(b), explicitly authorized waiver for erroneous payments derived from premium problems in Parts A and B. "[A]s evidenced by the statutory scheme of the [Social Security Act] and Medicare program," the Secretary's "justification for treating Part D beneficiaries differently is untenable …." 456 F.Supp.2d at 20. The Court recognized that, to a beneficiary facing repayment, the cause of the erroneous payment was irrelevant. *Id*. at 21. And, it is no argument that applying the waiver standards could result in a loss of money to the government: "Every waiver provision results in the government bearing a loss instead of the beneficiary." *Id.*

This Court relied extensively on the fact that "[t]he waiver regulations that the Secretary has determined should be applied to Part A and Part B premiums are consistent with Congress's intent to consider equity and hardship, whereas the Secretary's proffered distinction of Part D flatly contradicts such legislative intent." *Id*. at 22. There was nothing to indicate that Congress intended a different result for erroneous payments deriving from premium problems in the Part D context. *Id.* at 22-23.

The Court also found persuasive that the Secretary offered inconsistent explanations. He contended at one point that, with the premiums passed on to the insurers, it was the government seeking repayment, and, at another point, he argued that the money at issue belonged to the insurers. This contradiction "does not meet the Secretary's burden of providing a reasoned analysis to support this interpretation of the

relevant statute and regulations." *Id.* at 23 (internal quotation marks and citation omitted).

Defendants' persistent attempt to derive support from the legislative history is primarily a contention that, since no legislative history refers to premium refunds, plaintiffs can garner no help from those sources. See Motion to Dismiss at 31-33. As this Court has held, however, congressional intent nowhere suggests that mistakes occurring in the context of Part D premium withholding should be treated differently from those in Parts A and B. There was no need for the statute or legislative history to state the applicability of the right to waiver to Part D when that right existed for Parts A and B at the time that Part D was created. See 456 F.Supp.2d at 22-23.

Defendants seek to bolster their position by offering policy rationales. First, they claim that it is illogical to discriminate among Part D beneficiaries based on the method of premium payment they selected. Motion to Dismiss at 33. But this argument falters on its premise, for the reality is that the premium withholding mechanism worked correctly, so that the insurer was in fact paid.

Furthermore, the alleged "preferential treatment" (*id.*) accorded the plaintiffs in this case does not exist, for comparing them to other payors of Part D premiums is misplaced. In fact, the plaintiffs are discriminated against when compared to the correct group, which consists of other recipients of erroneous Title II payments. Plaintiffs here are asking only for the same treatment that all other Title II beneficiaries receive when their Social Security check is more than it should be.

The suggestion that authorizing the right to waiver in this situation would "create a disincentive to be self-reliant" (*id*. at 34) is frivolous and insensitive. These

beneficiaries have simply selected an option for paying their premiums that Congress has offered, that simplifies and expedites the payment process for the plans as well, and that benefits the Medicare program as a whole by ensuring that premiums are timely and fully paid. (And, in fact, the withholding mechanism worked here just as intended.)

There is no indication that any Part D enrollee has chosen or would choose the withholding option because of the possibility that SSA would later make an erroneous payment for which they could request waiver of recovery. Moreover, the choice of the withholding option in fact demonstrates the beneficiaries' responsibility, for, by doing so, they ensure that premiums are paid before monthly income can be exhausted on necessities such as food, rent, and utilities. Defendants' suggestion that, by selecting the withholding option beneficiaries demonstrate a deficiency in self-reliance, indicates a lack of sensitivity to the financial insecurity of many elderly and disabled beneficiaries, and their need for assistance in bill paying. Congress recognized this need when it authorized the withholding option, and defendants' criticism of those who have accepted this offer strays far from reality.

Defendants also opine that erroneous payments of Title II benefits are more deserving of waiver protection than "erroneous refunds of premiums under Medicare Part D," due to a perceived difference in their financial situations. Motion to Dismiss at 34. Putting aside that these *were* erroneous Title II payments, not premium refunds, defendants' logic is faulty.

Medicare Part D beneficiaries not eligible for the Low Income Subsidy (LIS) are essentially in the same position as Title II beneficiaries. They are elderly or disabled, and, although they are not entitled to the welfare protections of the LIS, they are

generally living on fixed incomes and are, as a group, in a precarious financial position, as over half of all Medicare beneficiaries have annual incomes of less than $18,000.  See *supra* at 24.  Contrary to defendants' implication, Title II beneficiaries are not recipients of welfare, unless their incomes are so low that they are also entitled to SSI (in which event they would be eligible for the LIS in Part D).  It would be irrational to distinguish on income grounds between Title II beneficiaries and Part D enrollees not eligible for the LIS; indeed, they are largely the same people.

Finally, defendants contend that this Court erred in determining that the POMS provision was based on § 404(b).  Motion to Dismiss at 38-39.  But that provision specifically dictates use of "the same test" and "the same rules and procedures" as in § 404(b) to determine whether recovery should be waived, POMS § HI 01001.330C., so that statute must provide the authority for the application of waiver rights to Parts A and B.

Moreover, defendants would be prohibited from applying the waiver standards to payments erroneously made in Parts A and B unless there was explicit statutory authority to do so.  In *Office of Personnel Management v. Richmond*,  496 U.S. 414 (1991), the Supreme Court held that, under the Appropriations Clause, a federal agency cannot pay out benefits without statutory authority, even to compensate an individual who has relied to his detriment on information provided by the agency.  Waiving recovery of an overpayment without statutory authority would effect exactly that result, for the same reason: unauthorized payment out of the Treasury to make up for an agency mistake.  The "payment" in this case is the decision not to recover the amount erroneously paid (*i.e.*,

allowing the mistaken payment to remain in the possession of the beneficiary), but it has the same impact as paying out money in the first place without a statutory basis.[20]

This Court correctly determined that no reasonable basis existed for denying the right to waiver to Part D beneficiaries when § 404(b) had been interpreted in the POMS to provide that right to Part B beneficiaries, and that therefore no deference was due.[21] No logical reason presents itself why reliance on § 404(b) for the POMS provision applicable to Parts A and B does not lead to the identical result in the Part D context. The Court's original determination should stand.

### V.    THE DUE PROCESS CLAUSE ALSO ENTITLES PLAINTIFFS TO THE RIGHTS TO NOTICE AND TO A PRIOR ORAL HEARING.

As plaintiffs have noted (*supra* at 17), if they have the right to seek waiver under 42 U.S.C. § 404(b), the regulations entitle them to notice of that right and the right to an oral hearing before any recovery is effected. 20 C.F.R. §§ 404.502a, 404.506(c)-(g). In the exercise of caution, however, plaintiffs also alleged that their rights to notice and to a prior oral hearing were also mandated by the Due Process Clause. New Complaint, ¶¶

---

[20] Defendants' attempt to distinguish *Richmond* misunderstands that decision. See Motion to Dismiss at 39 n. 20. The Supreme Court explicitly held that, where no statutory authority exists for payments out of the federal treasury, the Appropriations Clause does not allow payment – regardless of what egregious actions by the government caused the problem. 496 U.S. at 424-428. Waiver statutes provide that authorization, and exactly for the purpose of curing otherwise incurable mistakes by the government, but, in their absence, an agency is prohibited from transferring ownership of the erroneous payment from the government to the beneficiary.

[21] No deference is due for an additional reason: the policy of not applying the waiver rules in this situation is not the product of notice-and-comment rulemaking or, in fact, of any written analysis at all. See, *e.g., United States v. Mead Corp.*, 533 U.S. 218, 227-231 (2001); *Christensen v. Harris County*, 529 U.S. 576, 587 (2000); *Public Citizen, Inc. v. U.S. Dept. of Health and Human Services*, 332 F.3d 654, 660 (D.C.Cir. 2003).

51, 53.  Defendants have now repeated their contention that the due process claim should be dismissed.  Motion to Dismiss at 37; Opposition at 37.

The right to waiver is "a property interest [that] commands due process protection."  *Elliott*, 564 F.2d at 1230.  The *Elliott* court, ruling in a nationwide class action, held that due process guarantees the right to notice of the right to waiver under the Social Security waiver statute, *id*. at 1235-1236, and that holding was not appealed.  See *Yamasaki*, 442 U.S. at 692.  Consequently, there can be no dispute that due process guarantees the right to notice of the right to waiver.

The *Elliott* court also held that due process requires offering the right to an oral hearing on a waiver request prior to recovery of an overpayment.  564 F.2d at 1230-1235. The court held that balancing the three factors of the *Eldridge* test – the private interest at issue, the risk of erroneous deprivation, and the public interest –[22] led to the conclusion that due process required prior oral hearings: "[W]e merely require the Government to exercise a little forebearance [*sic*] before taking money from the claimants via recoupment."  *Id*. at 1235.  For the same reasons, due process requires defendants to provide prior oral hearings to the plaintiffs in this case.[23]

**VI.    DEFENDANTS' RENEWED ATTEMPT TO CONTEST THE STANDING OF THE ORGANIZATIONAL PLAINTIFFS SHOULD BE REJECTED AGAIN.**

To establish representational (associational) standing, an organization must allege that (1) at least one of its members has standing in their own right; (2) the organization seeks to protect interests germane to its purpose; and (3) neither the claim nor the

---

[22]  See *Mathews v. Eldridge*, 424 U.S. 319, 340-349 (1976).

[23]  The Supreme Court affirmed the requirement of providing the prior oral hearings, but on statutory rather than due process grounds.  See *Yamasaki*, 442 U.S. at 691-697.

requested relief requires the participation of individual members. *Sierra Club v. EPA,* 292 F.3d 894, 898 (D.C. Cir. 2002) (citing *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 342-43 (1977)). Disagreeing with this Court's prior analysis and ruling that the plaintiff organizations satisfied these criteria, defendants renew their contention that the first and third prongs of the test have not been met.

Defendants haphazardly offer only a vague one-sentence explanation and no analysis to support their position: "Like its predecessors, plaintiffs' second amended complaint fails to identify a single one of plaintiffs' members who has requested a decision by the Commissioner with respect to whether the recover-waiver provisions in 42 U.S.C. § 404(b) are applicable, and any such showing would require the participation of the member(s) in question." Motion to Dismiss at 22-23. Without more, defendants draw the unexamined conclusion that "[t]his essentially forecloses" plaintiffs' ability to proceed. *Id.* at 23 (internal quotation marks omitted). Point by point, plaintiffs will address the errors in defendants' unprecedented conflation of the first and third parts of the *Hunt* inquiry for associational standing.

With regard to the first prong, this Court earlier determined that plaintiffs have sufficiently alleged that at least one of their members has suffered the requisite injury-in-fact to possess standing. 456 F.Supp.2d at 15-16. Citing Supreme Court doctrine and authority in this Circuit, the Court rejected the Secretary's argument that plaintiffs must identify a particular individual by name, holding that such a member's "existence and injury can be reasonably inferred from the available statistics." *Id.* at 15. In a footnote, defendants preserve their disagreement with the court's analysis on this point and also obliquely assert that "plaintiffs cannot … rely on a statistical analysis to show a

likelihood of presentment." Motion to Dismiss at 23 n. 11. Defendants seem to be

arguing now that, in order to satisfy the first criteria for representational standing,

plaintiffs must identify a specific member who has presented claims invoking § 404(b).

If so, defendants grossly distort the standard.

The Supreme Court has stated that, to satisfy the constitutional elements of

Article III standing, an organization suing in its representational capacity must "allege

that its members, or any one of them, are suffering immediate or threatened injury as a

result of the challenged action of the sort that would make out a justiciable case *had the

members themselves brought suit*." *Warth v. Seldin,* 422 U.S. 490, 511 (1975) (emphasis

added). Plaintiffs have satisfied this pleading obligation. 456 F.Supp.2d at 16. There is

no requirement that organizations identify particular members who have been harmed by

the challenged policy, much less identify members who have been harmed *and* who have

invoked the exact statutory provision in presenting their claim for relief.[24]

To mandate a showing of individual members' presentment contravenes the very

principle behind associational standing, namely, to permit courts to exercise jurisdiction

over claims raised by organizations on behalf of their members so that the individual

members do not have to bring suit. The advantages of allowing organizations, with their

resources and expertise, to bring challenges in a single lawsuit benefits not only the

---

[24] Defendants point to no authority that holds otherwise. The decision quoted by
defendants, *Americans for Official English v. Arizona*, 520 U.S. 43, 65-66 (1997), only
reinforces the well-established standard that an organization need only demonstrate "the
requisite concrete injury" to its members in order to meet the first prong of the *Hunt* test.
The case that defendants reference to suggest that more is required, *Am. Coalition for
Competitive Trade v. Clinton,* 128 F.3d 761, 765 (D.C. Cir. 1997), does not even involve
an organization seeking representational standing, and has no bearing upon or relevance
to the question before this court.

members, but also the judicial system.  See, *e.g., Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock,* 477 U.S. 274, 289-90 (1986) ("The doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others.").

The Supreme Court's ruling in *Brock,* a case in which a union sought to challenge a federal official's interpretation of a federal statute, is instructive.  The defendant in *Brock* similarly invoked administrative exhaustion principles to claim that the union could not meet the first precondition in *Hunt.*  The Court held that the existence of state administrative and judicial processes posed no bar or jurisdictional impediment for the union to litigate its statutory claims on behalf of members who may or may not have invoked those processes.  477 U.S. at 284-286.  The critical issue defined by the Court was whether there were any union members who had a live interest in the claims sought to be raised by the union, which the Court had no difficulty inferring.  *Id.*  Likewise, the question in the instant matter is not whether any individual members of the plaintiff organizations have pursued their claims through the review mechanisms, but whether any of their members have sustained injury as a result of defendants' actions to support standing.  This question has already been resolved in plaintiffs' favor.

Defendants' attempt to inject their presentment requirement into the third prong of associational standing under *Hunt* must likewise fail.  Concerning this part of the inquiry*,* this Court has already determined that resolution of the disputed issues in this lawsuit and the provision of effective relief would not dictate the participation of individual members of the organizations.  456 F.Supp.2d. at 16.  The Court correctly reasoned that,

> [w]hile the right to obtain waiver for any particular member is a matter that will indeed require an individualized determination based on her own circumstances, the issue of notice is one that may be redressed on a group-wide basis, *see Pub. Citizen v. F.T.C.,* 869 F.2d 1541, 1548 (D.C.Cir. 1989) (concluding that a deprivation of individuals' right to information was sufficient to establish organizational standing), and has been properly alleged.

*Id.*

The Supreme Court has said that the prudential third precondition in *Hunt* "is best seen as focusing on … matters of administrative convenience and efficiency…" *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 557 (1996). The cases in this Circuit in which organizations did not meet the test have involved claims for damages or restitution, or where the relief sought would ultimately create an entitlement to monetary relief, and thus required individualized proof from actual members.[25] By contrast, the organizational plaintiffs here do not request relief of an individualized nature, but instead seek uniform notice of the right to request waiver of recovery. Whether any member finally goes through the process of seeking waiver or obtains a waiver is not at issue. If granted, the declaratory and injunctive relief sought in this case would "end the matter" without proof or participation from any particular member.

To accept defendants' argument that this Court could not grant relief absent individualized proof of presentment is to repudiate governing authority validating the ability of organizations to vindicate their members' rights under the Social Security Act.

---

[25] See, *e.g., Air Transport Ass'n of America v. Reno,* 80 F.3d 477 (D.C. Cir. 1996) (relevant to the inquiry is whether declaratory relief would "end the matter" without individualized proof); *Telecommunications Research & Action Center v. Allnet Communication Services, Inc.,* 806 F.2d 1093, 1094-1095 (D.C. Cir. 1986); *Long Term Care Pharmacy Alliance v. UnitedHealth Group, Inc.,* 498 F.Supp.2d 187 (D.D.C. 2007).

In a case against the Secretary brought by an association of 200 nursing homes, the Supreme Court explicitly rejected the association's assertion that it could not itself become a party to the administrative proceedings and therefore fell within the jurisdictional exception to the channeling provision of 42 U.S.C. § 405(h). *Shalala v. Illinois Council on Long Term Care, Inc.,* 529 U.S. 1, 24 (2000). The Court held that "[t]he Association *or* its members *must* proceed… through the special review channel that the Medicare statutes create." *Id.* at 5 (emphasis added). The plaintiff organizations in this case have done precisely that in presenting their § 404(b) claims in writing to the defendants, thus satisfying the jurisdictional requirement of § 405(g).[26]

In short, defendants' suggestion that organizations must identify specific members who were harmed and have presented a claim under § 404(b) in order to satisfy both the first and third parts of the *Hunt* test is meritless and without basis in doctrine or case law. As there has been no alteration in plaintiffs' original allegations, see Declarations of Pedro Rodriguez and Susan Murany (attachment to docket #8, filed Sept. 25, 2006), the Court should find that they continue to meet the standards for representational standing.

---

[26]  The authority cited by defendants, *AMA v. United Healthcare Corp.*, 2007 WL 1771498 (S.D.N.Y. June 18, 2007), is easily distinguishable as it involved claims concerning individualized plan assignments that, under the ERISA review provisions, could only be raised, and had to be administratively exhausted by, individual plan participants. Moreover, the court there found that exhaustion was not futile. *Id.* at *21. By contrast, rather than being precluded, organizations are *required to* channel claims brought under the Social Security Act through the judicial review mechanisms of 42 U.S.C. § 405(g), and the organizations here have complied with the jurisdictional element of that provision by presenting their claims to the Commissioner.

**VII.    DEFENDANTS SHOULD BE ORDERED TO SEND NOTICE TO ALL PART D ENROLLEES WHO RECEIVED THE ERRONEOUS PAYMENTS ADVISING THEM OF THEIR RIGHT TO SEEK WAIVER AND ITS ATTENDANT RIGHTS.**

In late September 2006, when this Court issued its preliminary injunction, fewer than half of the 230,000 Part D enrollees who received the erroneous payments had paid them back.  See Norwalk Dec., ¶ 4.  It was therefore appropriate for the Court to order, as an element of relief, that the Secretary first return all the payments that beneficiaries had refunded before offering the right to waiver.  See Order of September 27, 2006 (docket # 12), at 3.[27]

Plaintiffs continue to believe that universal restoration of the refunded amounts would be the fairest resolution of a situation created by the defendants' mistake and then their illegal demand for repayment.  Nevertheless, they recognize that, at this juncture (a year and a half after the relevant events), up-front repayment to all those who returned the erroneous payments could generate considerable confusion.  Consequently, their proposed order does not suggest that those amounts that have been repaid should first be returned, but, rather, that no further efforts be taken to demand repayments until all those who received the erroneous payments – whether or not they have paid them back – have been given their right to seek waiver.

The D.C. Circuit has countenanced such a resolution in a right-to-waiver case involving a far more complicated situation than this one.  In *Pope*, the Railroad Retirement Board had made changes to its waiver policy during the course of the litigation, but it had declined to inform annuitants of their rights.  The Court of Appeals

---

[27]    At the preliminary injunction phase of the case, the Secretary raised no objections to plaintiffs' proposed order, which the Court adopted in its entirety.

found that failure so significant in light of the harm that, in reversing the district court's denial of a preliminary injunction, it ordered the Board retroactively to apply the new notice and waiver rights to all annuitants for whom recovery had begun after the commencement of the lawsuit -- over four years before the decision issued -- including those for whom recovery was complete.  672 F.2d at 412-414.  Any burden on the government, the Court reasoned, "cannot outweigh the harm and deprivation suffered by an annuitant who has been wrongfully recouped in the past."  *Id.* at 413.

The instant case provides a far simpler scenario than existed in *Pope*, where the agency had to reconstruct the names of all those who had been subject to recoupment in the four-plus years since the complaint was filed.  Here, by contrast, defendants know exactly who received the one-time erroneous payments and can easily send them another letter – just as they have already sent at least three.  Under the circumstances, this is the least that should be done to correct defendants' illegal actions.

## CONCLUSION

It is unfortunate that this Court's preliminary injunction order was vacated due to a technicality unrelated to the merits of the case.  That problem has now been corrected, and it is appropriate to restore relief to the affected beneficiaries.  Accordingly, for the reasons stated, the motion to dismiss should be denied, and the Court should grant plaintiffs' motion for summary judgment and issue an order of declaratory and injunctive

relief that will begin the process of mitigating the harm caused occasioned by the

defendants' compounding of serious mistakes with illegal action.

Respectfully submitted,

DATED: December 12, 2007          /s/ Vicki Gottlich

VICKI GOTTLICH
D.C. Bar No. 937185
PATRICIA B. NEMORE
D.C. Bar No. 204446
Center for Medicare Advocacy, Inc.
1025 Connecticut Ave., N.W., Suite 709
Washington, D.C. 20036
(202) 293-5760

GILL DEFORD
D.C. Bar No. 459280
WEY-WEY KWOK
D.C. Bar No. 461647
JUDITH STEIN
BRAD PLEBANI
Center for Medicare Advocacy, Inc.
P.O. Box 350
Willimantic, CT 06226
(860) 456-7790

SALLY HART
Center for Medicare Advocacy, Inc.
2033 East Speedway Blvd., Suite 200
Tucson, AZ 85719
(520) 322-0126

Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I, Michael Rubin, under the direction of counsel for the plaintiffs, Vicki Gottlich, certify that on December 12, 2007, the Memorandum in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendants' Motion to Dismiss was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ Michael Rubin

Michael Rubin