UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

ACTION ALLIANCE OF SENIOR CITIZENS,            )
GRAY PANTHERS, LUCY CAROLYN LOVEALL,           )
                                               )
                    Plaintiffs,                )
                                               )
                    v.                         )     C.A. No. 06-1607 (HHK)
                                               )
MICHAEL LEAVITT, Secretary of Department       )
of Health and Human Services;  MICHAEL J. ASTRUE, )
Commissioner of the Social Security Administration, )
                                               )
                    Defendants.                )
_____ )

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

I.  THE ORGANIZATIONAL PLAINTIFFS HAVE STANDING AND
    SHOULD NOT BE DISMISSED. ........................................................................... 1

II.  PART D ENROLLEES HAVE THE RIGHT TO SEEK WAIVER
     OF RECOVERY WHEN THEY RECEIVE AN ERRONEOUS PAYMENT. ......... 7

III.  THE COURT SHOULD SIGN THE PROPOSED ORDER SUBMITTED
      BY PLAINTIFFS. ................................................................................................ 16

CONCLUSION .............................................................................................................. 18

## TABLE OF AUTHORITIES

### Cases

*Action Alliance of Senior Citizens v. Leavitt,*
456 F.Supp. 11 (D.D.C. 2006), vacated, 483 F.3d 852 (D.C. Cir. 2007) .............. *passim*

*Action Alliance of Senior Citizens v. Leavitt,*
483 F.3d 852 (D.C.Cir. 2007) ............................................................................. 4, 5, 13

*American Chiropractic Ass'n, Inc. v. Leavitt,*
431 F.3d 812 (D.C.Cir. 2005) ...................................................................................... 4

*American Mining Congress v. U.S. Army Corps of Engineers,*
962 F.Supp. 2 (D.D.C. 1997) ...................................................................................... 17

*Chevron U.S.A. Inc. v. Natural Res. Def. Council,*
467 U.S. 837 (1984)....................................................................................................... 7

*Christensen v. Harris County,*
529 U.S. 576 (2000)..................................................................................................... 15

*Doe # 1 v. Rumsfeld,*
341 F.Supp.2d 1 (D.D.C. 2004) .................................................................................. 17

*Gray Panthers Project Fund v. Thompson,*
273 F.Supp.2d 32 (D.D.C. 2002) .................................................................................. 2

*Gray Panthers v. Schweiker,*
652 F.2d 146 (D.C.Cir. 1980) ....................................................................................... 2

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock,*
477 U.S. 274 (1986)....................................................................................................... 5

*Landmark Legal Foundation v. I.R.S.,*
267 F.3d 1132 (D.C.Cir. 2001) ................................................................................... 16

*Londrigan v. F.B.I.,*
670 F.2d 1164 (D.C.Cir. 1981) ................................................................................... 10

*Lujan v. National Wildlife Federation,*
497 U.S. 871 (1990)..................................................................................................... 17

*National Mining Ass'n v. U.S. Army Corps of Engineers*,
    145 F.3d 1399 (D.C.Cir. 1998) ................................................................. 17

*Natural Res. Def. Council v. EPA*,
    464 F.3d 1 (D.C.Cir. 2006) ......................................................................... 6

*Office of Personnel Management v. Richmond*,
    496 U.S. 414 (1991) .................................................................................. 13

*Public Citizen, Inc. v. U.S. Dept. of Health & Human Services*,
    332 F.3d 654 (D.C.Cir. 2003) ................................................................... 16

*Purepac Pharm. Co. v. Thompson*,
    238 F.Supp.2d 191 (D.D.C. 2002), aff'd, 354 F.3d 877 (D.C.Cir. 2004)..................... 17

*Shalala v. Ill. Council on Long Term Care*,
    529 U.S. 1 (2000)................................................................................... 2, 3

*Shannon v. U.S. Civil Service Comm'n*,
    444 F.Supp. 354 (N.D.Cal. 1977), aff'd in part, rev'd in part,
    621 F.2d 1030 (9th Cir. 1980) .................................................................. 12

*Situ v. Leavitt*,
    2006 WL 3734373 (N.D.Cal. 2006) ......................................................... 10

*United States v. Mead Corp.*,
    533 U.S. 218 (2001)................................................................................. 15

*Warth v. Seldin*,
    422 U.S. 490 (1975).................................................................................... 6

*Zinman v. Shalala*,
    67 F.3d 524 (9th Cir. 1995) ...................................................................... 11

**Statutes**

28 U.S.C.
    § 1331................................................................................................... 3, 4

42 U.S.C.
    § 404(a)(1) ............................................................................................. 11
    § 404(b)........................................................................................... *passim*
    § 405(g)............................................................................................ 1, 2, 3, 4

**Regulations**

20 C.F.R.
   § 404.501(a) ................................................................................................... 11

**Rules**

Federal Rules of Civil Procedure
   Rule 56(e)......................................................................................................... 10

**INTRODUCTION**

Continuing defendants' policy of ignoring arguments with which they are uncomfortable, their Opposition to Plaintiffs' Motion for Summary Judgment (hereinafter, "Opp. to SJ") and its incorporation of the Reply in Support of Defendants' Motion to Dismiss (hereinafter, "Reply") maintain the pretense that the premium payments withheld from Social Security benefits and paid to the Part D plans were refunded to the enrollees. This, they urge, absolves defendants of the obligation to offer the right to waiver. Similarly, defendants ignore the fact that plaintiffs made two arguments on the merits: first, that the waiver statute, 42 U.S.C. § 404(b), unambiguously authorizes the right to waiver, and, in the alternative, that under "*Chevron* Step 2," denying the right to waiver to Part D enrollees is unreasonable.

Offering the same arguments that have twice failed to convince this Court, defendants are again unable to demonstrate why the right to waiver in the Part D context is not dictated by the statutory, regulatory, and manual scheme. Plaintiffs' motion for summary judgment should be granted, and the Court should order the appropriate declaratory and injunctive relief that plaintiffs have suggested.

**I.    THE ORGANIZATIONAL PLAINTIFFS HAVE STANDING AND SHOULD NOT BE DISMISSED.**

Both in their Opposition to Summary Judgment (at 2-3) and in their Reply on the Motion to Dismiss (at 1-2, 3-8), defendants contend that the two organizational plaintiffs lack standing because they have not shown (1) that any of their members satisfy the jurisdictional requirements of 42 U.S.C. § 405(g), and (2) that any of their members have suffered injury. Plaintiffs have previously responded to the first contention, and this

Court has already rejected the second contention, but plaintiffs will again refute these arguments.

1. Defendants' argument that, as an element of standing, organizational plaintiffs must identify members who have met the jurisdictional requirements of § 405(g) was never before raised in this case, despite the fact that defendants challenged the organizations' standing from the first. It has no support in the case law, for the logic of defendants' argument that members must themselves be plaintiffs in order "to establish the fact of the members' compliance with jurisdictional prerequisites," Reply at 5, would *always* preclude an organization from participating in a § 405(g) case. This is clearly not the law, as organizations have regularly participated in § 405(g) litigation. See, *e.g., Gray Panthers v. Schweiker*, 652 F.2d 146 (D.C.Cir. 1980); *Gray Panthers Project Fund v. Thompson*, 273 F.Supp.2d 32 (D.D.C. 2002).

Defendants' analysis of *Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1 (2000), relies on selective use of quotations and ignores the reality of the case. The statement previously cited by plaintiffs – "The association *or* its members must proceed instead through the special review channel that the Medicare statute creates," *id*. at 5 (emphasis added) -- makes clear that, if the requirements of § 405(g) are met, either an organization or its members may bring a case. That directly contradicts defendants' contention that organizations may never bring a case under § 405(g).

Moreover, the conclusion of the decision reiterates the point. After noting that exhaustion of administrative remedies could be waived, the Court makes this observation: "At a minimum, however, the matter must be presented to the agency prior to review in a federal court. *This the Council has not done*." *Id.* at 24 (emphasis added). The

implication is clear: if the Council had presented, it could have invoked § 405(g) jurisdiction. The Supreme Court nowhere suggests that only the Council's members could have taken that route.

In the decision's next paragraph, the Court specifically rejects the Council's contention that an organization cannot invoke § 405(g) jurisdiction. The entire quotation is necessary to demonstrate the basis of the Court's analysis and to repudiate defendants' attempt to undercut that analysis:

> The Council speaks only on behalf of its member institutions, and thus has standing only because of the injury those members allegedly suffer. It is essentially their rights to review that are at stake. And the statutes that create the special review channel adequately protect those rights.

*Id.* (citations omitted). In the context of the Court's response to the Council's contention that it could *not* proceed under § 405(g), the only logical reading of this statement is that the Court was recognizing the Council's right to so proceed. It derived that right from the rights of its members, but the Court gives no hint that *only* the members can enforce those rights.

Following this analysis, the D.C. Circuit considered another organization's contention that jurisdiction lay under 28 U.S.C. § 1331 because § 405(g) jurisdiction was not available to an organization. The Court of Appeals rejected this argument because jurisdiction could have been invoked under § 405(g):

> The Association's objection that it could not itself become a party to the administrative proceedings is an objection the Supreme Court rejected in *Illinois Council*, 529 U.S. at 24 …. An association "speaks only on behalf of its member[s], and thus has standing only because of the injury those members allegedly suffer." We therefore agree with the district court that Count 4 of the Association's complaint is jurisdictionally barred.

*American Chiropractic Ass'n, Inc. v. Leavitt*, 431 F.3d 812, 817 (D.C.Cir. 2005) (citations omitted). Again, the standing analysis is premised on the alleged injury to the organization's members, not on whether any members had been identified as presenting their claims. The Court of Appeals dismissed the Association's claim under § 1331 because it could have proceeded under § 405(g).

Finally, the Court of Appeals' decision in the present case supports plaintiffs' position. In its analysis of the applicability of § 405(g) to this case, the Court explained that district court jurisdiction was lacking because the plaintiff organizations had failed to present their claims to the Commissioner of the Social Security Administration (SSA). The Court nowhere suggests that the organizations had still another hurdle to overcome, namely, to show that some members had satisfied § 405(g) as well. The Court's sole point was that jurisdiction would lie if the organizations had presented their claims:

> [T]he Alliance ... failed to present a § 404(b) claim to the Commissioner of Social Security before seeking review; the omission deprives the federal courts of jurisdiction to consider the claim under § 405(g), and, *because that route was fully available to the Alliance*, precludes jurisdiction under the other provisions.

*Action Alliance of Senior Citizens v. Leavitt*, 483 F.3d 852, 856 (D.C.Cir. 2007) (emphasis added). Since the § 405(g) "route was fully available to the Alliance," defendants' contention that the organizations could not go forward under § 405(g) is directly contradicted.

Defendants' novel contention that organizations can never have standing in a § 405(g) case because their members' participation is necessary to demonstrate that the requirements of § 405(g) are met is not supported by the case law. Consequently, having

met the presentment requirement laid out by the Court of Appeals, Action Alliance and the Gray Panthers demonstrated their right to proceed in this Court.[1]

   2.  Defendants also argue, again, that the organizations lack standing because plaintiffs have not demonstrated that any members of the organizations received the erroneous payments (and therefore suffered injury from the defendants' failure to offer them waiver of recovery).  Opp. to SJ, at 2-3.  Defendants acknowledge that this Court had previously held to the contrary,[2] but contend that this Court's inference "at the preliminary injunction stage" is not sufficient to establish injury at this stage.  *Id.* at 3.

   In their opening brief on their Motion to Dismiss (at 23 n. 11), however, defendants recognized that the issue had been resolved against them in this court:

> To the extent that this Court previously relied on [a statistical] analysis to determine whether plaintiffs' members have suffered the injury-in-fact necessary for standing, defendants respectfully disagree with that portion of the Court's analysis, but *we acknowledge that the Court has ruled and reserve further argument for a later stage of this litigation.*

(Emphasis added.)

   Even if their Opposition to the Motion for Summary Judgment is deemed to be that "later stage of this litigation," defendants' contention cannot withstand the most

---

[1]  Defendants also persist in extrapolating support for their argument from *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274 (1986).  Reply at 4-5.  Their convoluted analysis ignores that the union was not seeking benefits on its members' behalf and that decisions on individual claims were not at issue.  477 U.S. at 284.  The sole issue was whether the union's membership included some who had been aggrieved by the challenged interpretation.  *Id*.  Similarly, in this case the organizations do not seek fact-based determinations that individual members are entitled to waiver of recovery, but, rather, that they all have a legal right to be notified of, and the right to seek, waiver.  As in *Brock*, it is a pure question of law.

[2]  "Plaintiffs have sufficiently alleged that at least one of their members would have standing to bring this case."  *Action Alliance of Senior Citizens v. Leavitt*, 456 F.Supp. 11, 16 (D.D.C. 2006), vacated on other grounds, 483 F.3d 852 (D.C.Cir. 2007).

basic scrutiny. The "statistical analysis" on which this Court premised its conclusion that there was injury to members of the plaintiff organizations is as valid in the summary judgment context as it was in the motion to dismiss context. This is demonstrated by the case on which this Court based its use of that analysis, *Natural Res. Def. Council v. EPA*, 464 F.3d 1 (D.C.Cir. 2006). See *Action Alliance*, 456 F.Supp.2d at 15-16.

In that case, the Court's statistical inference that "two to four of [the organization's] nearly half a million members will" be harmed as a result of the challenged policy, 464 F.3d at 7, came as part of the decision on the merits of a petition for review of a final rule. For all practical purposes, the statistical analysis was at the same stage and in the same context as exists in the instant situation; in both situations, organizational plaintiffs challenging a federal agency policy are using statistics to demonstrate that some of their members are being harmed. The only difference is that the challenges took place in different courts. Nothing in *Natural Res. Def. Council* suggests that any greater refinement is needed to establish the existence of injury to at least one member. This Court's conclusion that at least 140 of one organization's members were injured by the challenged policy is more than sufficient to meet the injury-in-fact standard.[3]

Neither of defendants' standing arguments – old or new – provides a rationale for dismissing the organizational plaintiffs from the case. Consequently, that aspect of

---

[3] Defendants' related suggestion that the plaintiff organizations must identify members harmed by the policy at issue, Opp. to SJ, at 3 n.1, has been expressly rejected by this Court. *Action Alliance*, 456 F.Supp.2d at 15 (citing *Nat. Res. Def. Council* and *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). Consequently, plaintiffs were not obligated to repeat the fact that members of the organizations had been harmed.

defendants' motion to dismiss and opposition to the motion for summary judgment should be rejected.

## II.    PART D ENROLLEES HAVE THE RIGHT TO SEEK WAIVER OF RECOVERY WHEN THEY RECEIVE AN ERRONEOUS PAYMENT.

On the merits, defendants continue to contend that plaintiffs have failed to state a claim and that, for the same reasons, they are not entitled to summary judgment. Opp. to SJ, at 1-2; Reply at 8-13. As before defendants repeatedly refer to the erroneous payments at issue in the case as premium refunds, when it has been established conclusively that (1) the premiums were (a) properly withheld from the enrollees' Social Security benefits, (b) paid to the plans, and (c) not recovered from the plans, and that (2), in an entirely separate transaction, SSA then made additional payments to the enrollees. Those payments from SSA were not premium refunds, therefore, for the premiums were in the coffers of the plans and the enrollees' obligations to the plans had been satisfied. It is simply not true, therefore, that a "refund in the amount of the premium is the same as a refund of the premium itself." Reply at 10. It is not a refund at all.

Defendants also continue to fail to acknowledge that plaintiffs base their argument on alternative approaches. First, plaintiffs contend that the language of the waiver statute establishes the intent of Congress that they are entitled to the right to waiver; in that event, that is the end of the inquiry and no deference is due the defendants' interpretation. See *Action Alliance*, 456 F.Supp.2d at 17 (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842 (1984)). In the alternative, if the statute is considered ambiguous, courts defer to an agency unless the interpretation is unreasonable, as this Court has previously determined in this case. See 456 F.Supp.2d at

17-19.  By conflating these separate arguments, however, the Secretary demands

absolute deference to every aspect of his approach, see Reply at 8-9 – despite the fact that

no formal policy has ever been promulgated.

     1.  Defendants recognize that the scenario of events involving the payment of

premiums to the plans, the erroneous payment to the enrollees, and the attempted

recovery of those payments took place essentially as plaintiffs have set out.  See Pls.

Statement of Material Facts and Def. Response, ¶¶ 1-8.  Accordingly, as plaintiffs have

previously demonstrated, 42 U.S.C. § 404(b) applies and requires that the right to seek

waiver be made available.  See Mem. in Support of Pls. Motion for Summary Judgment

and in Opposition to Defs. Motion to Dismiss (hereinafter,"Opening SJ Mem."), at 18-25.

     Defendants have no response to this legal analysis, but for the first time they posit

a factual variation on their previous positions.  They now claim that SSA made the

erroneous payments out of Medicare trust funds.  Opp. to SJ, at 1-2; Reply at 10.  But, the

Declaration of Maria Montilla (ex. A to the Opp. to SJ), on which they base this claim, is

highly questionable due to its source, content, timing, ambiguity, reliance on hearsay, and

lack of documentation, and is not probative.

     First, the declaration is by an employee of the Centers for Medicare & Medicaid

Services (CMS) in the Department of Health & Human Services, not by an official from

SSA, which was the independent agency that erroneously made the payments.  It is

peculiar and suspicious that defendants have not offered evidence from an SSA official as

to the actions that that agency took.  Furthermore, the declaration does not state that *all*

the erroneous payments came from Medicare trust funds; rather, it says that an unstated

"percentage" was paid out of the Part A and B trust funds, while "most of the refunds"

were from the Part D trust fund.[4]  Nor does the declaration state that SSA made the

erroneous payments directly out of the Medicare trust funds; quite possibly, the payments

were made by SSA from Title II funds and reimbursement was then made to the Title II

funds from the Medicare funds.  Adding further doubt about her knowledge of the

relevant events are her statements that the erroneous payments were made to both Part C

and Part D enrollees.  ¶¶ 2 and 3.  This contention differs from every other statement

made in this case, which is that the erroneous payments were sent only to Part D

enrollees.  See, *e.g.*, Declaration of Leslie Norwalk (docket # 16), ¶ 4.

     In short, this one-paragraph statement from a CMS employee does not provide a

clear, believable, and definitive explanation as to how the payment of erroneous funds

actually occurred.

     In addition, the declaration is, on its face, hearsay and lacking in foundation.  Ms.

Montilla admits that some of the information was not of her personal knowledge, but

came from "agency files" and "CMS staff".  ¶ 2.  Given that she is reporting in paragraph

4 on actions taken by *SSA*, that portion of her declaration is probably double-hearsay.

Nor does she provide any basis for establishing her competence to make these statements;

her employment in CMS does not indicate any connection to the erroneous payments

carried out by SSA.  The lack of written documentation for how SSA allegedly paid out

the erroneous payments makes her enigmatic statements all the more suspect.

     The limited and ambiguous content of the declaration is rendered the more

puzzling and questionable because of its timing: defendants have waited until the very

---

[4]  Ms. Montilla's declaration (¶ 4) actually states that the payments were in part from "the Medicare Prescription Drug Account in the Medicare *Part B* Trust Fund." (Emphasis added.)  Plaintiffs assume that that reference is a mistake, and that it was intended to be "the Medicare Part D Trust Fund."

end of the litigation to make this claim. Plaintiffs have believed and stated throughout the litigation that the erroneous payments were from Title II funds, and defendants have never once disputed that point or suggested some other source. See, *e.g.*, Brief for the Appellees (No. 06-5295 (D.C.Cir.)), at 26 ("[A]s noted, the incorrect payments were made by SSA out of Social Security funds."). Defendants' implicit position throughout has been that the source of the erroneous payments was Title II funds. The Secretary stated unequivocally in the Court of Appeals that "[t]he material facts are not in dispute" (Brief for the Appellant, at 11), but now attempts to interject a new fact into the equation.[5]

Given all these factors, at the very least the declaration's probative value should be seriously in doubt. Indeed, it would be appropriate to strike it altogether as not meeting the standards of F.R.Civ.P. 56(e).[6]

In any event, though, even if the declaration is taken to support defendants' contention, the legal result is no different. The crucial factors triggering the applicability of § 404(b) are that "more than the correct amount of payment" was made and it was

---

[5] Plaintiffs asked for "the source or fund from which the incorrect payments were made" in no. 3 of the interrogatories served on October 12, 2006 (exhibit to docket # 24). Defendants did not answer because the Court then stayed proceedings (docket # 26) and, on August 7, 2007, denied plaintiffs' motion for discovery. Plaintiffs did not re-serve their discovery requests because, by the time the case had returned to this Court, most of their inquiries had been answered by intervening documents or events. In particular, the issue of the source of the erroneous payments had been answered by defendants' repeated acquiescence to plaintiffs' statements that the source was Title II funds.

[6] See, *e.g., Londrigan v. F.B.I.*, 670 F.2d 1164, 1174-1175 (D.C.Cir. 1981) (stating, *inter alia*, that the rule's "requirement of personal knowledge by the affiant is unequivocal and cannot be circumvented" (footnotes omitted)); *Situ v. Leavitt*, 2006 WL 3734373, *4 (N.D.Cal. 2006) (in another Part D case, court notes inadmissible hearsay in declaration of CMS employee, but determines that declaration does not affect outcome of the motion).

made by SSA. There is no dispute that SSA did make the payments, and that it was acting pursuant to Title II. These were not erroneous payments "in some free-floating or abstract sense," as defendants describe plaintiffs' view of the statutory language. Reply at 9. Rather, they were payments made by SSA, under the authority of Title II, and those factors trigger the waiver statute. As this Court has explained: "There is nothing in Congress's legislative design … that indicates that the funding source of an erroneous payment is a factor that would change the balance of equities." 456 F.Supp.2d at 21.

As plaintiffs previously noted, the waiver statute does not restrict the right to waiver to erroneous payments with Title II funds as their source (see Opening Mem. on SJ, at 19), focusing its attention instead on the fact that SSA made "more than the correct amount of payment." 42 U.S.C. § 404(b). The regulation supports this focus, as it defines an overpayment as "a payment where no amount is payable under title II of the Act" or "a payment in excess of the amount due under title II of the Act." 20 C.F.R. § 404.501(a). Defendants claim, however, that the reference to "under this subchapter" in 42 U.S.C. § 404(a)(1) requires that the erroneous payment at issue in § 404(b) derive from Title II funds. Reply at 9.

Again, though, it is noteworthy that the waiver statute on its face applies to *any* erroneous payment by SSA and to recovery by *any* agency. Since Congress could have employed more restrictive wording, it is striking that the language of the waiver statute does not limit the applicability of waiver either to Title II-derived payments or to attempted collection by SSA. This approach is consistent with the purpose of the statute, which is directed at insuring that beneficiaries are not harmed as a consequence of the agency's mistakes. See, *e.g., Zinman v. Shalala*, 67 F.3d 524, 527 n. 1 (9th Cir. 1995).

The statutory language casts a broad net, with its protection for beneficiaries implicated whenever SSA makes an erroneous payment – regardless of the funding source or the agency attempting to collect.

Defendants' revised view of events makes the scenario of this case even more like that in *Shannon v. U.S. Civil Service Comm'n*, 444 F.Supp. 354 (N.D.Cal. 1977), aff'd in part, rev'd in part (on other grounds), 621 F.2d 1030 (9th Cir. 1980). In *Shannon*, the overpayment was caused by the failure to deduct premiums from monthly annuities for three health and life insurance programs. See 444 F.Supp. at 357-358. Since the beneficiaries received more than they were entitled to, and the funds did not receive their premium payments, the practical import was that part of the payments to the beneficiaries was made from the health and life insurance funds. The Commission argued that this error did not trigger the waiver statute because it was not a mistake in the calculation of the annuity, but, rather, in the failure to deduct. The district judge, however, saw no meaningful distinction:

> The cause of the overpayment is immaterial to the impact on the annuitant. By the language of the statute, Congress did not differentiate the various funds within the Commission when it authorized waiver of recovery …. The statute directs a limitation on recoupment "of payments." It does not direct a limitation on recovery for particular Commission mistakes.

*Id*. at 358; see *Action Alliance*, 456 F.Supp.2d at 21 (quoting part of the above).

The situation here as now depicted by defendants is virtually identical to that in *Shannon*. In both instances, beneficiaries receive extra money that derives from funds that do not normally provide a source of benefit payments, but that are under the control of the agency that is subject to the waiver statute. That was sufficient to trigger the right to waiver in *Shannon*, and the same should hold true here.

Defendants offer no real response to plaintiffs' contention that the waiver statute unambiguously applies to this situation beyond their new claim that the source of the erroneous payments was Medicare trust funds. For the reasons stated, plaintiffs believe that that assertion has not been proven. But, in any event, it does not change the outcome: SSA made "more than the correct amount of payment" to beneficiaries, and, accordingly, no agency – neither SSA nor CMS – may recover those payments without first offering the right to seek waiver.

2. If the Court concludes, however, that the statute is ambiguous, it should hold again, under *Chevron* Step 2, that the "legislative design" of § 404(b) requires providing the right to seek waiver. See 456 F.Supp.2d at 20-21.

This Court's reliance on the fact that the POMS provides for waiver in exactly the same circumstances for Parts A and B is correct. As this Court held and the plaintiffs have argued, the POMS provision derives from § 404(b). The Court of Appeals agreed: "Internal SSA policy guidelines, in the form of its Program Operations Manual System ('POMS'), create such a right on the basis of Title II's general waiver provision, 42 U.S.C. § 404(b)." 483 F.3d at 855. The Secretary continues to argue that the POMS provision is not grounded in § 404(b), Reply at 11-12, but no other basis exists for that authorization, and the Appropriations Clause requires that Congress expressly authorize any transfer from the Treasury. *Office of Personnel Management v. Richmond*, 496 U.S. 414, 424-428 (1991). No reason exists to treat the identical events occurring in Parts A and B and in Part D differently. As this Court noted: "Nowhere do the [Social Security recovery] regulations contemplate that the Secretary should take into account the *source*

13

of the funds that were incorrectly paid in determining whether waiver is appropriate."
456 F.Supp.2d at 22.

Searching for a distinction to explain the differential treatment, defendants return
to the statement that Part A and B premiums are owed to the government while Part D
premiums are owed to insurers.  Reply at 12.  Defendants do not explicitly state why that
distinction is relevant, but, in any event, this Court explicitly and convincingly rejected it
as having any significance.  456 F.Supp.2d at 20-22.  This Court noted, *inter alia*, that,
since the withheld benefits are paid over to the insurers as their premiums under Part D,
the government is the only entity to suffer any loss from the exercise of the right to
waiver, just as in the Parts A and B context.  This alleged rationale for differential
treatment has no more traction now than it did before.

Similarly, defendants' contention that Part D enrollees who select the withholding
option obtain an advantage over other Part D enrollees misses the point.  Congress made
the option available – and the option benefits both insurers and the Part D program by
guaranteeing that the premiums are paid before beneficiaries turn to other bills – and the
only unfair treatment that could result is that which now obtains: the denial of the right to
waiver to one group of beneficiaries receiving erroneous payments from SSA.

In addition, defendants demand deference to the challenged policy because of
"[t]he decision of the Commissioner on this issue …."  Reply at 2; see also *id*. at 8-9.  No
such deference is due, however.  This Court previously concluded that the "proffered
justification" for the denial of waiver to Part D enrollees was "arbitrary and does not
deserve deference under these circumstances."  456 F.Supp.2d at 23.  The Disman letter
(ex. H to the New Complaint) does not alter the situation.

The letter is nothing more than an initial determination written by an SSA employee in a regional office to an attorney for a beneficiary. It is not a regulation, a rule, a manual provision, a guideline, or any kind of formal or even informal rulemaking. The letter does not even purport to set out anything more than the opinion of its author.

Informal documents of this sort are not entitled to deference under *Chevron*, as the courts have repeatedly made clear. Thus, in *Christensen v. Harris County*, 529 U.S. 576, 587 (2000), the Supreme Court, after noting the obligation to defer to "an agency's regulation containing a reasonable interpretation of an ambiguous statute," turned to the document at issue:

> Here, however, we confront an interpretation contained in an opinion letter, not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking. Interpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference.

Similarly, in *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001), the Court determined that tariff "classification rulings are best treated like 'interpretations contained in policy statements, agency manuals, and enforcement guidelines.' *Christensen*, 529 U.S. at 587 …. They are beyond the *Chevron* pale." The initial determination letter here at issue does not even rise to the level of the documents rejected for deference in *Christensen* and *Mead*.

Following this line of authority, the D.C. Circuit considered the deference due a manual published by CMS' predecessor-in-name, the Health Care Financing Administration. Noting that "the Supreme Court has twice cited 'agency manuals' as an archetype of the kind of document that is not entitled to [*Chevron*] deference," the Court rejected the government's attempt "to bootstrap documents that otherwise would not

warrant *Chevron* deference into a more exalted status merely by mentioning them" in a contract. *Public Citizen, Inc. v. U.S. Dept. of Health & Human Services*, 332 F.3d 654, 660 (D.C.Cir. 2003). Similarly, a letter rejecting an individual's claim cannot be "bootstrapped" into a formal rulemaking merely by relying on it in litigation. See *Landmark Legal Foundation v. I.R.S.*, 267 F.3d 1132, 1135-1136 (D.C.Cir. 2001) (no *Chevron* deference to interpretation developed in litigation).

The Disman letter is not entitled to deference, and, as this Court has already concluded that the challenged policy is unreasonable, no deference should be accorded defendants' decision not to comply with § 404(b). Accordingly, as they offer no valid rationale for the differential treatment, and as the intent of Congress was clearly to recognize the potential hardship to beneficiaries without regard to the reason for the erroneous payment, the Court should reject defendants' attempt to distinguish the treatment of erroneous payments in the Part D context.

## III.    THE COURT SHOULD SIGN THE PROPOSED ORDER SUBMITTED BY PLAINTIFFS.

Finally, defendants contend that relief should be limited to the one individual plaintiff. Opp. to SJ, at 3-4. Their rationale for this position seems to flow from their argument that the organizational plaintiffs have failed to meet their alleged obligation to identify which members received erroneous refunds and pursued their administrative remedies. *Id*. Plaintiffs have previously explained (*supra* at 2-6) that no such obligation exists, and that therefore the organizations have standing.

Whether the organizations remain as plaintiffs or not, however, in this circumstance the appropriate relief (as this Court recognized when it issued the preliminary injunction) is to invalidate the policy at issue, not just to proscribe its

application to individual plaintiffs. *National Mining Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C.Cir. 1998) (relying on and quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting)); see also, *e.g., Doe # 1 v. Rumsfeld*, 341 F.Supp.2d 1, 17-19 (D.D.C. 2004); *American Mining Congress v. U.S. Army Corps of Engineers*, 962 F.Supp. 2, 4-5 (D.D.C. 1997). As Justice Blackmun explained:

> In some cases the "agency action" will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual. Under these circumstances a single plaintiff, so long as he is injured by the rule, may obtain "programmatic" relief that affects the rights of parties not before the court.

*Lujan*, 497 U.S. at 913 (Blackmun, J., dissenting).[7]

This case presents exactly the kind of situation in which government-wide or "programmatic" relief is appropriate to fully correct defendants' illegal policy. The policy to be enjoined applies to all 230,000 Part D enrollees in the same way: they were deprived of the rights to seek waiver, to hearings, and to notice. Their individual circumstances are of no consequence to the provision of relief, for the only relevant issue is that they have been deprived of the rights attendant to waiver of recovery. It would be inappropriate to invalidate the rule for only one affected individual. Rather, "a nationwide injunction invalidating an agency rule of broad applicability is appropriate even where a single plaintiff has challenged the legality of the rule." *Purepac Pharm. Co. v. Thompson*, 238 F.Supp.2d 191, 212 n. 28 (D.D.C. 2002), aff'd, 354 F.3d 877 (D.C.Cir. 2004).

---

[7] Although he was in dissent, Justice Blackmun was writing for all nine Justices on this point. *National Mining Ass'n*, 145 F.3d at 1409.

Defendants have not objected to the details of the proposed order submitted by plaintiffs. Their only contention is that relief should be limited to one individual. Once that proposition is rejected, the Court should order relief consistent with plaintiffs' proposal, as it did with the preliminary injunction order.

## CONCLUSION

For the reasons stated, the Court should grant plaintiffs' motion for summary judgment, order defendants to provide appropriate relief as set out in plaintiffs' proposed order, and enter judgment for plaintiffs.

Respectfully submitted,

DATED: January 22, 2008

/s/ Vicki Gottlich
VICKI GOTTLICH
D.C. Bar No. 937185
PATRICIA B. NEMORE
D.C. Bar No. 204446
Center for Medicare Advocacy, Inc.
1025 Connecticut Ave., N.W., Suite 709
Washington, D.C. 20036
(202) 293-5760

GILL DEFORD
D.C. Bar No. 459280
WEY-WEY KWOK
D.C. Bar No. 461647
JUDITH STEIN
BRAD PLEBANI
Center for Medicare Advocacy, Inc.
P.O. Box 350
Willimantic, CT 06226
(860) 456-7790

SALLY HART
Center for Medicare Advocacy, Inc.
2033 East Speedway Blvd., Suite 200
Tucson, AZ 85719
(520) 322-0126

Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I, Michael Rubin, under the direction of counsel for the plaintiffs, Vicki Gottlich, certify that, on January 22, 2008, the Reply Memorandum in Support of Plaintiffs' Motion for Summary Judgment was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ Michael Rubin
Michael Rubin